**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS) |

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE DESIGNATION OF DISNEY WORLDWIDE SERVICES, INC. AS STALKING HORSE PURCHASER WITH RESPECT TO THE DISNEY TARGET ASSETS, (E) AUTHORIZING THE DEBTOR TO DESIGNATE ADDITIONAL STALKING HORSE PURCHASERS FOR THE ASSETS AND (F) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS, (B) APPROVING THE ASSUMPTION OF THE TSA AND THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

Character Technologies, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), by and through its undersigned proposed counsel, hereby submits this motion (this "Motion") for entry of an order granting the relief described below. In support hereof, the Debtor relies on the *Declaration of Colin M. Adams in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration")[2] and the *Declaration of Adam*

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

*Dunayer in Support of the Debtor's Bidding Procedures Motion* (the "Dunayer Declaration") filed concurrently herewith, and further represents as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## RELIEF REQUESTED

4. By this Motion, the Debtor seeks entry of: (a) an order (the "Bidding Procedures Order") substantially in the form attached hereto as **Exhibit A:**

a. authorizing and approving certain bidding procedures (the "Bidding Procedures"), substantially in the form attached to the Motion as Exhibit 1, for the sale, license or other disposition (the "Sale") of all or substantially all of the Debtor's assets (the "Assets");

b. authorizing and approving certain bid protections (the "Bid Protections"), including a break-up fee and expense reimbursement of $700,000 (the "Break-Up Fee") for Disney Worldwide Services, Inc. ("Disney") as the stalking horse purchaser with respect to certain of the assets (the "Disney Target Assets") as set forth in the Stalking Horse Transaction Agreement (the "Stalking Horse Transaction Agreement") attached to this Motion as **Exhibit B**;

c. authorizing the Debtor to designate additional stalking horse purchasers (each, an "Additional Stalking Horse Purchaser" and together with Disney, the "Stalking Horse Purchasers") and additional stalking horse agreements (each, an "Additional Stalking Horse Agreement"), with respect to all or any subset of the Assets, other than the Disney Target Assets, and to offer the Bid Protections to any Additional Stalking Horse Purchaser;

d. scheduling a hearing (the "Sale Hearing") for approval of the Sale and approval of other deadlines related to the same;

e. authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") in connection therewith;

f. authorizing and approving certain assumption and assignment procedures for the Assigned Contracts provided for herein (collectively, the "Assumption and Assignment Procedures"); and

g. granting related relief.

5. The Debtor further requests the entry of an order (the "Sale Order"):

a. authorizing and approving the Sale to the Winning Bidder(s), free and clear of all Encumbrances (as defined in the Stalking Horse Transaction Agreement, if applicable, or any Additional Stalking Horse Agreement, or any other Alternative Agreement(s) of the Winning Bidder as applicable) other than Assumed Liabilities (as defined in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as applicable);

b. authorizing and approving the assumption of the TSA (as defined below) if Disney is the Winning Bidder and the assumption and assignment of the Purchased Contracts (as defined below) to the Winning Bidder(s); and

c. granting related relief.

## BACKGROUND

### A. General Background

6. On October 12, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no official committee of unsecured creditors has been appointed in this chapter 11 case.

7. The Debtor is a first in kind artificial intelligence ("AI") entertainment platform that allows users to have immersive, multimodal experiences with fictional or imagined characters. What started as a platform to have one-on-one chats tailored to user preferences has evolved to become a category leader in entertainment AI. Today, the Character.AI platform generates stunning visuals that become part of a story, creates dynamic video content with AI characters, and actively augments videos and stories with rich audio experiences to enhance immersion. In its four-year lifespan as an active platform, Character has amassed a large and engaged user base. The burgeoning and evolving field of AI entertainment, however, has proven to be costly to develop and grow. These high costs, coupled with potential litigation-related liabilities and regulatory engagement have contributed to the Debtor's inability to generate sufficient cash flows to support its business in the present form.

8. The Debtor has commenced this case to engage in value-maximizing sale transactions for the benefit of its stakeholders. The Debtor enters this case with the benefit of Disney (i) serving as the Stalking Horse Purchaser and setting a baseline bid for the sale of certain of its Assets and (ii) having agreed to provide transition services with the assistance of certain of the Debtor's former employees that Disney has hired. The Debtor intends to run a postpetition marketing and sale process for the benefit of stakeholders to solicit higher or better offers. If such offers are unavailable, or if the transaction with Disney is not approved, Character's platform will be wound down.

9. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration, filed contemporaneously herewith.

**B. The Sale Process**

10. As detailed in the First Day Declaration, the Debtor is in a precarious financial situation, largely caused by costly capital expenditures but accelerated by litigation and a changing regulatory environment. As a result, over a year prior to the Petition Date, the Debtor began searching for strategic or financial acquirors or partners to provide a path to continued operations of Character.AI.

11. In connection with these efforts, in August 2025, the Debtor engaged an investment banker (the "Prior Banker") to pursue strategic and financing alternatives in parallel. As part of this process, the Prior Banker oversaw the marketing of the Debtor's assets and approached approximately 28 potential parties (largely strategic and financial parties). Character and the Prior Banker received consistent feedback in this process that, although Character's product and engaged user base were impressive, the litigation and regulatory overhang on Character was too great. The Prior Banker's outreach resulted in only one proposal that was ultimately not deemed to be actionable. Thereafter, the strategic process continued in consultation with the Prior Banker, while the Debtor focused on engaging with strategic partners and undertaking operational changes to improve revenue and reduce costs. The Prior Banker's engagement with the Debtor concluded in August 2026.

12. By September 2026, the Debtor, through a special transaction committee (the "Initial Transaction Committee"), comprised solely of independent directors on the Debtor's board of directors (the "Board"), which was delegated authority to advise the Board in connection with

entry into a strategic transaction, engaged in discussions primarily with two parties who expressed interest in strategic transactions with Character. The Initial Transaction Committee considered proposals from both parties, including the relevant value that each would bring, the likelihood of the proposals being actionable, Character's ability to safely operate its platform after a transaction, the path for Character after a transaction to further maximize value, and the overall benefit to Character and its stakeholders. Character engaged in rounds of negotiations with both parties and the Initial Transaction Committee discussed the same over multiple meetings. During this time, Character faced mounting employee attrition, which posed a genuine operational risk because Character cannot operate the Character.AI platform without key personnel to monitor and ensure user safety at all times. The market for AI talent is extremely competitive, with companies offering considerable compensation and equity packages, while the equity upside at Character had become increasingly uncertain and Character's cash position and continual cash burn left only a limited runway. This attrition would have jeopardized the Debtor's ability to continue operating and to pursue a going-concern marketing process, and the Debtor had significant concerns that it may need to liquidate on an expedited basis absent a stabilizing solution.

13. Ultimately, the Initial Transaction Committee determined that the proposal from Disney was a superior proposal for several reasons. First, Disney's accommodation and agreement to structure its proposed transaction into two interrelated and integrated stages, one prepetition and one postpetition, allowed Character to receive an immediate capital infusion pursuant to that certain exclusivity and prepayment letter agreement (the "EPA") and reduce its personnel costs promptly by transitioning certain of its employees to Disney, while also retaining access to key employees through transition services provided by Disney to assist with safely running Character's platform for a limited period. These services were memorialized and agreed to pursuant to that

certain Transition Services Agreement (as amended, modified, or restated from time to time, the "TSA"). As part of the immediate capital infusion, Disney agreed to pay, pursuant to the EPA, $7,500,000 of the $20,000,000 cash consideration up-front, $2,000,000 of which serves as a refundable good-faith deposit. Between the up-front payment and the TSA, Disney's accommodations facilitated a path forward to maximize value for all stakeholders through a chapter 11 filing. Given the Debtor's diminishing cash reserve and significant litigation and regulatory risks, Disney required that the transaction be fully consummated in a chapter 11 sale process. Disney's transaction will be subject to higher and better offers through a sale process conducted by Houlihan Lokey ("Houlihan"), which the Debtor believes has the necessary experience, reputation, and global buyer network to support such process.

14. The Initial Transaction Committee finalized the terms with Disney in the EPA and the TSA. Thereafter, the Initial Transaction Committee recommended final approval of the EPA and the TSA to the Board and, as the initial, prepetition stage of the overall transaction, Character signed the agreements on September 18, 2026.

15. Pursuant to the terms of the EPA, the Debtor and Disney agreed upon a term sheet that contemplates a comprehensive transaction whereby, among other things, (i) Disney agreed to hire the majority of its workforce, including the Debtor's chief executive officer, up front (subject to certain employees remaining available to assist with the Debtor's operations, sale process, and wind down through the TSA), (ii) the Debtor agreed to release Disney and the transferring employees from certain matters, (iii) Disney agreed to pay the Debtor a $7,500,000 up-front payment prior to the Petition Date, of which $2,000,000 is serving as Disney's good faith refundable deposit, which represents 37.5% of the overall cash consideration , and (iv) the Debtor agreed to negotiate exclusively with Disney with respect to the subset of assets it seeks to acquire

(the "Disney Target Assets") from September 18, 2026 through the Petition Date. The vast majority of the Debtor's employees offered roles at Disney accepted their offers. Under the TSA, those employees continue to assist the Debtor with, among other things, operating its business, the Sale Process, and its wind down, for up to five months following September 18, 2026. To preserve a competitive process, Disney covenanted to make certain newly hired employees available to competing qualified bidders for diligence and, if Disney is not the Winning Bidder, to permit the Winning Bidder to interview and extend offers to up to 80% of such employees who wish to consider opportunities with that bidder, and to work in good faith to transition those who accept. This structure facilitated a value-maximizing Sale Process and avoided what the Debtor feared could be a precipitous and value-destructive liquidation due to sudden employee attrition. The releases in the EPA and the exclusivity period, together with the Break-Up Fee, were critical to Disney's agreement to serve as Stalking Horse Purchaser, and the exclusivity period terminated by its terms upon the Petition Date.

16. Thereafter, the Debtor and Disney negotiated and entered into an amended version of the TSA and a stalking horse agreement with respect to the Disney Target Assets (the "Stalking Horse Transaction Agreement"), which implements the second, postpetition stage of the overall transaction. The Disney Target Assets include a perpetual, worldwide, non-exclusive license to certain of the Debtor's intellectual property and related technology and the purchase of unreleased claims (if any) against the newly hired employees. The Stalking Horse Transaction Agreement is proposed to serve as a baseline bid for prospective bidders to negotiate from and will be subject to higher and otherwise better bids for the Disney Target Assets pursuant to the Bidding Procedures; prospective bidders may also seek to acquire the Debtor's other Assets. The Stalking Horse

Transaction Agreement also includes certain case milestones related to the Sale Process (as defined below).

17. Also in September 2026, the Debtor engaged Houlihan to serve as its investment banker to assist in canvassing the market for interested buyers of the Assets. Upon its retention, Houlihan immediately began conducting due diligence with respect to the Assets and preparing marketing materials. Given that the Debtor's Assets were marketed for over a year prepetition—both with the assistance of the Prior Banker and also independently by the Debtor itself—and will be marketed again in this chapter 11 case by Houlihan, the Debtor determined in its business judgment that the terms of Disney's bid maximized the value of its Assets.

18. As noted above, the EPA contained a short period for the parties to negotiate exclusively among themselves through the filing of the chapter 11 case to negotiate certain of the definitive documents. To augment the extensive prepetition marketing process for the Assets, which resulted in a stalking horse bid for the Disney Target Assets, and contemporaneous with the filing of this chapter 11 case, Houlihan has commenced its marketing process for the Assets, including circulating a "teaser" to various prospective buyers. The teaser includes a brief description of the Assets and the process outlined for the proposed sale, license, or disposition of the Debtor's Assets (the "Sale Process") and was accompanied by a form non-disclosure agreement (an "NDA"). In addition, prior to the Petition Date, in preparation for the Sale Process, Houlihan populated an electronic data room (the "Data Room") with related diligence information. This "teaser" and access to the Data Room will be made available to Potential Bidders (defined below) upon execution of an NDA.

19. In furtherance of Houlihan's ongoing efforts to actively market the Assets for sale, and consistent with the milestones and the Stalking Horse Transaction Agreement, the Debtor has

filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale that the Debtor expects will generate maximum value for its Assets. To facilitate the Sale, the Debtor, in consultation with Houlihan and its other professional advisors, has developed the Bidding Procedures to preserve flexibility in the Sale Process, generate the greatest level of interest in the Assets, and obtain the highest or otherwise best value for the Assets. Among other things, these procedures, in the Debtor's business judgment, create an appropriate timeline for the Sale Process, consistent with the Stalking Horse Transaction Agreement milestones. The Bidding Procedures also authorize, but do not require, the Debtor to designate Additional Stalking Horse Purchasers for all or any subset of the Assets.

**C. The Stalking Horse Transaction Agreement**

20. The Stalking Horse Transaction, including the Stalking Horse Transaction Agreement, which the Debtor and Disney have negotiated in good faith and at arm's length, will serve as a baseline for all prospective bidders. In light of the capital infusion provided by Disney in the form of the up-front payment, the Debtor's cash on hand provides sufficient runway to market its Assets. However, given the exigencies of the Debtor's financial condition, its monthly burn rate, and because the Stalking Horse Transaction Agreement includes an outside date for the Sale closing on or prior to December 17, 2026, a timely sale of the Assets, including the Disney Target Assets, in accordance with the milestones set forth in the Stalking Horse Transaction Agreement, is the best way to preserve value. The Debtor believes that the framework of the Stalking Horse Transaction, subject to higher or otherwise better offers, will maximize the value of the Assets and afford the best opportunity for continued service to the Debtor's users and maintenance of relationships with its vendors.

21. The Debtor believes that the Stalking Horse Transaction offered by Disney and commencing this chapter 11 case to pursue a sale of the Assets provide the best opportunity to maximize value.

22. As discussed throughout this Motion, the Bidding Procedures and the Sale timeline were designed with the objective of generating the greatest level of interest in and best value for the Assets, while allowing the Debtor to close the Sale (or Sales) in a timely and efficient manner. The Debtor and its professional advisors are confident that the Bidding Procedures and the other relief requested herein will facilitate the Sale of the Assets for the highest or otherwise best value. Finally, the auction and Sale Process contemplated by the Bidding Procedures will also serve as a market test to ensure that the Stalking Horse Transaction and any other sale transactions will maximize value.

23. Among other things, the Stalking Horse Transaction Agreement contemplates that Disney will pay $20 million in cash (the "Stalking Horse Purchase Price") to the Debtor, $7.5 million of which was paid prepetition pursuant to the EPA (including a $2 million refundable good-faith deposit). The Stalking Horse Transaction Agreement also includes various customary representations, warranties, and covenants by and from the Debtor and Disney, and certain conditions to closing and rights of termination related to the Sale and the chapter 11 case generally. The transaction contemplated by the Stalking Horse Transaction Agreement and assumption of the TSA is subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Order.

24. Certain material terms of the Stalking Horse Transaction Agreement that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv) are described below[3]:

[3] Any summary of the Stalking Horse Transaction Agreement contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse Transaction Agreement. To the extent that there is any conflict between

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| **Stalking Horse Purchaser** | Disney Worldwide Services, Inc. or one of its designated Affiliates. |
| **Purchase Price (Stalking Horse Transaction Agreement § 16.2(b); L.R. 6004-1(b)(iv)(N))** | The cash consideration to be paid by Disney to the Debtor for the Stalking Horse Transaction Agreement is $20 million. As discussed below, Disney also agreed to (i) hire certain of the Debtor's employees thereby shifting costs away from the Debtor and (ii) provide certain transition services. |
| **Purchased Assets (Stalking Horse Transaction Agreement §§ 3.1, 5.2)** | Subject to the Stalking Horse Transaction Agreement and effective as of the Closing, the Debtor shall grant and license to Disney, and Disney accepts, on the terms and conditions set forth in the Stalking Horse Transaction Agreement, a perpetual, worldwide, non-exclusive, transferable (in accordance with the terms of the Stalking Horse Transaction Agreement), sublicensable (through multiple tiers; in accordance with the terms of the Stalking Horse Transaction Agreement), non-terminable, irrevocable, fully paid-up, royalty-free right and license: (a) to use, integrate, copy and reproduce, distribute, execute, display, perform, modify and make Derivative Works of, the Licensed Technology in connection with the Licensee Products and Services, and (b) under the Licensed Patents to make, have made, use, have used, sell, offer for sale, import, export, distribute, develop, and otherwise commercially exploit Licensee Products and Services, and to practice any and all methods and processes claimed in the Licensed Patents in connection with the foregoing (the Licensed Technology and Licensed Patents, collectively, the "Licensed IP" and, such grant of license set forth in the Stalking Horse Transaction Agreement, the "License Grant"). Additionally, effective as of the Closing Date, the Debtor shall transfer and convey to Disney, and Disney shall purchase and accept, for good and valuable consideration any unreleased claims that the Debtor has against any of its former employees that accept offers of employment with Disney or any of its Affiliates (the "Purchased Employee Claims" and, together with the |

any summary contained herein and the actual terms and conditions of the Stalking Horse Transaction Agreement, the actual terms and conditions of the Stalking Horse Transaction Agreement shall control.

[4] Capitalized terms used in this table and not otherwise defined herein shall have the meaning ascribed to such terms in the Stalking Horse Transaction Agreement.

| **Key Terms of the Stalking Horse Transaction Agreement**[4] | |
|---|---|
| | Licensed IP and the License Grant (the "Disney Target Assets"). |
| **Retained Assets** | Except for the rights granted in connection with the License Grant and the Purchased Employee Claims, the Debtor shall retain all right, title and interest in and to its assets, properties, businesses and operations. |
| **Assumption of TSA** | Disney will assume the TSA pursuant to section 365 of the Bankruptcy Code. |
| **Assumed Liabilities** | Disney shall not assume, and the Debtor and its successors shall not take any position that Disney has assumed, any liabilities or obligations of the Debtor or its past, current or future affiliates, whether arising before, on or after the closing of the Initial Transaction or the Sale. The Debtor shall retain responsibility for such liabilities and obligations. |
| **Retained Liabilities** | All liabilities of the Debtor shall be Retained Liabilities following the Sale. |
| **Sale Free and Clear (Stalking Horse Transaction Agreement § 6.3; L.R. 6004-1(b)(iv)(M))** | The Debtor is seeking to sell the Disney Target Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code. |
| **No Successor Liability (Stalking Horse Transaction Agreement § 6.3; L.R. 6004-1(b)(iv)(L))** | The Debtor is seeking to consummate the Proposed Transaction (as defined in the EPA) and sell the Disney Target Assets free and clear of successor liability claims. |
| **Conditions to Closing (Stalking Horse Transaction Agreement § 14)** | Mutual Conditions. The respective obligations of the Debtor and Disney to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by both the Debtor and Disney: (a) the closing of the Initial Transaction and all of the conditions precedent thereto shall have occurred; (b) the absence of laws or court orders prohibiting, enjoining or otherwise staying the Stalking Horse Transaction; (c) the Debtor's board, acting upon the recommendation of a special committee of the board comprised solely of independent directors, will have reviewed and approved the Stalking Horse Transaction, including the Stalking Horse Transaction Agreement, the transaction economics, and, as applicable, the Bid Protections, Bidding Procedures, and the form of 363 Free and Clear Order; (d) receipt of all required approvals to |

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| | complete the Stalking Horse Transaction, including any consents required related to the License Grant and/or the Licensed IP, if any.<br><br>Conditions to Obligations of Disney. The obligation of Disney to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by Disney in its sole discretion: (a) the Debtor shall have given Disney reasonable access to diligence relevant to the Proposed Transaction consistent with the Term Sheet; (b) other than the 363 Free and Clear Order, the Transaction Documents shall be reasonably satisfactory to Disney; (c) the Debtor will have provided Disney with access to, and copies of, the Licensed Technology pursuant to the Stalking Horse Transaction Agreement, which excludes the Excluded IP, (d) no material adverse development shall have occurred with respect to the Licensed IP or the Key Employee group, (e) the Bankruptcy Court shall have entered the 363 Free and Clear Order, which shall be a final and non-appealable order and the entered order shall be in form and substance acceptable to Disney in its sole and absolute discretion, (f) the 363 Free and Clear Order shall not have been stayed as of the Closing, stayed pending appeal, reversed or vacated, (g) the Debtor shall have delivered or have caused to be delivered to Disney the deliverables set forth in the Stalking Horse Transaction Agreement, (h) the representations and warranties of Disney contained in the Stalking Horse Transaction Agreement shall be true and correct in all material respects as of the date of the Stalking Horse Transaction Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a particular period of time, which need only be true and correct in all material respects as of such or with respect to such period), and (i) the Debtor shall have performed or complied in all material respects with all agreements and covenants required by the Stalking Horse Transaction Agreement and the other Transaction Documents to be performed or complied with by the Debtor on or prior to the Closing.<br><br>Conditions to Obligations of the Debtor. The obligation of the Debtor to consummate the Closing shall be subject to |

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| | the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by the Debtor in its sole discretion: (a) the Debtor shall have received the Remaining Cash Consideration and release of Disney's Refundable Deposit, (b) other than the 363 Free and Clear Order, the Transaction Documents shall be reasonably satisfactory to the Debtor; (c) the Debtor shall have delivered or caused to be delivered to the Debtor those deliverables set forth in the Stalking Horse Transaction Agreement, (d) the representations and warranties of Disney contained in the Stalking Horse Transaction Agreement shall be true and correct in all material respects as of the date of the Stalking Horse Transaction Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a particular period of time, which need only be true and correct in all material respects as of such or with respect to such period), (e) Disney shall have performed or complied in all material respects with all agreements and covenants required by the Stalking Horse Transaction Agreement and the other Transaction Documents to be performed or complied with by Disney on or prior to the Closing, and (f) the Bankruptcy Court shall have entered an order approving the Proposed Transaction. |
| **Sale to Insider (L.R. 6004-1(b)(iv)(A))** | Disney is not an "insider" as such term is defined in section 101(31) of the Bankruptcy Code.[5] |
| **Agreements with Management (L.R. 6004-1(b)(iv)(B))** | There are no agreements between Disney and the Debtor's current management. |

[5] As noted below, Disney hired certain Debtor employees with the consent of the Debtor (acting through the Initial Transaction Committee). One of these newly hired employees was the Debtor's chief executive officer who was an "insider" of the Debtor within the meaning of section 101(31) of the Bankruptcy Code. Nonetheless, this should not change the standard of review because (i) no common identity of directors or controlling equity interest holders existed or exists between Disney, on the one hand, and the Debtor, on the other hand, (ii) the Initial Transaction Committee and the Restructuring Committee, as applicable, are comprised solely of independents and have led and recommended that the Board approve the proposed transaction with Disney, (iii) Disney did not and does not control the Debtor in any respect and (iv) none of the Debtor's former insiders has had meaningful input in substantial matters related to this chapter 11 case or the Debtor's sale process, including the proposed transaction with Disney. At all times in advance of the chapter 11 case, the Initial Transaction Committee and the Restructuring Committee, as applicable, have rigorously performed their obligations and maintained their independence.

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| **Closing and Other Deadlines (Stalking Horse Transaction Agreement § 16.1(c); L.R. 6004-1(b)(iv)(E))** | Unless otherwise mutually agreed upon in writing between the parties, in no event shall the closing of the Sale be consummated any later than December 17, 2026 (the "Outside Date") and Disney shall have a termination right in the event that the closing of the Sale has not occurred on or before the Outside Date; *provided* that Disney shall not be entitled to terminate the Stalking Horse Transaction Agreement if the failure of the Closing to be consummated by such date is caused by Disney's breach of any of its obligations under the Stalking Horse Transaction Agreement. |
| **Good Faith Deposit (Stalking Horse Transaction Agreement § 5.1; L.R. 6004- 1(b)(iv)(F))** | $2 million, which shall be held in a separate and designated account by the Debtor or its agent, and shall not become part of the Debtor's bankruptcy estate unless and until released from escrow to the Debtor pursuant to the applicable Stalking Horse Transaction Agreement or by order of the Bankruptcy Court. |
| **Interim Arrangements with Disney (L.R. 6004-1(b)(iv)(G))** | Disney has agreed to provide certain transition services to the Debtor pursuant to a prepetition transition services agreement, dated as of September 18, 2026 and as amended and restated on October [●], 2026 (the "TSA"). |
| **Releases (Stalking Horse Transaction Agreement § 12.1; L.R. 6004-1(b)(iv)(C))** | The Debtor, for itself and on behalf of its affiliates and each of its and their Representatives, and any successors and assigns of the foregoing (individually and collectively, the "Releasing Parties" and, each such party, a "Releasing Party"), hereby irrevocably, unconditionally and forever acquits, releases, waives and discharges, and further covenants and agrees that it will not assert, and completely waives and relinquishes, any claims against Disney and its Affiliates and any of its or their Representatives (including any Company Service Provider (as defined below) hired by Disney or any of its Affiliates (the "Hired Employees")), divisions, affiliated corporations, affiliated non-corporation entities and any successors, predecessors and assigns of the foregoing (individually and collectively, the "Licensee Parties") from any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action, liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, the Released Matters (as defined in the EPA), potential claims, counterclaims, cross-claims or demands, in law or in equity, asserted or unasserted, express or implied, actual or potential, known or unknown, matured or unmatured, contingent or vested, |

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| | liquidated or unliquidated, of any kind or nature or description whatsoever, that a Releasing Party had, presently has or may hereafter have or claim or assert to have against any of the Licensee Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and through either the Closing or entry of the 363 Free and Clear Order, whichever is later (collectively, the "Claims"), including any Claims that in any way arise from or out of, are based upon or indirectly or directly relate to the following: (a) the negotiation or execution of the Stalking Horse Transaction Agreement, the EPA, or the other Transaction Documents or any of the transactions contemplated hereby or thereby, other than any claim arising out of a breach of Disney's obligations under the Stalking Horse Transaction Agreement, the EPA, or the other Transaction Documents; (b) the recruitment, solicitation, hiring, employment or engagement by Disney or any of its Affiliates of, or the offer of employment by Disney or any of its Affiliates to, any current or former employee, consultant or other service provider of Debtor or any of its Affiliates (each, a "Company Service Provider"), and any restriction applicable to any Company Service Provider with respect to entering into any and all arrangements with, and providing any and all services and information to, the Licensee Parties; (c) any wind-up, liquidation, dissolution or cessation of the Debtor's and its affiliates' business operations or the sale or license of the Debtor's and its affiliates' assets, including the termination of any Company Service Provider; (d) the provision of any services by (i) any Company Service Provider to Disney or the other Licensee Parties and (ii) any Hired Employee to the Debtor or any of its affiliates (in each, including the use of any Technology and Intellectual Property Rights developed by such employees, consultants or other service providers during their employment with, or provision of services to, the Debtor or any of its affiliates, or otherwise developed or owned by the Debtor or its affiliates, or the use of any ideas, know-how and techniques); and (e) the Licensed IP; (all Claims, including the foregoing (a)-(e), collectively including the scope and substance of the releases set forth in the EPA, the "SHA Released Matters"); *provided, however,* that such Releasing Party is not releasing and does not acquit, waive, relinquish or |

| **Key Terms of the Stalking Horse Transaction Agreement[4]** | |
|---|---|
| | discharge, and the SHA Released Matters do not include, any rights or claims (x) available pursuant to the Stalking Horse Transaction Agreement, the EPA, or any other Transaction Document to which the Debtor or Disney is a party or the transactions contemplated hereby or thereby, including any employment, compensation or other arrangements between a Hired Employee and any Licensee Party, or (y) any matter that cannot be released as a matter of applicable law. The Debtor, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Disney or any of the Licensee Parties in connection with any of the SHA Released Matters. Further, without limiting the foregoing, the Debtor, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to assert any rights against Disney or any of the Licensee Parties in connection with any SHA Released Matters, including the recruitment, solicitation, hiring, employment or engagement by Disney or any of its Affiliates of, or the offer of employment by Disney or any of its Affiliates to, a Company Service Provider (in each case, whether arising prior to, concurrently with or following the Closing). |
| **Exculpation** | To the fullest extent permitted by applicable law, (a) Disney and its affiliates and successors and (b) their respective officers, directors, managers, employees, shareholders, agents, contractors, professionals, and assigns (together, the "TSA Exculpated Parties") shall not have or incur, before, on, or after the Closing, any liability to any person or entity for any claims, suits, demands, penalties, fines, charges, proceedings, causes of action, damages, losses, costs, or expenses of any nature (including attorneys' fees) arising, directly or indirectly, from (i) the administration, implementation, or performance of the TSA or (ii) the provision, management, or oversight of the transition services under the TSA; *provided*, that nothing in this provision (x) releases the parties to the TSA from their obligations thereunder or (y) exculpates any TSA Exculpated Party from liability for any act or omission determined by final order of the Court to constitute willful misconduct, bad faith, or gross negligence. |
| **Private Sale/No Competitive Bidding (L.R. 6004-1(b)(iv)(D))** | An Auction is expressly contemplated by the Stalking Horse Transaction Agreement and the Bidding Procedures and the Disney Target Assets under the Stalking Horse |

| **Key Terms of the Stalking Horse Transaction Agreement[4]** | |
|---|---|
| | Transaction Agreement will be subject to higher or otherwise better offers through the Sale Process. |
| **Use of Proceeds (L.R. 6004-1(b)(iv)(H))** | The Debtor is not seeking to release or allocate any sale proceeds without further order of the Court. |
| **Tax Exemption (L.R. 6004-1(b)(iv)(I))** | N/A. |
| **Record Retention (L.R. 6004-1(b)(iv)(J))** | N/A. The Debtor's records are not being purchased. |
| **Sale of Avoidance Actions (Stalking Horse Transaction Agreement § 5.2; L.R. 6004-1(b)(iv)(K))** | The Purchased Assets include the Purchased Employee Claims, which are any unreleased claims that the Debtor has against any former Debtor employees that accept offers of employment with Disney or any of its Affiliates. The Debtor does not believe there is any value to such claims. |
| **Credit Bid (L.R. 6004-1(b)(iv)(N))** | None. |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(O))** | To maximize the value received for the Disney Target Assets, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder (L.R. 6004-1(c)(i)(C))** | In consideration for Disney having expended considerable time and expense in connection with the Stalking Horse Transaction Agreement, the EPA, the TSA, and the hiring of former Debtor employees , among other things, and the negotiation thereof, and to compensate Disney as the Stalking Horse Purchaser, and regardless of whether or not Disney makes any matching or competing bids at the Auction (if applicable), the Debtor shall pay to Disney a break-up fee and reasonable expense reimbursement collectively capped at 3.5% of the Stalking Horse Purchase Price, or $700,000 (the "Bid Protections") in the event that: (i) the Debtor materially breaches the Stalking Horse Transaction Agreement or any other Transaction Document, or (ii) the Debtor consummates an alternative transaction involving the Disney Target Assets, including if Disney is not the Winning Bidder at the Auction (if applicable) (unless such alternative transaction is a "back-up bid" in the event the Closing does not occur due to the breach by Disney of any of its obligations under the Stalking Horse Transaction Agreement). The Bid Protections shall be due and payable simultaneous with the closing of the alternative transaction. The Bid Protections shall, subject to Court approval, be treated as an |

| Key Terms of the Stalking Horse Transaction Agreement[4] | |
|---|---|
| | administrative expense in the chapter 11 case under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code. |

**D. Designation of One or More Additional Stalking Horse Purchasers**

25. Based on the Debtor's decision to pursue strategic transactions through a chapter 11 process, and on the advice and counsel of the Debtor's advisors, the Debtor has determined, in its reasonable business judgment, that having the flexibility to designate one or more Additional Stalking Horse Purchasers for the Assets will enhance the Debtor's ability to maximize value of the Debtor's Assets and is in the best interests of its estate.

26. Accordingly, as set forth in greater detail in the Bidding Procedures, the Debtor requests authority to (i) designate one or more Additional Stalking Horse Purchasers in the event that the Debtor executes one or more stalking horse transactions for the Assets by November 9, 2026, and (ii) offer any such Additional Stalking Horse Purchaser the following bid protections: payment of a break-up fee and expense reimbursement in an amount collectively capped at 3.5% of the cash purchase price, as an administrative expense, in the event that the Debtor consummates one or more sale transactions for the Assets included in the applicable Additional Stalking Horse Agreement with one or more other bidders.

27. Given the urgency of the Debtor's need to maximize value for creditors through a timely and efficient Sale, the ability to designate one or more Additional Stalking Horse Purchasers and offer such parties the Bid Protections is justified and appropriate.

**E. The Bidding Procedures**

28. The Debtor is in the process of soliciting bids for all of the Assets, or any number or combination thereof, including the Disney Target Assets in accordance with the Bidding

Procedures. The Bidding Procedures describe, among other things, (i) the Assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtor, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Winning Bidder and the selection of any Back-Up Bidder. The Bidding Procedures reflect the Debtor's objective of conducting the Sale Process in an orderly, fair and open manner, while ensuring that the highest or otherwise best bid is generated for the Assets.

29. Certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

a. **Qualification as Bidder**. Any interested party that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder." To become a Qualifying Bidder, and thus be able to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the assets (the "Data Room"), a Potential Bidder must submit to the Debtor and its advisors:

   i. documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated bidding and transaction process;

   ii. an executed confidentiality agreement in form and substance satisfactory to the Debtor; and

   iii. sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has the financial wherewithal to consummate a Sale, and (ii) intends to access the Data Room for a *bona fide* purpose consistent with these Bidding Procedures.

b. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

c. **Due Diligence**. The Debtor will provide any Qualifying Bidder (including, for the avoidance of doubt, Disney) with reasonable access to the Data Room and any other additional information that the Debtor believes to be reasonable and

appropriate under the circumstances. All additional due diligence requests shall be directed to (x) the proposed investment banker for the Debtor, Houlihan Lokey, Attn: Daniel Cullins (dcullins@HL.com) and (y) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., Attn: Heather Lambert (hlambert@wsgr.com). The due diligence period shall extend through and including the Bid Deadline. The Debtor may, but shall not be obligated to, in its business judgment, furnish any due diligence information after the Bid Deadline. The Debtor reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to due diligence information, the Debtor and its estate shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtor.

d. **Bid Requirements**. *Qualifying Bid.* Other than in the case of Disney and the Stalking Horse Transaction Agreement or any Additional Stalking Horse Purchaser and its Additional Stalking Horse Agreement, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

i. be in writing;

ii. fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

iii. set forth the purchase price to be paid by such Qualifying Bidder;

iv. not propose payment in any form other than cash;

v. state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

vi. specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (a) purchase or license the Assets, or a number or combination of the Assets, and (b) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtor

and its estate than, the terms set forth in, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

vii. be accompanied by an alternative asset purchase agreement (an "Alternative Agreement") that reflects any variations from, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

viii. state that such Qualifying Bidder's offer is formal, binding, and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;

ix. to the extent that a Bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the sale, license or other disposition set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtor, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtor;

x. contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtor to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtor's receipt of such information;

xi. (A) identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition

to close the transactions contemplated by the Alternative Agreement; (B) provide for the payment of cure costs related to such executory contracts and unexpired leases, and (C) demonstrate that the Qualifying Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases;

xii. set forth the Qualifying Bidder's intentions with respect to (i) hiring any of the Debtor's current or former employees, and (ii) providing transition services to the Debtor;

xiii. include a commitment to close the transactions contemplated by the Alternative Agreement by no later than November 30, 2026;

xiv. not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment unless such Qualifying Bidder is seeking to be designated as an Additional Stalking Horse Purchaser with respect to the Assets in its bid;

xv. if the Alternative Agreement contemplates the license or purchase of the Disney Target Assets or the purchase of Assets subject to any Additional Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (1) the value offered by, as applicable, the Stalking Horse Transaction Agreement with respect to the Disney Target Assets or any Additional Stalking Horse Agreement with respect to any Assets included in the bid, plus (2) any applicable Break-Up Fee, plus (3) $1,000,000 (the "Minimum Overbid Amount");

xvi. not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

xvii. contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale. Such written acknowledgment and representation must include the following disclaimer: Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Assets without any surviving representations or warranties, on an "as is" and "where is" basis, except as set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement;

xviii. set forth each regulatory and third-party approval required for the Qualifying Bidder to consummate the Sale, and the time within which the Qualifying Bidder expects to receive such regulatory and third-party approvals, and the Debtor, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualifying Bidder will take to ensure receipt of such approvals as promptly as possible, when considering the other Bid Requirements. Each Qualifying Bidder must further agree that its legal counsel will coordinate in good faith with counsel to the Debtor to provide pertinent information regarding the Qualifying Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable;

xix. provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Winning Bid, in accordance with the terms of the Alternative Agreement;

xx. include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative Agreement;

xxi. provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative Agreement (or such additional amount as may be determined by the Debtor in its reasonable discretion); provided, however, that Disney is not required to make an additional deposit; and

xxii. provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative Agreement, the Debtor and its estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtor in consultation with the Consultation Parties (defined below), shall constitute a Qualifying Bid. The Debtor reserves the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim

under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

e. **Bid Deadline**. A Qualifying Bidder, other than Disney or any Additional Stalking Horse Purchaser that may be designated by the Debtor, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties so as to be received on or before **November 20, 2026 at 5:00 p.m. (ET)** (the "Bid Deadline"); *provided* that the Debtor may extend the Bid Deadline in consultation with the Consultation Parties (defined below) without further order of the Court. To the extent that the Bid Deadline is extended for all parties, the Debtor shall file a notice on the docket of the chapter 11 case indicating the same. Any party that does not submit a bid by the Bid Deadline will not be allowed to (x) submit any offer after the Bid Deadline, or (y) participate in the Auction.

f. **Evaluation of Qualifying Bids**. The Debtor shall make a determination whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid. No later than **November 21, 2026**, the Debtor shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the Minimum Overbid Amount, the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

g. **Consequence of No Qualifying Bids**. If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction with respect to the Assets covered by the applicable Stalking Horse Agreement and shall request at the Sale Hearing that the Court approve such Stalking Horse Agreement and the transactions contemplated thereunder.

h. **Auction**. If the Debtor timely receives one or more Qualifying Bids for all or any subset of the Assets, including, without limitation, the Disney Target Assets, then the Debtor shall conduct an auction (the "Auction"). Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes requested by the bidder in the form of Alternative Agreement as compared to any Stalking Horse Agreement designated by the Debtor with respect to the Assets subject to its bid; (c) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtor and its estate of such modifications or delay; (d) the total consideration to be received by the Debtor

and its estate; (e) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (f) the net benefit to the Debtor's estate; and (g) any other qualitative or quantitative factors the Debtor may reasonably deem appropriate under the circumstances. The Auction shall be governed by the following procedures:

i. the Auction shall be held on **November 23, 2026 at 10:00 a.m. (ET)** at a location to be determined by the Debtor or virtually via video conference pursuant to information to be timely provided by the Debtor to the Auction Participants (as defined below);

ii. only Disney, any Additional Stalking Horse Purchaser(s) designated by the Debtor, and the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

iii. the Auction Bidders shall appear at the Auction in person (or via Zoom, if permitted) in the Debtor's sole discretion, or through a duly authorized representative;

iv. only the Debtor, the Consultation Parties, and the Auction Bidders, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any creditors or parties in interest in the chapter 11 case may request permission in writing to attend the Auction no later than Noon (ET) two (2) days prior to the Auction and the Debtor, in its sole discretion, may reasonably determine to grant or deny such permission;

v. the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi. prior to the start of the Auction, each of the Auction Bidders shall confirm on the record of the proceedings that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale;

vii. bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $500,000, *provided* that: (i) each successive bid be a Qualifying Bid; and (ii) the Debtor shall retain the right to modify the bid increment requirements at the Auction;

viii. in any successive bid by Disney or any Additional Stalking Horse Purchaser designated by the Debtor, the amount of the applicable Break-Up Fee shall be included in the calculation of such bid;

ix. the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

x. all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid;

xi. the Debtor and its professional advisors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, or any applicable order of the Court, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders in advance of their application;

xii. each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xiii. the Auction Bidders shall have the right to make additional modifications to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion, be less favorable to the Debtor and its estate than the terms of, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected

as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv. the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv. upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties and subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction for all or substantially all or any subset of the Assets (the "Winning Bids"). In making this decision, the Debtor shall consider the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement submitted with the Winning Bid, as applicable, requested by each bidder, and the net benefit to the Debtor's estate. The bidder submitting such Winning Bid at the Auction shall become a "Winning Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement, as applicable. The Debtor may, in its business judgment, designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Winning Bidder does not close the Sale;

xvi. if the Winning Bidder is not Disney, Disney shall allow one (1) Winning Bidder to interview and make employment offers to any employees of Disney formerly employed by the Debtor who wish to consider opportunities with such Winning Bidder and shall work in good faith with such Winning Bidder to transition employees who accept an offer to the Winning Bidder; *provided* that Disney may designate up to 20% of such employees as outside the scope of such process, and Disney need not make available or allow the Winning Bidder (or any other party) the right to interview or make employment offers to such employees;

xvii. if the Winning Bidder is not Disney, Disney shall be entitled to the Break-Up Fee;

xviii. as soon as reasonably practicable after completion of the Auction, the Debtor will file with the Court and serve on the Transaction Notice Parties a notice setting forth the results of the Auction (the "Notice of Winning Bidder"), which will (a) identify the Winning Bidder and the Backup Bidder, if applicable; (b) include a copy of the Winning Bid and the Backup Bid, if applicable, or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Adequate Assurance Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Transaction Notice Parties of the outcome of the Auction;

xix. prior to the Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made;

**THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED STALKING HORSE TRANSACTION AGREEMENT, ADDITIONAL STALKING HORSE AGREEMENT, OR ALTERNATIVE AGREEMENT, AS APPLICABLE, SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

i. **Sale Hearing**. The Winning Bid and any Back-Up Bid and, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement related to such bids will be subject to approval by the Court. The Sale Hearing to approve the Winning Bid and any Back-Up Bid and the applicable asset purchase agreements of such bids shall take place on **November 24, 2026 at a time to be established by the Court (ET)**.

The Sale Hearing and any additional deadlines established in connection with the Bidding Procedures may be adjourned by the Debtor, in consultation with any Consultation Parties, Disney, and any Additional Stalking Horse Purchaser, or in the event Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then in consultation with the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 case.

At the Sale Hearing, the Debtor will seek entry of an order, substantially in the form of the Sale Order that, among other things: (i) authorizes and approves the Sale to Disney, any Additional Stalking Horse Purchaser or, in the event that Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), pursuant to the terms and conditions set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement or the Alternative Agreement submitted by the Winning Bidder, as applicable.

j. **Backup Bidder**. Notwithstanding any of the foregoing, in the event that the Winning Bidder fails to close the Sale on or before November 30, 2026 (or such date as may be extended by the Debtor), the Back-Up Bid will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtor shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties; *provided, however,* that Disney, if operating as the Back-Up Bidder, shall not be subject to any penalties, and Disney shall be permitted to terminate the Sale unilaterally if the Sale does not close on or prior to December 17, 2026 and the failure to close is not on account of Disney's material breach; *provided, further,* that any duties and related requirements for Disney to serve as the Back-Up Bidder, or milestones in connection therewith, shall be subject to the terms of the last bid Disney submitted at the Auction.

k. **Return of Deposits**. All Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder no later than five (5) business days following the closing of the Sale, including that certain $2,000,000 fully refundable deposit to be paid to Disney to the extent Disney is not selected as the Winning Bidder. The deposit of the Winning Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of any Stalking Horse Agreement or any Alternative Agreement, as applicable, the Debtor and its estate shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.[6]

l. **Fiduciary Out**. Nothing in the Bidding Procedures will require any director or officer of the Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such director or officer reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, would

[6] For the avoidance of doubt, the Debtor's retention of a Deposit shall not constitute a waiver of any of the Debtor's legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are reserved.

result in a violation of applicable law or be inconsistent with his or her fiduciary obligations.

m. **Reservation of Rights**. Notwithstanding any of the foregoing, the Debtor may, and reserves the right to, modify the Bidding Procedures at or prior to the Auction, including, without limitation, to modify, extend, enlarge, revise, or otherwise alter any or all of the deadlines set forth herein or related hereto including, without limitation, with respect to the marketing process, the submission of bids, the designation of Additional Stalking Horse Purchasers, Qualifying Bidders, and Auction Participants, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the closing of any Sale to Winning Bidders or Back-Up Bidders, as applicable, as well as to modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all of the Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing. Nothing in the Bidding Procedures shall obligate the Debtor to consummate or pursue any transaction with a Qualifying Bidder, other than Disney, subject to, and in accordance with the terms of the Bidding Procedures and the Stalking Horse Transaction Agreement.

30. The following is a summary of the key dates established by the Bidding Procedures and the Assumption and Assignment Procedures:

| **Date** | **Deadline/Event** |
|---|---|
| November 4, 2026 | Deadline for Debtor to file and serve Assumption and Assignment Notice |
| November 9, 2026 | Deadline to designate Additional Stalking Horse Purchasers |
| November 13, 2026 at 4:00 p.m. (ET) | Sale Objection Deadline |
| November 18, 2026 at 4:00 p.m. (ET) | Contract Objection Deadline[7] |
| November 20, 2026 at 5:00 p.m. (ET) | Bid Deadline |
| November 21, 2026 | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |

[7] The Sale Objection Deadline and Contract Objection Deadlines apply to all objections to the Sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by any Stalking Horse Purchaser), with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* any Stalking Horse Purchaser, which such objections shall be due at or prior to the Sale Hearing.

| **Date** | **Deadline/Event** |
|---|---|
| November 23, 2026 | Auction |
| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
| November 23, 2026 at Noon (ET) | Debtor's Deadline to Reply to Sale Objections |
| November 24, 2026, subject to Court availability | Sale Hearing |

31. The Debtor respectfully submits that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of the chapter 11 case. Such timeline provides an approximately 38-day period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, relevant information regarding the Debtor's business has been made available in the Data Room, allowing potential bidders (subject to an executed NDA) to immediately conduct diligence on the Assets, and the Debtor and its advisors have been marketing the Assets for some time now.

**F. Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing**

32. The Debtor also requests approval of the sale notice (the "Transaction Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

33. Upon entry of the Bidding Procedures Order, the Debtor will serve the Transaction Notice by regular mail on: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Disney; (iii) all parties known by the Debtor to assert a lien or encumbrance on any of the Assets; (iv) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (v) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date;

(vi) the Office of the Attorney General in each state in which the Debtor has operated; (vii) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have had any tax liability; (viii) the Federal Trade Commission; (ix) the United States Attorney General/Antitrust Division of Department of Justice; (x) all non-Debtor parties to any of the Assigned Contracts; (xi) all of the Debtor's other known creditors and equity security holders; and (xii) all other parties that have filed a notice of appearance and demand for service of papers in the chapter 11 case as of the service date (collectively, the "Transaction Notice Parties").

34. The Debtor will also cause the Transaction Notice to be published once in the national edition of *USA Today*, and post the Transaction Notice and the Bidding Procedures Order on the website of the Debtor's claims and noticing agent, Stretto, Inc. ("Stretto") at https://cases.stretto.com/chartech.

## G. Assumption and Assignment Procedures

35. To facilitate the Sale, the Debtor seeks authority to assume and assign to Disney, any other Additional Stalking Horse Purchaser, or in the event that any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then the Winning Bidder(s), the Assigned Contracts in accordance with the Assumption and Assignment Procedures.

36. The Assumption and Assignment Procedures are as follows:

a. On or before November 4, 2026 (the "Assumption and Assignment Notice Deadline"), the Debtor shall file with the Court and serve on any non-Debtor counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assigned Contract, a notice (the "Assumption and Assignment Notice"). The form of Assumption and Assignment Notice is attached as Exhibit 3 to the Proposed Order attached hereto as **Exhibit A**.

b. Any Assumption and Assignment Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtor believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assigned Contracts. If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assigned Contract, (ii) the Cure Amount for its Assigned Contract or (iii) the provision of adequate assurance

of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "Contract Objection") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c. Any Contract Objection shall: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **4:00 p.m. (ET) on November 18, 2026 (the "Contract Objection Deadline")**, and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required under the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. Any objections to adequate assurance of future performance by Disney shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Winning Bidder other than Disney or any Additional Stalking Horse Purchaser designated by the Debtor shall be filed in accordance with subparagraph (g) below.

d. The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801 (Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com)); (ii) proposed investment banker to the Debtor, Houlihan Lokey (Attn: David Cullins (email: dcullins@hl.com)); (iii) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com), Bryan Uelk (bryan.uelk@skadden.com), and Samuel J. Cammer (samuel.cammer@skadden.com)); (iv) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; and (v) counsel to the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey (linda.casey@usdoj.gov)).

e. As soon as practicable after the completion of the Auction, the Debtor shall file with the Court a notice identifying the bidder(s) selected as the winning bidder(s) with respect to all or any subset of the Assets (each, a "Winning Bidder" and, if more than one, the "Winning Bidders") (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) with respect to all or any of the Assets and the amount of each of the Winning Bid and the Back-Up Bid (if any) with respect to all or any of the Assets, and (ii) the Selected Assigned Contracts, *provided, however,* that if Disney is serving as the Back-Up Bidder, the protections that apply to Disney's Back-Up Bid set forth in Section 14 of the Bidding Procedures shall apply.

f. As soon as reasonably practicable after completion of the Auction, the Debtor will cause to be served by electronic mail, and if unavailable, overnight mail, upon each affected Counterparty and its counsel (if known) the Notice of Winning Bidder.

g. At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to Disney, any Additional Stalking Horse Purchaser, or in the event that a Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), of only those Assigned Contracts that have been selected by Disney or any Additional Stalking Horse Purchaser, or, in the event that any Stalking Horse Purchaser is not designated as a Winning Bidder, then the Winning Bidder, to be assumed and assigned (each, a "Selected Assigned Contract," and collectively, the "Selected Assigned Contracts"). The Debtor and its estate reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

h. Further, if Disney is the Winning Bidder, at the Sale Hearing, the Debtor will seek Court approval of assumption of the TSA, any amendments or exhibits thereto, and any related or ancillary agreement.

i. If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the applicable Winning Bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with respect to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtor and its estate or the applicable Winning Bidder for such Selected Assigned Contract, or the property of any of them that existed prior to the entry of the Sale Order.

j. To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtor, in consultation with the Winning Bidder, or fixed by the Court; *provided, however,* that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtor and assigned to the Winning Bidder for such Selected Assigned Contract, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtor or the

Winning Bidder for such Selected Assigned Contract, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

k. Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtor are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtor shall file with the Court and serve, by regular mail, on the Counterparties an Assumption and Assignment Notice, and such Counterparties shall be required to file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assigned Contracts to the applicable Winning Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## BASIS FOR REQUESTED RELIEF

### A. The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved.

37. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions. If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

38. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

39. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

40. The Debtor believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will allow the Debtor to conduct the Sale Process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability

to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

41. At the same time, the Bidding Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale within an appropriate timeframe. Given the robust and extensive prepetition marketing of the Debtor's assets conducted by the Prior Banker and the Debtor-led negotiations, which were advised by the Initial Transaction Committee, which led to the entry into the EPA and the TSA with Disney, the Debtor's Assets were marketed for more than a year before the Petition Date and will be marketed in bankruptcy for 38 days. In light of the unique nature of the Debtor's business and the considerable costs of operating the Debtor's business in chapter 11, and in respect of the outside date memorialized in the Stalking Horse Transaction Agreement, the Debtor submits that this marketing and sale process is more than sufficient to ensure a broad market test of the value of the Assets, solicit participation from all Potential Bidders, and ensure that a thorough and robust sale process is undertaken within the constraints of the Debtor's liquidity. Likewise, entry into the Stalking Horse Transaction Agreement will further ensure that the Debtor obtains fair market value by setting a minimum price for the Disney Target Assets that will be tested in the marketplace.

42. Moreover, because the Bidding Procedures afford the Debtor flexibility to designate other Additional Stalking Horse Purchasers with respect to all or any subset of the Assets, this opportunity is not limited to the Stalking Horse Transaction Agreement, but will ensure that all of the Assets are marketed for potential sale to a party (or parties) offering the highest or otherwise best price. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above market. As set forth in greater detail in the Dunayer

Declaration filed contemporaneously herewith, Houlihan, the Debtor's proposed investment banker in connection with the Sale Process, believes that the Bidding Procedures are appropriately crafted to, and will maximize the value of the Assets.

**B. Shortened Notice of this Motion Is Appropriate Under the Circumstances.**

43. As set forth in greater detail in the *Debtor's Motion for an Order Shortening Time for Notice of the Hearing to Consider the Debtor's Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling Certain Dates and Deadlines With Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving the Designation of Disney Worldwide Services, Inc. as Stalking Horse Purchaser With Respect to the Disney Target Assets, (E) Authorizing the Debtor to Designate Additional Stalking Horse Purchasers for the Assets, (F) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases; and (II) An Order (A) Authorizing and Approving the Sale of Assets, (B) Approving the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Motion to Shorten"), filed contemporaneously herewith, the Debtor has requested to shorten notice with respect to the approval of these Bidding Procedures such that thirteen (13) days' notice will be provided in advance of the hearing on this Motion. As explained by the Motion to Shorten, this reduced notice period is necessary under the circumstances due to, among other things, the Debtor's limited liquidity and substantial monthly cash burn, the need to kickstart Houlihan's marketing of the Assets now that the exclusive period with Disney has concluded and the need to comply with the Sale Process milestones set forth in the Stalking Horse Transaction Agreement. Notwithstanding this shortened notice, because an expedited hearing on approval of the relief requested by this Motion will ultimately serve to lengthen rather than truncate the Sale Process in this case, the Debtor submits that shortening notice is in the best interests of all

stakeholders in this chapter 11 case by ensuring that the market test for the Assets is as robust as possible in light of the Debtor's liquidity constraints and the requirements of the Stalking Horse Transaction Agreement.

**C. The Form and Manner of Service of the Transaction Notice Should be Approved.**

44. Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with twenty-one days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction (if any) and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

45. As noted above, as soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtor will serve the Transaction Notice upon the Transaction Notice Parties or their respective counsel. In addition, the Debtor will publish the Transaction Notice in accordance with the process described above.

46. The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Transaction Notice, and the Assumption and Assignment Notice as provided for herein, constitute good and adequate notice of the Sale and any proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtor requests that this Court approve the form and manner of the Transaction Notice and the Assumption and Assignment Notice.

**D. Sufficient Business Justification Exists for Consummation of the Sale under Sections 105(a) and 363(b) of the Bankruptcy Code**

47. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) (same).

48. The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

49. The Debtor submits that its decision to consummate the Sale represents a reasonable exercise of the Debtor's business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtor will continue to conduct an extensive and comprehensive process to market the Assets, anchored by the Disney's bid in connection with the Disney Target Assets. The open and fair auction and sale process

contemplated by the Bidding Procedures will ensure that the Debtor's estate receives the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by Disney or any other Additional Stalking Horse Purchaser or, in the event any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then the Winning Bidder(s), and establish that the Debtor and such bidder have proceeded in good faith.

50. Further, as noted above, in the First Day Declaration, Disney agreed to hire a majority of the Debtor's workforce, including its chief executive officer, and to address the Debtor's attrition concerns through EPA and the TSA. One of these newly hired employees was the Debtor's chief executive officer who was an "insider" of the Debtor within the meaning of section 101(31) of the Bankruptcy Code. Despite this fact, this should not change the standard of review because (i) no common identity of directors or controlling equity interest holders existed or exists between Disney, on the one hand, and the Debtor, on the other hand, (ii) the Initial Transaction Committee and the Restructuring Committee, as applicable, are comprised solely of independents and have led and recommended that the Board approve the proposed transaction with Disney, (iii) Disney did not and does not control the Debtor in any respect and (iv) none of the Debtor's former insiders has had meaningful input in substantial matters related to this chapter 11 case or the Debtor's sale process, including the proposed transaction with Disney. At all times in advance of the chapter 11 case, the Initial Transaction Committee and the Restructuring Committee, as applicable, have rigorously performed their obligations and maintained their independence. Therefore, despite Disney's hiring of the Debtor's chief executive, the business judgement standard of review should not change. Further, Disney's bid for the Disney Target

Assets will be subject to a higher or better offer in connection with Houlihan's postpetition marketing process.

51. Additionally, the Debtor believes that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rule 2002(a) and (c) require the Debtor to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. The Debtor believes that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse Transaction Agreement, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

52. The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtor's estate, and represents the best path forward for maximizing recoveries in connection with this chapter 11 case. The Debtor submits that ample business justification exists for the consummation of the Sale, and therefore requests that this Court approve such Sale.

**E. The Sale of the Assets Free and Clear of All Encumbrances Other Than the Assumed Liabilities Is Authorized Under Section 363(f) of the Bankruptcy Code**

53. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

54. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

55. The Debtor submits that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Encumbrances other than Assumed Liabilities (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.

56. Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtor anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders, if any, will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection

(provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

57. Furthermore, section 363(f)(4) of the Bankruptcy Code authorizes a sale of the Assets free and clear of any interests, claims, liens, and security interests. Section 363(f)(4) of the Bankruptcy Code provides that a debtor may sell property free and clear of an interest with respect to such property if "such interest is in bona fide dispute." 11 U.S.C. § 363(f)(4). Although not defined in the Bankruptcy Code, courts have defined a "bona fide dispute" as existing "when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest." *In re NJ Affordable Homes Corp.*, 2006 Bankr. LEXIS 4498, Case No. 05-60442 (DHS), at *38, *41 (Bankr. D.N.J. Jun. 29, 2006). However, the court is not required to resolve the bona fide dispute; it only must determine that a valid dispute exists. *Id.* at *42.

58. Finally, the Debtor proposes that any Encumbrances asserted against the Assets be transferred to, and attach to, the proceeds of the Sale. Accordingly, the Assets may be sold free and clear in accordance with section 363(f) of the Bankruptcy Code.

**F. The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

59. Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c)

of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale free and clear of Encumbrances, other than Assumed Liabilities, the Debtor requests that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, Disney, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Winning Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**G. The Bid Protections Have a Sound Business Purpose and Should be Approved.**

60. The Debtor has agreed to provide standard bid protections to any Additional Stalking Horse Purchaser, including Disney. The Debtor submits that the proposed Bid Protections for Disney and any other Additional Stalking Horse Purchaser designated by the Debtor are appropriate in the circumstances of this chapter 11 case and consistent with market practice and should be approved as administrative obligations of the Debtor's estate.

61. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders typically require break-up fees

and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations omitted).

62. Thus, the use of bid protections has become an established practice in chapter 11 cases, and break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of sale processes conducted under section 363 of the Bankruptcy Code. *See In re Integrated Res., Inc.*, 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). Courts generally recognize that bid protections may be necessary to convince a bidder to make a public bid and set a floor, in that they provide compensation for the risks that the bidder is undertaking. *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

63. Here, the Debtor submits that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts and in the best interests of the Debtor's estate. The Bidding Procedures demonstrate a sound exercise of the Debtor's business judgment, as such procedures are designed to maximize the value to be received by the Debtor's estate for the Assets and will provide the Debtor with an adequate opportunity to consider competing bids and select the highest or otherwise best offer for the Assets.

64. Moreover, an orderly and expeditious sale process is critical to maximize recoveries for the Debtor's stakeholders. In formulating the Bidding Procedures, the Debtor balanced the need

to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to run a sale process given the Debtor's limited liquidity runway quickly and efficiently. The Bidding Procedures provide for the marketing of the Debtor's business and the consummation of one or more Sale Transactions while the Debtor still has available liquidity, which is quickly declining.

**H. The Bid Protections and the Additional Stalking Horse Purchasers**

65. Under the Stalking Horse Transaction Agreement, Disney is entitled to the Bid Protections which include a break-up fee and expense reimbursement collectively capped at 3.5% of the Stalking Horse Purchase Price (or, $700,000) (together, the "Break-Up Fee"). Moreover, the Debtor requests authority to grant, among others, Bid Protections, including a Break-Up Fee to any other Additional Stalking Horse Purchaser designated with respect to the Assets.

66. In both instances, the Debtor submits that the Bid Protections are: (i) actual and necessary costs and expenses of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and thus are allowed administrative expense priority; (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by having Disney and any other Additional Stalking Horse Purchaser; (iii) reasonable and appropriate, in light of comparable transactions, to the commitments to be made and the efforts to be expended by Disney and any other Additional Stalking Horse Purchaser; and (iv) necessary to induce Disney and any other Additional Stalking Horse Purchaser to continue to pursue a sale transaction.

67. Indeed, following the Debtor's prepetition marketing process, Disney emerged with the highest and best proposal for the Disney Target Assets and insisted that it receive the Bid Protections set forth in the Stalking Horse Transaction Agreement, if it was going to provide a floor for any in-court sale of the Disney Target Assets. Without the promise of the Bid Protections,

Disney's participation in the due diligence, bidding, and negotiation processes would likely have been significantly curtailed and could have left the Debtor without the benefit of a stalking horse bid at all.

68. Thus, with respect to Disney, the Bid Protections enabled the Debtor to secure an adequate floor for the Disney Target Assets, thereby ensuring that competing bids will be materially higher or otherwise better than the consideration provided for by the Stalking Horse Transaction Agreement—a clear benefit to the Debtor's estate. With respect to any other Additional Stalking Horse Purchaser designated by the Debtor, the Bid Protections are expected to function similarly inducing participation of Potential Bidders and providing a floor for competitive bidding with respect to additional Assets. In addition, payment of the Bid Protections will not diminish the Debtor's estate to the extent the Bid Protections become payable as a result of the Debtor's consummation of a competing bid, as the Bidding Procedures require that any initial Qualifying Bid exceed the bid of Disney or any other Additional Stalking Horse Purchaser by an amount in excess of the Bid Protections.

69. Accordingly, the Debtor believes that the Bid Protections are fair and appropriate under the circumstances and should be approved.

## I. The Assumption of the TSA and the Assumption and Assignment of the Purchased Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code

70. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures*

*Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

71. The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

72. The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test

"requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

73. Here, the Debtor has exercised its sound business judgment in determining that assumption and assignment of the Selected Assigned Contracts is in the best interests of the Debtor and its estate, and accordingly the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

74. As set forth above, the Sale will provide significant benefits to the Debtor's estate. To that end, the assumption, assignment and sale of the Selected Assigned Contracts is necessary for the Debtor to obtain the benefits of the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as applicable. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the

Winning Bidder of any Selected Assigned Contract, the Debtor will be relieved from any liability for any subsequent breach associated therewith.

75. Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Selected Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtor proposes to file with the Court, and serve on each Counterparty to a Selected Assigned Contract, an Assumption and Assignment Notice that states the proposed Cure Amount for each such contract. As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Winning Bidder and to the proposed Cure Amount, if applicable. Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtor's assumption and assignment of any Selected Assigned Contract.

76. Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

77. Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

78. Here, the Winning Bidder will have provided adequate assurance of future performance with respect to any Selected Assigned Contract. For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance. To the extent that the Qualifying Bidder (other than Disney or any other Additional Stalking Horse Purchaser designated by the Debtor) is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor. Furthermore, given that the Debtor will submit evidence that all requirements for the assumption and assignment of such contracts at the

Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Winning Bidder to provide adequate assurance of future performance.

79. Similarly, the Debtor has exercised its sound business judgment in determining that the TSA should be assumed. In connection with the Sale, the Debtor also seeks authority to assume, and to perform under, the TSA, including the EPA, pursuant to sections 363 and 365 of the Bankruptcy Code. The assumption of the TSA reflects a sound exercise of the Debtor's business judgment for at least three reasons: (i) the Debtor has an ongoing need for critical transition support services from Disney for a limited period following Disney's or its affiliates' employment of certain of the Debtor's former employees; (ii) assumption recognizes and gives effect to the terms of the EPA, which are material terms critical to the overall transaction, including its payment structure, the hiring of certain employees, the granting of releases, and certain confidentiality concerns; and (iii) assumption is necessary to provide for consummation of the transaction in full. The TSA was an integral component of the transaction, as it allowed the Debtor to minimize employee attrition risk during a time of substantial uncertainty into the Debtor's going-concern prospects. Therefore, the TSA has allowed, and will continue to facilitate the preservation of the Debtor's Assets in connection with the Sale Process.

80. The Debtor is not in default of any of its obligations under the TSA and, accordingly, cure amounts owed, if any, to Disney under section 365(b) of the Bankruptcy Code in connection with its assumption should be minimal since the TSA is on below-market terms. In addition, the Debtor needs the TSA services to complete its sale process and wind down. Accordingly, the Debtor respectfully requests that the Court authorize the Debtor to assume the TSA as of the Closing and find that such assumption is made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

81. Therefore, the Debtor respectfully requests the Court to (a) approve the proposed assumption and assignment of the Selected Assigned Contracts, and (b) find that all anti-assignment provisions of such contracts are unenforceable under section 365(f) of the Bankruptcy Code.[8]

**WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)**

82. Pursuant to Bankruptcy Rule 6004(h), "[u]nless the Court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered" Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). As set forth throughout this Motion, any delay in the Debtor's ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtor, its creditors and estate.

83. For this reason and those set forth above, the Debtor submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

**NOTICE**

84. Notice of this Motion will be provided to: (a) the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, Attn:

[8] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Linda Casey (email: linda.casey@usdoj.gov); (b) counsel to Disney; (c) all parties known by the Debtor to assert a lien or encumbrance on any of the Assets; (d) all persons known or reasonably believed to have asserted an interest in or a claim to any of the Assets; (e) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (f) the Office of the United States Attorney for the District of Delaware; (g) the Office of the Attorney General in each state in which the Debtor has operated; (h) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (i) the Federal Trade Commission; (j) the Environmental Protection Agency; (k) the United States Attorney General/Antitrust Division of the Department of Justice; (l) the Debtor's largest unsecured creditors (excluding insiders); and (m) all other parties that have filed a notice of appearance and demand for service of papers in the chapter 11 case as of the date hereof. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtor requests entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 13, 2026
Wilmington, Delaware

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Shane M. Reil (No. 6195)
Heather P. Lambert (No. 6923)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
sreil@wsgr.com
hlambert@wsgr.com

*Proposed Counsel to the Debtor and Debtor in Possession*