# EXHIBIT A

**Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS)<br><br>**Ref. Docket No. ___** |

**ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE DESIGNATION OF DISNEY WORLDWIDE SERVICES, INC. AS STALKING HORSE PURCHASER WITH RESPECT TO THE DISNEY TARGET ASSETS, (E) AUTHORIZING THE DEBTOR TO DESIGNATE ADDITIONAL STALKING HORSE PURCHASERS FOR THE ASSETS; AND (F) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession (the "Debtor") for, *inter alia*, the entry of an order (a) authorizing and approving the bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit 1** for the sale, license or other disposition (the "Sale") of all or substantially all of the Debtor's assets (the "Assets"), or any subset thereof; (b) authorizing and approving certain bid protections (the "Bid Protections"), including a break-up fee and expense reimbursement of $700,000 (together, the "Break-Up Fee") for Disney Worldwide Services, Inc. ("Disney"), the stalking horse purchaser with respect to the Assets (the "Disney Target Assets") included in that certain Stalking Horse Transaction Agreement dated as of October __, 2026 attached to the Motion as Exhibit B (the "Stalking Horse Transaction Agreement"); (c) authorizing the Debtor to designate additional

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Motion.

stalking horse purchasers (each, an "Additional Stalking Horse Purchaser" and together with Disney, the "Stalking Horse Purchasers") and additional stalking horse agreements (each, an "Additional Stalking Horse Agreement"), with respect to all or any subset of the Assets, and to offer the Bid Protections to any Additional Stalking Horse Purchaser; (d) scheduling a hearing (the "Sale Hearing") for approval of the Sale and approval of other deadlines related to the same; (e) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") in connection therewith; (f) authorizing and approving certain assumption and assignment procedures for the Assigned Contracts provided for herein (collectively, the "Assumption and Assignment Procedures"); and (g) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as set forth herein; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion; and a hearing on the Motion having been held; and the Court having found and determined that the relief set forth herein is in the best interests of the Debtor, its estate and creditors and all parties in interest, and that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[3]

A. This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference.

B. Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C. The statutory and legal predicates for the relief requested in the Motion and provided for herein are sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D. The Debtor has demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required, except as otherwise provided for herein. A reasonable opportunity to object or to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

E. The Transaction Notice (as defined below), substantially in the form attached hereto as **Exhibit 2**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the auction for the Assets (the "Auction"), the Sale, and the Sale Hearing, and any and all objection deadlines related thereto, and no other or further notice of the foregoing is required.

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F. The Bidding Procedures are: (a) fair, reasonable, and appropriate; (b) negotiated in good faith and at arm's length; and (c) designed to promote a competitive bidding process, so as to maximize recovery with respect to the Sale.

G. The Debtor has demonstrated a compelling and sound business justification for the Court to approve the Bid Protections, including payment of the Break-Up Fee, if necessary, to Disney in accordance with the Stalking Horse Transaction Agreement and, as applicable, to any Additional Stalking Horse Purchaser in accordance with the terms of the applicable Additional Stalking Horse Agreement. The Bid Protections approved herein are fair, reasonable, and provide a benefit to the Debtor's estate and stakeholders. If triggered in accordance with the terms of the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement designated by the Debtor, payment of the Break-Up Fee, under this Order and upon the conditions set forth in the Stalking Horse Transaction Agreement, or any other Additional Stalking Horse Agreement designated by the Debtor, and the Bidding Procedures are (a) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (b) reasonably tailored to encourage, rather than hamper, bidding for the applicable Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of potential bidders in the Sale process, thereby increasing the likelihood that the Debtor will receive the best possible price and terms for the Assets, (c) of substantial benefit to the Debtor's estate and stakeholders, (d) reasonable and appropriate, (e) a material inducement for, and conditions necessary to, ensure that Disney and any Additional Stalking Horse Purchaser designated by the Debtor will continue pursuit of the proposed agreement to purchase the Assets in accordance with the applicable Stalking Horse Agreement, and (f) reasonable in relation to the lost opportunities resulting from the time and

money spent pursuing such transaction of Disney or any Additional Stalking Horse Purchaser designated by the Debtor.

H. The Assumption and Assignment Procedures provided for herein and the Assumption Notice (as defined below), in substantially the form attached hereto as **Exhibit 3**, are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures and the Assumption and Assignment Notice have been tailored to provide an adequate opportunity for all Counterparties (as defined below) to assert any Contract Objections (as defined below).

I. Entry of this Order is in the best interests of the Debtor, its estate, its creditors, and all other interested parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The portions of the Motion seeking approval of (a) the Debtor's entry into the Stalking Horse Transaction Agreement (subject to higher or otherwise better offers in accordance with this Order) and all of its terms, including the Bid Protections, (b) the Debtor's ability to designate Additional Stalking Horse Purchasers and provide Bid Protections to such Additional Stalking Horse Purchasers, (c) the Assumption and Assignment Procedures, (d) the Bidding Procedures, (e) the date and time of the Sale Hearing, and (f) the noticing and objection procedures related to each of the foregoing, including, without limitation, the notice of the Sale and the entry of this Order, substantially in the form attached hereto as **Exhibit 2** (the "Transaction Notice"), and the notice of the Debtor's potential assumption and assignment of the Assigned Contracts, substantially in the form attached hereto as **Exhibit 3** (the "Assumption and Assignment Notice") (subclauses (a) – (f) above, collectively, the "Bidding and Auction Process") are hereby GRANTED to the extent set forth herein.

2. Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3. The Debtor is authorized to (a) designate Disney as the Stalking Horse Purchaser with respect to the Stalking Horse Transaction Agreement, and (b) grant the Bid Protections to Disney and such designation and grant are hereby approved.

4. The Debtor is further authorized to (a) designate Additional Stalking Horse Purchasers with respect to all or any subset of the Assets, other than the Assets proposed to be acquired by Disney, (b) to enter into a form of Additional Stalking Horse Agreement with such Additional Stalking Horse Purchaser(s), subject to final Court approval at the Sale Hearing, and (c) to grant the Bid Protections to such Additional Stalking Horse Purchasers.

5. The Bidding Procedures are hereby approved. The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order. The Debtor is hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

6. For all purposes under the Bidding Procedures: (a) Disney shall be considered a Qualifying Bidder and the Stalking Horse Transaction Agreement shall be considered a Qualifying Bid; (b) Disney is, and will be deemed to be a Qualifying Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by Disney; and (c) in determining whether the Potential Bidders

constitute Qualifying Bidders, the Debtor may consider a combination of bids for the Assets, including the Disney Target Assets.

7. The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

8. The Bid Protections set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement are approved, including, with respect to the Stalking Horse Transaction Agreement, the Break-Up Fee comprised of a break-up fee and expense reimbursement equal to $700,000, or 3.5% of the cash purchase price.

9. Further, if Disney is not selected as the Winning Bidder, consistent with the Stalking Horse Transaction Agreement, Disney will provide to one such Winning Bidder transition services reasonably comparable to those included in that certain form of transition services agreement, which is attached hereto as **Exhibit 4**, for a reasonable period of time no greater than the lesser of (a) 60 days following the closing of the Sale and (b) 75 days after conclusion of the Auction; provided, that, if there are multiple Winning Bidders, Disney shall only be required to provide such transition services to one Winning Bidder.

10. No entity other than Disney or any Additional Stalking Horse Purchaser designated by the Debtor in accordance with the Bidding Procedures shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

11. The obligations of the Debtor to pay the Break-Up Fee: (a) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code, *provided* that the Break-Up Fee shall be payable directly out of proceeds, and as a precondition to, an Alternative Transaction (as defined in the Bidding Procedures); (b) shall survive the termination

of the applicable Stalking Horse Agreement; and (c) shall be payable in accordance with the terms set forth in the applicable Stalking Horse Agreement. Disney is not required to seek relief from the automatic stay to enforce any remedies available to Disney related to the Break-Up Fee under the Stalking Horse Transaction Agreement.

12. The following "Assumption and Assignment Procedures" are hereby approved:

a. On or before November 4, 2026 (the "Assumption and Assignment Notice Deadline"), the Debtor shall file with the Court and serve on any non-Debtor counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assigned Contract, an Assumption and Assignment Notice.

b. Any Assumption and Assignment Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtor believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assigned Contracts. If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assigned Contract, (ii) the Cure Amount for its Assigned Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "Contract Objection") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c. Any Contract Objection shall: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **4:00 p.m. (ET) on November 18, 2026 (the "Contract Objection Deadline")**, and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required under the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. Any objections to adequate assurance of future performance by Disney shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Winning Bidder other than Disney or any Additional Stalking Horse Purchaser designated by the Debtor shall be filed in accordance with subparagraph (g) below.

d. The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801 (Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com); (ii) proposed investment banker to the Debtor, Houlihan

Lokey (Attn: Daniel Cullins (email: dcullins@hl.com)); (iii) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com) Bryan Uelk (bryan.uelk@skadden.com), and Samuel J. Cammer (samuel.cammer@skadden.com)); (iv) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; and (v) counsel to the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda J. Casey (linda.casey@usdoj.gov)).

e. As soon as practicable after the completion of the Auction, the Debtor shall file with the Court a notice identifying the bidder(s) selected as the winning bidder(s) with respect to all or any subset of the Assets (each, a "Winning Bidder" and, if more than one, the "Winning Bidders") (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) with respect to all or any of the Assets and the amount of each of the Winning Bid and the Back-Up Bid (if any) with respect to all or any of the Assets; and (ii) the Selected Assigned Contracts, *provided, however,* that if Disney is serving as the Back-Up Bidder, the protections that apply to Disney's Back-Up Bid as set forth in this Section 14 of the Bidding Procedures shall apply.

f. As soon as reasonably practicable after completion of the Auction, the Debtor will cause to be served by electronic mail, and if unavailable, overnight mail, upon each affected Counterparty and its counsel (if known) the Notice of Winning Bidder.

g. At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to Disney, any Additional Stalking Horse Purchaser, or in the event that a Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), of only those Assigned Contracts that have been selected by Disney or any Additional Stalking Horse Purchaser, or, in the event that any Stalking Horse Purchaser is not designated as a Winning Bidder, then the Winning Bidder, to be assumed and assigned (each, a "Selected Assigned Contract," and collectively, the "Selected Assigned Contracts"). The Debtor and its estate reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

h. If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the applicable Winning Bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with respect to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall

be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtor and its estate or the applicable Winning Bidder for such Selected Assigned Contract, or the property of any of them that existed prior to the entry of the Sale Order.

i. To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtor, in consultation with the Winning Bidder, or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtor and assigned to the Winning Bidder for such Selected Assigned Contract, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtor or the Winning Bidder for such Selected Assigned Contract, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

j. Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtor are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtor shall file with the Court and serve, by regular mail, on the Counterparties an Assumption and Assignment Notice, and such Counterparties shall be required to file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assigned Contracts to the applicable Winning Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

13. The Debtor's decision to assume and assign any Assigned Contracts is subject to this Court's approval and the closing of the applicable Sale(s). Accordingly, absent this Court's approval and the closing of the Sale(s), the Assigned Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtor and its estate under the Bankruptcy Code in connection with the chapter 11 case.

14. The Assumption and Assignment Procedures are appropriate and fair to all Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules. The Assumption and Assignment Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all Counterparties and any other affected parties of the Debtor's intent to assume and assign to the Winning Bidder, some or all of the Assigned Contracts, and (ii) afford the Counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

15. The inclusion of a contract, lease or other agreement on an Assumption Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtor and its estate with respect thereto shall be reserved.

16. The Transaction Notice, the Assumption and Assignment Notice, the Bidding Procedures, the Auction, the Sale Hearing, the Assumption and Assignment Procedures and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the assumption and assignment to the Winning Bidder or Winning Bidders of the Assigned Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby approved.

17. The Transaction Notice is approved. Within two (2) business days after entry of this Order, the Debtor shall serve the Transaction Notice by regular mail on: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Disney; (c) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; (d) all parties known by the

Debtor to assert a lien or encumbrance on any of the Assets; (e) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (f) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (g) the Office of the United States Attorney for the District of Delaware; (h) the Office of the Attorney General in each state in which the Debtor has operated; (i) the Office of the Secretary of State in each state in which the Debtor has operated; (j) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (k) the Federal Trade Commission; (l) the United States Attorney General/Antitrust Division of Department of Justice; (m) all non-Debtor parties to any of the Assigned Contracts; (n) all of the Debtor's other known creditors and equity security holders; and (o) all other parties that have filed a notice of appearance and demand for service of papers in this chapter 11 case as of the service date (collectively, the "Transaction Notice Parties").

18. The Debtor shall post the Transaction Notice, the Assumption and Assignment Notice, and this Order, on the website of the Debtor's claims and noticing agent, Stretto, Inc. ("Stretto") at https://cases.stretto.com/chartech. With respect to parties whose identities or addresses are not reasonably ascertained by the Debtor, publication of the Transaction Notice in *USA Today* within seven (7) business days of the entry of this Order, or as soon as reasonably practicable thereafter, and shall also post the Transaction Notice on the Debtor's blog and online community webpages (which are the online locations through which the Debtor regularly communicates with the public). Publication of the Transaction Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008, and is reasonably calculated to provide notice to any affected party, including any Potential Bidders; and afford the affected

party the opportunity to exercise any rights affected by the Motion and the relief granted by the Order.

19. Any objections to the Sale or to the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on November 13, 2026** **(the "Sale Objection Deadline"**), and proof of service of such Sale Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties. If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale and being heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

20. Failure to file a Sale Objection on or before the Sale Objection Deadline (a) shall forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to the entry of the Sale Order, and/or to the consummation and performance of the Sale contemplated by the Stalking Horse Transaction Agreement, any other Additional Stalking Horse Agreement, or any Alternative Agreement with a Winning Bidder other than any Stalking Horse Purchaser, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to the entry of the Sale Order and consummation of the Sale and all transactions related thereto.

21. As part of its bid, each Qualifying Bidder must provide to the Debtor and the other Bidding Procedures Notice Parties information supporting the Qualifying Bidder's ability to

comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to such Qualifying Bidder, which information may include (i) financial statements and (ii) annual reports; and (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance. To the extent that a Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial or other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.

22. The Deposit of each Qualifying Bidder (including the Deposit Disney has already paid in accordance with that certain Exclusivity and Prepayment Agreement, dated September 18, 2026, between and among the Debtor and Disney, and any Deposit provided by any Additional Stalking Horse Purchaser) shall be held in a separate and designated account by the Debtor or its agent, and shall not become part of the Debtor's bankruptcy estate unless and until released from escrow to the Debtors pursuant to the applicable Stalking Horse Agreement or by order of this Court.

23. Any party in receipt of Adequate Assurance Information under this Order shall review the Adequate Assurance Information received on a confidential basis and shall not disclose the Adequate Assurance Information except as previously provided in this Order and the Bidding Procedures. Such counterparty may not use or disclose, except to representatives, attorneys, advisors, and financing sources (collectively, "Representatives"), any confidential Adequate

Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under section 365(f)(2)(B) and, if applicable, 365(b)(3) of the Bankruptcy Code has been provided; and (b) in support of any objection (the "Assignment Objection") (subject to the limitations on disclosure set forth herein) by such Counterparty relating to adequate assurance of future performance. Any Assignment Objection that includes confidential, non-public Adequate Assurance Information must be filed under seal unless disclosure of such confidential, non-public information is authorized by the Debtor and the applicable assignee. The party filing an Assignment Objection under seal shall follow the procedures for the same set forth in Local Rule 9018-1(d). The unredacted versions of such Assignment Objections shall be served upon the Debtor, the other Bidding Procedures Notice Parties, and the U.S. Trustee, with a copy to the Court's chambers; provided, further, that all rights of all parties in interest in the chapter 11 case are reserved to oppose the filing under seal of any such information and to seek any other relief from this Court with respect to such matter. Any Representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

24. If no timely Qualifying Bids other than the Stalking Horse Transaction Agreement for the Disney Target Assets or any other Additional Stalking Horse Agreement for all or substantially all of the Assets or any subset thereof, are submitted on or before the Bid Deadline, the Debtor shall not hold the Auction and shall request at the Sale Hearing that this Court approve the applicable Stalking Horse Agreement and the transactions contemplated thereunder. If the Debtor timely receives one or more Qualifying Bids for competing sets of the Assets, including, without limitation, the Disney Target Assets, then the Debtor shall conduct the Auction on November 23, 2026 at 10:00 a.m. (ET) at a location to be determined by the Debtor or virtually by

videoconference pursuant to information to be timely provided to the Auction Participants (as defined below). Only the Debtor, the Consultation Parties, the Auction Bidders, and any creditors or parties in interest who submit a request to attend the Auction in accordance with the Bidding Procedures (collectively, the "Auction Participants").

25. Following service of a notice of Auction results, parties may raise objections solely with respect to the conduct of the Auction, the Winning Bidder (only if not a Stalking Horse Purchaser), modifications to any Stalking Horse Agreement, and adequate assurance of future performance by a Winning Bidder other than any Stalking Horse Purchaser (each such objection, a "Supplemental Sale Objection") at the Sale Hearing.

26. The Debtor shall have until November 23, 2026 at Noon (ET) to file and serve a reply to any objection filed in connection with the Sale, including any Sale Objection or Contract Objection.

27. The Sale Hearing shall be held before this Court on November 24, 2026 at [●] (ET), unless otherwise determined by the Court.

28. The Sale Hearing and any other dates related thereto, including any dates set forth in the Bidding Procedures, may be adjourned by the Debtor in consultation with the Consultation Parties and the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 case.

29. In the event there is a conflict between this Order or the Bidding Procedures, on the one hand, and the Motion, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, an Alternative Agreement, or any notice served in connection with the Motion

or this Order on the other hand, this Order and the Bidding Procedures shall control and govern. If there is a conflict between this Order and the Bidding Procedures, this Order shall control and govern.

30. Prior to mailing the Assumption and Assignment Notice and the Transaction Notice, as applicable, the Debtor, in consultation with Disney and any Additional Stalking Horse Purchaser designated by the Debtor, may fill in, or cause to be filled in, any missing dates or other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make other non-material changes as the Debtor deems necessary or appropriate.

31. Nothing in this Order or the Bidding Procedures will require any director or officer of the Debtor to take any action, or to refrain from taking any action, to the extent such director or officer reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, would result in a violation of applicable law or be inconsistent with his or her fiduciary obligations.

32. This Order shall be immediately effective upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules is expressly waived. The Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order and may, in its sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

33. The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

34. Attached hereto as **Schedule A** is a summary of the key dates established by this Order.

35. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

**SCHEDULE A**

| **Date** | **Deadline/Event** |
|---|---|
| November 4, 2026 | Deadline for Debtor to file Assumption and Assignment Notice |
| November 9, 2026 | Deadline to designate Additional Stalking Horse Purchasers |
| November 13, 2026 at 4:00 p.m. (ET) | Sale Objection Deadline |
| November 18, 2026 at 4:00 p.m. (ET) | Contract Objection Deadline[1] |
| November 20, 2026 at 5:00 p.m. (ET) | Bid Deadline |
| November 21, 2026 | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |
| November 23, 2026 | Auction |
| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
| November 23, 2026 at Noon (ET) | Debtor's Deadline to Reply to Sale Objections |
| November 24, 2026, subject to Court availability | Sale Hearing |

[1] The Sale Objection Deadline and Contract Objection Deadlines apply to all objections to the Sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by any Stalking Horse Purchaser), with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* any Stalking Horse Purchaser, which shall be due at or prior to the Sale Hearing.

# EXHIBIT 1

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS) |

## BIDDING PROCEDURES

On October 12, 2026, the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). The Debtor is maintaining its business and managing its property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On [●], 2026, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Bidding Procedures Order"), among other things, granting certain relief requested in the related motion [Docket No. [●]] (the "Bidding Procedures Motion"), including authorizing the Debtor to solicit bids and approving the procedures set forth herein (collectively, the "Bidding Procedures") to be employed by the Debtor in connection with the proposed sale, license or other disposition (the "Sale") of all or substantially all of the Debtor's assets (the "Assets") free and clear of all Encumbrances other than Assumed Liabilities,[2] including the Sale of certain of the Assets (the "Disney Target Assets") to Disney Worldwide Services, Inc. ( "Disney"), pursuant to the Stalking Horse Transaction Agreement dated as of October __, 2026 (the "Stalking Horse Transaction Agreement") between Disney and the Debtor, or any additional stalking horse agreement (each, an "Additional Stalking Horse Agreement") between the Debtor and any additional Stalking Horse Purchaser (an "Additional Stalking Horse Purchaser") designated by the Debtor or, in the event that any Stalking Horse Purchaser is not designated as a Winning Bidder, then an Alternative Agreement (as defined below) with the Winning Bidder(s). The Stalking Horse Transaction Agreement is attached to the Bidding Procedures Motion as Exhibit B.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

(A) **THE INVESTMENT BANKER FOR THE DEBTOR, HOULIHAN LOKEY, ATTN: DANIEL CULLINS (214-220-8473) (EMAIL: DCULLINS@HL.COM).; AND**

(B) **PROPOSED COUNSEL TO THE DEBTOR, WILSON SONSINI GOODRICH & ROSATI, P.C., ATTN: ERIN R. FAY (EFAY@WSGR.COM) AND SHANE M. REIL (SREIL@WSGR.COM).**

***Summary of Key Dates Established by Bidding Procedures***

| **Date** | **Deadline/Event** |
|---|---|
| November 4, 2026 | Deadline for Debtor to file Assumption Notice |
| November 9, 2026 | Deadline to designate Additional Stalking Horse Purchasers |
| November 13, 2026 at 4:00 p.m. (ET) | Sale Objection Deadline |
| November 18, 2026 at 4:00 p.m. (ET) | Contract Objection Deadline[3] |
| November 20, 2026 at 5:00 p.m. (ET) | Bid Deadline |
| November 21, 2026 | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |
| November 23, 2026 | Auction |
| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
| November 23, 2026 at Noon (ET) | Debtor's Deadline to Reply to Sale Objections |
| November 24, 2026, subject to Court availability For | Sale Hearing |

1. **The Stalking Horse Transaction Agreement**

On October __, 2026, the Debtor entered into the Stalking Horse Transaction Agreement with Disney. As set forth more fully in the Stalking Horse Transaction Agreement, the price to be paid by Disney consists of $20 million in cash (the "Stalking Horse Purchase Price"). Disney is deemed to be a Qualifying Bidder (as defined below), and the Stalking Horse Transaction Agreement is deemed to be a Qualifying Bid (as defined below).

[3] The Sale Objection Deadline and Contract Objection Deadlines apply to all objections to the Sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by any Stalking Horse Purchaser) with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* any Stalking Horse Purchaser, which shall be due at or prior to the Sale Hearing.

**2. Authorization to Designate Additional Stalking Horse Purchasers**

These Bidding Procedures authorize but do not require the Debtor to designate Additional Stalking Horse Purchasers with respect to all or any subset of the Assets, other than the Assets proposed to be acquired by Disney, any Additional Stalking Horse Agreement entered into with such Additional Stalking Horse Purchaser shall be deemed to be a Qualifying Bid (as defined below) and such Additional Stalking Horse Purchaser shall be deemed to be a Qualifying Bidder (as defined below) for all purposes under these Bidding Procedures.

**3. Assets for Sale**

The Debtor shall offer for Sale all or substantially all of the Assets or any subset thereof, including the Disney Target Assets, *provided* that the Debtor determines that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures. Potential Bidders may bid on all or any number or combination of the Assets.

**4. Participation Requirements**

Any interested party that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder." To become a Qualifying Bidder, and thus be able to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the assets (the "Data Room"), a Potential Bidder must submit to the Debtor and its advisors:

(a) documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated bidding and transaction process;

(b) an executed confidentiality agreement in form and substance satisfactory to the Debtor; and

(c) sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has the financial wherewithal to consummate a Sale, and (ii) intends to access the Data Room for a *bona fide* purpose consistent with these Bidding Procedures;

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

**5. Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents

of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

**6. Form of Agreement for Sale of the Assets; Including the Transferred Property**

Potential Bidders should reference the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement. As set forth below, Potential Bidders intending to submit bids that include the Disney Target Assets, or any combination of Assets must include with their bids:

(a) a statement that such Potential Bidder offers to (i) purchase or license the Disney Target Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtor and its estate than, as applicable, the terms set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement designated by the Debtor with respect to the Assets included in the bid; and

(b) a clean and duly executed transaction agreement (an "Alternative Agreement") and a marked copy of such agreement showing variations from the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement.

**7. Due Diligence**

The Debtor will provide any Qualifying Bidder (including, for the avoidance of doubt), Disney with reasonable access to the Data Room and any other additional information that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtor, Houlihan Lokey, Attn: Daniel Cullins (214-220-8473); (dcullins@hl.com) and (b) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., Attn: Heather Lambert (hlambert@wsgr.com).

The due diligence period shall extend through and including the Bid Deadline. The Debtor, in its business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtor reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtor and its estate shall be authorized to provide due diligence information to Qualifying Bidders *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtor.

**8. Bid Requirements**

Other than in the case of Disney and the Stalking Horse Transaction Agreement or any Additional Stalking Horse Purchaser and its Additional Stalking Horse Agreement, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under these Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

a. be in writing;

b. fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

c. set forth the purchase price to be paid by such Qualifying Bidder;

d. not propose payment in any form other than cash;

e. state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f. specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase or license the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtor and its estate than, the terms set forth in, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

g. be accompanied by an alternative asset purchase agreement (an "Alternative Agreement") that reflects any variations from, as applicable, the Stalking Horse Transaction Agreement or any other Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

h. state that such Qualifying Bidder's offer is formal, binding, and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;

i. to the extent that a Bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the sale, license or

other disposition set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtor, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtor;

j. contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtor to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtor's receipt of such information;

k. (A) identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative Agreement; (B) provide for the payment of cure costs related to such executory contracts and unexpired leases, and (C) demonstrate that the Qualifying Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases;

l. set forth the Qualifying Bidder's intentions with respect to (i) hiring any of the Debtor's current or former employees, and (ii) providing transition services to the Debtor;

m. include a commitment to close the transactions contemplated by the Alternative Agreement by no later than December 17, 2026;

n. not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment unless such Qualifying Bidder is seeking to be designated as an Additional Stalking Horse Purchaser with respect to the Assets in its bid;

o. if the Alternative Agreement contemplates the exclusive license or purchase of the Disney Target Assets, or the purchase of Assets subject to any other Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (1) the value offered by, as applicable, the Stalking Horse Transaction Agreement with respect to the Disney Target Assets or any Additional Stalking Horse Agreement with respect to any Assets included in the bid, plus (2) any applicable Break-Up Fee, plus (3) $1,000,000 (collectively, the "Minimum Overbid Amount");

p. not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

q. contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale. Such written acknowledgment and representation must include the following disclaimer: Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Assets without any surviving representations or warranties, on an "as is" and "where is" basis, except as set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement;

r. set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Sale, and the time within which the Qualified Bidder expects to receive such regulatory and third-party approvals, and the Debtor, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible, when considering the other Bid Requirements. Each Qualified Bidder must further agree that its legal counsel will coordinate in good faith with counsel to the

Debtor to provide pertinent information regarding the Qualified Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Qualified Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable;

s. provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Winning Bid, in accordance with the terms of the Alternative Agreement;

t. include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative Agreement;

u. provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative Agreement (or such additional amount as may be determined by the Debtor in its reasonable discretion); and

v. provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative Agreement, the Debtor and its estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtor in consultation with the Consultation Parties (defined below), shall constitute a Qualifying Bid. The Debtor reserves the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

**9. Bid Deadline**

A Qualifying Bidder, other than Disney or any Additional Stalking Horse Purchaser that may be designated by the Debtor, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties so as to be received on or before **November 20, 2026 at 5:00 p.m. (ET)** (the "Bid Deadline"); *provided* that the Debtor may extend the Bid Deadline in consultation with the Consultation Parties (defined below) without further order of the Court. To the extent that the Bid Deadline is extended for all

parties, the Debtor shall file a notice on the docket of the chapter 11 case indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

**10. Evaluation of Qualifying Bids**

The Debtor shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than **November 21, 2026**, the Debtor shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the Minimum Overbid Amount, the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

**11. No Qualifying Bids**

If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction with respect to the Assets covered by the applicable Stalking Horse Agreement and shall request at the Sale Hearing that the Court approve such Stalking Horse Agreement and the transactions contemplated thereunder.

**12. Auction**

If the Debtor timely receives one or more Qualifying Bids for all or any subset of the Assets, including, without limitation, the Disney Target Assets, then the Debtor shall conduct an auction (the "Auction"). Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes requested by the bidder in the form of Alternative Agreement as compared to any Stalking Horse Agreement designated by the Debtor with respect to the Assets subject to its bid; (c) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtor and its estate of such modifications or delay; (d) the total consideration to be received by the Debtor and its estate; (e) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (f) the net benefit to the Debtor's estate; and (g) any other qualitative or quantitative factors the Debtor may reasonably deem reasonably appropriate under the circumstances.

The Auction shall be governed by the following procedures:

(a) the Auction shall be held on **November 23, 2026 at 10:00 a.m. (ET)** at a location to be determined by the Debtor or virtually via video conference pursuant to

information to be timely provided by the Debtor to the Auction Participants (as defined below);

(b) only Disney, any Additional Stalking Horse Purchaser(s) designated by the Debtor, and the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

(c) the Auction Bidders shall appear at the Auction in-person (or via Zoom, if permitted) in the Debtor's sole discretion, or through a duly authorized representative;

(d) only the Debtor, the Consultation Parties, and the Auction Bidders, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any creditors or parties in interest in the chapter 11 case may request permission in writing to attend the Auction no later than Noon (ET) two (2) days prior to the Auction and the Debtor, in its sole discretion, may reasonably determine to grant or deny such permission;

(e) the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f) prior to start of the Auction, each of the Auction Bidders shall confirm on the record of the proceedings that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale;

(g) bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $500,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(h) in any successive bid by Disney or any Additional Stalking Horse Purchaser designated by the Debtor, the amount of the applicable Break-Up Fee shall be included in the calculation of such bid;

(i) the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(j) all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid;

(k) the Debtor and its professional advisors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, or any applicable order of the Court, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders in advance of their application;

(l) each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(m) the Auction Bidders shall have the right to make additional modifications to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion be less favorable to the Debtor and its estate than the terms of, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(n) the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(o) upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties and subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction for all or substantially all or any subset of the Assets (the "Winning Bids"). In making this decision, the Debtor shall consider the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and

nature of any changes to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement submitted with the Winning Bid, as applicable, requested by each bidder, and the net benefit to the Debtor's estate. The bidder submitting such Winning Bid at the Auction shall become a "Winning Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement, as applicable. The Debtor may, in its business judgment, designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Winning Bidder does not close the Sale;

(p) if the Winning Bidder is not Disney, Disney shall allow one (1) Winning Bidder to interview and make employment offers to any employees of Disney formerly employed by the Debtor who wish to consider opportunities with such Winning Bidder and shall work in good faith with such Winning Bidder to transition employees who accept an offer to the Winning Bidder; *provided* that Disney may designate up to 20% of such employees as outside the scope of such process, and Disney need not make available or allow the Winning Bidder (or any other party) the right to interview or make employment offers to such employees;

(q) if the Winning Bidder is not Disney, Disney shall be entitled to the Break-Up Fee;

(r) as soon as reasonably practicable after completion of the Auction, the Debtor will file with the Court and serve on the Transaction Notice Parties a notice setting forth the results of the Auction (the "Notice of Winning Bidder"), which will (a) identify the Winning Bidder and the Back-Up Bidder, if applicable; (b) include a copy of the Winning Bid and the Back-Up Bid, if applicable, or a summary of the material terms of such bid, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Adequate Assurance Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Transaction Notice Parties of the outcome of the Auction; and

(s) prior to the Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made;

**THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED STALKING HORSE TRANSACTION AGREEMENT, ADDITIONAL STALKING HORSE AGREEMENT, OR ALTERNATIVE AGREEMENT, AS APPLICABLE, SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**13. Sale Hearing**

The Winning Bid and any Back-Up Bid and, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement related to such bids will be subject to approval by the Court. The Sale Hearing to approve the Winning Bid and any Back-Up and the applicable asset purchase agreements of such bids shall take place on **November 24, 2026] at [●] (ET)**.

The Sale Hearing and any additional deadlines established in connection with these Bidding Procedures may be adjourned by the Debtor, in consultation with any Consultation Parties, Disney, and any Additional Stalking Horse Purchaser, or in the event Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then in consultation with the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 case.

At the Sale Hearing, the Debtor will seek entry of an order, substantially in the form of the Sale Order that, among other things: (i) authorizes and approves the Sale to Disney, any Additional Stalking Horse Purchaser or, in the event that Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), pursuant to the terms and conditions set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement or the Alternative Agreement submitted by the Winning Bidder, as applicable.

**14. Back-Up Bidder**

Notwithstanding any of the foregoing, in the event that the Winning Bidder fails to close the Sale on or before the date that is two weeks following entry of the Sale Order (or such date as may be extended by the Debtor), the Back-Up Bid will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtor shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties; *provided, however,* that Disney, if operating as the Back-Up Bidder, shall not be subject to any penalties, and, Disney shall be permitted to terminate the Sale unilaterally if the Sale does not close on or prior to December 17, 2026 and the failure to close is not on account of Disney's material breach; *provided, further,* that any duties and related requirements for Disney to serve as the Back-Up Bidder, or milestones in connection therewith, shall be subject to the terms of the last bid Disney submitted at the Auction.

**15. Return of Deposits**

All Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder no later than five (5) business days following the closing of the Sale, including that certain $2,000,000 fully refundable deposit to be paid to Disney to the extent Disney is not selected as the Winning Bidder. The deposit of the Winning Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such

bidder, then, subject to the terms of any Stalking Horse Transaction Agreement or any Alternative Agreement, as applicable, the Debtor and its estate shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.[4]

**16. Bidding Procedures Notice Parties**

The term "Bidding Procedures Notice Parties" shall mean: (a) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801, Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com); (b) proposed investment banker for the Debtor, Houlihan Lokey, Attn: Daniel Cullins (dcullins@hl.com); (c) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001, Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com), Bryan Uelk (bryan.uelk@skadden.com)_and Samuel J. Cammer (samuel.cammer@skadden.com)); and (d) counsel to any official committee of unsecured creditors that may be appointed in the chapter 11 case.

**17. The Consultation Parties**

The Debtor shall consult with any official committee of unsecured creditors appointed by the Bankruptcy Court and counsel to such committee (the "Consultation Parties") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtor shall not be required to consult with any Consultation Party (and its advisors) that is a Qualified Bidder. For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its reasonable business judgment.

**18. Fiduciary Out**

Nothing in these Bidding Procedures will require any director or officer of the Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such director or officer reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, would result in a violation of applicable law or be inconsistent with his or her fiduciary obligations.

**19. Reservation of Rights**

Except as otherwise provided in the Stalking Horse Transaction Agreement or the Bidding Procedures Order, the Debtor may, and reserves the right to, modify the Bidding Procedures at or prior to the Auction, including, without limitation, to modify, extend, enlarge, revise, or otherwise alter any or all of the deadlines set forth herein or related hereto including, without limitation, with respect to the marketing process, the submission of bids, the designation of Additional Stalking

---

[4] For the avoidance of doubt, the Debtor's retention of a Deposit shall not constitute a waiver of any of the Debtor's legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are reserved.

Horse Purchasers, Qualified Bidders, and Auction Participants, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the closing of any Sale to Winning Bidders or Back-Up Bidders, as applicable, as well as to modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all of the Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing. Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualifying Bidder, other than Disney subject to, and in accordance with the terms of these Bidding Procedures and the Stalking Horse Transaction Agreement.

# EXHIBIT 2

## Transaction Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS)<br><br>**Ref. Docket No. __** |

**NOTICE OF PROPOSED SALE OF ASSETS, STALKING HORSE AGREEMENT, BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that the above-captioned debtor and debtor-in-possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), on October 12, 2026, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtor is seeking to sell, license or dispose of (the "Sale") all or substantially all of its assets (the "Assets") free and clear of all encumbrances. In connection with the Sale, the Debtor has entered into Stalking Horse Transaction Agreement, dated as of October [●], 2026 (the "Stalking Horse Transaction Agreement") for the sale or license of certain assets (the "Disney Target Assets") with Disney Worldwide Services, Inc. ("Disney"), free and clear of all encumbrances, subject to the Debtor's acceptance of higher or otherwise better offers in accordance with the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that by order, dated [●], 2026 [Docket No. [●]] (the "Bidding Procedures Order")[2], the Bankruptcy Court approved certain relief requested in the related motion [Docket No. [●]] (the "Bidding Procedures Motion"), and certain "Bidding Procedures" that govern the Sale. The Bidding Procedures also authorize, but do not require, the Debtor to designate any other Additional Stalking Horse Purchaser pursuant to any Asset Purchase Agreement (an "Additional Stalking Horse Agreement") with respect to such Additional Stalking Horse Purchaser, subject to the Debtor's acceptance of higher or otherwise better offers in accordance with the Bidding Procedures.

Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse Transaction Agreement are available for download at **https://cases.stretto.com/chartech** (the "Case Website") from the Debtor's claims and noticing agent, Stretto, Inc. ("Stretto"). A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtor that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact (i) the proposed investment banker to**

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

**the Debtor, Houlihan Lokey, Attn: Daniel Cullin (dcullins@hl.com); and (ii) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com).**

- The deadline to submit a bid for any Assets is **November 20, 2026 at 5:00 p.m. (ET)**.

- Any objections to the Sale or the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **November 13, 2026 at 4:00 p.m. (ET)** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties. The "Objection Notice Parties" are as follows: (a) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801 (Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com)); (b) proposed investment banker for the Debtor, Houlihan Lokey, (Attn: Daniel Cullins (email: dcullins@hl.com)); (c) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com), Bryan Uelk (bryan.uelk@skadden.com), and Samuel J. Cammer (samuel.cammer@skadden.com)); (d) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; and (e) the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, Attn: Linda Casey (Linda.Casey@usdoj.gov).

- An auction for the Assets, unless cancelled or adjourned in accordance with the Bidding Procedures Order, will be held on **November 23, 2026 at 10:00 a.m. (ET)**, at a location to be determined by the Debtor, or virtually via videoconference pursuant to information to be timely provided by the Debtor to the Auction Participants.

- Unless adjourned in accordance with the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the Sale on **November 24, 2026 at [●] (ET)**, subject to the Bankruptcy Court's availability.

**PLEASE TAKE FURTHER NOTICE THAT FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER OR ANY OTHER APPLICABLE ORDER OF THE COURT ENTERED IN THIS CHAPTER 11 CASE MAY RESULT IN THE REJECTION OF YOUR BID AND YOUR DISQUALIFICATION FROM PARTICIPATING IN THE BIDDING FOR AND AUCTION OF ANY OF THE DEBTOR'S ASSETS.**

**PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE SALE AND BEING HEARD**

**AT THE SALE HEARING, AND THE BANKRUPTCY COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

Dated: October [●], 2026
Wilmington, Delaware

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Draft*
Erin R. Fay (No. 5268)
Shane M. Reil (No. 6195)
Heather P. Lambert (No. 6923)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
sreil@wsgr.com
hlambert@wsgr.com

*Proposed Counsel to the Debtor and Debtor in Possession*

**EXHIBIT 3**

**Assumption Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS)<br><br>**Ref. Docket No. __** |

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTOR**

**PLEASE TAKE NOTICE THAT:**

The above-captioned debtor and debtor-in-possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), on October 12, 2026, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtor is seeking to assume and assign certain of its executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of its assets (the "Assets"), free and clear of all encumbrances.[2] In connection with the Sale, the Debtor has entered into a Stalking Horse Transaction Agreement dated as of October [●], 2026 (the "Stalking Horse Transaction Agreement") with Disney Worldwide Services, Inc. ("Disney") for certain of the Debtor's Assets (the "Disney Target Assets"), subject to the Debtor's acceptance of higher or otherwise better offers in accordance with the Bidding Procedures.

By order, dated [●], 2026 [Docket No. [●]] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. [●]] (the "Bidding Procedures Motion"), certain "Assumption and Assignment Procedures" that govern the Debtor's assumption and assignment of its executory contracts and unexpired leases in connection with the Sale, and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. The Bidding Procedures also authorize, but do not require, the Debtor to designate any other Additional Stalking Horse Purchaser pursuant to any additional stalking horse agreements (each, an "Additional Stalking Horse Agreement" and, together with the Stalking Horse Transaction Agreement, a "Stalking Horse Agreement") with respect to such Additional Stalking Horse Purchaser, subject to the Debtor's acceptance of higher or otherwise better offers in accordance with the Bidding Procedures.

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below).

Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse Transaction Agreement are available for download at https://cases.stretto.com/chartech (the "Case Website") from the Debtor's claims and noticing agent, Stretto, Inc. ("Stretto").

**You are receiving this Notice because you or one of your affiliates may be a party to an unexpired lease or an executory contract that *may* be assumed and assigned (collectively, the "Assigned Contracts") in connection with such Sale. A list of the Assigned Contracts is attached hereto as Exhibit A.**

The Debtor has determined the cure amounts owing (each, a "Cure Amount," and collectively, the "Cure Amounts") under each Assigned Contract and have listed the applicable Cure Amounts on **Exhibit A** attached hereto. The Cure Amounts are the only amounts proposed to be paid upon any assumption and assignment of the Assigned Contracts, in full satisfaction of all amounts outstanding under the Assigned Contracts.

**To the extent that a Counterparty to an Assigned Contract objects to (a) the assumption and assignment of the Counterparty's Assigned Contract, (b) the Cure Amount for its Assigned Contact, or (c) the provision of adequate assurance of future performance, the Counterparty must file and serve an objection (a "Contract Objection"). Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before November 18, 2026 at 4:00 p.m. (ET) (the "Contract Objection Deadline"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.**

****Any objections to adequate assurance of future performance by Disney or any other Additional Stalking Horse Purchaser designated by the Debtor shall also be filed by the Contract Objection Deadline.****

****Any objections to adequate assurance of future performance by a Winning Bidder other than Disney or any other Additional Stalking Horse Purchaser designated by the Debtor shall be due at or prior to the Sale Hearing.****

The "Objection Notice Parties" are as follows: (a) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801 (Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com)); (b) proposed investment banker to the Debtor, Houlihan Lokey (Attn: Daniel Cullins (email: dcullins@hl.com)); (c) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com) Bryan Uelk

(bryan.uelk@skadden.com), and Samuel J. Cammer (samuel.cammer@skadden.com)); (d) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; and (e) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey (Linda.Casey@usdoj.gov)).

If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the applicable Winning Bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with respect to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtor and its estate or the applicable Winning Bidder for such Selected Assigned Contract, or the property of any of them that existed prior to the entry of the Sale Order.

**If no timely objection is received as to adequate assurance of future performance with respect to a Contract, the non-Debtor party to such Contract shall be deemed to have consented to the assumption, assignment, and/or transfer of the applicable Contract to the proposed assignee, and shall be forever barred and estopped from asserting or claiming that any conditions to such assumption, assignment, and/or transfer must be satisfied under such applicable Contract or that any related right or benefit under such applicable Contract cannot or will not be available to the proposed assignee.**

Subject to the terms of the Bidding Procedures Order, an auction (the "Auction") for the Assets, including the Contracts, will be conducted on **November 23, 2026 at 10:00 a.m. (ET),** at a location to be determined by the Debtor, or virtually via videoconference pursuant to information to be timely provided by the Debtor to the Auction Participants. After the Auction, the Debtor will file and serve a notice that identifies the Winning Bidder for the Assets, including any Contracts**.**

**The Debtor will seek to assume and assign the Contracts that have been selected by the Winning Bidder(s) (each, a "Selected Assigned Contract" and collectively, the "Selected Assigned Contracts") at a hearing before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, [●], Courtroom #[●], (a "Sale Hearing") on November 24, 2026 at [●] (ET), subject to the Bankruptcy Court's availability, or such other date as determined by the Debtor, in consultation with Disney or any other Stalking Horse Purchaser, or in the event that any Stalking Horse Purchaser is not designated as the Winning Bidder, then in consultation with the Winning Bidder(s), in accordance with the terms of the Bidding Procedures Order**.

To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with

respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtor, in consultation with the Winning Bidder, or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtor and assigned to the Winning Bidder for such Selected Assigned Contract, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtor or the Winning Bidder for such Selected Assigned Contract, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtor are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtor shall file with the Court and serve, by regular mail, on the Counterparties an Assumption and Assignment Notice, and such Counterparties shall be required to file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assigned Contracts to the applicable Winning Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

Dated: October [●], 2026
Wilmington, Delaware

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Draft*

Erin R. Fay (No. 5268)
Shane M. Reil (No. 6195)
Heather P. Lambert (No. 6923)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
sreil@wsgr.com
hlambert@wsgr.com

*Proposed Counsel to the Debtor and Debtor in Possession*

# EXHIBIT 4

## Winning Bidder Transition Services Agreement

**TRANSITION SERVICES AGREEMENT**

**by and between**

**DISNEY WORLDWIDE SERVICES, INC.**

**and**

**[WINNING BIDDER]**

**Dated as of [●], 2026**

# TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

1.1 Definitions....2

ARTICLE II

SERVICES

2.1 Provision of Services ....5
2.2 Omitted Service Amendments ....10
2.3 No Management Authority ....11
2.4 Employment Offer ....11

ARTICLE III

COMPENSATION

3.1 Compensation for Services ....11
3.2 Payment Terms ....12
3.3 Cash Calls ....12
3.4 Books and Records ....13

ARTICLE IV

TERM

4.1 Commencement ....13
4.2 Termination....13
4.3 Effect of Termination....13

ARTICLE V

LIMITATION ON LIABILITY; DISCLAIMER

5.1 Limitation on Liability....13
5.2 DISCLAIMER OF WARRANTIES....14

ARTICLE VI

INDEMNIFICATION

6.1 Indemnification ....................14

ARTICLE VII

OTHER COVENANTS

7.1 Confidentiality ....................14
7.2 Use of Disney Name ....................16

ARTICLE VIII

RELEASE

8.1 Release of Claims ....................16
8.2 Disclaimer ....................17

ARTICLE IX

MISCELLANEOUS

9.1 Force Majeure ....................17
9.2 Relationship of Parties ....................17
9.3 Counterparts; Effectiveness; Entire Agreement....................18
9.4 Governing Law; Dispute Resolution ....................18
9.5 Assignment ....................18
9.6 No Third Party Beneficiaries ....................19
9.7 Notices ....................19
9.8 Severability ....................20
9.9 Amendments and Waivers ....................20
9.10 Representations and Warranties....................20

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of [●], 2026 (the "Effective Date"), is entered into by and between Disney Worldwide Services, Inc., a Florida corporation ("Disney"), and [Winning Bidder], a [●] ("[Winning Bidder]"). Capitalized terms used, but not otherwise defined, herein shall have their respective meanings set forth in the Exclusivity Agreement.

W I T N E S S E T H

WHEREAS, Disney and Character Technologies, Inc. ("CAI") are parties to that certain Exclusivity and Prepayment Agreement, dated September 18, 2026 (together with all exhibits and schedules thereto, the "Exclusivity Agreement");

WHEREAS, CAI has engaged in a competitive auction process for the disposition of some or all of its assets (the "Auction"), and, pursuant to the Exclusivity Agreement, in the event that a bidder other than Disney is the winning bidder for (i) that certain perpetual, worldwide, non-exclusive license to certain of CAI's intellectual property and related technology (the "IP License") or (ii) substantially all of CAI's assets (including the intellectual property related to the IP License), properties, businesses, or operations, including through an acquisition of an exclusive license of CAI's intellectual property, then Disney shall provide to one such winning bidder certain transition services;

WHEREAS, [Winning Bidder] was selected as a winning bidder, and this Agreement is being entered into by Disney and [Winning Bidder] to satisfy Disney's obligation to provide transition services to one winning bidder pursuant to the Exclusivity Agreement;

WHEREAS, pursuant to the Exclusivity Agreement, Disney has agreed to provide to [Winning Bidder] certain transition services, subject to the terms and conditions set forth herein, to facilitate [Winning Bidder's] continued operation of the Purchased Assets;

WHEREAS, pursuant to the Exclusivity Agreement, Disney has agreed to allow one winning bidder to interview and make employment offers to former CAI employees who wish to consider opportunities with such winning bidder;

WHEREAS, Disney may provide, or cause its Group members or Sub-Contractors to provide to [Winning Bidder] such services for a limited period of time from and after the Effective Date; and

WHEREAS, each of Disney and [Winning Bidder] desires to reflect herein the terms of their agreement with respect to certain transition services pursuant to the Exclusivity Agreement.

NOW, THEREFORE, subject to the terms, conditions, covenants and provisions of this Agreement, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by this Agreement, Disney and [Winning Bidder], for themselves, their successors and assigns, mutually covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Affected Party" has the meaning ascribed thereto in Section 9.1.

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person. As used in this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" and whether or not such terms are capitalized), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning ascribed thereto in the preamble.

"Applicable Termination Date" means, with respect to each Service, the termination date specified with respect to such Service in Schedule A, which in each case, shall occur no later than the lesser of (a) sixty (60) days following the Effective Date and (b) seventy-five (75) days following the conclusion of the Auction.

"Auction" has the meaning ascribed thereto in the recitals.

"Business" means the business relating to the Character.AI App, Website, and Platform Services.

"CAI" has the meaning ascribed thereto in the recitals.

"Cash Call" has the meaning ascribed thereto in Section 3.3.

"Confidential Information" has the meaning ascribed thereto in Section 7.1.

"Cost of Services" means, with respect to each Service, what the Service Provider reasonably determines in good faith, to be its fully allocated cost of providing such Service (provided that the Service Recipient may reasonably request the Service Provider to discuss in good faith such determination of costs), including, for the avoidance of doubt and without duplication, an allocation of, among other things, general and administrative expenses, overhead, employee salaries, wages, compensation, benefits and related costs, including everything constituting such employees' total compensation, as well as the cost of holiday, vacation, sickness, disability benefits, living, educational, amenity and housing allowances, cost of mobilization and demobilization, travel time, bonuses, and other customary allowances applicable to the salaries and wages chargeable, as well as the costs for employee benefits (which employee costs shall be allocated based on the number of hours spent performing the Services relative to the total hours worked by such employees), costs of maintaining offices and other

facilities, costs of materials purchased or furnished, costs for owned equipment, facilities and utilities of the Service Provider, insurance costs and all other costs and expenditures incurred by the Service Provider in connection with such Service (other than Third-Party Costs), plus a ten percent (10%) margin.

"Deliverables" has the meaning ascribed thereto in Section 2.1(p).

"Disney" has the meaning ascribed thereto in the preamble.

"Disney Group" means Disney and its Affiliates.

"Disney Group Parties" means, collectively, the members of the Disney Group and their respective Representatives.

"Disney Parties" has the meaning ascribed thereto in Section 8.1.

"Dispute" has the meaning ascribed thereto in Section 2.1(d).

"Dispute Notice" has the meaning ascribed thereto in Section 2.1(d).

"Effective Date" has the meaning ascribed thereto in the preamble.

"Excluded Service" means any service identified in Schedule B.

"Exclusivity Agreement" has the meaning ascribed thereto in the recitals.

"Executive Leadership Group" has the meaning ascribed thereto in Section 2.1(c).

"Force Majeure Event" has the meaning ascribed thereto in Section 9.1.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court of competent jurisdiction, arbitral body (public or private), agency, commission or official, including any political subdivision thereof.

"Group" means either the Disney Group or the [Winning Bidder] Group, as the context requires.

"IP License" has the meaning ascribed thereto in the recitals.

"Law" means, with respect to any Person, any transnational, domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, permit, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, issued, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Omitted Services" has the meaning ascribed thereto in Section 2.2.

"Party" means either [Winning Bidder] or Disney, and "Parties" means both [Winning Bidder] and Disney.

"Performing Party" has the meaning ascribed thereto in Section 9.1.

"Person" means an individual, firm, corporation, partnership, limited liability company, association, trust, joint venture or other entity or organization, including a Governmental Authority.

"Purchased Assets" means [●].[1]

"Reference Date" means September 18, 2026.

"Released Matters" has the meaning ascribed thereto in Section 8.1.

"Releasing Parties" has the meaning ascribed thereto in Section 8.1.

"Representatives" means, with respect to any Person, its directors, members, partners, officers, employees, agents and advisors (including legal, financial and accounting advisors).

"Sales Taxes" has the meaning ascribed thereto in Section 3.1(b).

"Service Employee" has the meaning ascribed thereto in Section 2.1(e).

"Service Fees" has the meaning ascribed thereto in Section 3.1(a).

"Service Manager" has the meaning ascribed thereto in Section 2.1(c).

"Service Provider" means one or more members of the Disney Group in its or their capacity as the provider(s) of any Services to any Service Recipient.

"Service Provider Data" means (a) any data or information of the Service Provider or its Group members, or their respective vendors, customers or other business partners, that is provided to or obtained by the Service Recipient or its personnel in the performance of the Service Recipient's obligations under this Agreement and (b) any data or information to the extent related to the Service Provider or its Group members that is collected, generated or processed by the Service Recipient or its personnel solely in connection with the performance of the Service Recipient's obligations pursuant to this Agreement.

"Service Recipient" means one or more members of the [Winning Bidder] Group in its or their capacity as the recipient(s) of any Services from any Service Provider.

"Service Recipient Data" means (a) any data or information of the Service Recipient or its Group members, or their respective vendors, customers or other business partners, that is provided to or obtained by the Service Provider or its personnel in the performance of the Service Provider's obligations under this Agreement and (b) any data or information to the extent

---

1 **Note to Draft**: To be negotiated between Disney and [Winning Bidder].

related to the Service Recipient or its Group members that is collected, generated or processed by the Service Provider or its personnel solely in connection with the performance of the Service Provider's obligations pursuant to this Agreement.

"Services" means the individual services identified in Schedule A.

"Sub-Contractor" has the meaning ascribed thereto in Section 2.1(f).

"Taxes" means all federal, state, county, provincial, national, local, foreign and other taxes, charges, fees, duties (including customs duties), levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, goods and services, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, occupational, interest equalization, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, employment insurance and social security taxes, premiums or levies, which are imposed by any Governmental Authority, including any interest, penalties or additions to tax attributable thereto.

"Third-Party Costs" has the meaning ascribed thereto in Section 2.1(f).

"[Winning Bidder]" has the meaning ascribed thereto in the preamble.

"[Winning Bidder] Group" means, collectively, [Winning Bidder] and its [Subsidiaries].

"[Winning Bidder] Group Parties" means, collectively, the members of the [Winning Bidder] Group and their respective Representatives.

"Withholding Taxes" has the meaning ascribed thereto in Section 3.1(d).

## ARTICLE II

## SERVICES

2.1 Provision of Services.

(a) Disney shall provide, or cause the applicable Service Provider or Sub-Contractor to provide, the Services to [Winning Bidder] and the applicable members of the [Winning Bidder] Group, in each case, as Service Recipient(s), in accordance with the terms of this Agreement. The Parties acknowledge and agree that the Services are provided for the benefit of the operation of the Purchased Assets as used in the Business that exists as of the Reference Date on a transitional basis only. Accordingly, as promptly as practicable following the execution of this Agreement, [Winning Bidder] agrees to use commercially reasonable efforts to cease using the Services or transition each Service to [Winning Bidder]'s or its Group members' own internal organization or to alternate service providers under other arrangements. The Service Provider shall use commercially reasonable efforts (taking into account the express limitations set forth in this Agreement, including in Section 2.1(e)) to perform, or cause to be performed, the Services in substantially the same manner, and with substantially the same degree of care, quality and priority, as such Services (or reasonably similar services) were provided by or on behalf of CAI to the Business immediately prior to the Reference Date. The Service Recipient agrees and

acknowledges that the Services shall be provided by the Service Provider solely using Service Recipient Systems (as defined in Schedule D). To the extent that Service Recipient Systems are not suitable for providing the Services or the Service Provider is unable to use or access Service Recipient Systems, other than due to the fault of the Service Provider, the Service Provider shall be relieved and excused from any further obligation to provide or make available the applicable Services that could not be provided for such reason, and the Service Provider shall not be considered in breach of this Agreement for failure to provide such Services.

(b) [Winning Bidder] shall pay, perform, discharge and satisfy, or cause the applicable members of the [Winning Bidder] Group to pay, perform, discharge and satisfy, as and when due, its and their respective obligations as Service Recipients under this Agreement in accordance with the terms of this Agreement.

(c) Each of Disney and [Winning Bidder] agrees to appoint (i) an employee representative, which may be an employee of one of its Group members (each such representative, a "Service Manager"), who shall have overall responsibility for overseeing the day-to-day operation, compliance and performance of this Agreement and implementing, managing and coordinating the Services and (ii) an executive steering leadership group (each such group, an "Executive Leadership Group") that shall have responsibility for project oversight, including information security standards, governance and dispute escalation, in each case, pursuant to this Agreement on behalf of Disney and [Winning Bidder], respectively. Initially, the Service Managers and Executive Leadership Groups shall be the individuals set forth in Schedule C. Either Party may change its designated Service Manager or Executive Leadership Group at any time upon written notice given to the other Party in accordance with Section 9.7. The Service Managers shall consult and coordinate with each other on a regular basis during the term of this Agreement.

(d) Except as otherwise provided in this Agreement, the Parties shall resolve all disputes arising under or in connection with this Agreement (each, a "Dispute") in accordance with the following procedures (including, for the avoidance of doubt, any Dispute relating to payments with respect to the Services). All Disputes shall be first discussed in person, by teleconference or by video conference by the Service Managers within ten (10) calendar days after receipt of written notice from either Party specifying the nature of the Dispute and requesting that the resolution process set forth in this Section 2.1(d) be initiated (a "Dispute Notice"). If any Dispute is not resolved by the Service Managers within fourteen (14) calendar days after receipt of a Dispute Notice, or such longer period as the Service Managers may agree in writing, then, upon the written request of either Party, the Executive Leadership Groups shall meet in person, by teleconference or by video conference for the purpose of resolving the Dispute. The Executive Leadership Groups shall negotiate in good faith to resolve the Dispute. If the Executive Leadership Groups do not resolve the Dispute within fourteen (14) calendar days after the date the Dispute was referred to them, or such longer period as the Executive Leadership Groups may agree in writing, the Parties may pursue any other rights, remedies or actions that may be available to them in accordance with Section 9.4.

(e) The Service Provider shall use commercially reasonable efforts to cause the Services to be performed by the individual(s) who have historically performed such Services (or reasonably similar services) during the twelve (12) months prior to the Reference Date (each

such individual, a "Service Employee"), in each case only for so long as such Service Employee(s) remain employed by the Service Provider (or its Group member or Sub-Contractor, as applicable) and is reasonably available to perform the applicable Service. In the event that any Service Employee(s) are not (or are no longer so) employed by the Service Provider, the Service Provider shall use commercially reasonable efforts to assign, and make available, personnel familiar with the applicable Service (solely to the extent such personnel exist) to perform such Service; provided, that, if there are no other personnel familiar with the applicable Service, then the Service Provider shall be relieved and excused from any further obligation to provide or make available the Services historically performed by such Service Employee(s), and the Service Provider shall not be considered in breach of this Agreement for failure to provide such Services. Subject to the foregoing, the Service Provider shall determine (in its sole and absolute discretion) the personnel who shall perform the Services to be provided by the Service Provider. For the avoidance of doubt, the Service Provider shall not be obligated to cause the Services to be performed by any individual(s), including independent contractors, other than the Service Employees and other personnel familiar with the applicable Services, including any legacy employees, independent contractors or representatives of the Service Provider. The Service Recipient acknowledges and agrees that no such personnel shall be required to dedicate more than twenty percent (20%) of their hours of employment by or work on behalf of the Service Provider to the performance or support of the Services. All personnel performing Services shall remain at all times, and be deemed to be, employees, independent contractors or representatives solely of the Service Provider responsible for providing such Services (or of such Service Provider's Group member or Sub-Contractor, as the case may be) for all purposes, and shall not be, or be deemed to be, employees, independent contractors or representatives of the Service Recipient. Service Recipient also shall not be considered a joint employer of any of the employees, independent contractors, or representatives performing the Services. The Service Provider (or its Group member or Sub-Contractor, as the case may be) shall be solely responsible for (x) payment of (i) all compensation, (ii) all income, disability, withholding and other employment Taxes and (iii) all medical benefit premiums, vacation pay, sick pay and other employee benefits payable to or with respect to personnel who perform Services on behalf of the Service Provider, as well as (y) (i) the filing, collection, withholding, and transmission of all federal, state and local income, unemployment, payroll and employment taxes and other withholdings required by federal, state or local law or regulation payable with respect to the employees providing the Services in accordance with applicable law, and (ii) providing unemployment insurance and workers' compensation benefits to all such employees. In addition, as between Service Provider and Service Recipient, Service Provider shall be responsible for ensuring that such employees comply with all written policies and legal requirements applicable to the performance of the Services. All such personnel shall be under the sole direction, control and supervision of the Service Provider (or its Group member or Sub-Contractor, as the case may be) and the Service Provider (or its Group member or Sub-Contractor, as the case may be) has the sole right to exercise all authority with respect to the employment, substitution, termination, assignment and compensation of such personnel.

(f) The Service Provider may, at its option, from time to time, (i) delegate any or all of its obligations to perform Services under this Agreement to any one or more of its Group members or (ii) engage the services of other professionals, consultants or other third parties (each, a "Sub-Contractor") in connection with the performance of the Services; provided, however, that the Service Provider shall remain ultimately responsible for ensuring that its

obligations hereunder are satisfied with respect to any Services provided by any such Group member or Sub-Contractor and shall be liable for any such Group member's or Sub-Contractor's failure to so satisfy such obligations; provided, further, that Disney's Service Manager, and not any such Group member or Sub-Contractor, shall be the Service Recipient's sole point of contact regarding the Services, including with respect to payment. [Winning Bidder] shall reimburse Disney for all documented costs, fees and expenses paid by Disney or the applicable Service Provider to any third party, including Sub-Contractors, in connection with the provision of the Services ("Third-Party Costs"), including any documented third-party fees, penalties or other costs incurred in connection with third-party consents, waivers or licenses that Disney or the applicable Service Provider reasonably determines are necessary for the provision of the Services.

(g) The Services shall be used by the applicable Service Recipient solely for the operation of [Winning Bidder]'s business for substantially the same purpose and in substantially the same manner as used by the Business during the three (3) months prior to the Reference Date.

(h) In the event that the Service Provider reasonably deems it necessary to suspend delivery of a Service hereunder for maintenance, repair or replacement or legal, compliance or security purposes, the Service Provider shall not be obligated to deliver such Service during such periods, but shall use commercially reasonable efforts to minimize the duration and impact of the interruption. Notwithstanding anything to the contrary in this Agreement, in no event shall the Service Provider (or any of its Group members or Sub-Contractors) be required to (i) provide Services to any Person that the Service Recipient directly or indirectly acquires after the Effective Date, or in any jurisdiction in which Services were not provided as of the Effective Date, (ii) provide Services to the extent that the provision of any such Service would require any consent, waiver or license of any third party, unless and until such consent, waiver or license has been obtained, (iii) expand its facilities, incur any capital expenditures, employ additional personnel or maintain the employment of any specific persons to provide the Services hereunder or (iv) disclose to any member of the [Winning Bidder] Group any contracts by which any member of the Disney Group acquires from third parties any components or inputs to any Service.

(i) The Service Recipient shall cooperate with the Service Provider to the extent necessary or appropriate to facilitate the performance of the Services in accordance with the terms of this Agreement. Without limiting the generality of the foregoing, (i) each Party shall, and shall cause its Group members to, give the other Party and its Group members and, in the case of Disney, its Sub-Contractors reasonable access to, and necessary rights to use, any information, assets, systems, materials and technologies to the extent reasonably necessary for the performance or receipt of the Services and (ii) the Service Recipient shall, and shall cause its Group members to, upon reasonable written notice, give to the Service Provider and its Group members and Sub-Contractors reasonable access, during regular business hours and at such other times as are reasonably required, to the relevant premises and personnel to the extent reasonably necessary for the performance of the Services; provided, that Disney shall only be required to grant such access and rights to (1) legacy employees of the Business and (2) such other employees of the [Winning Bidder] Group that Disney, in its sole discretion, has approved in writing. Each Party shall (and shall cause its Group members and their personnel and, in the

case of Disney, its Sub-Contractors' personnel, providing or receiving Services to): (A) not attempt to obtain access to, use or interfere with (1) any information technology systems of the other Party or its Group members, or (2) any confidential or competitively sensitive information owned, used or processed by the other Party, except, in each case, to the extent reasonably necessary to do so to provide or receive Services or as permitted under Section 2.1(i)(i); (B) maintain reasonable security measures to protect the systems of the other Party and its Group members to which it has access pursuant to this Agreement against access by unauthorized third parties; (C) not disable, damage or erase or disrupt or impair the normal operation of the information technology systems of the other Party or its Group members; and (D) promptly notify the other Party of any confirmed misuse, disclosure or loss of, or inability to account for, the other Party's confidential or competitively sensitive information, and any confirmed unauthorized access to its or any member of its Group's facilities, systems or network reasonably likely to affect the other Party and shall investigate such confirmed security incidents and reasonably cooperate with the other Party's incident response team to mitigate and limit the impact of such a security incident.

(j) [Winning Bidder] acknowledges that Disney is agreeing to perform, or cause to be performed, the Services in order to facilitate the release of claims set forth in Article VIII and the operation of the Purchased Assets. The Services shall not include, and no Service Provider (or any Group member or Sub-Contractor of a Service Provider) shall be obligated to provide, any Service the provision of which to a Service Recipient from and after the Effective Date would constitute, or reasonably be expected to constitute, (i) a violation of any Law or (ii) a breach of any contractual obligation owed to a third party.

(k) Each Party acknowledges that it may be necessary for each Party to make proprietary and/or third-party software available to the other Party in the course and for the purpose of performing or receiving, as applicable, Services. Each Party (i) shall, and shall cause the members of its Group and, in the case of Disney, its Sub-Contractors to, comply with the license restrictions applicable to any and all proprietary or third-party software made available to such Party by the other Party in the course of the provision of Services hereunder, (ii) acknowledges the license terms of use applicable to all proprietary or third party software in its possession as of the Effective Date and (iii) agrees that it shall be responsible for providing to the other Party a copy of the applicable license terms (or, solely with respect to open source software or other software with publicly available license terms, information sufficient to direct such other Party to a copy thereof) for any and all proprietary or third-party software first made available to such other Party from and after the Effective Date, solely to the extent such provision would not violate the providing Party's duty of confidentiality owed to any third party. In the event there are any additional licensing or other costs associated with the provision of third party software pursuant to this Section 2.1(k), such costs shall be borne by the Service Recipient.

(l) Subject to Section 2.2, the Parties agree that the Services constitute all of the services to be provided to the [Winning Bidder] Group by Disney (or its Group members or Sub-Contractors, as the case may be) from and after the Effective Date.

(m) [Winning Bidder] and its Group members shall not be granted or have access to Disney computer systems. If there is a need for such access, [Winning Bidder] and Disney will agree on the terms pursuant to which such access will be allowed.

(n) Each Party agrees to comply with the data processing addendum attached to and incorporated into this Agreement as set forth in Schedule D, which shall govern the Processing of Personal Data (as such terms are defined in Schedule D) in connection with the provision and receipt of the Services. The Parties shall, as reasonably requested by the other Party, execute all further documents as are reasonably necessary to comply with applicable Data Protection Laws (as defined in Schedule D) in connection with the provision and receipt of the Services.

(o) Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that, as between the Parties, any and all Service Recipient Data shall be owned by the Service Recipient or its applicable Group member, subject to any limitations imposed by third-party vendors or subcontractors with respect thereto, and any and all Service Provider Data shall be owned by the Service Provider or its applicable Group member, subject to any limitations imposed by third-party vendors or subcontractors with respect thereto.

(p) Any work product, deliverables, documents, code, materials or other tangible or intangible output (other than Service Recipient Data and Service Provider Data, which are addressed above) created, developed or prepared by or on behalf of the Service Provider specifically for the Service Recipient in the course of performing the Services (collectively, "Deliverables") shall be owned by the Service Recipient, and the Service Provider hereby assigns, and shall cause its Group members and Sub-Contractors to assign, to the Service Recipient all right, title and interest in and to such Deliverables, including any intellectual property rights therein or thereto.

2.2 Omitted Service Amendments. From time to time during the thirty (30)-day period commencing on the Effective Date, [Winning Bidder] may request Disney to provide, or cause the applicable Service Provider or Sub-Contractor to provide, services (other than Excluded Services) on a going-forward basis that are not identified in Schedule A that (a) were provided, directly or indirectly, by CAI (or its Subsidiaries) to the Business during the three (3) months prior to the Reference Date, (b) are reasonably necessary for the continued operation of the Purchased Assets for substantially the same purpose and in substantially the same manner as it was conducted during the three (3) months prior to the Reference Date and (c) a Service Recipient cannot otherwise secure from a third party on commercially reasonable terms ("Omitted Services"). In the event that [Winning Bidder] desires to have Disney provide, or cause the applicable Service Provider or Sub-Contractor to provide, Omitted Services and Disney is reasonably capable of providing, or causing the applicable Service Provider or Sub-Contractor to provide, such Omitted Services, then [Winning Bidder] and Disney shall in good faith negotiate an amendment to Schedule A, which shall describe in detail the service, project scope, term, price and payment terms applicable to such Omitted Services. Any request for an Omitted Service shall be in writing and shall specify (x) the type and the scope of the requested service, (y) where and to whom the requested service is to be provided and (z) the proposed term for the requested service; provided, that the term of any Omitted Service shall terminate no later than the lesser of (i) sixty (60) days following the Effective Date and (ii) seventy-five (75) days following the conclusion of the Auction. Once agreed to in writing, the amendment to Schedule A shall be deemed part of this Agreement as of such date and the Omitted Services shall be deemed "Services" provided hereunder, subject to the terms and conditions of this Agreement.

2.3 No Management Authority. No Service Provider (or any Group member or Sub-Contractor of a Service Provider) shall be authorized by, or shall have any responsibility under, this Agreement to manage the affairs of the business of any Service Recipient.

2.4 Employment Offer. Disney shall allow [Winning Bidder] to interview and make employment offers to former CAI employees who wish to consider opportunities with [Winning Bidder] and shall work in good faith with [Winning Bidder] to transition those employees who accept an offer. Disney shall make reasonably available the former CAI employees for the purpose described in the immediately preceding sentence and shall not interfere with, hinder or take any other action intended to impede the interview or offer process; provided, however, that such employees may still perform their day-to-day work obligations in the ordinary course; provided, further, that Disney may designate up to 20% of the former CAI employees as outside the scope of such process and need not make available or allow any party a right to interview or make employment offers to such employees.

**ARTICLE III**

**COMPENSATION**

3.1 Compensation for Services.

(a) As consideration for the Services received by Service Recipient in accordance with this Agreement, Service Recipient shall pay, or cause to be paid, to Service Provider the amounts calculated in accordance with the Cost of Services (such aggregate amount, the "Service Fees"), in addition to the Service Recipient's reimbursement of the Service Provider for any Third-Party Costs in accordance with the procedures set forth in Section 3.2.

(b) The amount of any sales Tax, value-added Tax, goods and services Tax or similar Tax that is required to be assessed and remitted by any Service Provider in connection with the Services provided hereunder ("Sales Taxes") shall be promptly paid to the Service Provider by the Service Recipient in accordance with Section 3.2. Such payment shall be in addition to the Service Fees and Third-Party Costs (unless such Sales Tax is expressly already accounted for in the applicable Service Fees and Third-Party Costs).

(c) The Parties shall, and shall cause each of their respective Group members to, cooperate with each other in good faith and provide any information and/or documentation reasonably requested from time to time, in each case to enable the other Party to handle any audits, examinations or inquiries with respect to Sales Taxes and to enable the other Party to comply with applicable Law with respect to Sales Taxes.

(d) All payments by the Service Recipient under this Agreement shall be made without deduction or withholding for Taxes, except as required by applicable Law. If the Service Recipient is required by applicable Law to deduct or withhold any Taxes, other than Sales Taxes, from any payment under this Agreement (such Taxes, "Withholding Taxes"), the Service Recipient may deduct such Withholding Taxes from the applicable payment, shall timely remit them to the appropriate Governmental Authority and shall have no obligation to pay any additional amount to the Service Recipient in respect thereof. The Service Recipient shall

provide the Service Provider original receipts or other reasonable evidence of remittance and reasonably cooperate in any related audit, examination or inquiry. The Service Recipient and the Service Providers shall cooperate in furnishing information and documentation reasonably necessary to support any available foreign tax credit, exemption or reduced rate. Sales Taxes shall be governed by Sections 3.1(b) and 3.1(c). The obligations under this Section 3.1(d) shall survive expiration or termination of this Agreement with respect to payments attributable to Services provided before such expiration or termination.

3.2 Payment Terms.

(a) The Service Provider shall bill the Service Recipient within sixty (60) days after the end of each full calendar month following the Effective Date, or at such other interval specified with respect to a particular Service in Schedule A, an amount equal to the Service Fees and Third-Party Costs due for all Services provided in such month or other specified interval, as applicable, plus any Sales Taxes; provided, that the Service Provider may, in its sole discretion, bill the Service Recipient more frequently for Service Fees and Third-Party Costs as and when the Service Provider receives bills therefor from the applicable third parties. Invoices shall be directed to the Service Manager appointed by [Winning Bidder] or to such other Person designated in writing from time to time by such Service Manager. The Service Recipient shall pay such amount in full within thirty (30) days after receipt of each invoice by wire transfer of immediately available funds to the account designated by the Service Provider for this purpose or upon the Service Provider's written request, directly to the applicable third party. If the last day of such time period is not a Business Day, the Service Recipient shall pay such amount on or before the following Business Day. In addition to any other remedies for non-payment, if any payment is not received by the Service Provider on or before the date such amount is due, then a late payment interest charge, calculated at a ten percent (10.0%) per annum rate, compounded monthly, shall immediately begin to accrue and any such late payment interest charges shall become immediately due and payable in addition to the amount otherwise owed under this Agreement and provided for in the applicable invoice.

(b) If the Service Recipient objects to the amount of any invoice, the Service Recipient shall pay the full amount of the invoice, including any amounts to which the Service Recipient objects, to the Service Provider and shall promptly provide written notice to the Service Provider of any amounts billed and paid to which the Service Recipient objects, reasonably detailing the basis for the Service Recipient's objection. Any such objection shall be deemed to be a Dispute hereunder subject to the provisions applicable to Disputes set forth in Section 2.1(d).

3.3 Cash Calls. If Disney expects that the Service Provider shall incur material Third-Party Costs in connection with the provision of any Services pursuant to this Agreement, Disney may, at its option, provide a written cash call ("Cash Call") to [Winning Bidder] of the amount of such Third-Party Costs in advance of the Service Provider incurring the same and [Winning Bidder] shall within five (5) days of receipt of such Cash Call provide such amount to the Service Provider for payment by wire transfer of immediately available funds to the account designated by Disney for this purpose.

3.4 Books and Records. Disney shall, and shall cause each Service Provider to, maintain complete and accurate books of account and other documentation as reasonably necessary to support the accuracy of invoices issued pursuant to Section 3.2(a).

## ARTICLE IV

## TERM

4.1 Commencement. This Agreement is effective as of the date hereof and shall remain in effect with respect to a particular Service until the occurrence of the Applicable Termination Date with respect to such Service, unless earlier terminated (a) in its entirety or with respect to a particular Service, in each case in accordance with Section 4.2, or (b) by mutual consent of the Parties.

4.2 Termination. If a Service Provider or Service Recipient materially breaches any of its respective obligations under this Agreement (and the period for resolution of the Dispute relating to such breach set forth in Section 2.1(d) has expired), the non-breaching Party may terminate this Agreement with respect to the Service for which such obligations are owed, effective upon not less than thirty (30) days' written notice of termination to the breaching Party, if the breaching Party does not cure such breach within thirty (30) days after receiving written notice thereof from the non-breaching Party. The termination of this Agreement with respect to any Service pursuant to this Section 4.2 shall not affect the Parties' rights or obligations under this Agreement with respect to any other Service; provided, that any other Service upon which the performance of such Service is dependent or bundled shall also be terminated.

4.3 Effect of Termination. In the event of any termination of this Agreement in its entirety or with respect to any Service, Service Provider shall have no further obligation to provide the applicable terminated Services, but each Party, Service Provider and Service Recipient shall remain liable for all of their respective obligations that accrued hereunder prior to the date of such termination, including all obligations of each Service Recipient to pay any amounts due to any Service Provider hereunder pursuant to Section 3.1, Section 3.2 and Section 3.3. In addition to the surviving obligations set forth in the preceding sentence, Section 2.1(o), this Section 4.3, Article V, Article VI, Article VII, Article VIII and Article IX shall each survive the termination of this Agreement.

## ARTICLE V

## LIMITATION ON LIABILITY; DISCLAIMER

5.1 Limitation on Liability.

(a) NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE [WINNING BIDDER] GROUP PARTIES ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE BEING PROVIDED "AS IS" AND AS AN ACCOMMODATION. ACCORDINGLY, EXCEPT TO THE EXTENT FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, ACTUAL FRAUD OR BAD FAITH OF A DISNEY GROUP

PARTY, OR ANY BREACH BY A DISNEY GROUP PARTY OF ITS OBLIGATIONS UNDER SECTION 7.1 (CONFIDENTIALITY) (AS TO WHICH NO LIMITATION UNDER THIS SENTENCE SHALL APPLY), NO DISNEY GROUP PARTY SHALL HAVE ANY LIABILITY TO ANY [WINNING BIDDER] GROUP PARTY ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER.

(b) IN NO EVENT SHALL ANY DISNEY GROUP PARTY BE LIABLE, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE TO ANY [WINNING BIDDER] GROUP PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING LOSS OF PROFITS) AS A RESULT OF ANY BREACH, PERFORMANCE OR NON-PERFORMANCE BY DISNEY OR ANY SERVICE PROVIDER OR SUB-CONTRACTOR UNDER THIS AGREEMENT.

5.2 DISCLAIMER OF WARRANTIES. THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT ARE FURNISHED WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. NO DISNEY GROUP PARTY MAKES ANY REPRESENTATION OR WARRANTY THAT ANY SERVICE COMPLIES WITH ANY LAW, DOMESTIC OR FOREIGN.

## ARTICLE VI

## INDEMNIFICATION

6.1 Indemnification. The Service Recipient shall defend, indemnify and hold the Service Provider and its Affiliates, and their respective officers, directors, shareholders, agents, employees, contractors and assigns of each, harmless from and against any and all suits, claims, demands, penalties, fines, charges, proceedings, causes of action, damages, losses, liabilities, costs and expenses of any nature whatsoever (including attorneys' fees) arising directly or indirectly from or out of: (a) the operation or support of the Purchased Assets while the Services are provided under this Agreement, (b) Service Recipient's use of the Services or (c) the Service Recipient's failure to comply with its obligations under this Agreement. The provisions of this Section 6.1 shall survive any determination that this Agreement or any portion hereof is void or voidable.

## ARTICLE VII

## OTHER COVENANTS

7.1 Confidentiality.

(a) Each Party hereby acknowledges that confidential information of such Party or its Group members may be exposed to the other Party or its Group members, or its or their respective Representatives (including, in the case of Disney, its Sub-Contractors), as a result of the activities contemplated by this Agreement (such information, "Confidential

Information”). Each Party agrees that Confidential Information is a valuable asset of its owner, and its public disclosure or use outside of the activities contemplated by this Agreement without the prior consent of the relevant Party or its Group member would cause substantial harm to such disclosing Party or other Person. Therefore, each Party agrees to treat, and to cause its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors) to treat, all Confidential Information received by it with the amount of care that a reasonable business Person would use to protect its own valuable and proprietary Confidential Information and not to disclose any Confidential Information to any Person who does not have a contractual or fiduciary obligation with such Person to keep such Confidential Information confidential. In addition, neither Party shall utilize or permit its Group members, or its or their respective Representatives (including, in the case of Disney, its Sub-Contractors), to utilize Confidential Information for any purpose other than for the benefit of the [Winning Bidder] or the owner of such information, as the case may be.

(b) Notwithstanding the foregoing, each Party may disclose Confidential Information to its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors), on a need-to-know basis; provided that such Party shall remain liable for any breach of this Section 7.1 by its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors).

(c) Except as may be required by Law or stock exchange rule, neither Party shall, without the prior written consent of the other Party, advertise, issue any press release or otherwise publicize the fact that the Parties have entered into this Agreement or disclose the terms and conditions of this Agreement.

(d) As used herein, “Confidential Information” shall not include information (i) that has become generally available to the public through no fault of the receiving Person, (ii) either (x) is known to the receiving Person prior to being furnished by the disclosing Person, or (y) becomes available to the receiving Person on a non-confidential basis from a source other than the disclosing Person; provided that the source was not prohibited by any legal, contractual or fiduciary obligation to the disclosing Person or any third party from disclosing such information, or (iii) disclosed to the extent necessary pursuant to (1) any Law, (2) the order of a court of competent jurisdiction, (3) any rule or regulation of an administrative agency, (4) any stock exchange rule or other market or reporting system, (5) any deposition, interrogatory, oral questions, request for information or documents, subpoena, civil investigative demand or similar process, (6) any required report, statement or testimony submitted to any municipal, state or national (including foreign regulatory) bodies having or claiming to have jurisdiction, or (7) other legal, judicial, arbitration, regulatory or administrative process or proceeding; provided that, under the circumstances described in this subparagraph (iii), the Person required to make the disclosure shall, to the extent legally permissible, notify in writing the Person whose Confidential Information shall be disclosed of such event and shall cooperate with any reasonable request or efforts by such Person, at such Person’s sole expense, to take reasonable legally permissible actions to limit the scope of disclosure required in connection therewith and shall exercise reasonable efforts to obtain assurance that confidential treatment shall be accorded to such Confidential Information.

(e) The terms of this Section 7.1 shall continue to apply after the expiration or termination of this Agreement for (i) two (2) years with respect to Confidential Information concerning (A) the intellectual property rights of a Party or its Group members, (B) clients, vendors and customers of a Party or its Group members and (C) the business plans of a Party or its Group members and (ii) one (1) year with respect to all other Confidential Information.

7.2 Use of Disney Name. [Winning Bidder] shall acquire no right under this Agreement to use, and [Winning Bidder] shall not use, the name "Disney", "ABC", "ESPN", "Lucasfilm", "Marvel" or "Pixar" (either alone or in conjunction with or as a part of any other word, mark or name) or any marks, fanciful characters or designs of Disney or any of its Group members (including, for purposes of clarity and the avoidance of doubt, The Walt Disney Company) in any manner whatsoever.

## ARTICLE VIII

## RELEASE

8.1 Release of Claims. [Winning Bidder], for itself and on behalf of its controlled affiliates and each of its and their agents, controlling persons and other representatives, and any successors and assigns of the foregoing (individually and collectively, the "Releasing Parties"), hereby irrevocably, unconditionally and forever acquits, releases, waives and discharges, and further covenants and agrees that it will not assert, and completely waives and relinquishes, any claims against Disney and its affiliates and any of its or their officers, directors, employees, consultants, advisors, agents, controlling persons and other representatives, divisions, affiliated corporations, affiliated non-corporation entities and any successors, predecessors and assigns of the foregoing (individually and collectively, the "Disney Parties") from any and all past, present and future losses, costs, suits, actions, causes of action, liabilities, contributions, attorneys' fees, damages, punitive damages, expenses, claims, potential claims, counterclaims, cross-claims or demands, in law or in equity, asserted or unasserted, express or implied, actual or potential, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that a Releasing Party had, presently has or may hereafter have or claim or assert to have against any of the Disney Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from August 1, 2026 and through the Effective Date that in any way arises from or out of, are based upon, or indirectly or directly relate to the debtor, the reorganized debtor, the debtor's chapter 11 case, all agreements, actions, and transactions arising out of or in any way related to the debtor's chapter 11 case, restructuring, reorganization, and/or wind-down activities, including any transaction proposed or effectuated between [Winning Bidder] and the debtor or between one or more of the Disney Parties and the debtor or the debtor's current or former employees, and the provision of transition services by any of the Disney Parties to the debtor pursuant to a transition services agreement or to [Winning Bidder] pursuant to this Agreement, and the recruitment, solicitation, hiring, employment, or engagement by any of the Disney Parties of any of the debtor's former employees, and any related intellectual property use, including with respect to the Licensed IP (collectively, the "Released Matters"); provided, however, that such Releasing Party is not releasing and does not acquit, waive, relinquish or discharge (and Released Matters does not include) any matter that cannot be released as a matter of applicable law. [Winning Bidder], for itself and on behalf of the

Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Disney or any of the Disney Parties in connection with any of the Released Matters.

8.2 Disclaimer. The foregoing release is intended to be complete, global and all-encompassing and specifically include claims that are known, unknown, fixed, contingent or conditional with respect to the matters described therein as of the date hereof. [Winning Bidder] hereby expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the released party, including the following provisions of California Civil Code Section 1542: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

## ARTICLE IX

## MISCELLANEOUS

9.1 Force Majeure. In case performance of any terms or provisions hereof shall be delayed or prevented, in whole or in part, because of or related to compliance with any Law or requirement of any national securities exchange, or because of riot, war, public disturbance, pandemic (including any lockdowns, quarantines, "shelter in place" or "stay at home" orders, shutdowns, closures, sequesters and other protective measures in response thereto by any Governmental Authority), strike, labor dispute, unavailability of labor, fire, explosion, storm, flood, act of God or act of terrorism that is not within the control of the performing Party, Service Provider or Service Recipient whose performance is interfered with (each, a "Performing Party") and which by the exercise of reasonable diligence such Performing Party is unable to prevent, or for any other reason which is not within the control of such Performing Party whose performance is interfered with and which by the exercise of reasonable diligence such Performing Party is unable to prevent (each, a "Force Majeure Event"), then upon prompt written notice, stating the date and extent of such interference and the Force Majeure Event which is the cause thereof, by the Performing Party to the other Party, Service Recipient or Service Provider (each, an "Affected Party"), as applicable, the Performing Party shall be excused from its obligations hereunder during the period such Force Majeure Event or its effects continue, and no liability shall attach against either the Performing Party or the Affected Party on account thereof; provided, however, that the Performing Party shall promptly resume the required performance upon the cessation of the Force Majeure Event or its effects. No Performing Party shall be excused from performance under this Section 9.1 if such Performing Party fails to use commercially reasonable efforts to mitigate the effects of the Force Majeure Event on such Performing Party's ability to perform hereunder.

9.2 Relationship of Parties. Nothing in this Agreement shall be deemed or construed by the Parties or any third party as creating a relationship of principal and agent, partnership or joint venture between the Parties, between any Service Provider and any Service Recipient or with any individual providing Services, it being understood and agreed that no provision

contained herein, and no act of any Party or its Group members, shall be deemed to create any relationship between the Parties or Group members other than the relationship set forth herein. Each Party and each Service Provider shall act under this Agreement solely as an independent contractor and not as an agent or employee of the other Party or any of such Party's Group members.

9.3 Counterparts; Effectiveness; Entire Agreement.

(a) This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that each Party need not sign the same counterpart. Delivery of a copy of this Agreement bearing a Party's signature by electronic mail in PDF format or by other similar electronic means shall have the same effect as physical delivery of the paper document bearing the original signature.

(b) This Agreement, the other Transaction Documents and the other agreements referred to herein and therein constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof and thereof.

9.4 Governing Law; Dispute Resolution. This Agreement, and all claims or causes of action whether in contract or tort, that may be based on or arise out of or relate to this Agreement, shall be governed by and construed in accordance with the Laws of the State of Delaware (without regard to any applicable principles of conflicts of law). Each party hereto (a) irrevocably submits to the personal jurisdiction of the United States District Court for the District of Delaware, or if and only if the United States District Court does not have jurisdiction, then before the Court of Chancery of the State of Delaware, or if and only if neither such court shall have jurisdiction, then before any other state or federal court sitting in Delaware having subject matter jurisdiction, and (b) agrees that any actions or proceedings arising in connection with this Agreement shall be brought, tried and determined exclusively in the courts referred to in clause (a) of this Section 9.4 and consents to service of process outside the State of Delaware pursuant to the requirements of such court in any matter subject to it. The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may have to the laying of venue of any such action or proceeding in such courts and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

9.5 Assignment. This Agreement and the rights and obligations hereunder shall not be assignable by either Party without the express written consent of the other Party; provided, that, without such consent, Disney may assign its rights and obligations hereunder to an Affiliate at any time. Any attempted assignment in violation of this Section 9.5 shall be void. Subject to the preceding sentences, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. Nothing in this Section 9.5 shall affect or impair (a) Disney's ability to designate one or more Group members to provide Services as a Service Provider hereunder, or a Service Provider's ability to delegate any or all of its obligations under this Agreement to one or more Group members or Sub-Contractors pursuant to Section 2.1(f), or (b) [Winning Bidder]'s ability to designate one or more Group members to receive Services as a Service Recipient hereunder.

9.6 No Third Party Beneficiaries. The agreements, covenants and representations contained herein are for the benefit of the Parties and are not for the benefit of any third parties, except to the extent that any other Person is expressly granted any rights (including provisions applicable to a Party's Group members and as contemplated by Article V) under this Agreement.

9.7 Notices. All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and received) and shall be given, if to Disney, to:

Disney Worldwide Services, Inc.
c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-0763
Attention: Justin Warbrooke
Email: justin.warbrooke@disney.com

with a copy to:

The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-1245
Attention: Justin Radell; Lisa Phua
Email: justin.radell@disney.com; lisa.phua@disney.com

and

Skadden, Arps, Slate, Meagher & Flom
One Manhattan West
New York, New York 10001
Attention: Stuart Levi; Brandon Van Dyke; Ron Meisler; Bryan Uelk; Samuel Cammer
Email: Stuart.Levi@skadden.com; Brandon.VanDyke@skadden.com; Ron.Meisler@skadden.com; Bryan.Uelk@skadden.com; Samuel.Cammer@skadden.com

if to [Winning Bidder], to:

[●]
Attention: [●]
E-mail: [●]

with a copy to:

[●]
Attn: [●]
Email: [●]

or such other address or e-mail address as such party may hereafter specify for such purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the

place of receipt and such day is a Business Day in the place of receipt and, in the case of notice by e-mail, upon receipt by the notifying party of confirmation by the receiving party of receipt of the notifying e-mail on the same day such e-mail notice and request for receipt was given. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

9.8 Severability. If any provision, sentence, phrase or word of this Agreement or the application thereof to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision, sentence, phrase or word to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby and a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid provision.

9.9 Amendments and Waivers. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

9.10 Representations and Warranties. Each Party represents and warrants to the other Party that (i) it has the requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of such Party, and (iii) this Agreement has been duly executed and delivered by such Party and constitutes the valid and binding obligation of such Party, enforceable against it in accordance with the terms hereunder.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**DISNEY WORLDWIDE SERVICES, INC.**

By: ______________________________
Name:
Title:

**[WINNING BIDDER]**

By: ______________________________
Name:
Title:

# SCHEDULE A

## Form of Services Schedule

| | |
|---|---|
| **Service Name** | **Transition Services** |
| **Summary** | Transition services to support the Purchased Assets. |
| **Service Description** | Personnel needed to support the Purchased Assets. |
| **Service Term** | Not to exceed the lesser of (a) sixty (60) days following the Effective Date and (b) seventy-five (75) days following the conclusion of the Auction. |
| **Service Recipient Contact** | [●] |
| **Service Provider Contact** | Justin Radell, Assistant General Counsel, The Walt Disney Company |

## SCHEDULE B

### Excluded Services

The following corporate services:

1. legal and compliance advice;
2. tax advice;
3. human resources (including any hiring and firing decisions, or any actual hiring or firing of employees);
4. employee benefits (including allocation or issue of employee credit cards and cell phones);
5. treasury;
6. public policy;
7. government relations;
8. communications and marketing;
9. senior management;
10. procurement;
11. corporate development or strategy; and
12. any disaster recovery, crisis management and/or business continuity arrangements.

# SCHEDULE C

**Service Managers**

- Disney: Justin Radell, Assistant General Counsel, The Walt Disney Company
- [Winning Bidder]: [●]

**Executive Leadership Groups**

- Disney: Justin Radell, Assistant General Counsel, The Walt Disney Company
- [Winning Bidder]: [●]

## SCHEDULE D

**Data Processing Addendum**

1. Definitions.

(a) "Data Protection Law" means any Law (including any and all legislative and/or regulatory amendments or successors thereto) regarding privacy, data protection, information security, and/or the Processing of Personal Data.

(b) "Personal Data" means any Service Recipient Data that relates to, or can be used to identify, contact, or precisely locate an identified or identifiable individual, and information considered to be personal data or personal information as defined under, or otherwise governed by, applicable Data Protection Law.

(c) "Process," "Processing" or "Processed" means any operation or set of operations which is performed upon Personal Data irrespective of the purposes and means applied, including access, collection, recording, organization, structuring, adaptation, alteration, retrieval, consultation, retention, storage, transfer, disclosure (including disclosure by transmission), dissemination or otherwise making available, alignment, combination, use, blocking, erasure and destruction.

(d) "Security Incident" means any unlawful or unauthorized Processing, destruction, alteration, disclosure, loss, acquisition or access to Personal Data or any other compromise of Personal Data in the possession or control of Service Provider. For the avoidance of doubt, Service Recipient Systems are not in the possession, custody or control of Service Provider.

(e) "Service Recipient Systems" means any system in the possession, custody or control of Service Recipient.

(f) Unless otherwise defined, the capitalized terms in this Schedule D shall have the same meaning as such terms in the Agreement.

2. Data Processing. The Parties acknowledge that Service Provider and its personnel may provide limited professional services as a courtesy to Service Recipient in connection with the Services, and that such Services will be provided by Service Provider using only Service Recipient Systems. Service Recipient remains solely responsible for determining the purposes and means of Processing, providing lawful and documented instructions, ensuring that such instructions comply with applicable Data Protection Laws, and satisfying all controller obligations with respect to Personal Data. Service Provider will Process Personal Data only as reasonably necessary to provide the Services and only on Service Recipient's documented instructions, except as otherwise required by Law. To the extent Service Provider's personnel access Personal Data, such access will be conducted directly through Service Recipient Systems using Service Recipient-managed laptops or devices, and Service Provider will not be required to receive, host, copy, retain, or maintain Personal Data outside of Service Recipient Systems unless expressly agreed in writing.

Service Provider's obligations as processor are limited to the obligations required by Data Protection Laws and those expressly set forth in this Schedule D, and Service Provider will otherwise have no liability for Service Recipient Systems or Service Recipient's instructions, data, notices, consents, legal bases, or other controller obligations. Service Provider agrees that it will:

(a) follow Service Recipient's lawful, documented instructions for Processing Personal Data, provided that Service Provider shall not be responsible for determining whether such instructions comply with Data Protection Laws;

(b) promptly notify Service Recipient if Service Provider determines an instruction of Service Recipient with respect to Personal Data is unlawful;

(c) promptly notify Service Recipient if Service Provider determines that it can no longer comply with Service Recipient's documented instructions or applicable processor obligations under this Schedule D;

(d) ensure that Service Provider's personnel who access Personal Data are subject to appropriate confidentiality obligations and receive privacy and security training appropriate to their role;

(e) provide reasonable information in Service Provider's possession or control necessary to demonstrate compliance with this Schedule D, provided that unless otherwise required by Data Protection Law, any review or audit will be limited to information reasonably necessary to assess Service Provider's processor obligations and will not require access to Service Provider's systems, networks, or any confidential information; and

(f) provide reasonable assistance to Service Recipient to the extent such assistance is reasonably necessary for Service Recipient to comply with its controller obligations under Data Protection Laws and relates to Personal Data Processed by Service Provider under this Agreement.

3. Data Security. Service Provider shall maintain reasonable and appropriate administrative, technical, and organizational measures designed to protect Personal Data Processed by Service Provider against unauthorized Processing, access, disclosure, or loss, taking into account the nature of the limited access provided and the fact that access will occur through Service Recipient Systems on Service Recipient-managed laptops or devices.

4. Security Incident. In the event Service Provider becomes aware of a Security Incident, it shall notify Service Recipient promptly and without undue delay and in any event within forty-eight (48) hours of becoming aware of the Security Incident. Unless otherwise required by applicable Law, Service Provider shall not notify any third party of, or make any public announcement concerning, the Security Incident where such notification or announcement expressly identifies Service Recipient without Service Recipient's prior written consent. Service Provider shall promptly investigate the Security Incident to the

extent possible within its reasonable capacity. In the event of legal action brought by either Party against a third party in connection with a Security Incident, Service Provider and Service Recipient each agree that it shall provide such assistance as may be reasonably necessary to enable the other Party to successfully prosecute such legal action.

5. Data Subject Requests and Regulatory Requests. Service Provider will provide reasonable assistance to the extent Service Provider is legally required to assist and such assistance relates to Personal Data Processed by Service Provider under this Agreement. Because access to Personal Data is expected to occur through Service Recipient Systems and Service Provider is not expected to separately host or retain Personal Data, Service Provider's data subject and regulatory requests obligations shall apply only to Personal Data, if any, in Service Provider's possession or control.

6. Controller Obligations. Service Recipient will comply with all obligations of a controller with respect to the Processing of Personal Data pursuant to this Agreement, including providing all required notices, obtaining all required consents or other legal bases, responding to data subject and regulatory requests, and ensuring that its instructions to Service Provider are lawful, complete, accurate, and documented.

7. Termination of Processing. Upon termination or expiration of the Agreement, Service Provider shall cease Processing Personal Data as soon as reasonably practicable, except to the extent continued Processing is required by Data Protection Law or necessary to complete wind-down activities. Because access to Personal Data is expected to occur through Service Recipient Systems and Service Provider is not expected to separately host or retain Personal Data, Service Provider's return or deletion obligations shall apply only to Personal Data, if any, in Service Provider's possession or control.

8. Cross-Border Transfer. In the event that Data Protection Laws impose restrictions on the cross-border transfer of Personal Data that are not contemplated herein, the Parties agree to meet in good faith to complete any formalities and enter any documents as may be required by such Data Protection Laws.

9. For the avoidance of doubt, the terms of this Schedule D shall not apply where both Parties agree that they act as independent controllers with regard to applicable Personal Data. In the event that both Parties act as independent controllers with regard to any Services, the Parties shall negotiate in good faith the terms under which such Services shall be provided.