# EXHIBIT B

## Stalking Horse Transaction Agreement

# STALKING HORSE TRANSACTION AGREEMENT

This STALKING HORSE TRANSACTION AGREEMENT (this "**Agreement**") is entered into by and between Disney Worldwide Services, Inc., a Florida corporation ("**Licensee**"), and Character Technologies, Inc., a Delaware corporation ("**Licensor**"). Capitalized terms used, but not otherwise defined, herein shall have their respective meanings set forth in the Exclusivity and Prepayment Agreement.

W I T N E S S E T H

WHEREAS, Licensor and Licensee are parties to that certain letter agreement, dated September 18, 2026 (the "**Exclusivity and Prepayment Agreement**") and that certain Transition Services Agreement, dated as of September 18, 2026 as amended on October 13, 2026 (the "**TSA**");

WHEREAS, the Exclusivity and Prepayment Agreement contemplates that Licensor and Licensee will execute this Agreement, and this Agreement is being entered into by Licensor and Licensee to satisfy the requirements described therein;

WHEREAS, in connection with the transactions contemplated by the Exclusivity and Prepayment Agreement, Licensor intends to provide Licensee with the License Grant of the Licensed IP and convey to Licensee, and Licensee intends to purchase from Licensor, the Purchased Employee Claims on the terms and conditions set forth herein;

WHEREAS, in connection with the transactions contemplated by the Exclusivity and Prepayment Agreement, Licensee in coordination with Licensor, has made offers to and hired certain employees of Licensor, including certain of Licensor's officers, and is providing transition services for a period of time to the Licensor pursuant to the TSA, and Licensor has provided a release of claims for the benefit of such employees, each in an effort to assist the Licensor in its efforts to maximize value and minimize employee attrition risk;

WHEREAS, the parties acknowledge and agree that the transactions contemplated by this Agreement, the Exclusivity and Prepayment Agreement, and the TSA have been and are, made at arm's length and in good faith;

WHEREAS, in furtherance of the foregoing, Licensor intends to commence a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, the execution and delivery of this Agreement is subject to, among other things, the entry of the 363 Free and Clear Order; and

WHEREAS, the parties desire to consummate the proposed transaction ("**Proposed Transaction**") contemplated by this Agreement, the Exclusivity and Prepayment Agreement, and the TSA as promptly as practicable after the Bankruptcy Court enters the 363 Free and Clear Order.

NOW, THEREFORE, subject to the terms, conditions, covenants and provisions of this Agreement, the TSA, the Exclusivity and Prepayment Agreement, and the 363 Free and Clear Order (collectively, the "**Transaction Documents**"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by this Agreement and the other Transaction Documents (as applicable), Licensor and Licensee, for themselves, their successors and assigns, mutually covenant and agree as follows:

1. Definitions. As used in this Agreement, the following terms shall have the following meanings:

1.1. "**363 Free and Clear Order**" means the Bankruptcy Court order approving, among other things, the Proposed Transaction, including this Agreement and assumption of the TSA, substantially in the form attached hereto as Exhibit A, and which shall be in form and substance acceptable to Licensee in its sole and absolute discretion; provided, however, that an order in the form of Exhibit A is acceptable to Licensee.

1.2. "**Affiliate**" means any entity directly or indirectly controlling or controlled by or in common control with The Walt Disney Company ("**TWDC**") (but only for so long as such entity is an Affiliate of Disney), where "control" is defined as the ownership of at least 50% of the equity or beneficial interests of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity, and any other entity with respect to which TWDC or any of such Affiliates has management or operational responsibility (even though TWDC or such Affiliate may own less than 50% of the equity of such entity).

1.3. "**Agreement**" has the meaning set forth in the Preamble.

1.4. "**Bankruptcy Code**" has the meaning set forth in the Recitals.

1.5. "**Bankruptcy Court**" has the meaning set forth in the Recitals.

1.6. "**Bid Deadline**" means the deadline by which a party must submit a qualified bid in accordance with the terms of the Bidding Procedures Order.

1.7. "**Bidding Procedures Motion**" means a motion seeking entry of the Bidding Procedures Order.

1.8. "**Bidding Procedures Order**" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B, approving, among other things, the execution, delivery, and performance of this Agreement by Licensor (other than the performance of those obligations to be performed at or after the Closing), including payment of the Bid Protections, the Licensor's designation of the Licensee as the stalking horse, the bidding procedures for the submission of competing bids and the conduct of the auction, and the implementation of an

initial overbid amount and subsequent bidding increments for the auction, certain bidding procedures in connection therewith, which shall be satisfactory to the Licensee in its sole discretion; provided, however, that an order substantially in the form attached hereto as Exhibit B is acceptable to Licensee. For the avoidance of doubt, references to the "Bidding Procedures Order" encompass the bidding procedures approved thereby.

1.9. "**Bid Protections**" has the meaning set forth in Section 16.2(b).

1.10. "**Chapter 11 Case**" has the meaning set forth in the Recitals.

1.11. "**Claims**" has the meaning set forth in Section 12.1.

1.12. "**Closing**" has the meaning set forth in Section 7.1.

1.13. "**Closing Notice**" has the meaning set forth in Section 15.

1.14. "**Company Service Provider**" has the meaning set forth in Section 12.1.

1.15. "**Derivative Work**" means any "derivative work" as defined in the Copyright Law of the U.S., Title 17 U.S.C. § 101 *et seq.*

1.16. "**Disney**" means TWDC and its Affiliates.

1.17. "**Disney Assignee**" has the meaning set forth in Section 3.3.

1.18. "**Encumbrances**" has the meaning set forth in Section 6.3.

1.19. "**Exclusivity and Prepayment Agreement**" has the meaning set forth in the Recitals.

1.20. "**Finished Model**" means an AI model that has completed the entire development and refinement pipeline, and that is ready for use by end users.

1.21. "**Hired Employees**" has the meaning set forth in Section 12.1.

1.22. "**Intellectual Property Rights**" means any and all tangible and intangible and now known or hereafter existing (a) rights associated with works of authorship throughout the universe, including copyrights (including the sole and exclusive right to prepare Derivative Works of the copyrighted work and to copy, manufacture, reproduce, distribute copies of, modify, publicly perform and publicly display the copyrighted work and all Derivative Works thereof), Moral Rights, author's rights and mask-work rights; (b) rights in and relating to the protection of trade secrets and confidential information; (c) Patent Rights; (d) trade names, logos, common law trademarks and service marks, trademark and service mark registrations or any other brand elements, and applications therefor (including intent to use applications) throughout the world, and domain names, uniform resource locators, other names and locators associated with the Internet,

and applications or registrations therefor; (e) other intellectual and industrial property and proprietary rights (of every kind and nature throughout the universe and however designated) relating to intangible property that are analogous to any of the foregoing rights (including logos, character rights, "rental" rights and rights to remuneration), whether arising by operation of law, contract, license or otherwise; (f) in each case of the foregoing (a) through (e), if applicable, registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force in the U.S. and throughout the universe (including rights in any of the foregoing); and (g) in each case of the foregoing (a) through (e), rights in and relating to the sole and exclusive possession, ownership and use of any of the foregoing throughout the universe, including the right to license and sublicense, franchise, assign, pledge, mortgage, sell, transfer, convey, grant, gift over, divide, partition and use (or not use) in any way any of the foregoing now or hereafter.

1.23. "**License Grant**" has the meaning set forth in Section 3.1.

1.24. "**Licensed IP**" has the meaning set forth in Section 3.1.

1.25. "**Licensed Patents**" means the patents and patent applications (whether or not published) listed on Schedule A hereto or otherwise owned by Licensor as of the Closing, and all Patent Rights claiming priority to such patents and patent applications (whether or not published).

1.26. "**Licensee Products and Services**" means any products and services offered by Licensee or a Disney Assignee in the capacity of a permitted transferee or sublicensee, in any embodiment under branding owned or controlled by Licensee or, as applicable, a Disney Assignee.

1.27. "**Licensed Technology**" means the Technology listed on Schedule A hereto and all related Intellectual Property Rights owned by Licensor, but excluding Excluded IP.

1.28. "**Licensee**" has the meaning set forth in the Preamble.

1.29. "**Licensee Parties**" has the meaning set forth in Section 12.1.

1.30. "**Licenses**" has the meaning set forth in Section 6.1.

1.31. "**Licensor**" has the meaning set forth in the Preamble.

1.32. "**Moral Rights**" means rights of attribution, paternity and integrity, claims to authorship, rights to object to any distortion, mutilation or other modification of, or other derogatory actions in relation to, any Intellectual Property Rights, whether or not such would be prejudicial to a party's honor or reputation, and any similar right, existing under applicable laws.

1.33. "**Mutual NDA**" has the meaning set forth in Section 17.3.

1.34. "**Outputs**" means the text, image, audio, video, data or other materials, generated or output by any use of the Licensed IP, but excluding the Licensed IP itself.

1.35. "**Outside Date**" means December 17, 2026.

1.36. "**Patent Rights**" means any and all national, regional and international patents and patent applications, designs, and other industrial property rights and rights associated therewith, and all continuations, continuations-in-part, divisionals, provisionals, revalidations, reissues, reexaminations, substitutions, restorations, extensions (including supplementary protection certificates and the like) and patents of addition.

1.37. "**Petition Date**" means the date on which the Licensor commences the Chapter 11 Case in the Bankruptcy Court.

1.38. "**Purchased Employee Claims**" has the meaning set forth in Section 5.2.

1.39. "**Refundable Deposit**" has the meaning set forth in Section 5.1.

1.40. "**Refundable Deposit Notice**" has the meaning set forth in Section 5.1.

1.41. "**Releasing Parties**" has the meaning set forth in Section 12.1.

1.42. **"Remaining Cash Consideration"** has the meaning set forth in Section 5.1.

1.43. "**SHA Released Matters**" has the meaning set forth in Section 12.1.

1.44. "**Technology**" means all technology, methods, techniques, processes, designs, design rules, inventions (whether or not patented or patentable), diagrams, plans, discoveries, ideas, concepts, prototypes, specifications, schematics, formulae, compositions, communication protocols, algorithms, routines, reports, layout designs, topographies, cores, blocks, libraries, technology business plans, technology proposals, technology financial information, technology pricing and cost information, bills of material, user interfaces, websites, network configurations and architectures, test vectors and procedures, protocols, works of authorship, artificial intelligence (including deep learning, machine learning, natural language processing, neural network and reinforcement learning technologies, foundation models, language models, multi-modal models, world models, robotics and embodied models and agentic and embedding models), including all components, artifacts, materials and information embodying, comprising or used to develop, train, fine-tune, evaluate, deploy or operate such technologies (such as architectures, weights, parameters and other model artifacts, training, fine-tuning, evaluation, inference and orchestration pipelines, code, recipes, configurations, prompts, safety controls, benchmarks, evaluation and experiment results and memory and retrieval systems), software, files, information, documentation, test data, design data, performance data, quality data, technical data, datasets, databases and data collections, metadata and other scientific or technical information, as well as any other forms of technology and

embodiments of Intellectual Property Rights, in each case whether or not embodied in any tangible form.

1.45. "**Term Sheet**" means that certain binding term sheet attached to the Exclusivity and Prepayment Agreement.

1.46. "**Transaction Documents**" has the meaning set forth in the Recitals.

1.47. "**TSA**" has the meaning set forth in the Recitals.

1.48. "**TWDC**" has the meaning set forth in Section 1.2.

1.49. "**Unprocessed Data**" means any data collected by or on behalf of Licensor or its affiliates from publicly available sources and in Licensor's or its affiliates' possession or control that has not undergone Licensor's standard practices for onboarding such data into one or more Licensor database(s) of data available for training purposes, including pre-processing, de-identification, classification, reformatting, data cleaning or other similar processing activities.

1.50. "**Up-Front Payment**" has the meaning set forth in Section 5.1.

2. Certain Capitalized Terms. Capitalized terms used but not defined herein shall have the meanings given to them in the Exclusivity and Prepayment Agreement or the Term Sheet.

3. License Scope.

3.1. Grant of License. Subject to Section 3.2 and effective as of the Closing, Licensor shall grant and hereby grants to Licensee, and Licensee accepts, on the terms and conditions set forth herein, a perpetual, worldwide, non-exclusive, transferable (in accordance with Section 3.3), sublicensable (through multiple tiers; in accordance with Section 3.4), non-terminable, irrevocable, fully paid-up, royalty-free right and license: (a) to use, integrate, copy and reproduce, distribute, execute, display, perform, modify and make Derivative Works of, the Licensed Technology in connection with Licensee Products and Services, and (b) under the Licensed Patents to make, have made, use, have used, sell, offer for sale, import, export, distribute, develop, and otherwise commercially exploit Licensee Products and Services, and to practice any and all methods and processes claimed in the Licensed Patents in connection with the foregoing (the Licensed Technology and Licensed Patents, collectively, the "**Licensed IP,**" and such grant of license set forth in this Section 3.1, the "**License Grant**"). As set forth more fully in Section 13 below, the License Grant shall be a license of "intellectual property rights" for the purposes of Section 365(n) of the U.S. Bankruptcy Code.

3.2. Excluded IP. For the avoidance of doubt, Licensee acknowledges that the Licensed IP does not include: (a) any Technology or Intellectual Property Rights licensed by Licensor from a third party; (b) any trade names, logos, common law trademarks and service marks, trademark and service mark registrations or any other brand elements, and applications therefor (including intent to use

applications); (c) any domain names, uniform resource locators, other names and locators associated with the Internet, and applications or registrations therefor or social media accounts or handles and any website content; (d) any consumer-facing applications of Licensor; (e) Licensor's end user data or databases, any personally identifiable information of Licensor end users, any input entered by Licensor end users when engaging with Licensor's products and services, or any outputs generated for end users by Licensor's products and services; (f) any Unprocessed Data; or (g) training data or any Finished Models, including each user-selectable conversational model or chat style (collectively, the "**Excluded IP**").

3.3. Transferability. The License Grant may be assigned or transferred by Licensee without the prior written consent of Licensor only to: (a) any buyer or successor entity in connection with the sale, divestiture or spin-off of a business, asset or entity from Disney (i) that is using the Licensed IP at the time of closing of such sale, divestiture or spin-off or (ii) to which the Licensed IP relates or (b) Affiliates of Licensee (collectively, (a) and (b), "**Disney Assignees**"); in each case of the foregoing (a) and (b), with the right to sublicense through multiple tiers solely as set forth in Section 3.4. For the avoidance of doubt, Licensee may not sublicense (other than as set forth in Section 3.4), transfer or assign (other than as set forth in this Section 3.3) the License Grant on a standalone basis to any third party.

3.4. Sublicensing. The License Grant may be sublicensed (through multiple tiers) by Licensee or any Disney Assignee only to (a) consumer end users of Licensee Products and Services as necessary for their receipt or use of such Licensee Products and Services, (b) service providers, subcontractors, agents, or vendors and any distributors, resellers, systems integrators or other entities in any applicable channel of distribution (i) of the Licensee Products and Services themselves and with respect to the Licensee Products and Services, (ii) of Disney in connection with the provision of services to Disney with respect to the Licensee Products and Services, or (iii) of a Disney Assignee with respect to the provision of services to such Disney Assignee in connection with the Licensee Products and Services, (c) Affiliates of Disney (but only for so long as such entity is an Affiliate of Disney) and (d) a Disney Assignee in accordance with Section 3.3, but only to conduct the acquired business as it was conducted as of such divestiture or spin-off (and any natural extensions or evolutions thereof). Licensee shall ensure that its sublicensees comply with all of the applicable provisions of this Agreement and shall be responsible and liable to Licensor in the event that any of its sublicensees fail to comply with such provisions.

3.5. No Implied Restrictions. No provision of this Agreement shall be construed to require Licensee to meet minimum sales, development, or commercialization obligations, or to mark products.

3.6. Survival of License. The License Grant shall survive any (a) termination of the Transaction Documents or this Agreement; (b) change of control, or assignment or exclusive licensing of the Licensed IP, in whole or in part, occurring after the

Closing; and (c) bankruptcy or insolvency of Licensor (including the protections available under Section 365(n) of the U.S. Bankruptcy Code).

3.7. Delivery. On and after the date hereof and up to the Closing, Licensor and Licensee shall meet and confer on the process, information and other steps necessary to enable Licensor to make available to Licensee on the Closing the Licensed Technology pursuant to the License Grant by providing Licensee with access to the relevant GitHub and Google Drive repositories (or any other means necessary to make the Licensed Technology available to Licensee). Licensor shall implement such access for a thirty (30) day period and Licensee shall reasonably cooperate in facilitating such implementation.

3.8. Prosecution. Licensor shall have no obligation to prosecute, maintain, enforce, support or update the Licensed IP.

4. Ownership.

4.1. Ownership of Licensed IP. Licensor shall retain ownership of all right, title and interest in the Licensed IP and may continue to use, develop, license and otherwise exploit or monetize the Licensed IP.

4.2. Ownership of Derivative Works. Licensee shall own any right, title and interest in all modifications, improvements, enhancements, Derivative Works (other than the original work that is Licensed IP for such Derivative Work) and Outputs (including any models, weights and synthetic data), in each case created by or on behalf of Licensee with respect to the Licensed IP. For the avoidance of doubt, this Section 4.2 shall not be deemed an assignment of any of the foregoing (including any Intellectual Property Rights therein or thereto) from Licensor to Licensee. Licensor and any successor (including a buyer of Licensor's Intellectual Property Rights) shall not (a) challenge, through the courts, administrative governmental bodies, private organizations, or in any other manner the rights of Licensee to exploit the Outputs by any means whatsoever, or (b) thwart, hinder or subvert the intent of the grants to Licensee herein; provided that, in each case of the foregoing (a) and (b), Licensor does not otherwise have a reasonable basis to assert that the Outputs infringe upon Licensor's Intellectual Property Rights that were not part of the Licensed IP and such Outputs were not generated in violation of, and do not relate to a violation of, this Agreement with respect to Licensed IP.

4.3. Confidentiality. Licensee shall treat any source code in the Licensed Technology as confidential information of Licensor pursuant to the Mutual NDA and will be treated in a confidential manner until it ceases to qualify as confidential information.

5. Additional Covenants.

5.1. Cash Consideration. For the avoidance of doubt, the up-front payment in the amount of $5.5 million (the "**Up-Front Payment**") and the refundable deposit in

the amount of $2 million (the "**Refundable Deposit**") were paid by Licensee to Licensor on the date of, and in accordance with, the Exclusivity and Prepayment Agreement and the remaining $12.5 million of the Cash Consideration owed shall be paid upon the Closing (the "**Remaining Cash Consideration**"). The Refundable Deposit shall be promptly and fully refundable to Licensee if (i) Licensee is not selected as the winning bidder (to the extent there is an auction), (ii) the Proposed Transaction is not consummated prior to the Outside Date (as may be extended by mutual agreement) or (iii) Licensee is entitled to a refund under Section 1(b) of the Exclusivity and Prepayment Agreement. To the extent the Refundable Deposit is payable to Licensee in accordance herewith, or in accordance with the terms of the Exclusivity and Prepayment Agreement, Licensee shall provide a notice to Licensor specifying the account to which the Licensor shall wire funds in the amount of the Refundable Deposit (the "**Refundable Deposit Notice**"), and the Licensor shall wire such funds to Licensee no later than three business days following the date of the Refundable Deposit Notice.

5.2. Conveyance of Employee Claims. Effective as of the Closing, Licensor shall transfer and convey to Licensee, and Licensee shall purchase and accept, for good and valuable consideration any unreleased claims that Licensor has against any former Licensor employees that accept offers of employment with Disney or any of its Affiliates (the "**Purchased Employee Claims**").

5.3. Bankruptcy Court Filings.

(a) The Licensor shall consult with the Licensee concerning the Bidding Procedures Order and the 363 Free and Clear Order, as well as any other orders of the Bankruptcy Court relating to the Proposed Transaction, and the bankruptcy proceedings in connection therewith, and will provide the Licensee with copies of any material applications, pleadings, notices, proposed orders, and other documents to be filed by the Licensor in the Chapter 11 Case that relate in any way to the Proposed Transaction at least three (3) business days prior to the making of any such filing or submission to the Bankruptcy Court or as soon as reasonably practicable. The Licensor shall provide the Licensee with prompt notice of (A) the filing of any objection to (or any threat or notice of intention by any person to file any objection to) this Agreement, the Proposed Transaction, the Bidding Procedures Motion, the Licensee or (B) the commencement of (or any threat or notice of intention of any person to commence), any action, suit, proceeding, whether at law or in equity or by or before any governmental authority or in arbitration, that relates in any way to this Agreement, the Bidding Procedures Order, or the Proposed Transaction.

(b) Licensor shall file the Bidding Procedures Motion with the Bankruptcy Court on or prior to October 13, 2026.

(c) Licensor shall cause the Bid Deadline to occur by November 20, 2026, and, if an auction is necessary, shall cause the auction to occur by

November 23, 2026, or such later dates as may be required by the Bankruptcy Court.

(d) Licensor shall not take any action to cause the Chapter 11 Case to be dismissed or converted to a case under chapter 7 of the Bankruptcy Code prior to the Closing.

5.4. Diligence Access. The Licensor shall give or have given, as applicable, Licensee reasonable access to diligence relevant to the Proposed Transaction consistent with the Term Sheet.

5.5. Expenses. Each party will be responsible for its own costs and expenses, including, without limitation, all fees and expenses of such party's representatives, incurred in connection with a potential transaction, including the negotiation of the term sheet and the negotiation, delivery and execution of the Exclusivity and Prepayment Agreement and the definitive agreements underlying the Proposed Transaction.

6. Representations and Warranties. The following representations and warranties are made as of the date of this Agreement.

6.1. Proprietary Rights Warranty. Licensor hereby represents and warrants: (a) it is the exclusive owner of the Licensed IP (other than any open source software therein), (b) that it has obtained all other rights, licenses, permissions or other consents (if any) necessary (collectively, "**Licenses**") to grant the License Grant; (c) there is no, and in the past two (2) years there has not been, any claim, litigation or proceeding pending or threatened in writing challenging the Licensor's ownership of the Intellectual Property Rights in the Licensed IP; and (d) all employees and other contractors who created any material Licensed IP entered into binding agreements with Licensor that assigned to Licensor such employee's or contractor's rights in or to such Licensed IP, or such rights vested in Licensor by operation of law with respect to employees.

6.2. Organization and Standing. Each party represents and warrants to the other party that it is duly organized, validly existing and in good standing (where applicable) under the laws of its applicable jurisdiction of organization.

6.3. Encumbrances. Licensor hereby represents and warrants that the Licensed IP is free and clear of all liens, claims (including successor liability), liabilities, interests and encumbrances (the "**Encumbrances**") that would prevent the granting or exercise of the License Grant; provided, however that the Parties agree that other non-exclusive licenses of the Licensed IP are not Encumbrances on the Licensed IP.

6.4. Due Authorization. Each party represents and warrants to the other party that (i) it has the requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery,

and performance of this Agreement have been duly authorized by all necessary corporate action on the part of such party, and (iii) this Agreement has been duly executed and delivered by such party and constitutes the valid and binding obligation of such party, enforceable against it in accordance with its terms.

6.5. Ownership of Employee Claims. Licensor has good and valid title to all of the Purchased Employee Claims, and at the Closing, Licensee will acquire good and valid title to the Purchased Employee Claims free and clear of all liens, claims, encumbrances, and other interests.

6.6. Compliance with Laws. Licensor hereby represents and warrants that, (a) in all material respects and to its knowledge, it is, and has been, in compliance with, and is not in default under, or in violation of any laws applicable to its development of Licensed IP, and (b) except as previously disclosed to Licensee, there are no filed and pending or, to the knowledge of Licensor, threatened in writing during the twelve (12) months prior to the Effective Date, claims from any governmental authority relating to any non-compliance of Licensor with respect to its development or commercialization of Licensed IP.

6.7. Disclaimers. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THIS SECTION 6, THE LICENSED IP IS PROVIDED "AS-IS." LICENSOR MAKES NO ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER. LICENSOR EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. LICENSOR DOES NOT WARRANT THAT LICENSEE'S USE OF THE LICENSED IP WILL BE ERROR-FREE, SECURE, OR UNINTERRUPTED. LICENSOR EXERCISES NO CONTROL OVER AND EXPRESSLY DISCLAIMS ANY LIABILITY ARISING OUT OF OR BASED UPON THE LICENSEE'S USE OF THE LICENSED IP.

7. Closing.

7.1. Closing Details. The purchase, sale, assignment and conveyance of the Licensed IP and the Purchased Employee Claims contemplated by this Agreement and the other Transaction Documents shall be deemed to take place at 12:01 a.m. Eastern Time, on the date on which the Licensee delivers the Closing Notice to the Licensor (the "**Closing**").

7.2. Licensor Deliverables. At or prior to Closing, Licensor shall deliver or cause to be delivered to Licensee: (i) this Agreement, duly executed by Licensor; (ii) access to the Licensed Technology as described in Section 3.7; (iii) a duly executed certificate of a duly authorized officer of Licensor certifying the

satisfaction, unless waived by Licensee, of the conditions set forth in Section 14.1 and 14.2; and (iv) a copy of the entered 363 Free and Clear Order.

7.3. Licensee Deliverables. At or prior to Closing, Licensee shall deliver or cause to be delivered to Licensor: (i) this Agreement, duly executed by Licensee; (ii) the Remaining Cash Consideration and permission to release the Licensee's deposit to Licensee; and (iii) a duly executed certificate of a duly authorized officer of Licensor certifying the satisfaction, unless waived by Licensor, of the conditions set forth in Section 14.1 and Section 14.3.

8. Promotion. For the avoidance of doubt, Licensor shall acquire no right under this Agreement to use, and shall not use, the names "Disney", "ABC", "ESPN", "Pixar", "Marvel", "Lucasfilm" or "National Geographic" (either alone or in conjunction with or as a part of any other word or name) or any fanciful characters or designs of The Walt Disney Company or any of its Affiliates: (a) in any advertising, publicity, promotion or other disclosures of similar type; (b) to express or to imply any endorsement of any product or service; or (c) in any other manner (whether or not similar to uses prohibited by (a) and (b) above). The provisions of this Section 8 shall survive expiration or termination of this Agreement or any determination that this Agreement or any portion hereof is void or voidable.

9. Equitable Relief. Each Party acknowledges and agrees that any failure by such Party to perform its obligations under this Agreement may result in irreparable harm to the other Party, because monetary damages alone would not provide sufficient relief, and that the other Party is therefore entitled to seek specific performance or an injunction (without any need or requirement to post a bond) to enforce all its rights under this Agreement in accordance with the terms of this Agreement.

10. Consequential Damages. EXCEPT FOR ANY LIABILITY FOR LICENSOR'S BREACH OF SECTION 8 (PROMOTION), NEITHER PARTY SHALL BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES WITH RESPECT TO, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

11. Term. The term of this Agreement shall commence upon the Closing and continue in perpetuity.

12. Release and Waiver.

12.1. Licensor, for itself and on behalf of its affiliates and each of its and their Representatives, and any successors and assigns of the foregoing (individually and collectively, the "**Releasing Parties**" and, each such party, a "**Releasing Party**"), hereby irrevocably, unconditionally and forever acquits, releases, waives and discharges, and further covenants and agrees that it will not assert, and completely waives and relinquishes, any claims against Licensee and its Affiliates and any of its or their Representatives (including any Company Service Provider (as defined below) hired by Licensee or any of its Affiliates (the "**Hired Employees**")), divisions, affiliated corporations, affiliated non-corporation

entities and any successors, predecessors and assigns of the foregoing (individually and collectively, the "**Licensee Parties**") from any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action, liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, the Released Matters (as defined in the Exclusivity and Prepayment Agreement), potential claims, counterclaims, cross-claims or demands, in law or in equity, asserted or unasserted, express or implied, actual or potential, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that a Releasing Party had, presently has or may hereafter have or claim or assert to have against any of the Licensee Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and through either the Closing or entry of the 363 Free and Clear Order, whichever is later (collectively, the "**Claims**"), including any Claims that in any way arise from or out of, are based upon or indirectly or directly relate to the following: (a) the negotiation or execution of this Agreement, the Exclusivity and Prepayment Agreement, or the other Transaction Documents or any of the transactions contemplated hereby or thereby, other than any claim arising out of a breach of Licensee's obligations under this Agreement, the Exclusivity and Prepayment Agreement, or the other Transaction Documents; (b) the recruitment, solicitation, hiring, employment or engagement by Licensee or any of its Affiliates of, or the offer of employment by Licensee or any of its Affiliates to, any current or former employee, consultant or other service provider of Licensor or any of its Affiliates (each, a "**Company Service Provider**"), and any restriction applicable to any Company Service Provider with respect to entering into any and all arrangements with, and providing any and all services and information to, the Licensee Parties; (c) any wind-up, liquidation, dissolution or cessation of Licensor's and its affiliates' business operations or the sale or license of Licensor's and its affiliates' assets, including the termination of any Company Service Provider; (d) the provision of any services by (i) any Company Service Provider to Licensee or the other Licensee Parties and (ii) any Hired Employee to Licensor or any of its affiliates (in each case, including the use of any Technology and Intellectual Property Rights developed by such employees, consultants or other service providers during their employment with, or provision of services to, Licensor or any of its affiliates, or otherwise developed or owned by Licensor or its affiliates, or the use of any ideas, know-how and techniques); and (e) the Licensed IP; (all Claims, including the foregoing (a)-(e), collectively including the scope and substance of the releases set forth in the Exclusivity and Prepayment Agreement, the "**SHA Released Matters**"); *provided*, *however*, that such Releasing Party is not releasing and does not acquit, waive, relinquish or discharge, and the SHA Released Matters do not include, any rights or claims (x) available pursuant to this Agreement, the Exclusivity and Prepayment Agreement or any other Transaction Document to which Licensor and Licensee are a party or the transactions contemplated hereby or thereby, including any employment, compensation or other arrangements between a Hired Employee and any

Licensee Party or (y) any matter that cannot be released as a matter of applicable law. Licensor, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Licensee or any of the Licensee Parties in connection with any of the SHA Released Matters. Further, without limiting the foregoing, Licensor, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Licensee or any of the Licensee Parties in connection with any SHA Released Matters, including the recruitment, solicitation, hiring, employment or engagement by Licensee or any of its Affiliates of, or the offer of employment by Licensee or any of its Affiliates to, a Company Service Provider (in each case, whether arising prior to, concurrently with or following the Closing).

12.2. As a condition to Licensee entering into this Agreement, Licensor agrees and acknowledges that Licensee and its Affiliates are express third-party beneficiaries of the provisions of this Section 12 with respect to SHA Released Matters as such SHA Released Matters pertain to the Hired Employees and shall have the right, exercisable in the sole discretion of Licensee and its Affiliates, to enforce the terms and conditions of this Section 12, or prevent the breach thereof, or to exercise any other right, or seek any other remedy, which may be available to Licensee and its Affiliates as third-party beneficiaries of this Section 12, in each case, in respect of the SHA Released Matters.

12.3. The releases contained herein are intended to be complete, global and all-encompassing and specifically include claims that are known, unknown, fixed, contingent or conditional with respect to the matters described herein as of the date hereof. Licensor hereby expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the released party, including the following provisions of California Civil Code Section 1542: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

13. Section 365(n) of the Bankruptcy Code. After the Closing, the Parties agree that (i) this Agreement constitutes an executory contract subject to the provisions of Section 365 of the Bankruptcy Code, and (ii) any and all licenses granted to Licensee under this Agreement, are "intellectual property" for purposes of Section 365(n) of the Bankruptcy Code. Notwithstanding the commencement of any proceeding under the Bankruptcy Code or comparable insolvency proceeding by or against Licensor or any subsequent purchaser of all or a portion of the Licensed IP or any Intellectual Property Rights therein after the Closing, (a) all rights in the Licensed IP granted to Licensee under this Agreement shall be deemed fully retained by and vested in Licensee as protected intellectual property rights under Section 365(n), and (b) Licensee shall have all of

the rights afforded to non-debtor licensees under Section 365(n). The Parties further agree that, after the Closing and in the event of a rejection of this Agreement by Licensor in any bankruptcy proceeding by or against Licensor under the Bankruptcy Code or rejection or repudiation by a foreign representative in a foreign bankruptcy proceeding that is subject to chapter 15 of the Bankruptcy Code, if Licensee elects to retain its rights under this Agreement pursuant to Section 365(n)(1)(B), Licensor shall not interfere with Licensee's rights to the Licensed IP and all embodiments thereof in accordance with Section 365(n)(3)(B). Upon the initiation of a voluntary or involuntary bankruptcy proceeding regarding Licensor under the laws of any jurisdiction, anywhere in the world, after the Closing, any rights in Licensed IP granted by Licensor to Licensee pursuant to this Agreement shall survive the bankruptcy of Licensor to the extent permitted under applicable Law. Without limiting the foregoing, Section 365(n) shall apply to any case commenced under chapter 15 of the U.S. Bankruptcy Code and, if the foreign representative in such a case rejects this Agreement within the meaning of Section 365 of the Bankruptcy Code, after the Closing, Licensee shall be entitled to make the election and exercise the rights (and be bound by any consequent obligations) described in Section 365(n) of the Bankruptcy Code.

14. Conditions Precedent to Closing.

14.1. Mutual Conditions. The respective obligations of Licensor and Licensee to consummate the Closing shall be subject to the satisfaction of, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by both Licensor and Licensee:

(a) The closing of the Initial Transaction and all of the conditions precedent thereto shall have occurred.

(b) The absence of laws or court orders prohibiting, enjoining or otherwise staying the License Transaction.

(c) Licensor's board, acting upon the recommendation of a special committee of the board comprised solely of independent directors, will have reviewed and approved the License Transaction, including this Agreement, the transaction economics, and, as applicable, the Break-Up Fee and Expense Reimbursement, bid procedures, and the form of 363 Free and Clear Order.

(d) Receipt of all required approvals to complete the License Transaction, including any consents required related to the License Grant and/or the Licensed IP, if any.

14.2. Conditions to Obligations of Licensee. The obligation of Licensee to consummate the Closing shall be subject to the satisfaction of, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by Licensee in its sole discretion:

(a) The Licensor shall have given Licensee reasonable access to diligence relevant to the Proposed Transaction consistent with the Term Sheet.

(b) Other than the 363 Free and Clear Order, the Transaction Documents shall be reasonably satisfactory to Licensee.

(c) Licensor will have provided Licensee with access to, and copies of, the Licensed Technology pursuant to Section 3.7, which excludes the Excluded IP.

(d) No material adverse development shall have occurred with respect to the Licensed IP or the Key Employee group.

(e) The Bankruptcy Court shall have entered the 363 Free and Clear Order, which shall be a final and non-appealable order and the entered order shall be in form and substance acceptable to Licensee in its sole and absolute discretion.

(f) The 363 Free and Clear Order shall not have been stayed as of the Closing, stayed pending appeal, reversed or vacated.

(g) Licensor shall have delivered or have caused to be delivered to Licensee those deliverables set forth in Section 7.2.

(h) The representations and warranties of Licensor contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a particular period of time, which need only be true and correct in all material respects as of such or with respect to such period).

(i) The Licensor shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by the Licensor on or prior to the Closing.

14.3. Conditions to Obligations of Licensor. The obligation of Licensor to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable law, be waived in writing by Licensor in its sole discretion:

(a) The Licensor shall have received the Remaining Cash Consideration and release of Licensee's Refundable Deposit.

(b) Other than the 363 Free and Clear Order, the Transaction Documents shall be reasonably satisfactory to Licensor.

(c) Licensee shall have delivered or have caused to be delivered to Licensor those deliverables set forth in Section 7.3.

(d) The representations and warranties of Licensee contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a particular period of time, which need

only be true and correct in all material respects as of such or with respect to such period).

(e) The Licensee shall have performed or complied in all material respects with all agreements and covenants required by this Agreement and the other Transaction Documents to be performed or complied with by the Licensee on or prior to the Closing.

(f) The Bankruptcy Court shall have entered an order approving the Proposed Transaction.

15. Closing Notice. Upon such time as the Licensor, acting reasonably and in good faith, determines that the obligations of the Licensor and Licensee as set forth in Section 14 have been satisfied, or, to the extent permitted by applicable law, waived in accordance with the terms of Section 14, the Licensor shall deliver a notice to the Licensee stating that Licensor has made such determination (the "**Closing Notice**").

16. Termination.

16.1. Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual consent of Licensor and Licensee;

(b) by Licensor if: (i) Licensee shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement, the Exclusivity and Prepayment Agreement or the TSA or in any certificate delivered by Licensor in connection herewith in a manner that, either individually, or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth herein; (ii) Licensee shall have materially breached the Bidding Procedures Order, and in each case, such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by Licensor to Licensee, which notice must specify in reasonable detail the alleged breach; *provided* that Licensor shall not be entitled to terminate this Agreement if the failure of the Closing to be consummated by such date is caused by Licensor's breach of any of its obligations under this Agreement; or (iii) the board of directors of Licensor determines, after consultation with, and advice from, outside counsel, that proceeding with the Proposed Transaction would be inconsistent with its fiduciary duties.

(c) by Licensee if: (i) Licensor shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement, the Exclusivity and Prepayment Agreement or the TSA, or in any certificate delivered by Licensee in connection herewith in a manner that, either individually, or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth herein; (ii) Licensor fails to file the Chapter 11 Case with the Bankruptcy Court by October 12, 2026; (iii) Licensor fails to file the Bidding Procedures Motion with the Bankruptcy Court on or prior to October 13, 2026; (iv) the Bankruptcy Court fails to enter the Bidding Procedures Order, including approval of the Bid

Protections, by the 21st day following the commencement of the Chapter 11 Case or such later date as may be required by the Bankruptcy Court, or if the Bidding Procedures Order has been entered by such date but is stayed, stayed pending appeal, reversed or vacated, or if such Bidding Procedures Order has been entered by such date but has been amended, supplemented or otherwise modified in any manner not reasonably acceptable to Licensee; (v) the Bid Deadline has not occurred by November 20, 2026, or such later date as may be required by the Bankruptcy Court, and, if an auction is necessary, the auction is not held by November 23, 2026, or such later date as may be required by the Bankruptcy Court; (vi) the Bankruptcy Court has not entered the 363 Free and Clear Order by November 30, 2026; (vii) the 363 Free and Clear Order has been timely entered but it is not in form and substance acceptable to Licensee in its sole and absolute discretion; provided, however, that an order in the form of Exhibit A is acceptable to the Licensee; (viii) any of the conditions set forth in this Agreement shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 17, 2026, unless such failure shall be due to the failure of Licensee to perform or comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing; (ix) Licensor shall have materially breached the Bidding Procedures Order or the 363 Free and Clear Order, and in each case, such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by Licensee to Licensor; *provided* that Licensee shall not be entitled to terminate this Agreement if the failure of the Closing to be consummated by such date is caused by Licensee's breach of any of its obligations under this Agreement; (x) the Bankruptcy Court enters an order materially inconsistent with the Bidding Procedures Order or inconsistent with the 363 Free and Clear Order or consummation of the Proposed Transaction; (xi) prior to the Closing, any party obtains a final and unstayed order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any portion of the Licensed IP or the Purchased Employee Claims; (xii) the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code prior to the Closing, or (xiii) if the Closing has not occurred on or prior to December 17, 2026; *provided* that Licensee shall not be entitled to terminate this Agreement if the failure of the Closing to be consummated by such date is caused by Licensee's breach of any of its obligations under this Agreement.

16.2. Effect of Termination.

(a) Except as otherwise provided in this Section 16.2, in the event of termination of this Agreement by either party hereto in accordance with Section 16.1, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other parties hereto, except for (i) Licensor's obligation to refund promptly to the Licensee the Refundable Deposit in accordance with the terms of the Exclusivity and Prepayment

Agreement, and (ii) liability for fraud or willful breach of this Agreement prior to such termination.

(b) In consideration for Licensee having expended considerable time and expense in connection with this Agreement, the Exclusivity and Prepayment Agreement, the TSA, and the hiring of former Licensor employees, among other things, and the negotiation thereof, and to compensate Licensee as the stalking horse bidder, and regardless of whether or not Licensee makes any matching or competing bids at the auction (if applicable), Licensor shall pay to Licensee a break-up fee and reasonable expense reimbursement collectively capped at 3.5% of the $20 million cash purchase price (the "**Bid Protections**") in the event that (i) Licensor materially breaches this Agreement or any other Transaction Document, or (ii) Licensor consummates an alternative transaction involving the Transferred Assets, including if Licensee is not the successful bidder at the auction (if applicable) (unless such alternative transaction is a "back-up bid" in the event the Closing does not occur due to the breach by Licensee of any of its obligations under this Agreement). The Bid Protections shall be due and payable simultaneously with the closing of the alternative transaction. The Bid Protections shall, subject to Bankruptcy Court approval, be treated as an administrative expense in the Chapter 11 Case under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code. Licensor acknowledges and agrees that: (i) the approval of the Bid Protections is an integral part of the transactions contemplated by this Agreement and the other Transaction Documents; (ii) in the absence of Licensor's obligation to pay the Bid Protections, Licensee would not have entered into this Agreement or the other Transaction Documents; (iii) the entry of Licensee into this Agreement and the other Transaction Documents is necessary for preservation of the estate of Licensor and is beneficial to Licensor because, in Licensor's business judgment, it will enhance Licensor's ability to maximize value for the benefit of their creditors and other stakeholders; (iv) the Bid Protections are reasonable in relation to Licensee's costs and efforts and to the magnitude of the transactions contemplated hereby and Licensee's lost opportunities resulting from the time spend pursuing the transactions contemplated hereby; and (v) time is of the essence with respect to the entry of the Bidding Procedures Order.

(c) If Licensor fails to take any action necessary to cause the delivery of the Bid Protections under circumstances in which Licensee is entitled to the Bid Protections and, in order to obtain the Bid Protections, the Licensee commences a suit with respect to the same, which results in a judgment in favor of Licensee, Licensor shall pay to Licensee, in addition to the Bid Protections, an amount in cash equal to the reasonable and documented costs and expenses (including attorney's fees) incurred by Licensee in connection with such suit.

17. General Terms.

17.1. Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware and the laws of the

United States without giving effect to the principles of conflicts of law. The provisions of the United Nations Convention on the International Sale of Goods and the Uniform Computer Information Transactions Act, however designated, are excluded and shall not apply to this Agreement or any transactions hereunder.

17.2. Forum. Any action or proceeding brought by either party against the other party arising out of or related to this Agreement shall be brought exclusively in the Bankruptcy Court where the Licensor's bankruptcy is pending while such proceeding is pending and thereafter in a state or federal court of competent jurisdiction located in Delaware.

17.3. Confidentiality of Material. Licensor and Licensee acknowledge and agree that the terms of that certain Mutual Non-Disclosure Agreement, by and between Licensee and Licensor, dated August 19, 2026 (the "**Mutual NDA**"), shall remain in full force and effect and shall apply to this Agreement, *mutatis mutandis*.

17.4. Notices. Any notice or other communication required or permitted to be given hereunder shall be given in writing and delivered in person, mailed or delivered by recognized courier service, properly addressed and stamped with the required postage, to the intended recipient at its address specified below and shall be deemed effective upon receipt. Either party may from time to time change its address by giving the other party notice of the change in accordance with this section.

If to Licensee: Disney Worldwide Services, Inc.
c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-0763
Attention: Justin Warbrooke
Email: justin.warbrooke@disney.com

With a copy to: The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-1245
Attention: Justin Radell; Lisa Phua
Email: justin.radell@disney.com; lisa.phua@disney.com

and

Skadden, Arps, Slate, Meagher & Flom
One Manhattan West
New York, New York 10001
Attention: Brandon Van Dyke; Stuart Levi; Ron Meisler; Samuel Cammer; and Bryan Uelk
Email: Brandon.VanDyke@skadden.com; Stuart.Levi@Skadden.com; Ron.Meisler@skadden.com; Samuel.Cammer@skadden.com; Bryan.Uelk@skadden.com

| | |
|---|---|
| If to Licensor: | Character Technologies, Inc.<br>700 El Camino Real, Suite 120, #1152<br>Menlo Park, California 94025<br>Attention: John Chatowski, General Counsel<br>Email: john.chatowski@character.ai |
| With a copy to: | Wilson Sonsini Goodrich & Rosati, Professional Corporation<br>222 Delaware Avenue #800<br>Wilmington, Delaware 19801<br>Attention: Erin Fay<br>Email: efay@wsgr.com<br><br>and<br><br>Wilson Sonsini Goodrich & Rosati, Professional Corporation<br>One Market Plaza, Spear Tower, Suite 3300<br>San Francisco, California 94105<br>Attention: Rich Mullen; Brendan Mahan<br>Email: rich.mullen@wsgr.com; bmahan@wsgr.com |

17.5. Complete Agreement; Modifications. This Agreement, the 363 Free and Clear Order, the Exclusivity and Prepayment Agreement, the TSA, and any schedules hereto constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior written, and all prior or contemporaneous oral agreements, representations, warranties, statements, promises and understandings with respect to the subject matter hereof and any shrink-wrap, click license or web-posted terms and conditions (whether made available before, on or after the date hereof). In the event of a conflict between the terms and conditions of this Agreement (without schedules) and the terms of the schedules, the terms and conditions of this Agreement (without schedules) shall govern. This Agreement may not be amended, altered or modified except by a writing signed by an officer of Licensee and Licensor.

17.6. Nonwaiver. Any failure by either party to insist upon or enforce performance by the other party of any of the provisions of this Agreement or to exercise any rights or remedies under this Agreement or otherwise by law shall not be construed as a waiver or relinquishment of such party's right to assert or rely upon the provision, right, or remedy in that or any other instance; rather the provision, right, or remedy shall be and remain in full force and effect.

17.7. Severability. In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, such provision shall be deemed to apply only to the maximum extent permitted by law, and the remainder of this Agreement shall remain valid and enforceable according to its terms.

17.8. Counterparts. This Agreement may be executed in counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives, to be effective as of the date first written above.

**DISNEY WORLDWIDE SERVICES, INC.**

Signed by:

By: David Howard

429A668EEF86420...

Name: David M. Howard

Title: President

Date: October 13, 2026

**CHARACTER TECHNOLOGIES, INC.**

By:______________________________

Name:____________________________

Title:_____________________________

Date:_____________________________

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives, to be effective as of the date first written above.

| **DISNEY WORLDWIDE SERVICES, INC.** | **CHARACTER TECHNOLOGIES, INC.** |
|---|---|
| By:___________________________________ | By: Signed by: Colin Adams 154163D0A0F34BB... |
| Name:_______________________________ | Name: Colin Adams |
| Title:________________________________ | Title: Chief Executive Officer |
| Date:________________________________ | Date: October 13, 2026 |

## SCHEDULE A

## Licensed IP

**Licensed Technology**

The code repositories, documentations, frameworks, tools, and any other artifacts produced for each of the following areas:

- **Post-training stack:** The codebases, scripts, and documentation used to fine-tune and align models after their initial training phase.
- **Training recipes:** The documented processes, configuration files, and step-by-step methodologies required to successfully train the models.
- **Reward model:** The underlying frameworks and training code used to train, evaluate and score model outputs.
- **Benchmarks:** The evaluation frameworks, scoring code, and technical documentation used to measure model performance and capabilities.
- **Eval Framework:** The comprehensive architecture, technical design and any other relevant documentations, codebases, and standardized methodologies used to systematically assess model quality, safety, and performance against defined criteria.
- **Model safety stack:** The complete set of code repositories and system architectures designed to post-train for safety, develop classifiers, filters, monitoring systems, and other relevant processes and artifacts to ensure safe model outputs.
- **Closed source vLLM to serve with classifier heads with optimization:** The proprietary serving infrastructure, including optimization code and frameworks used to run classifier heads efficiently.
- **Fallback classifier stack:** The secondary classification code and frameworks utilized when primary safety or routing models fail or encounter errors.
- **RL adapters for safety:** The reinforcement learning code repositories and training scripts used to adapt base models for safety parameters.
- **AI infrastructure stack:** The foundational codebase, automation scripts, and architectural documentation used to manage and optimize the AI hardware and software environments.
- **Training infrastructure:** The specific codebase, frameworks, orchestration tools used to manage and execute large-scale model training runs, and any documentations and other artifacts produced.
- **Inference stack (GPU/cluster management, model routing, deployment):** The code repositories and operational systems for managing GPU clusters, routing inference requests, and deploying model updates.
- **SRE workflows:** The Site Reliability Engineering documentation, automated scripts, and procedural workflows used to maintain system uptime, scaling, and reliability.
- **Lorebook and prompt management stack:** The software frameworks and code used to manage character contexts, store lore configurations, and handle prompt structuring.

- **Guardian (long horizon safety monitoring):** The code repositories and analytical frameworks for the Guardian system, used to monitor safety and context over extended conversational interactions. All documentations related to the design, implementation, running, and evaluations of the system.
- **Age assurance (age prediction model):** The underlying architecture, training code, and frameworks for the age prediction systems.
- **Evaluation and PT data platform:** The data processing infrastructure, code pipelines, and frameworks used to manage and format data for pre-training and evaluation. All design documentations and tools developed.
- **Multi-modal stack (image/video generation models and post-training stack):** The underlying codebase, architectural frameworks, and documentations for processing and generating images and video, along with their post-training methodologies. The training pipelines, scripts, and evaluation processes.
- **Chat stack (scale and model routing) and chat styles framework:** The core conversational infrastructure backend code responsible for handling massive user scale and routing messages to the appropriate model endpoints.
- **Safety Prevalence (measurement and metrics stack):** The analytical codebases, measurement tools, all documentations, and logging frameworks used to track and report on safety metrics across the platform.
- **Prompt optimization framework:** The specific code, algorithms, and documented methodologies used to automatically refine and optimize system and user prompts.
- **Trust and Safety Moderation stack:** The comprehensive suite of code repositories, automated moderation frameworks, and documentation used to enforce community guidelines.
- **AI Red teaming and adversarial testing frameworks:** The tools, codebases, scripts, and documented methodologies used to simulate attacks, test model vulnerabilities, and defend against adversarial prompts or jailbreaks.
- **Security infrastructure and processes:** The proprietary tools, architectures, and documented workflows developed to ensure overall system security, including AppSec frameworks and analysis tools for AI products, as well as custom configurations and access control frameworks for endpoints, APIs, and administrative interfaces.
- **Data science and agentic pipelines:** The code repositories for data processing code sources, data agents, agentic pipelines utilized for data science workflows, and any associated frameworks, tools, and documented processes supporting data science operations.
- **Additional Technical Materials:** Any other training infrastructure, training pipelines, know-how, evaluation frameworks, safety tools, documentation, design-specifications and technical materials reasonably necessary to utilize the foregoing and develop future models and any embodiment of such intellectual property.

**Licensed Patents**

| TITLE | APP. NO.<br>REG. NO. | APP. DATE<br>REG. DATE | OWNER | STATUS |
|---|---|---|---|---|
| Utilizing meta agents to modify the behavior of large language model-based agents | 19/193,627 | 4/29/2025 | Character Technologies Inc. | Not yet published |
| Audio turn understanding system | 19/200,200 | 5/6/2025 | Character Technologies Inc. | Pending |
| Audio turn understanding system | 18/900,278<br>12,322,384 | 9/27/2024<br>6/3/2025 | Character Technologies Inc. | Issued |
| Character turn summaries | 19/368,795 | 10/24/2025 | Character Technologies Inc. | Pending |
| Character turn summaries | 19/084,517<br>12,481,835 | 3/19/2025<br>11/25/2025 | Character Technologies Inc. | Issued |
| Retraining a large language model | 19/688,207 | 5/26/2026 | Character Technologies Inc. | Not yet published |
| Optimizing key value cache for large language model inference | 19/671,754 | 5/8/2026 | Character Technologies Inc. | Pending |
| Retraining a large language model | 19/208,332<br>12,664,375 | 5/14/2025<br>6/23/2026 | Character Technologies Inc. | Issued |
| Optimizing key value cache for large language model inference | 19/191,984<br>12,682,211 | 4/28/2025<br>7/14/2026 | Character Technologies Inc. | Issued |

# **Exhibit A**

## **Form of 363 Free and Clear Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*<br><br>CHARACTER TECHNOLOGIES, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. [__]-[_____] ([__])<br><br>Related Docket Nos. [__,__] |

**ORDER (A) APPROVING SALE OF CERTAIN OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING AND APPROVING ASSUMPTION OF TRANSITION SERVICES AGREEMENT, [(C) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS], (D) AUTHORIZING DEBTOR TO ENTER INTO AND PERFORM UNDER THE STALKING HORSE AGREEMENT, AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"),[2] of the above-captioned debtor and debtor in possession (the "Debtor"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order (this "363 Free and Clear Order"): (a) authorizing and approving the Debtor's entry into and performance under that certain Stalking Horse Transaction Agreement, substantially in the form attached hereto as **Exhibit A** (together with all schedules and exhibits thereto, the "Stalking Horse Agreement"), by and between the Debtor and Disney

---

1 The Debtor and the last four digits of its tax identification number are: (8842). The Debtor's mailing address for the purpose of the Chapter 11 Case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

2 Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Motion or the Stalking Horse Agreement (as defined below).

Worldwide Services, Inc., a Florida Corporation (the "Buyer"); (b) authorizing and approving: (i) all acts taken or required to be taken (including the performance, execution, filing, implementation, consummation, entry into, payment, and provision of services) and all terms, obligations, releases, conditions, waivers, limitations, disclaimers, carveouts, and similar provisions of, under, in connection with, in furtherance of, and with respect to, the Stalking Horse Agreement, that certain letter agreement dated September 18, 2026, by and between the Debtor and the Buyer (together with all schedules and exhibits thereto, the "Exclusivity and Prepayment Agreement"), and that certain Transition Services Agreement, dated September 18, 2026 and amended and restated on [●], 2026, attached hereto as **Exhibit B** (together with all schedules and exhibits thereto, including the Exclusivity and Prepayment Agreement, and as amended, restated, or modified from time to time, the "TSA"); (ii) the sale of the Transferred Property (as defined below) free and clear of all liens, claims, and encumbrances; [(iii) the assumption and assignment of the Assigned Contracts (as defined below), if any] ((b)(i), [and] (b)(ii), [and (b)(iii)] collectively, the "Transaction"); and ([iii / iv]) entry into, implementation, and consummation of the Transaction; (c) authorizing and approving the assumption of the TSA; (d) [authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "Assigned Contract" and, collectively, the "Assigned Contracts") upon the closing of the Transaction (the "Closing"), subject to (i) the occurrence of any supplemental Contract Objection deadline set forth in a supplemental Assumption and Assignment Notice (each as defined in the Bidding Procedures Order), without any objection being filed or withdrawn with respect to such Assigned Contract, (ii) an order of this Court authorizing the assumption and assignment of the Assigned Contracts, and (iii) the payment by the Buyer of any payments to cure any defaults arising under any such Assigned Contract (the "Cure Amounts");] and (e) granting related relief,

all as more fully set forth in the Motion; and this Court having entered the [*Order (A) Approving Bidding Procedures and Bid Protections; (B) Scheduling Certain Dates and Deadlines With Respect Thereto; (C) Approving the Form and Manner of Notice Thereof; (D) Approving the Stalking Horse Agreement, and (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. [●]] (the "Bidding Procedures Order")], approving, among other things, certain bidding procedures (the "Bidding Procedures") to govern the sale of all or substantially all of the Debtor's assets; and the Debtor and the Buyer having negotiated the Transaction in good faith, at arm's length, and the Debtor having determined, in a sound exercise of its business judgment, that the Buyer has submitted the highest or otherwise best bid for the Transferred Assets and that the Buyer is the Winning Bidder (as defined in the Bidding Procedures), each in accordance with the Bidding Procedures and the Bidding Procedures Order; and the Court having conducted a hearing on the Motion (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Stalking Horse Agreement, the TSA, including the Exclusivity and Prepayment Agreement, any and all objections to the Transaction, including the Stalking Horse Agreement, assumption of the TSA, [and assumption and assignment of the Assigned Contracts, if any]; and the Court having heard statements of counsel and considered the evidence presented in support of the relief requested in the Motion at the Sale Hearing and in the declarations of [●], [●], and [●] (collectively, the "Transaction Declarations"); and it appearing that due notice of the Motion, the Sale Hearing, the Stalking Horse Agreement, and the Transaction has been provided and such notice was appropriate and no other notice need be provided; [and it appearing that any objections that were filed have either been resolved, adjourned as stated on the record at the hearing, or overruled]; and it appearing that the relief requested in the Motion is in

the best interests of the Debtor, its estate, its stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion, the Transaction Declarations, and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby:

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a)–(b)(1) and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. This 363 Free and Clear Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). This Court may enter a final order consistent with Article III of the United States Constitution. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this 363 Free and Clear Order, and expressly directs entry of judgment as set forth herein.

C. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact set forth herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law set forth herein constitute findings of fact, they are adopted as such.

**Transferred Property**

D. The Debtor is the sole and lawful owner of, and has clear and marketable title to, (a) that certain intellectual property and related technology that is the basis for that certain perpetual, worldwide, non-exclusive, transferable (subject to certain limitations), sublicensable (subject to certain limitations), non-terminable, irrevocable, fully paid-up, royalty-free right and license (the "IP License"). Pursuant to the Stalking Horse Agreement, the Debtor will grant to Buyer the IP License and the Debtor will sell and the Buyer will purchase any claims that the Debtor has against current or former Debtor employees who accept or have accepted offers of employment with the Buyer or any of its affiliates that have not previously been released by the Debtor (collectively, the "Transferred Property"). The Debtor's right, title, and interest in and to the Transferred Property constitutes property of the Debtor's estate and title thereto is presently, or will be, vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

**Notice and Opportunity to Object**

E. As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, Sale Hearing, Stalking Horse Agreement, Bidding Procedures, Bidding Procedures Order (including, without limitation, the deadline for submitting Qualified Bids), Transaction (including the selection of the Buyer as the Successful Bidder), the Debtor's intent to assume the TSA, and the proposed entry of this 363 Free and Clear Order has been provided to each party entitled to such notice in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Bankruptcy Rule 2002-1(b), and in compliance with the Bidding Procedures Order. No other or further notice of the foregoing is required. With respect to parties whose identities or addresses are not reasonably ascertained by the Debtor, publication of the Transaction

Notice in *USA Today* on [●], 2026, and the posting of the Transaction Notice on the website of the Debtor's claims and noticing agent, Stretto, Inc., at https://cases.stretto.com/chartech on [●], 2026 and on the Debtor's blog and online community webpages (which are the online locations through which the Debtor regularly communicates with the public), was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such parties.

F. A reasonable opportunity to object and to be heard regarding the relief requested in the Motion and granted by this 363 Free and Clear Order, including, but not limited to, the consummation of the Transaction, the Debtor's entry into, and performance under, the Stalking Horse Agreement, and the assumption of the TSA, was afforded to all interested persons and entities.

G. [In accordance with the Bidding Procedures Order, the Debtor has served a notice of its intent to assume [and assign] certain Assigned Contracts and of the Cure Amounts upon each Counterparty to such Assigned Contract at Docket No. [●] (such notice an "<u>Assumption and Assignment Notice</u>"). The service and provision of such notice[s] was good, sufficient, and appropriate under the circumstances; Counterparties to the Assigned Contracts have had or will have an adequate opportunity to object to: (i) the assumption and assignment of the Counterparties' Assigned Contracts, (ii) the Cure Amounts for the Assigned Contracts set forth in the Assumption and Assignment Notice(s), and (iii) the provision of adequate assurance of future performance on or before the Contract Objection Deadline. The initial Contract Objection Deadline occurred on November [18], 2026. All Contract Objections filed prior to the Contract Objection Deadline were either resolved prior to the commencement of the Sale Hearing, were adjudicated at the Sale Hearing, or will be adjudicated at such other date and time as may be determined by the Debtor in consultation with the Buyer. With respect to any Contract Objections related solely to a Cure

Dispute that were not resolved at or prior to the Sale Hearing, the Assigned Contract may be assumed by the Debtor and assigned to the Buyer provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code will be deposited in a segregated account by the Debtor or the Buyer for such Assigned Contract pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute. Additional Assumption and Assignment Notices may be served in accordance with the Bidding Procedures Order following entry of this Order and Counterparties to such additional Assigned Contracts shall be required to file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assigned Contracts to the Buyer without further notice to creditors or other parties in interest and without the need for further order of this Court, and such assumption and assignment shall be subject to the terms of this Order.

H. Contract Objections must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) be filed with the Clerk of the Court on or before the applicable Contract Objection Deadline; (iv) be served upon the Objection Notice Parties identified in the Bidding Procedures Order; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

**Business Judgment**

I. The Debtor has demonstrated good, sufficient, and sound business purposes to promptly consummate the Transaction, including assumption of the TSA, and that doing so is an

appropriate exercise of the Debtor's business judgment and is in the best interests of the Debtor, its estate, its creditors, and other parties in interest. Such business reasons for promptly consummating the Transaction include, but are not limited to, the fact that: (i) the transfer of the Transferred Property pursuant to the Transaction documents presents the best opportunity and represents the best method to maximize the value of the Debtor's estate for the benefit of the Debtor, its estate, its creditors, and other parties in interest; (ii) the purchase price and other terms set forth in the Stalking Horse Agreement and other Transaction documents constitute the highest or otherwise best offer received for the Transferred Property; (iii) certain special committees of the Debtor's board of directors (the "Board"), the members of which are each disinterested with respect to the Transaction (each, a "Special Committee"), led the strategic direction of the marketing process and all negotiations with the Buyer, and have recommended the Board approve the Transaction, including the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA (including assumption thereof, and in connection with such, the assumption of the Exclusivity and Prepayment Agreement), and (iv) unless the Transaction is consummated as provided for in this 363 Free and Clear Order, the Debtor and its estate may receive significantly less value for all stakeholders. The business reasons for assumption of the TSA include but are not limited to: (i) the Debtor's ongoing need for critical transition support services from the Buyer for a period of time following the Buyer's or its affiliates' employment of certain of the Debtor's former employees; (ii) the need to recognize and give effect to the terms of the Exclusivity and Prepayment Agreement, which are material terms critical to the Transaction, including the Transaction's payment structure, the hiring of certain employees, the granting of releases, and certain confidentiality concerns; and (iii) and the need to provide for consummation of the Transaction in full.

J. The Debtor had good, sufficient, and sound business purposes for entering into the TSA and the Exclusivity and Prepayment Agreement, and the Debtor's entry into the TSA and Exclusivity and Prepayment Agreement were integral components of the Transaction. In particular, the Debtor demonstrated that to maximize the value of the Transferred Property through a marketing and sale process, it needed to minimize employee attrition risk and that the Buyer's or its affiliates' prepetition employment of the Debtor's former employees and the provision of transition services for a limited period pursuant to the TSA were all done in furtherance of this purpose and as part of the Transaction, at the request and with the consent of the Debtor, acting through a Special Committee. The Debtor demonstrated that it entered into the TSA because it needed critical transition services for a limited period from the Buyer following the Buyer's or its affiliates' employment of certain of the Debtor's former employees. Further, the Debtor demonstrated that its agreement to enter into the Exclusivity and Prepayment Agreement (including the releases contained therein) was necessary to induce the Buyer and its affiliates to hire the Debtor's former employees, provide the transition services contemplated by the TSA during and after the marketing and sale process for a limited period, and agree to the terms of the Stalking Horse Agreement or the terms of an alternative form of transition services agreement if the Buyer was not chosen as the [Winning Bidder].

**Marketing Process and Highest or Otherwise Best Offer**

K. The Debtor, consistent with its fiduciary duties, conducted a robust and extensive marketing process overseen by the Special Committees both before and after the commencement of this Chapter 11 Case, which was substantively and procedurally fair to all parties and all Potential Bidders, and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Transferred Property.

L. The Bidding Procedures were appropriately tailored to maximize the value obtained through any sale of the Debtor's property for the benefit of the Debtor's estate. The Debtor, overseen by a Special Committee, and the Debtor's advisors, adequately marketed the Transferred Property and conducted the marketing and sale process in accordance with the Bidding Procedures and the Bidding Procedures Order, which marketing and sale process was made possible by the Buyer's or its affiliates' employment of certain of the Debtor's former employees and provision of transition services through the TSA for a limited period. Ultimately, the Debtor, overseen by a Special Committee and in consultation with its advisors, determined that the Transaction, including the Stalking Horse Agreement, constituted the highest and best offer for the sale of the Transferred Property, and selected the Buyer as the Winning Bidder. The Debtor determined, at the recommendation of a Special Committee and in a valid and sound exercise of its business judgment, that consummation of the Transaction will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.

M. The Transaction process was conducted in a proper manner and was overseen by a Special Committee, wherein: (i) the Transaction process was non-collusive, duly noticed, free of unfair dealing, and provided a full, fair, reasonable, and adequate opportunity for any person or entity to make an offer, including a higher or otherwise better offer than the Buyer, to purchase the [Debtor's property, including, without limitation, the] Transferred Property; (ii) the Debtor provided Potential Bidders with sufficient information to enable them to make an informed judgment on whether to bid on the Debtor's property and considered any and all Qualified Bids (if any); (iii) the Debtor and the Buyer have negotiated and undertaken their roles leading to the entry into the Stalking Horse Agreement, TSA and Exclusivity and Prepayment Agreement in a diligent, non-collusive, fair, reasonable, and good-faith manner; (iv) the competitive, fair, and open sale

process conducted by the Debtor, and its advisors, both prior to the commencement of this Chapter 11 Case and postpetition pursuant to the Bidding Procedures and Bidding Procedures Order resulted in the highest or otherwise best value for the Debtor's property, was in the best interest of the Debtor, its creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

N. The transfer of the Transferred Property and the consideration provided therefore by the Buyer pursuant to the Stalking Horse Agreement and the Exclusivity and Prepayment Agreement are fair and reasonable, the highest or otherwise best offer, shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and were the result of a fair and non-collusive bidding process. Such bidding process was conducted in compliance with the Bidding Procedures and Bidding Procedures Order and was free from unfair dealing.

**Single, Integrated Transaction**

O. Entry of this 363 Free and Clear Order authorizing and approving the Transaction, including the Stalking Horse Agreement and assumption of the TSA, is a necessary condition precedent to the Buyer consummating the Transaction. The terms of this 363 Free and Clear Order, the Stalking Horse Agreement, the TSA, the Exclusivity and Prepayment Agreement, and the Buyer's or its affiliates' employment of certain of the Debtor's former employees are inextricably linked and technically and collectively constitute a single, integrated transaction.

**No *Sub Rosa* Plan**

P. The consummation of the Transaction outside a plan of reorganization pursuant to Stalking Horse Agreement and the transactions contemplated thereby, [including the assumption and assignment of the Assigned Contracts,] neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation

for the Debtor. The Transaction does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

**Disclosure of Connections**

Q. The Buyer disclosed to the Debtor in certain of the bid materials all information required by the Bidding Procedures concerning the identity of the Buyer and its employees, agents, and affiliates. The Buyer's disclosures comply with the disclosure requirements of the Bidding Procedures and are sufficient to provide the Debtor and the Debtor's advisors complete and accurate information concerning all material connections between the Buyer and the Debtor, its affiliates and their respective current or former directors and officers. The Buyer's disclosures establish that because the Buyer or its affiliates solicited, made offers of employment to, and hired certain Debtor employees with the consent of the Debtor (acting through a Special Committee), certain employees of the Buyer were "insiders" of the Debtor within the meaning of section 101(31) of the Bankruptcy Code, insofar as certain former employees of the Debtor, including the Debtor's former Chief Executive Officer, are presently employed by the Buyer. Although certain members of the Buyer were insiders of the Debtor, (i) no common identity of directors or controlling equity interest holders existed or exists between Buyer, on the one hand, and the Debtor, on the other hand, (ii) a Special Committee led and recommended that the Board approve the marketing process and review and approve the Transaction, and (iii) the Buyer did not and does not control the Debtor in any respect.

**Good Faith of Buyer**

R. The Buyer has not acted in a collusive manner, and the consideration to be paid by the Buyer under the Stalking Horse Agreement, as well as that which it has already paid pursuant to the Exclusivity and Prepayment Agreement, was not controlled by any agreement among bidders and was negotiated at arm's length, in good faith, and without collusion pursuant to section

363(m) of the Bankruptcy Code and is fair, adequate, and reasonable under the circumstances. Specifically: (i) at all times prior to entry into the Exclusivity and Prepayment Agreement and from and after the Petition Date, the Buyer recognized that the Debtor was free to deal with any other party interested in purchasing the Transferred Property and at all times in general the Buyer recognized that the Debtor was free to deal with any other party interested in buying any of the Debtor's other assets; (ii) the Buyer complied in all respects with the provisions of the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Rules, and the Bankruptcy Code; (iii) the Buyer agreed to subject its bid to the competitive sale process set forth in the Bidding Procedures and Bidding Procedures Order; (iv) all payments made by the Buyer in connection with the Transaction have been disclosed; (v) no common identity of directors or controlling stockholders exists among the Buyer and the Debtor, and the sale process was overseen by a Special Committee comprised of independent directors which, after thorough consideration of the Transaction and other Qualified Bids received (if any) recommended approval of the Transaction to the Board; (vi) the negotiation and execution of the Transaction was at arm's length and in good faith, and at all times each of the Buyer and the Debtor were represented by competent counsel of their choosing; (vii) the Buyer has not acted in a collusive manner with any person, and there was no fraud or unfair dealing in connection with the bidding process and the sale of the Transferred Property.

S. The Debtor, the Buyer, and each of their respective affiliates, management, boards of directors, officers, directors, members, partners, principals, employees, agents, advisors, and representatives, have acted in good faith and without any collusion or fraud of any kind. The Buyer is consummating the Transaction in good faith and for reasonably equivalent value and is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Buyer is

therefore entitled to all of the protections afforded under section 363(m), has proceeded in good faith in all respects in connection with the Transaction, and would not have entered or agreed to consummate the Transaction if it were not granted all of the protections afforded under section 363(m) of the Bankruptcy Code.

**No Fraudulent Transfer**

T. The Transaction, including the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, and the TSA, were not entered into, and are not being consummated, for the purpose of hindering, delaying, or defrauding the Debtor or its creditors under applicable law, and none of the parties to such documents are consummating the Transaction with any fraudulent or otherwise improper purpose. The consideration provided by the Buyer in connection with the Transaction, including pursuant to the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, and the TSA, constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia. None of the Debtor, the Buyer, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Transaction (including the various terms of the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, or the TSA) to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

**Buyer Not Successor**

U. Neither the Buyer nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors, and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents,

representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Buyer Parties") is a continuation of the Debtor or its estate, no Buyer Party is holding itself out to the public as a continuation of the Debtor or its estate, and the Transaction, including, without limitation, the Buyer's or its affiliates' employment of the Debtor's former employees, the Buyer's provision of transition services pursuant to the TSA for a limited period, and the Debtor's and Buyer's performance under the Exclusivity and Prepayment Agreement, does not amount to a consolidation, merger, or *de facto* merger of the Buyer (or any other Buyer Party) and the Debtor. Further, no employees of the Debtor will be deemed to transfer to any Buyer Party by operation of law in connection with the Transaction.

V. The authorization and approval of the Transaction, including the (i) approval of the Stalking Horse Agreement, (ii) approval of the terms and all actions taken under the Exclusivity and Prepayment Agreement, (iii) assumption of the TSA, [and (iv) assignment to the Buyer of the Assigned Contracts (which shall be subject to further order of this Court except as set forth herein)] will not subject the Buyer or any of its affiliates to any liability whatsoever that arises prior to the Closing or by reason of transfer of the Transferred Property under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory, and/or applicable state or federal law or otherwise. [For the avoidance of doubt, and notwithstanding anything to the contrary in this 363 Free and Clear Order, any contract that is not a Closing Date Assigned Contract (as defined herein) shall not be an Assigned Contract or part of the Transferred Property under this 363 Free and Clear Order or the Transaction Documents until further order of this Court.]

**Validity of Transfer**

W. The Debtor, acting through a Special Committee, authorized the execution and delivery of the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, and the TSA, and consummation of the Transaction. The Debtor and its affiliates (i) have full corporate power and authority to execute and deliver all documents contemplated by the Transaction, as applicable, (ii) have all of the power and authority necessary to consummate the Transaction, and (iii) have taken all action necessary to authorize and approve the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, and the TSA, and to consummate the Transaction, and no further consents or approvals are required for the Debtor to consummate the Transaction.

**Section 363(f) Is Satisfied**

X. The transfer of the Transferred Property to the Buyer [and the assumption and assignment to the Buyer of the Assigned Contracts] under the terms of the Stalking Horse Agreement and the TSA meet[s] the applicable provisions of section 363(f) of the Bankruptcy Code such that the transfer of the Transferred Property will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial rights, title, and interests in the Transferred Property free and clear of any and all liens, claims, interests, and encumbrances and will not subject any Buyer Party to any liability for any liens, claims, interests, and encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Stalking Horse Agreement and this 363 Free and Clear Order. All holders of liens, claims, interests, and encumbrances who did not object, or withdrew their objections, to the Transaction are deemed to have consented to the Transaction pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, interests, and encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, interests, and encumbrances, if any, attach to the proceeds of

the Transaction (in the same order of priority and with the same validity, force, and effect that such holder had prior to the Transaction, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable). Those holders of claims who did object and that have an interest in the Transferred Property fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

Y. The Buyer has expressly relied upon the finality of this 363 Free and Clear Order and the protections afforded by section 363(f) of the Bankruptcy Code in agreeing to consummate the Transaction and pay the purchase price in connection with the Transaction. The Buyer would not have entered into the Stalking Horse Agreement, the TSA, or the Exclusivity and Prepayment Agreement, and would not agree to consummate the Transaction [, including the assumption and assignment of the Assigned Contracts,] (i) if the transfer of the Transferred Property were not free and clear of all interests of any kind or nature whatsoever or (ii) if the Buyer or any of its affiliates would, or in the future could, be liable for any interests, in each case, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise. Not transferring the Transferred Property free and clear of all interests of any kind or nature whatsoever would adversely impact the Debtor's efforts to maximize the value of its estate.

[**Assumption and Assignment of the Assigned Contracts**

Z. Solely with respect to any Assigned Contract listed on an Assumption and Assignment Notice for which the Contract Objection Deadline has occurred, and for which no Contract Objection has been filed and with respect to which Buyer has requested that such Contract be treated as a ["Transferred Contract"] under the Stalking Horse Agreement (each such contract, a "Closing Date Assigned Contract"), the Cure Amounts listed on such Assumption and Assignment Notices are deemed to be the sole amounts necessary to be paid upon assumption of

such Closing Date Assigned Contracts under Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A). All Cure Amounts, if any, with respect to the Closing Date Assigned Contracts shall be satisfied by the Buyer in accordance with the Stalking Horse Agreement.

AA. The assumption and assignment of the Assigned Contracts pursuant to the terms of this 363 Free and Clear Order are integral to the Transaction, are in the best interests of the Debtor and its estate, creditors, and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtor.

BB. The Debtor has met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts. The Buyer and/or the Debtor has provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Contracts and provided adequate assurance of future performance, within the meaning of sections 365(b)(1) of the Bankruptcy Code. The Buyer has provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.]

**Prompt Consummation**

CC. For the reasons stated in the Motion, Transaction Declarations, and/or on the record at the Sale Hearing, consummation of the Transaction, including the Debtor's entry into the Stalking Horse Agreement and assumption of the TSA, must be approved promptly to maximize the value of the Debtor's estate and its property. Time, therefore, is of the essence in consummating the Transaction, including effectuating the Stalking Horse Agreement and assuming the TSA. Accordingly, the Debtor and the Buyer intend to enter into the Stalking Horse Agreement and close the Transaction as soon as reasonably practicable. The Debtor has demonstrated compelling

circumstances and a good, sufficient, and sound business purpose and justification for immediate approval, effectuation, and consummation of the Transaction, including the Stalking Horse Agreement and assumption of the TSA. There is no legal or equitable reason to delay approval, effectuation, and consummation of the Transaction, including the Stalking Horse Agreement and assumption of the TSA. Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1. The Motion is GRANTED as set forth herein.

2. All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled[, except for any unresolved Contract Objections to or reservation of rights with respect to the proposed assumption and assignment of any Assigned Contracts, which may be consensually resolved among the parties or adjudicated at a subsequent hearing in accordance with the Bidding Procedures Order and the terms of this 363 Free and Clear Order. All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code, except as otherwise set forth herein. All objections to the entry of this 363 Free and Clear Order or to the relief granted herein that were not timely filed or raised at the Sale Hearing (if applicable) are forever barred.

**Approval of the Transaction, the Stalking Horse Agreement, and Related Documents**

3. The Transaction, including the Stalking Horse Agreement, assumption of the TSA, and all other related documents or actions (if any) that are necessary or appropriate to consummate the Transaction, are hereby authorized and approved in all respects. The failure specifically to include any particular term or component of the Transaction in this 363 Free and Clear Order shall

not diminish or impair its effectiveness, it being the intent of the Court that the Transaction, including the Stalking Horse Agreement and the assumption of the TSA, each be authorized and approved in full.

4. Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtor into the Transaction, including the Stalking Horse Agreement and any other Transaction document, is hereby authorized and approved as a valid exercise of the Debtor's business judgment. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor and its officers, employees, and agents are authorized, empowered, and directed to (a) take any and all actions, including entry into any additional documents, necessary or appropriate to consummate the Transaction, including the transfer of the Transferred Property to the Buyer pursuant to and in accordance with the terms and conditions of the Stalking Horse Agreement and this 363 Free and Clear Order, (b) execute, deliver, and perform, as applicable, under the Stalking Horse Agreement and the TSA, and [(c) assume and assign any and all Assigned Contracts (subject to parties' rights as set forth in the Bidding Procedures Order, this 363 Free and Clear Order, and the applicable Assumption and Assignment Notice).] [For the avoidance of doubt, and notwithstanding anything to the contrary in this 363 Free and Clear Order, any contract that is not a Closing Date Assigned Contract shall not be an Assigned Contract or part of the Transferred Property under this 363 Free and Clear Order or the Stalking Horse Agreement until further order of this Court.]

5. The Debtor is authorized to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Units (as defined in section 101(27) of the Bankruptcy Code), any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transaction and this 363 Free and Clear Order, including amended and restated certificates, articles of incorporation, and bylaws, and all such other actions, filings,

or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Units or as any of the officers of the Debtor may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

**Consummation of the Transaction**

6. Pursuant to Sections 105(a), 363(b), 363(f), 365(a), [365(b), 365(f),] and 365(n) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Transferred Property to the Buyer upon the Closing in accordance with the Transaction-related documents and this 363 Free and Clear Order, and the Buyer is acquiring only the Transferred Property, except as otherwise stated in this 363 Free and Clear Order or the executed documents related to the Transaction, as applicable.

7. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the Transaction, including the ability of (a) the Debtor to transfer the Transferred Property to the Buyer in accordance with the Transaction documents and this 363 Free and Clear Order, (b) the Buyer to provide to the Debtor the services contemplated under the TSA and for the Buyer to receive the benefits under the TSA, and (c) the Buyer to facilitate the completion of the Debtor's Chapter 11 Case and to facilitate any potential wind down of the Debtor, as applicable, through the services available under the TSA.

8. At Closing, all of the Debtor's right, title, and interest in and to, and possession of, the Transferred Property shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Transferred Property. All persons or entities, presently, or at or after the Closing, in possession of some or all of the Transferred Property, are directed to

surrender possession of any and all portions of the Transferred Property to the Buyer on the Closing or at such time thereafter as the Buyer may request.

9. Except as otherwise set forth herein, this 363 Free and Clear Order (a) shall be effective as a determination that, as of the Closing, (i) the Transferred Property shall have been transferred to the Buyer free and clear of all liens, claims, interests, and encumbrances, (ii) holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Transaction are deemed to have consented to the Transaction being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code and holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Transferred Property, if any, attach to the proceeds of the Transaction with the same priority that existed immediately prior to the Closing, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transaction, including the

implementation of the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, and the TSA. The Transferred Property is sold free and clear of any reclamation rights. All liens, claims, interests, and encumbrances on the Transferred Property shall attach to the proceeds of the Transaction (in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Transaction, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable, or as otherwise provided herein). Notwithstanding anything to the contrary in this 363 Free and Clear Order, no liens shall attach to any Transferred Property upon or after Closing that is contemplated to be transferred to the Buyer in the Transaction, whether or not such Transferred Property is transferred at Closing or thereafter, or remain in the possession or control of the estate following Closing.

10. Except as otherwise provided in the executed documents related to the Transaction, as applicable, and this 363 Free and Clear Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtor, the Transaction, including the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA (and, for avoidance of doubt, the Buyer's or its affiliates' employment of certain former Debtor employees and the corresponding provision of transition services for a limited period), the Transferred Property, and the ownership, sale, or operation of the Transferred Property prior to Closing or the transfer of the Transferred Property to the Buyer, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Buyer Party and its property (including, without limitation, the Transferred Property). Following the Closing, no holder of any

claim or interest shall interfere with the Buyer's title to or use and enjoyment of the Transferred Property or the TSA based on or related to any such claim or interest, or based on any action the Debtor may take in its Chapter 11 Case.

11. If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtor or in the Transferred Property, or in any way related to the Transaction, shall not have delivered to the Debtor prior to the Closing of the Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, interests, and encumbrances that the person or entity has with respect to the Debtor, the Transaction, or the Transferred Property or otherwise, then only with regard to the Transferred Property that is purchased by the Buyer pursuant to the Transaction, upon or after Closing, (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Transferred Property; (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this 363 Free and Clear Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release, discharge, and termination of all liens, claims, interests, and encumbrances against the Buyer Parties and the Transferred Property, and (c) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, interests, and encumbrances that are extinguished or otherwise released pursuant to this 363 Free and Clear Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Transferred Property. This 363 Free and Clear Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government

agency, department, or office. Notwithstanding the foregoing, the provisions of this 363 Free and Clear Order authorizing and approving consummation of the Transaction, the Debtor's entry into the Stalking Horse Agreement, assumption of the TSA, and transfer of the Transferred Property free and clear of liens, claims, interests, and encumbrances, shall be self-executing and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this 363 Free and Clear Order.

**No Successor or Transferee Liability**

12. To the fullest extent permitted by law, no Buyer Party shall be deemed, as a result of any action taken in connection with the Transaction, including the Stalking Horse Agreement, Exclusivity and Prepayment Agreement, TSA, and Buyer's or its affiliates' employment of certain of the Debtor's former employees, or the transfer, operation, or use of the Transferred Property to (a) be a legal successor, or otherwise be deemed a successor to the Debtor, (b) have, *de facto* or otherwise, merged with or into the Debtor, (c) be a joint employer, co-employer or single integrated enterprise with the Debtor, or (d) be an alter ego or a mere continuation or substantial continuation of the Debtor or the enterprise of the Debtor including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation. Further, no employee shall be deemed to transfer to any Buyer Party by operation of law in connection with the Transaction. The Transaction, including the Stalking Horse Agreement and the Exclusivity and

Prepayment Agreement, are not an acquisition of the equity of the Debtor or an acquisition of all or substantially all of the assets of the Debtor.

13. Immediately prior to the Closing, the Buyer was not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Buyer and the Debtor.

14. No Buyer Party shall have any responsibility for (a) any liability or other obligation of the Debtor or related to the Transaction, including the Transferred Property (and, for the avoidance of doubt, the underling intellectual property and related IP License), or (b) any claims against the Debtor or any of its predecessors or affiliates. No Buyer Party shall have any liability whatsoever with respect to the Debtor (or its predecessors' or affiliates') respective businesses or operations or the Debtor's (or its predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown, as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Transaction, including the Transferred Property and any assumed contracts, prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation, or other employee benefits which is or has been sponsored, maintained, or contributed to by the Debtor or with respect to which the Debtor has any liability, whether or not contingent, including, without limitation, any

"multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which the Debtor has at any time contributed, or had any obligation to contribute. No Buyer Party shall have any liability or obligation under any applicable law, including, without limitation, (i) the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.*, (ii) the Comprehensive Environmental Response Compensation and Liability Act, (iii) the Age Discrimination and Employment Act of 1967 (as amended), (iv) the Federal Rehabilitation Act of 1973 (as amended), (v) the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, or (vi) any foreign, federal, state, or local labor, employment, or environmental law, by virtue of the Buyer's purchase of the Transferred Property or the Buyer's or any of its affiliates' hiring of any employees of the Debtor. Without limiting the foregoing, no Buyer Party shall have any liability or obligation with respect to any environmental liabilities of the Debtor or any environmental liabilities associated with the Transferred Property.

15. Effective upon the Closing and subject to the terms of this 363 Free and Clear Order, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, such as any judicial, administrative, arbitral, or other proceeding, against any Buyer Party or their respective property (including, without limitation, the Transferred Property), with respect to any (a) claim in this Chapter 11 Case or in connection with or related to the Transaction or the Debtor or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to each of clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff (to the extent not taken prepetition) or right of subrogation or recoupment

of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this 363 Free and Clear Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) to the maximum extent permitted under applicable law (including to the extent provided under Section 525 of the Bankruptcy Code), revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Transferred Property or conduct any of the businesses operated with respect to such property.

16. To the fullest extent permitted by applicable law, (a) the Buyer and its affiliates and successors and (b) their respective officers, directors, managers, employees, shareholders, agents, contractors, professionals, and assigns (together, the "TSA Exculpated Parties") shall not have or incur, before, on, or after the Closing, any liability to any person or entity for any claims, suits, demands, penalties, fines, charges, proceedings, causes of action, damages, losses, costs, or expenses of any nature (including attorneys' fees) arising, directly or indirectly, from (i) the administration, implementation, or performance of the TSA or (ii) the provision, management, or oversight of the transition services under the TSA; *provided*, that nothing in this paragraph (x) releases the parties to the TSA from their obligations thereunder, or (y) exculpates any TSA Exculpated Party from liability for any act or omission determined by final order of the Court to constitute willful misconduct, bad faith, or gross negligence.

**Good Faith of Buyer**

17. The Transaction is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction (including, without limitation, entry into the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, assumption of the TSA, [and the

assumption and assignment of the Assigned Contracts in accordance with this Order)], unless such authorization and consummation of such Transaction are duly and properly stayed pending such appeal.

18. Neither the Debtor nor the Buyer have engaged in any action or inaction that would cause or permit the Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer in connection with the Transaction, including the Stalking Horse Agreement and the TSA, including the Exclusivity and Prepayment Agreement, is substantial, fair, and reasonable and the Transaction may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

**Assumption of the TSA**

19. The Debtor is authorized to assume and directed to perform under the TSA, including the Exclusivity and Prepayment Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code. The TSA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court. The Debtor is not in default of any obligations under the TSA such that it owes no cure obligations to the Buyer under the TSA. The assumption of the TSA is made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

[**Assumption and Assignment of Assigned Contracts**

20. The Debtor is authorized and directed at the Closing, and subject to payment of applicable Cure Amounts, to assume and assign each of the Closing Date Assigned Contracts to the Buyer and to have such Closing Date Assigned Contracts assumed by the Buyer, pursuant to sections 105(a) and 365 of the Bankruptcy Code, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Closing Date

Assigned Contracts to the Buyer. The payment of the applicable Cure Amounts (if any) for the Closing Date Assigned Contracts shall (a) effect a cure of all defaults existing thereunder as of the Closing and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default. Upon the payment of Cure Amounts, if any, by the Buyer for the Closing Date Assigned Contracts, such Closing Date Assigned Contracts shall remain in full force and effect, and no default shall exist under the Closing Date Assigned Contract, nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such default. The Cure Amounts with respect to such Closing Date Assigned Contracts shall not be subject to further dispute or audit, including, without limitation, any dispute or audit based on performance prior to the Closing. After payment of the Cure Amounts by the Buyer for the Closing Date Assigned Contracts, neither the Debtor nor the Buyer shall have any further liabilities to the counterparties to the Closing Date Assigned Contracts [other than the Buyer's obligations under the Closing Date Assigned Contracts that accrue and become due and payable on or after Closing].

21. For the avoidance of doubt and notwithstanding anything to the contrary in this 363 Free and Clear Order or the documents related to the Transaction, as applicable, all contract counterparties' rights with respect to the assumption and assignment of their respective contracts, and any Cure Amount proposed with respect thereto, are reserved through the Contract Objection Deadline or a supplemental Contract Objection Deadline (as applicable), and any such timely objections that are not resolved prior to an Assumption/Assignment/Cure Hearing shall be subject to adjudication at an Assumption/Assignment/Cure Hearing or such later hearing as may be agreed to by the Debtor and the contract counterparty, or as otherwise determined by the Court. Except with respect to the TSA, which shall be assumed pursuant to this 363 Free and Clear Order as of Closing, and notwithstanding anything herein to the contrary, no contract shall be assumed or

assigned to the Buyer on the Closing or otherwise unless Buyer has requested that such contract be treated as a [“Transferred Contract”] under the Stalking Horse Agreement and the Debtor shall file on the docket and serve a notice upon the applicable counterparties identifying the Closing Date Assigned Contracts that the Buyer has requested be treated as a [“Transferred Contract”] as of the Closing.

22. Any non-Debtor counterparty to an Assigned Contract that does not file with the Court an objection to such assumption and assignment by the Contract Objection Deadline (as applicable) is deemed to have consented to such assumption and assignment.

23. Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Amounts, the Closing Date Assigned Contracts that the Buyer designates to be assumed and assigned under the Stalking Horse Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Any provisions in any Closing Date Assigned Contract that prohibit or condition the assignment of such Closing Date Assigned Contract to the Buyer or allow the counterparty to such Closing Date Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Closing Date Assigned Contract to the Buyer, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtor under the Closing Date Assigned Contracts, and such Closing Date Assigned Contracts shall remain in full

force and effect for the benefit of the Buyer. Each counterparty to the Closing Date Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtor or any Buyer Party or their respective property any assignment fee, acceleration, default, breach, or claim or pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Closing Date Assigned Contracts and (b) asserting against any Buyer Party (or its respective property, including, without limitation, the Transferred Property) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against, the Debtor existing as of the Closing or arising by reason of the Closing.

24. Upon the Closing and the payment of the relevant Cure Amounts, if any, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Closing Date Assigned Contracts and the Debtor shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Closing Date Assigned Contracts. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtor as a result of the assumption and assignment of the Closing Date Assigned Contracts. The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Closing Date Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtor or the Buyer, as the case may be, to enforce every term and condition of such Closing Date Assigned Contract. The validity of the assumption and assignment of any Closing Date Assigned Contract to the Buyer shall not be affected by any existing dispute between the Debtor and any counterparty to such Closing Date Assigned Contract. Any party that may have had the right to consent to the assignment of any Closing Date Assigned Contract and did not timely object prior to the passage

of the Contract Objection Deadline will be deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

25. All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing after the Contract Objection Deadline and prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing, or as soon thereafter as reasonably practicable.

26. Notwithstanding any term of any Closing Date Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Closing Date Assigned Contract that purport to be personal only to, or exercisable only by, the Debtor, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer subject to the other applicable terms of the Closing Date Assigned Contracts. Any extension or renewal options in connection with all Closing Date Assigned Contracts that the Debtor validly exercised prior to the entry of this 363 Free and Clear Order, and all terms of the Closing Date Assigned Contracts, are in full force and effect and have not been previously rejected, and the Debtor's time to assume or reject the Closing Date Assigned Contracts has not otherwise expired.

27. The Debtor's obligations to counterparties of any unexpired leases pursuant to section 365(d)(3) of the Bankruptcy Code through the effective date of assumption or assignment or rejection of any such unexpired leases shall not be affected or modified by this 363 Free and Clear Order.

28. The assignments of each of the Closing Date Assigned Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

29. Nothing in this 363 Free and Clear Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtor that any Assigned Contract is an executory contract or unexpired lease under Section 365 of the Bankruptcy Code.

30. The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of their respective rights to enforce every term and condition of the Assigned Contracts.]

**Other Provisions**

31. To the maximum extent permitted by applicable law, and in accordance with the Transaction, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Permits") of the Debtor with respect to the Transferred Property. To the extent the Buyer cannot operate under any Permits in accordance with the previous sentence, such Permits shall be in effect while the Buyer, with assistance from the Debtor, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Permits to the Buyer. The Debtor shall maintain the Permits in good standing to the fullest extent allowed by applicable law for the Buyer's benefit until equivalent new Permits are issued to the Buyer.

32. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any Permit relating to the Transferred Property sold, transferred, or conveyed to the Buyer on account of the filing or pendency of this Chapter 11 Case or the consummation of the Transaction.

33. Upon or after the Closing, the Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies and/or to take any and all actions permitted in connection with Transaction, including the Stalking Horse Agreement, the TSA, this 363 Free and Clear Order, or any other Transaction-related

document with respect to the Transaction. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

34. Neither the Buyer nor the Debtor shall have an obligation to consummate the Transaction until all conditions precedent in any Transaction-related document, as applicable, and each of their respective obligations to consummate the Transaction, have been met, satisfied, or waived in accordance with the Transaction.

35. The terms and provisions of the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA and this 363 Free and Clear Order shall be binding in all respects upon the Debtor, its affiliates, its estate, all creditors of (whether known or unknown) and holders of equity interests in the Debtor, any statutory committee appointed in this Chapter 11 Case, any holders of claims against or on all or any portion of the Transferred Property, [all counterparties to the Assigned Contracts,] the Buyer, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in the Debtor's Chapter 11 Case or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA and any other Transaction-related documents shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, its shareholders, or any trustee(s), examiner(s), or receiver(s).

36. The terms and provisions of this 363 Free and Clear Order, all other Transaction-related documents, and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in this Chapter 11 Case; (b) converting this

Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing this Chapter 11 Case; or (d) pursuant to which this Court abstains from hearing this Chapter 11 Case. The terms and provisions of this 363 Free and Clear Order, notwithstanding the entry of any such orders described in (a)–(d) above, shall continue in this Chapter 11 Case, or following dismissal of this Chapter 11 Case.

37. Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction, including the terms and transactions contemplated by the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement and the TSA.

38. The Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA and the Transaction contemplated hereunder, shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

39. The IP License shall have the protections of section 365(n) of the Bankruptcy Code.

40. The Stalking Horse Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not, based on the Debtor's business judgment, have a material adverse effect on the Debtor's estate or its creditors. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtor's estate or its creditors shall require notice to the party or parties materially and adversely affected and Court approval.

41. All time periods set forth in this 363 Free and Clear Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

42. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this 363 Free and Clear Order shall be effective immediately upon entry and the Debtor and the Buyer are authorized to consummate the Transaction immediately upon entry of this 363 Free and Clear Order and to take any action and perform any act authorized under this Order.

43. To the extent there is any explicit conflict between the terms of this 363 Free and Clear Order and the Stalking Horse Agreement, the TSA, or the Exclusivity and Prepayment Agreement, the terms of the 363 Free and Clear Order shall control. Nothing contained in any chapter 11 plan hereinafter confirmed in this Chapter 11 Case or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA, or the terms of this 363 Free and Clear Order. To the extent this 363 Free and Clear Order is inconsistent with any prior order or pleading filed in this Chapter 11 Case, the terms of this 363 Free and Clear Order shall govern.

44. The provisions of this 363 Free and Clear Order are nonseverable and mutually dependent.

[*Remainder of Page Intentionally Left Blank*]

45. The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this 363 Free and Clear Order, including matters related to the terms, provisions, and enforcement of this 363 Free and Clear Order and the Transaction, including the Stalking Horse Agreement, the Exclusivity and Prepayment Agreement, the TSA, any amendments thereto, any waiver and any related or ancillary agreement.

# **Exhibit A**

Stalking Horse Agreement

(Intentionally Omitted)

**Exhibit B**

TSA

**AMENDED AND RESTATED**

**TRANSITION SERVICES AGREEMENT**

**by and between**

**DISNEY WORLDWIDE SERVICES, INC.**

**and**

**CHARACTER TECHNOLOGIES, INC.**

**Dated as of October 13, 2026**

## TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

1.1 Definitions.....1

ARTICLE II

SERVICES

2.1 Provision of Services.....4
2.2 Omitted Service Amendments.....9
2.3 No Management Authority.....9
2.4 Diligence Services.....10

ARTICLE III

COMPENSATION

3.1 Compensation for Services.....10
3.2 Payment Terms.....10
3.3 Cash Calls.....11
3.4 Books and Records.....11

ARTICLE IV

TERM

4.1 Commencement.....11
4.2 Termination.....11
4.3 Effect of Termination.....12

ARTICLE V

LIMITATION ON LIABILITY; DISCLAIMER

5.1 Limitation on Liability.....12
5.2 DISCLAIMER OF WARRANTIES.....12

ARTICLE VI

INDEMNIFICATION

6.1 Indemnification ....................13

ARTICLE VII

OTHER COVENANTS

7.1 Confidentiality ....................13
7.2 Use of Disney Name ....................14
7.3 Exclusivity Agreement ....................14

ARTICLE VIII

MISCELLANEOUS

8.1 Force Majeure ....................15
8.2 Relationship of Parties ....................15
8.3 Counterparts; Effectiveness; Entire Agreement ....................15
8.4 Governing Law; Dispute Resolution ....................16
8.5 Assignment ....................16
8.6 No Third Party Beneficiaries ....................16
8.7 Notices ....................16
8.8 Severability ....................18
8.9 Amendments and Waivers ....................18
8.10 Representations and Warranties ....................18

**AMENDED AND RESTATED TRANSITION SERVICES AGREEMENT**

This AMENDED AND RESTATED TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of October 13, 2026, is entered into by and between Disney Worldwide Services, Inc., a Florida corporation ("Disney"), and Character Technologies, Inc., a Delaware corporation ("CAI"). Capitalized terms used, but not otherwise defined, herein shall have their respective meanings set forth in the Exclusivity Agreement.

W I T N E S S E T H

WHEREAS, Disney and CAI are parties to that certain Exclusivity and Prepayment Agreement, dated as of the Effective Date (the "Exclusivity Agreement");

WHEREAS, following the execution of the Exclusivity Agreement by CAI and Disney, and Disney's hiring of certain employees of CAI, CAI will need Disney to provide certain services, subject to the terms and conditions set forth herein, to facilitate CAI's continued operation of its business and the orderly wind down of CAI's Character.AI App, Website and Platform Services;

WHEREAS, Disney may provide, or cause its Group members or Sub-Contractors to provide, to CAI such services for a limited period of time from and after the Effective Date;

WHEREAS, Disney and CAI entered into that certain Transition Services Agreement (the "Original Agreement"), dated as of the Effective Date; and

WHEREAS, each of Disney and CAI desires to amend and restate the Original Agreement in its entirety to reflect herein the terms of their agreement with respect to such services, including to govern the Processing of Personal Data (as such terms are defined in Schedule D) in connection with the provision and receipt of the Services, such that this Agreement shall supersede and replace the Original Agreement in its entirety.

NOW, THEREFORE, subject to the terms, conditions, covenants and provisions of this Agreement, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by this Agreement, Disney and CAI, for themselves, their successors and assigns, mutually covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Affected Party" has the meaning ascribed thereto in Section 8.1.

"Affiliate" means, with respect to a specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common

control with, such specified Person. As used in this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" and whether or not such terms are capitalized), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning ascribed thereto in the preamble.

"Applicable Termination Date" means, with respect to each Service, the termination date specified with respect to such Service in Schedule A, which in each case, shall occur no later than the five (5)-month anniversary of the Effective Date.

"CAI" has the meaning ascribed thereto in the preamble.

"CAI Group" means, collectively, CAI and its Subsidiaries.

"CAI Group Parties" means, collectively, the members of the CAI Group and their respective Representatives.

"Cash Call" has the meaning ascribed thereto in Section 3.3.

"Confidential Information" has the meaning ascribed thereto in Section 7.1.

"Deliverables" has the meaning ascribed thereto in Section 2.1(p).

"Disney" has the meaning ascribed thereto in the preamble.

"Disney Group" means Disney and its Affiliates.

"Disney Group Parties" means, collectively, the members of the Disney Group and their respective Representatives.

"Dispute" has the meaning ascribed thereto in Section 2.1(d).

"Dispute Notice" has the meaning ascribed thereto in Section 2.1(d).

"Effective Date" means September 18, 2026.

"Excluded Service" means any service identified in Schedule B.

"Exclusivity Agreement" has the meaning ascribed thereto in the recitals.

"Executive Leadership Group" has the meaning ascribed thereto in Section 2.1(c).

"Force Majeure Event" has the meaning ascribed thereto in Section 8.1.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court of competent

jurisdiction, arbitral body (public or private), agency, commission or official, including any political subdivision thereof.

"Group" means either the Disney Group or the CAI Group, as the context requires.

"Law" means, with respect to any Person, any transnational, domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, permit, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, issued, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Omitted Services" has the meaning ascribed thereto in Section 2.2.

"Original Agreement" has the meaning ascribed thereto in the recitals.

"Party" means either CAI or Disney, and "Parties" means both CAI and Disney.

"Performing Party" has the meaning ascribed thereto in Section 8.1.

"Person" means an individual, firm, corporation, partnership, limited liability company, association, trust, joint venture or other entity or organization, including a Governmental Authority.

"Qualified Bidder Diligence Services" has the meaning ascribed thereto in Section 2.4.

"Representatives" means, with respect to any Person, its directors, members, partners, officers, employees, agents and advisors (including legal, financial and accounting advisors).

"Sales Taxes" has the meaning ascribed thereto in Section 3.1(b).

"Service Employee" has the meaning ascribed thereto in Section 2.1(e).

"Service Manager" has the meaning ascribed thereto in Section 2.1(c).

"Service Provider" means one or more members of the Disney Group in its or their capacity as the provider(s) of any Services to any Service Recipient.

"Service Provider Data" means (a) any data or information of the Service Provider or its Group members, or their respective vendors, customers or other business partners, that is provided to or obtained by the Service Recipient or its personnel in the performance of the Service Recipient's obligations under this Agreement and (b) any data or information to the extent related to the Service Provider or its Group members that is collected, generated or processed by the Service Recipient or its personnel solely in connection with the performance of the Service Recipient's obligations pursuant to this Agreement.

"Service Recipient" means one or more members of the CAI Group in its or their capacity as the recipient(s) of any Services from any Service Provider.

"Service Recipient Data" means (a) any data or information of the Service Recipient or its Group members, or their respective vendors, customers or other business partners, that is provided to or obtained by the Service Provider or its personnel in the performance of the Service Provider's obligations under this Agreement and (b) any data or information to the extent related to the Service Recipient or its Group members that is collected, generated or processed by the Service Provider or its personnel solely in connection with the performance of the Service Provider's obligations pursuant to this Agreement.

"Services" means the individual services identified in Schedule A.

"Sub-Contractor" has the meaning ascribed thereto in Section 2.1(f).

"Taxes" means all federal, state, county, provincial, national, local, foreign and other taxes, charges, fees, duties (including customs duties), levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, goods and services, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, occupational, interest equalization, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, employment insurance and social security taxes, premiums or levies, which are imposed by any Governmental Authority, including any interest, penalties or additions to tax attributable thereto.

"Third-Party Costs" has the meaning ascribed thereto in Section 2.1(f).

## ARTICLE II

## SERVICES

2.1 Provision of Services.

(a) Disney shall provide, or cause the applicable Service Provider or Sub-Contractor to provide, the Services to CAI and the applicable members of the CAI Group, in each case, as Service Recipient(s), in accordance with the terms of this Agreement. The Parties acknowledge and agree that the Services are provided for the benefit of the operation of CAI's business that exists as of the Effective Date on a transitional basis only. Accordingly, as promptly as practicable following the execution of this Agreement, CAI agrees to use commercially reasonable efforts to cease using the Services or transition each Service to CAI's or its Group members' own internal organization or to alternate service providers under other arrangements. Service Recipient acknowledges that the Services are contingent on the Service Recipient Dependencies set forth on Schedule A. The Service Provider shall use commercially reasonable efforts (taking into account the express limitations set forth in this Agreement, including in Section 2.1(e)) to perform, or cause to be performed, the Services in substantially the same manner, and with substantially the same degree of care, quality and priority, as such Services (or reasonably similar services) were provided by or on behalf of CAI to CAI's business immediately prior to the Effective Date. The Service Recipient agrees and acknowledges that the Services shall be provided by the Service Provider solely using Service Recipient Systems (as defined in Schedule D). To the extent that Service Recipient Systems are not suitable for providing the Services or the Service Provider is unable to use or access Service Recipient

Systems, other than due to the fault of the Service Provider, the Service Provider shall be relieved and excused from any further obligation to provide or make available the applicable Services that could not be provided for such reason, and the Service Provider shall not be considered in breach of this Agreement for failure to provide such Services.

(b) CAI shall pay, perform, discharge and satisfy, or cause the applicable members of the CAI Group to pay, perform, discharge and satisfy, as and when due, its and their respective obligations as Service Recipients under this Agreement in accordance with the terms of this Agreement.

(c) Each of Disney and CAI agrees to appoint (i) an employee representative, which may be an employee of one of its Group members (each such representative, a "Service Manager"), who shall have overall responsibility for overseeing the day-to-day operation, compliance and performance of this Agreement and implementing, managing and coordinating the Services and (ii) an executive steering leadership group (each such group, an "Executive Leadership Group") that shall have responsibility for project oversight, including information security standards, governance and dispute escalation, in each case, pursuant to this Agreement on behalf of Disney and CAI, respectively. Initially, the Service Managers and Executive Leadership Groups shall be the individuals set forth in Schedule C. Either Party may change its designated Service Manager or Executive Leadership Group at any time upon written notice given to the other Party in accordance with Section 8.7. The Service Managers shall consult and coordinate with each other on a regular basis during the term of this Agreement.

(d) Except as otherwise provided in this Agreement, the Parties shall resolve all disputes arising under or in connection with this Agreement (each, a "Dispute") in accordance with the following procedures (including, for the avoidance of doubt, any Dispute relating to payments with respect to the Services). All Disputes shall be first discussed in person, by teleconference or by video conference by the Service Managers within ten (10) calendar days after receipt of written notice from either Party specifying the nature of the Dispute and requesting that the resolution process set forth in this Section 2.1(d) be initiated (a "Dispute Notice"). If any Dispute is not resolved by the Service Managers within fourteen (14) calendar days after receipt of a Dispute Notice, or such longer period as the Service Managers may agree in writing, then, upon the written request of either Party, the Executive Leadership Groups shall meet in person, by teleconference or by video conference for the purpose of resolving the Dispute. The Executive Leadership Groups shall negotiate in good faith to resolve the Dispute. If the Executive Leadership Groups do not resolve the Dispute within fourteen (14) calendar days after the date the Dispute was referred to them, or such longer period as the Executive Leadership Groups may agree in writing, the Parties may pursue any other rights, remedies or actions that may be available to them in accordance with Section 8.4.

(e) The Service Provider shall use commercially reasonable efforts to cause the Services to be performed by the individual(s) who have historically performed such Services (or reasonably similar services) during the twelve (12) months prior to the Effective Date (each such individual, a "Service Employee"), in each case only for so long as such Service Employee(s) remain employed by the Service Provider (or its Group member or Sub-Contractor, as applicable) and is reasonably available to perform the applicable Service. In the event that any Service Employee(s) are not (or are no longer so) employed by the Service Provider, the Service

Provider shall use commercially reasonable efforts to assign, and make available, personnel familiar with the applicable Service (solely to the extent such personnel exist) to perform such Service; provided, that, if there are no other personnel familiar with the applicable Service, then the Service Provider shall be relieved and excused from any further obligation to provide or make available the Services historically performed by such Service Employee(s), and the Service Provider shall not be considered in breach of this Agreement for failure to provide such Services. Subject to the foregoing, the Service Provider shall determine (in its sole and absolute discretion) the personnel who shall perform the Services to be provided by the Service Provider. For the avoidance of doubt, the Service Provider shall not be obligated to cause the Services to be performed by any individual(s), including independent contractors, other than the Service Employees and other personnel familiar with the applicable Services, including any legacy employees, independent contractors or representatives of the Service Provider. The Service Recipient acknowledges and agrees that no such personnel shall be required to dedicate more than twenty percent (20%) of their hours of employment by or work on behalf of the Service Provider to the performance or support of the Services. All personnel performing Services shall remain at all times, and be deemed to be, employees, independent contractors or representatives solely of the Service Provider responsible for providing such Services (or of such Service Provider's Group member or Sub-Contractor, as the case may be) for all purposes, and shall not be, or be deemed to be, employees, independent contractors or representatives of the Service Recipient. Service Recipient also shall not be considered a joint employer of any of the employees, independent contractors, or representatives performing the Services. The Service Provider (or its Group member or Sub-Contractor, as the case may be) shall be solely responsible for (x) payment of (i) all compensation, (ii) all income, disability, withholding and other employment Taxes and (iii) all medical benefit premiums, vacation pay, sick pay and other employee benefits payable to or with respect to personnel who perform Services on behalf of the Service Provider, as well as (y) (i) the filing, collection, withholding, and transmission of all federal, state and local income, unemployment, payroll and employment taxes and other withholdings required by federal, state or local law or regulation payable with respect to the employees providing the Services in accordance with applicable law, and (ii) providing unemployment insurance and workers' compensation benefits to all such employees. In addition, Service Provider shall be responsible for ensuring that such employees comply with all written policies and legal requirements applicable to the performance of the Services. All such personnel shall be under the sole direction, control and supervision of the Service Provider (or its Group member or Sub-Contractor, as the case may be) and the Service Provider (or its Group member or Sub-Contractor, as the case may be) has the sole right to exercise all authority with respect to the employment, substitution, termination, assignment and compensation of such personnel.

(f) The Service Provider may, at its option, from time to time, (i) delegate any or all of its obligations to perform Services under this Agreement to any one or more of its Group members or (ii) engage the services of other professionals, consultants or other third parties (each, a "Sub-Contractor") in connection with the performance of the Services; provided, however, that the Service Provider shall remain ultimately responsible for ensuring that its obligations hereunder are satisfied with respect to any Services provided by any such Group member or Sub-Contractor and shall be liable for any such Group member's or Sub-Contractor's failure to so satisfy such obligations; provided, further, that Disney's Service Manager, and not any such Group member or Sub-Contractor, shall be the Service Recipient's sole point of contact

regarding the Services, including with respect to payment. CAI shall reimburse Disney for all documented costs, fees and expenses paid by Disney or the applicable Service Provider to any third party, including Sub-Contractors, in connection with the provision of the Services ("Third-Party Costs"), including any documented third-party fees, penalties or other costs incurred in connection with third-party consents, waivers or licenses that Disney or the applicable Service Provider reasonably determines are necessary for the provision of the Services.

(g) The Services shall be used by the applicable Service Recipient solely for the operation of CAI's business for substantially the same purpose and in substantially the same manner as used by the CAI business during the three (3) months prior to the Effective Date, and for the orderly wind down of CAI's Character.AI App, Website and Platform Services.

(h) In the event that the Service Provider reasonably deems it necessary to suspend delivery of a Service hereunder for maintenance, repair or replacement or legal, compliance or security purposes, the Service Provider shall not be obligated to deliver such Service during such periods, but shall use commercially reasonable efforts to minimize the duration and impact of the interruption. Notwithstanding anything to the contrary in this Agreement, in no event shall the Service Provider (or any of its Group members or Sub-Contractors) be required to (i) provide Services to any Person that the Service Recipient directly or indirectly acquires after the Effective Date, or in any jurisdiction in which Services were not provided as of the Effective Date, (ii) provide Services to the extent that the provision of any such Service would require any consent, waiver or license of any third party, unless and until such consent, waiver or license has been obtained, (iii) expand its facilities, incur any capital expenditures, employ additional personnel or maintain the employment of any specific persons to provide the Services hereunder or (iv) disclose to any member of the CAI Group any contracts by which any member of the Disney Group acquires from third parties any components or inputs to any Service.

(i) The Service Recipient shall cooperate with the Service Provider to the extent necessary or appropriate to facilitate the performance of the Services in accordance with the terms of this Agreement. Without limiting the generality of the foregoing, (i) each Party shall, and shall cause its Group members to, give the other Party and its Group members and, in the case of Disney, its Sub-Contractors reasonable access to, and necessary rights to use, any information, assets, systems, materials and technologies to the extent reasonably necessary for the performance or receipt of the Services and (ii) the Service Recipient shall, and shall cause its Group members to, upon reasonable written notice, give to the Service Provider and its Group members and Sub-Contractors reasonable access, during regular business hours and at such other times as are reasonably required, to the relevant premises and personnel to the extent reasonably necessary for the performance of the Services; provided, that Disney shall only be required to grant such access and rights to (1) legacy employees of the CAI business and (2) such other employees of the CAI Group that Disney, in its sole discretion, has approved in writing. Each Party shall (and shall cause its Group members and their personnel and, in the case of Disney, its Sub-Contractors' personnel, providing or receiving Services to): (A) not attempt to obtain access to, use or interfere with (1) any information technology systems of the other Party or its Group members, or (2) any confidential or competitively sensitive information owned, used or processed by the other Party, except, in each case, to the extent reasonably necessary to do so to provide or receive Services or as permitted under Section 2.1(i)(i); (B) maintain reasonable security measures to protect the systems of the other Party and its Group members to which it

has access pursuant to this Agreement against access by unauthorized third parties; (C) not disable, damage or erase or disrupt or impair the normal operation of the information technology systems of the other Party or its Group members; and (D) promptly notify the other Party of any confirmed misuse, disclosure or loss of, or inability to account for, the other Party's confidential or competitively sensitive information, and any confirmed unauthorized access to its or any member of its Group's facilities, systems or network reasonably likely to affect the other Party and shall investigate such confirmed security incidents and reasonably cooperate with the other Party's incident response team to mitigate and limit the impact of such a security incident.

(j) CAI acknowledges that Disney is agreeing to perform, or cause to be performed, the Services in order to facilitate the release of Released Matters (as defined in the Exclusivity Agreement) set forth in Section 4 (*Release and Waiver*) of the Exclusivity Agreement and the operation of the CAI business, and support the orderly wind down of CAI's Character.AI App, Website and Platform Services. The Services shall not include, and no Service Provider (or any Group member or Sub-Contractor of a Service Provider) shall be obligated to provide, any Service the provision of which to a Service Recipient from and after the Effective Date would constitute, or reasonably be expected to constitute, (i) a violation of any Law or (ii) a breach of any contractual obligation owed to a third party.

(k) Each Party acknowledges that it may be necessary for each Party to make proprietary and/or third-party software available to the other Party in the course and for the purpose of performing or receiving, as applicable, Services. Each Party (i) shall, and shall cause the members of its Group and, in the case of Disney, its Sub-Contractors to, comply with the license restrictions applicable to any and all proprietary or third-party software made available to such Party by the other Party in the course of the provision of Services hereunder, (ii) acknowledges the license terms of use applicable to all proprietary or third party software in its possession as of the Effective Date and (iii) agrees that it shall be responsible for providing to the other Party a copy of the applicable license terms (or, solely with respect to open source software or other software with publicly available license terms, information sufficient to direct such other Party to a copy thereof) for any and all proprietary or third-party software first made available to such other Party from and after the Effective Date, solely to the extent such provision would not violate the providing Party's duty of confidentiality owed to any third party. In the event there are any additional licensing or other costs associated with the provision of third party software pursuant to this Section 2.1(k), such costs shall be borne by the Service Recipient.

(l) Subject to Section 2.2, the Parties agree that the Services constitute all of the services to be provided to the CAI Group by Disney (or its Group members or Sub-Contractors, as the case may be) from and after the Effective Date.

(m) CAI and its Group members shall not be granted or have access to Disney computer systems. If there is a need for such access, CAI and Disney will agree on the terms pursuant to which such access will be allowed.

(n) Each Party agrees to comply with the data processing addendum attached to and incorporated into this Agreement as set forth in Schedule D, which shall govern the Processing of Personal Data (as such terms are defined in Schedule D) in connection with the provision and receipt of the Services. The Parties shall, as reasonably requested by the other Party, execute all

further documents as are reasonably necessary to comply with applicable Data Protection Laws (as defined in Schedule D) in connection with the provision and receipt of the Services.

(o) Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that, as between the Parties, any and all Service Recipient Data shall be owned by the Service Recipient or its applicable Group member, subject to any limitations imposed by third-party vendors or subcontractors with respect thereto, and any and all Service Provider Data shall be owned by the Service Provider or its applicable Group member, subject to any limitations imposed by third-party vendors or subcontractors with respect thereto.

(p) Any work product, deliverables, documents, code, materials or other tangible or intangible output (other than Service Recipient Data and Service Provider Data, which are addressed above) created, developed or prepared by or on behalf of the Service Provider specifically for the Service Recipient in the course of performing the Services (collectively, "Deliverables") shall be owned by the Service Recipient, and the Service Provider hereby assigns, and shall cause its Group members and Sub-Contractors to assign, to the Service Recipient all right, title and interest in and to such Deliverables, including any intellectual property rights therein or thereto.

2.2 Omitted Service Amendments. From time to time during the forty-five (45)-day period commencing on the Effective Date, CAI may request Disney to provide, or cause the applicable Service Provider or Sub-Contractor to provide, services (other than Excluded Services) that are not identified in Schedule A that (a) were provided, directly or indirectly, by the CAI Group to the CAI business during the three (3) months prior to the Effective Date, (b) are reasonably necessary for the continued operation of the CAI business for substantially the same purpose and in substantially the same manner as it was conducted during the three (3) months prior to the Effective Date or reasonably necessary for the orderly wind down of CAI's Character.AI App, Website and Platform Services and (c) a Service Recipient cannot otherwise secure from a third party on commercially reasonable terms ("Omitted Services"). In the event that CAI desires to have Disney provide, or cause the applicable Service Provider or Sub-Contractor to provide, Omitted Services and Disney is reasonably capable of providing, or causing the applicable Service Provider or Sub-Contractor to provide, such Omitted Services, then CAI and Disney shall in good faith negotiate an amendment to Schedule A, which shall describe in detail the service, project scope, term, price and payment terms applicable to such Omitted Services. Any request for an Omitted Service shall be in writing and shall specify (a) the type and the scope of the requested service, (b) where and to whom the requested service is to be provided and (c) the proposed term for the requested service; provided, that the term of any Omitted Service shall terminate no later than five (5) months following the Effective Date. Once agreed to in writing, the amendment to Schedule A shall be deemed part of this Agreement as of such date and the Omitted Services shall be deemed "Services" provided hereunder, subject to the terms and conditions of this Agreement.

2.3 No Management Authority. No Service Provider (or any Group member or Sub-Contractor of a Service Provider) shall be authorized by, or shall have any responsibility under, this Agreement to manage the affairs of the business of any Service Recipient.

2.4 Diligence Services. Disney and CAI shall work together in good faith to identify five (5) Key Employees (as defined in the Exclusivity Agreement) who shall be made reasonably available for diligence with potential bidders who (a) have signed a non-disclosure agreement with CAI, (b) have submitted evidence to CAI demonstrating the party's financial capability to consummate a proposed transaction, (c) have submitted to CAI a preliminary indication of interest and (d) CAI expects will be deemed to be qualified bidders under the relevant bidding procedures approved by the U.S. Bankruptcy Court for the District of Delaware (such Services provided by the Key Employees, the "Qualified Bidder Diligence Services").

## ARTICLE III

## COMPENSATION

3.1 Compensation for Services.

(a) The Parties have agreed that the Services Provider will not charge a fee to the Service Recipient with respect to each Service rendered pursuant to this Agreement. However, the Service Recipient shall reimburse the Service Provider for any Third-Party Costs in accordance with the procedures set forth in Section 3.2.

(b) The amount of any sales Tax, value-added Tax, goods and services Tax or similar Tax that is required to be assessed and remitted by any Service Provider in connection with the Services provided hereunder ("Sales Taxes") shall be promptly paid to the Service Provider by the Service Recipient in accordance with Section 3.2. Such payment shall be in addition to the Third-Party Costs (unless such Sales Tax is expressly already accounted for in the applicable Third-Party Costs).

(c) The Parties shall, and shall cause each of their respective Group members to, cooperate with each other in good faith and provide any information and/or documentation reasonably requested from time to time, in each case to enable the other Party to handle any audits, examinations or inquiries with respect to Sales Taxes and to enable the other Party to comply with applicable Law with respect to Sales Taxes.

3.2 Payment Terms.

(a) The Service Provider shall bill the Service Recipient within sixty (60) days after the end of each full calendar month following the Effective Date, or at such other interval specified with respect to a particular Service in Schedule A, an amount equal to the Third-Party Costs due for all Services provided in such month or other specified interval, as applicable, plus any Sales Taxes; provided, that the Service Provider may, in its sole discretion, bill the Service Recipient more frequently for Third-Party Costs as and when the Service Provider receives bills therefor from the applicable third parties. Invoices shall be directed to the Service Manager appointed by CAI or to such other Person designated in writing from time to time by such Service Manager. The Service Recipient shall pay such amount in full within thirty (30) days after receipt of each invoice by wire transfer of immediately available funds to the account designated by the Service Provider for this purpose or upon the Service Provider's written request, directly to the applicable third party. If the last day of such time period is not a Business

Day, the Service Recipient shall pay such amount on or before the following Business Day. In addition to any other remedies for non-payment, if any payment is not received by the Service Provider on or before the date such amount is due, then a late payment interest charge, calculated at a ten percent (10.0%) per annum rate, compounded monthly, shall immediately begin to accrue and any such late payment interest charges shall become immediately due and payable in addition to the amount otherwise owed under this Agreement and provided for in the applicable invoice.

(b) If the Service Recipient objects to the amount of any invoice, the Service Recipient shall pay the full amount of the invoice, including any amounts to which the Service Recipient objects, to the Service Provider and shall promptly provide written notice to the Service Provider of any amounts billed and paid to which the Service Recipient objects, reasonably detailing the basis for the Service Recipient's objection. Any such objection shall be deemed to be a Dispute hereunder subject to the provisions applicable to Disputes set forth in Section 2.1(d).

3.3 Cash Calls. If Disney expects that the Service Provider shall incur material Third-Party Costs in connection with the provision of any Services pursuant to this Agreement, Disney may, at its option, provide a written cash call ("Cash Call") to CAI of the amount of such Third-Party Costs in advance of the Service Provider incurring the same and CAI shall within five (5) days of receipt of such Cash Call provide such amount to the Service Provider for payment by wire transfer of immediately available funds to the account designated by Disney for this purpose.

3.4 Books and Records. Disney shall, and shall cause each Service Provider to, maintain complete and accurate books of account and other documentation as reasonably necessary to support the accuracy of invoices issued pursuant to Section 3.2(a).

## ARTICLE IV

## TERM

4.1 Commencement. This Agreement is effective as of the Effective Date and shall remain in effect with respect to a particular Service until the occurrence of the Applicable Termination Date with respect to such Service, unless earlier terminated (a) in its entirety or with respect to a particular Service, in each case in accordance with Section 4.2, or (b) by mutual consent of the Parties.

4.2 Termination. If a Service Provider or Service Recipient materially breaches any of its respective obligations under this Agreement (and the period for resolution of the Dispute relating to such breach set forth in Section 2.1(d) has expired), the non-breaching Party may terminate this Agreement with respect to the Service for which such obligations are owed, effective upon not less than thirty (30) days' written notice of termination to the breaching Party, if the breaching Party does not cure such breach within thirty (30) days after receiving written notice thereof from the non-breaching Party. The termination of this Agreement with respect to any Service pursuant to this Section 4.2 shall not affect the Parties' rights or obligations under

this Agreement with respect to any other Service; provided, that any other Service upon which the performance of such Service is dependent or bundled shall also be terminated.

4.3 Effect of Termination. In the event of any termination of this Agreement in its entirety or with respect to any Service, Service Provider shall have no further obligation to provide the applicable terminated Services, but each Party, Service Provider and Service Recipient shall remain liable for all of their respective obligations that accrued hereunder prior to the date of such termination, including all obligations of each Service Recipient to pay any amounts due to any Service Provider hereunder pursuant to Section 3.1, Section 3.2 and Section 3.3. In addition to the surviving obligations set forth in the preceding sentence, Section 2.1(n), this Section 4.3, Article V, Article VI, Section 7.1, Section 7.2 and Article VIII shall each survive the termination of this Agreement.

## ARTICLE V

## LIMITATION ON LIABILITY; DISCLAIMER

5.1 Limitation on Liability.

(a) NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE CAI GROUP PARTIES ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE BEING PROVIDED “AS IS” AND AS AN ACCOMMODATION AND WITHOUT SEPARATE CONSIDERATION. ACCORDINGLY, EXCEPT TO THE EXTENT FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR ACTUAL FRAUD OR BAD FAITH OF A DISNEY GROUP PARTY, OR ANY BREACH BY A DISNEY GROUP PARTY OF ITS OBLIGATIONS UNDER SECTION 7.1 (CONFIDENTIALITY) (AS TO WHICH NO LIMITATION UNDER THIS SENTENCE SHALL APPLY), NO DISNEY GROUP PARTY SHALL HAVE ANY LIABILITY TO ANY CAI GROUP PARTY ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER.

(b) IN NO EVENT SHALL ANY DISNEY GROUP PARTY BE LIABLE, WHETHER IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE TO ANY CAI GROUP PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING LOSS OF PROFITS) AS A RESULT OF ANY BREACH, PERFORMANCE OR NON-PERFORMANCE BY DISNEY OR ANY SERVICE PROVIDER OR SUB-CONTRACTOR UNDER THIS AGREEMENT.

5.2 DISCLAIMER OF WARRANTIES. THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT ARE FURNISHED WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. NO DISNEY GROUP PARTY MAKES ANY REPRESENTATION OR WARRANTY THAT ANY SERVICE COMPLIES WITH ANY LAW, DOMESTIC OR FOREIGN.

## ARTICLE VI

## INDEMNIFICATION

6.1 Indemnification. The Service Recipient shall defend, indemnify and hold the Service Provider and its Affiliates, and their respective officers, directors, shareholders, agents, employees, contractors and assigns of each, harmless from and against any and all suits, claims, demands, penalties, fines, charges, proceedings, causes of action, damages, losses, liabilities, costs and expenses of any nature whatsoever (including attorneys' fees) arising directly or indirectly from or out of: (a) the conduct and operation of the CAI business (including CAI's Character.AI App, Website and Platform Services) while the Services are provided under this Agreement, (b) the Service Recipient's use of the Services or (c) the Service Recipient's failure to comply with its obligations under this Agreement. The provisions of this Section 6.1 shall survive any determination that this Agreement or any portion hereof is void or voidable.

## ARTICLE VII

## OTHER COVENANTS

7.1 Confidentiality.

(a) Each Party hereby acknowledges that confidential information of such Party or its Group members may be exposed to the other Party or its Group members, or its or their respective Representatives (including, in the case of Disney, its Sub-Contractors), as a result of the activities contemplated by this Agreement (such information, "Confidential Information"). Each Party agrees that Confidential Information is a valuable asset of its owner, and its public disclosure or use outside of the activities contemplated by this Agreement without the prior consent of the relevant Party or its Group member would cause substantial harm to such disclosing Party or other Person. Therefore, each Party agrees to treat, and to cause its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors) to treat, all Confidential Information received by it with the amount of care that a reasonable business Person would use to protect its own valuable and proprietary Confidential Information and not to disclose any Confidential Information to any Person who does not have a contractual or fiduciary obligation with such Person to keep such Confidential Information confidential. In addition, neither Party shall utilize or permit its Group members, or its or their respective Representatives (including, in the case of Disney, its Sub-Contractors), to utilize Confidential Information for any purpose other than for the benefit of the CAI or the owner of such information, as the case may be.

(b) Notwithstanding the foregoing, each Party may disclose Confidential Information to its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors), on a need-to-know basis; provided that such Party shall remain liable for any breach of this Section 7.1 by its Group members and its and their respective Representatives (including, in the case of Disney, its Sub-Contractors).

(c) Except as may be required by Law or stock exchange rule, neither Party shall, without the prior written consent of the other Party, advertise, issue any press release or

otherwise publicize the fact that the Parties have entered into this Agreement or disclose the terms and conditions of this Agreement; provided, that CAI may disclose the existence of this Agreement and its general scope and terms (i) in connection with CAI's chapter 11 bankruptcy filing and related proceedings, including in any filings with, or disclosures to, the Bankruptcy Court, and (ii) to any official committee of unsecured creditors appointed in CAI's chapter 11 case, or its professional advisors, which disclosure under this clause (ii) may be made on a confidential, professionals'-eyes-only or similarly restricted basis.

(d) As used herein, "Confidential Information" shall not include information (i) that has become generally available to the public through no fault of the receiving Person, (ii) either (x) is known to the receiving Person prior to being furnished by the disclosing Person, or (y) becomes available to the receiving Person on a non-confidential basis from a source other than the disclosing Person; provided that the source was not prohibited by any legal, contractual or fiduciary obligation to the disclosing Person or any third party from disclosing such information, or (iii) disclosed to the extent necessary pursuant to (1) any Law, (2) the order of a court of competent jurisdiction, (3) any rule or regulation of an administrative agency, (4) any stock exchange rule or other market or reporting system, (5) any deposition, interrogatory, oral questions, request for information or documents, subpoena, civil investigative demand or similar process, (6) any required report, statement or testimony submitted to any municipal, state or national (including foreign regulatory) bodies having or claiming to have jurisdiction, or (7) other legal, judicial, arbitration, regulatory or administrative process or proceeding; provided that, under the circumstances described in this subparagraph (iii), the Person required to make the disclosure shall, to the extent legally permissible, notify in writing the Person whose Confidential Information shall be disclosed of such event and shall cooperate with any reasonable request or efforts by such Person, at such Person's sole expense, to take reasonable legally permissible actions to limit the scope of disclosure required in connection therewith and shall exercise reasonable efforts to obtain assurance that confidential treatment shall be accorded to such Confidential Information.

(e) The terms of this Section 7.1 shall continue to apply after the expiration or termination of this Agreement for (i) two (2) years with respect to Confidential Information concerning (A) the intellectual property rights of a Party or its Group members, (B) clients, vendors and customers of a Party or its Group members and (C) the business plans of a Party or its Group members and (ii) one (1) year with respect to all other Confidential Information.

7.2 Use of Disney Name. CAI shall acquire no right under this Agreement to use, and CAI shall not use, the name "Disney", "ABC", "ESPN", "Lucasfilm", "Marvel" or "Pixar" (either alone or in conjunction with or as a part of any other word, mark or name) or any marks, fanciful characters or designs of Disney or any of its Group members (including, for purposes of clarity and the avoidance of doubt, The Walt Disney Company) in any manner whatsoever.

7.3 Exclusivity Agreement. Each party hereto hereby agrees to perform under, comply with and implement the terms of, the Exclusivity Agreement, which is attached hereto as Exhibit A and incorporated into this Agreement.

## ARTICLE VIII

## MISCELLANEOUS

8.1 Force Majeure. In case performance of any terms or provisions hereof shall be delayed or prevented, in whole or in part, because of or related to compliance with any Law or requirement of any national securities exchange, or because of riot, war, public disturbance, pandemic (including any lockdowns, quarantines, "shelter in place" or "stay at home" orders, shutdowns, closures, sequesters and other protective measures in response thereto by any Governmental Authority), strike, labor dispute, unavailability of labor, fire, explosion, storm, flood, act of God or act of terrorism that is not within the control of the performing Party, Service Provider or Service Recipient whose performance is interfered with (each, a "Performing Party") and which by the exercise of reasonable diligence such Performing Party is unable to prevent, or for any other reason which is not within the control of such Performing Party whose performance is interfered with and which by the exercise of reasonable diligence such Performing Party is unable to prevent (each, a "Force Majeure Event"), then upon prompt written notice, stating the date and extent of such interference and the Force Majeure Event which is the cause thereof, by the Performing Party to the other Party, Service Recipient or Service Provider (each, an "Affected Party"), as applicable, the Performing Party shall be excused from its obligations hereunder during the period such Force Majeure Event or its effects continue, and no liability shall attach against either the Performing Party or the Affected Party on account thereof; provided, however, that the Performing Party shall promptly resume the required performance upon the cessation of the Force Majeure Event or its effects. No Performing Party shall be excused from performance under this Section 8.1 if such Performing Party fails to use commercially reasonable efforts to mitigate the effects of the Force Majeure Event on such Performing Party's ability to perform hereunder.

8.2 Relationship of Parties. Nothing in this Agreement shall be deemed or construed by the Parties or any third party as creating a relationship of principal and agent, partnership or joint venture between the Parties, between any Service Provider and any Service Recipient or with any individual providing Services, it being understood and agreed that no provision contained herein, and no act of any Party or its Group members, shall be deemed to create any relationship between the Parties or Group members other than the relationship set forth herein. Each Party and each Service Provider shall act under this Agreement solely as an independent contractor and not as an agent or employee of the other Party or any of such Party's Group members.

8.3 Counterparts; Effectiveness; Entire Agreement.

(a) This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that each Party need not sign the same counterpart. Delivery of a copy of this Agreement bearing a Party's signature by electronic mail in PDF format or by other similar electronic means shall have the same effect as physical delivery of the paper document bearing the original signature.

(b) This Agreement, the other Transaction Documents and the other agreements referred to herein and therein constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof and thereof.

8.4 Governing Law; Dispute Resolution. This Agreement, and all claims or causes of action whether in contract or tort, that may be based on or arise out of or relate to this Agreement, shall be governed by and construed in accordance with the Laws of the State of Delaware (without regard to any applicable principles of conflicts of law). Each party hereto (a) irrevocably submits to the personal jurisdiction of the United States District Court for the District of Delaware, or if and only if the United States District Court does not have jurisdiction, then before the Court of Chancery of the State of Delaware, or if and only if neither such court shall have jurisdiction, then before any other state or federal court sitting in Delaware having subject matter jurisdiction, and (b) agrees that any actions or proceedings arising in connection with this Agreement shall be brought, tried and determined exclusively in the courts referred to in clause (a) of this Section 8.4 and consents to service of process outside the State of Delaware pursuant to the requirements of such court in any matter subject to it. The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may have to the laying of venue of any such action or proceeding in such courts and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

8.5 Assignment. This Agreement and the rights and obligations hereunder shall not be assignable by either Party without the express written consent of the other Party; provided, that, without such consent, Disney may assign its rights and obligations hereunder to an Affiliate at any time. Any attempted assignment in violation of this Section 8.5 shall be void. Subject to the preceding sentences, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. Nothing in this Section 8.5 shall affect or impair (a) Disney's ability to designate one or more Group members to provide Services as a Service Provider hereunder, or a Service Provider's ability to delegate any or all of its obligations under this Agreement to one or more Group members or Sub-Contractors pursuant to Section 2.1(f), or (b) CAI's ability to designate one or more Group members to receive Services as a Service Recipient hereunder.

8.6 No Third Party Beneficiaries. The agreements, covenants and representations contained herein are for the benefit of the Parties and are not for the benefit of any third parties, except to the extent that any other Person is expressly granted any rights (including provisions applicable to a Party's Group members and as contemplated by Article V) under this Agreement.

8.7 Notices. All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and received) and shall be given, if to Disney, to:

Disney Worldwide Services, Inc.
c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-0763
Attention: Justin Warbrooke

Email: justin.warbrooke@disney.com

with a copy to:

The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-1245
Attention: Justin Radell; Lisa Phua
Email: justin.radell@disney.com; lisa.phua@disney.com

and

Skadden, Arps, Slate, Meagher & Flom
One Manhattan West
New York, New York 10001
Attention: Brandon Van Dyke; Ron Meisler; Samuel Cammer
Email: Brandon.VanDyke@skadden.com; Ron.Meisler@skadden.com; Samuel.Cammer@skadden.com

if to CAI, to:

Character Technologies, Inc.
700 El Camino Real, Suite 120, #1152
Menlo Park, CA 94025
Attention: John Chatowski, General Counsel
E-mail: john.chatowski@character.ai

with a copy to:

Wilson Sonsini Goodrich & Rosati, Professional Corporation
222 Delaware Avenue #800
Wilmington, DE 19801
Attn: Erin Fay
Email: efay@wsgr.com

and

Wilson Sonsini Goodrich & Rosati, Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Attn: Rich Mullen
Brendan Mahan
Email: rich.mullen@wsgr.com
bmahan@wsgr.com

or such other address or e-mail address as such party may hereafter specify for such purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the

place of receipt and such day is a Business Day in the place of receipt and, in the case of notice by e-mail, upon receipt by the notifying party of confirmation by the receiving party of receipt of the notifying e-mail on the same day such e-mail notice and request for receipt was given. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

8.8 Severability. If any provision, sentence, phrase or word of this Agreement or the application thereof to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision, sentence, phrase or word to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby and a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid provision.

8.9 Amendments and Waivers. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

8.10 Representations and Warranties. Each Party represents and warrants to the other Party that (i) it has the requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of such Party, and (iii) this Agreement has been duly executed and delivered by such Party and constitutes the valid and binding obligation of such Party, enforceable against it in accordance with the terms hereunder.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**DISNEY WORLDWIDE SERVICES, INC.**

Signed by:

By: David Howard
429A668EEF86420...

Name: David M. Howard
Title: President

**CHARACTER TECHNOLOGIES, INC.**

By: ______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**DISNEY WORLDWIDE SERVICES, INC.**

By: ________________________________
Name:
Title:

**CHARACTER TECHNOLOGIES, INC.**

Signed by:
By: Colin Adams
154163D0A0F34BB...
Name: Colin Adams
Title: Chief Executive Officer

**SCHEDULE A**

**Form of Services Schedule**

| **Service Name** | **Transition Services** |
|---|---|
| **Summary** | Transition services (a) to maintain the continued operation of the CAI business consistent with the manner in which such services were provided to CAI immediately prior to the Effective Date and subject to the express terms of the Agreement, (b) for the orderly wind down or transition of CAI's Character.AI App, Website and Platform Services and (c) for the Qualified Bidder Diligence Services. |
| **Service Description** | Personnel needed (a) to support engineering, app and website maintenance, trust and safety, and monetization functions of CAI to support the ongoing operation of the Character.AI App, Website and Platform Services, consistent with the manner in which such services were provided to CAI immediately prior to the Effective Date and subject to the express terms of the Agreement, (b) for the orderly wind down or transition of the Character.AI App, Website and Platform Services and (c) for the Qualified Bidder Diligence Services. |
| **Service Term** | With respect to clauses (a) in the Summary and Service Description above: not to extend beyond the earlier of (a) the five-month anniversary of the Effective Date and (b) the Closing (as defined in the Exclusivity Agreement).<br><br>With respect to clauses (b) and (c) in the Summary and Service Description above: not to exceed the five-month anniversary of the Effective Date. |
| **Service Recipient Contact** | John Chatowski, General Counsel, Character Technologies, Inc. |
| **Service Provider Contact** | Justin Radell, Assistant General Counsel, The Walt Disney Company |

# SCHEDULE B

## Excluded Services

The following corporate services:

1. legal and compliance advice;
2. tax advice;
3. human resources (including any hiring and firing decisions, or any actual hiring or firing of employees);
4. employee benefits (including allocation or issue of employee credit cards and cell phones);
5. treasury;
6. public policy;
7. government relations;
8. communications and marketing;
9. senior management;
10. procurement;
11. corporate development or strategy; and
12. any disaster recovery, crisis management and/or business continuity arrangements.

# SCHEDULE C

**Service Managers**

- Disney: Justin Radell, Assistant General Counsel, The Walt Disney Company
- CAI: John Chatowski, Associate General Counsel, Character Technologies, Inc.

**Executive Leadership Groups**

- Disney: Justin Radell, Assistant General Counsel, The Walt Disney Company
- CAI: John Chatowski, Associate General Counsel, Character Technologies, Inc.

# SCHEDULE D

## Data Processing Addendum

1. Definitions.

(a) "Data Protection Law" means any Law (including any and all legislative and/or regulatory amendments or successors thereto) regarding privacy, data protection, information security, and/or the Processing of Personal Data.

(b) "Personal Data" means any Service Recipient Data that relates to, or can be used to identify, contact, or precisely locate an identified or identifiable individual, and information considered to be personal data or personal information as defined under, or otherwise governed by, applicable Data Protection Law.

(c) "Process," "Processing" or "Processed" means any operation or set of operations which is performed upon Personal Data irrespective of the purposes and means applied, including access, collection, recording, organization, structuring, adaptation, alteration, retrieval, consultation, retention, storage, transfer, disclosure (including disclosure by transmission), dissemination or otherwise making available, alignment, combination, use, blocking, erasure and destruction.

(d) "Security Incident" means any unlawful or unauthorized Processing, destruction, alteration, disclosure, loss, acquisition or access to Personal Data or any other compromise of Personal Data in the possession or control of Service Provider. For the avoidance of doubt, Service Recipient Systems are not in the possession, custody or control of Service Provider.

(e) "Service Recipient Systems" means any system in the possession, custody or control of Service Recipient.

(f) Unless otherwise defined, the capitalized terms in this Schedule D shall have the same meaning as such terms in the Agreement.

2. Data Processing. The Parties acknowledge that Service Provider and its personnel may provide limited professional services as a courtesy to Service Recipient in connection with the Services, and that such Services will be provided by Service Provider using only Service Recipient Systems. Service Recipient remains solely responsible for determining the purposes and means of Processing, providing lawful and documented instructions, ensuring that such instructions comply with applicable Data Protection Laws, and satisfying all controller obligations with respect to Personal Data. Service Provider will Process Personal Data only as reasonably necessary to provide the Services and only on Service Recipient's documented instructions, except as otherwise required by Law. To the extent Service Provider's personnel access Personal Data, such access will be conducted directly through Service Recipient Systems using Service Recipient-managed laptops or devices, and Service Provider will not be required to receive, host, copy, retain, or maintain Personal Data outside of Service Recipient Systems unless expressly agreed in writing.

Service Provider's obligations as processor are limited to the obligations required by Data Protection Laws and those expressly set forth in this Schedule D, and Service Provider will otherwise have no liability for Service Recipient Systems or Service Recipient's instructions, data, notices, consents, legal bases, or other controller obligations. Service Provider agrees that it will:

(a) follow Service Recipient's lawful, documented instructions for Processing Personal Data, provided that Service Provider shall not be responsible for determining whether such instructions comply with Data Protection Laws;

(b) promptly notify Service Recipient if Service Provider determines an instruction of Service Recipient with respect to Personal Data is unlawful;

(c) promptly notify Service Recipient if Service Provider determines that it can no longer comply with Service Recipient's documented instructions or applicable processor obligations under this Schedule D;

(d) ensure that Service Provider's personnel who access Personal Data are subject to appropriate confidentiality obligations and receive privacy and security training appropriate to their role;

(e) provide reasonable information in Service Provider's possession or control necessary to demonstrate compliance with this Schedule D, provided that unless otherwise required by Data Protection Law, any review or audit will be limited to information reasonably necessary to assess Service Provider's processor obligations and will not require access to Service Provider's systems, networks, or any confidential information; and

(f) provide reasonable assistance to Service Recipient to the extent such assistance is reasonably necessary for Service Recipient to comply with its controller obligations under Data Protection Laws and relates to Personal Data Processed by Service Provider under this Agreement.

3. Data Security. Service Provider shall maintain reasonable and appropriate administrative, technical, and organizational measures designed to protect Personal Data Processed by Service Provider against unauthorized Processing, access, disclosure, or loss, taking into account the nature of the limited access provided and the fact that access will occur through Service Recipient Systems on Service Recipient-managed laptops or devices.

4. Security Incident. In the event Service Provider becomes aware of a Security Incident, it shall notify Service Recipient promptly and without undue delay and in any event within forty-eight (48) hours of becoming aware of the Security Incident. Unless otherwise required by applicable Law, Service Provider shall not notify any third party of, or make any public announcement concerning, the Security Incident where such notification or announcement expressly identifies Service Recipient without Service Recipient's prior written consent. Service Provider shall promptly investigate the Security Incident to the

extent possible within its reasonable capacity. In the event of legal action brought by either Party against a third party in connection with a Security Incident, Service Provider and Service Recipient each agree that it shall provide such assistance as may be reasonably necessary to enable the other Party to successfully prosecute such legal action.

5. Data Subject Requests and Regulatory Requests. Service Provider will provide reasonable assistance to the extent Service Provider is legally required to assist and such assistance relates to Personal Data Processed by Service Provider under this Agreement. Because access to Personal Data is expected to occur through Service Recipient Systems and Service Provider is not expected to separately host or retain Personal Data, Service Provider's data subject and regulatory requests obligations shall apply only to Personal Data, if any, in Service Provider's possession or control.

6. Controller Obligations. Service Recipient will comply with all obligations of a controller with respect to the Processing of Personal Data pursuant to this Agreement, including providing all required notices, obtaining all required consents or other legal bases, responding to data subject and regulatory requests, and ensuring that its instructions to Service Provider are lawful, complete, accurate, and documented.

7. Termination of Processing. Upon termination or expiration of the Agreement, Service Provider shall cease Processing Personal Data as soon as reasonably practicable, except to the extent continued Processing is required by Data Protection Law or necessary to complete wind-down activities. Because access to Personal Data is expected to occur through Service Recipient Systems and Service Provider is not expected to separately host or retain Personal Data, Service Provider's return or deletion obligations shall apply only to Personal Data, if any, in Service Provider's possession or control.

8. Cross-Border Transfer. In the event that Data Protection Laws impose restrictions on the cross-border transfer of Personal Data that are not contemplated herein, the Parties agree to meet in good faith to complete any formalities and enter any documents as may be required by such Data Protection Laws.

9. For the avoidance of doubt, the terms of this Schedule D shall not apply where both Parties agree that they act as independent controllers with regard to applicable Personal Data. In the event that both Parties act as independent controllers with regard to any Services, the Parties shall negotiate in good faith the terms under which such Services shall be provided.

# **EXHIBIT A**

**Exclusivity Agreement**

[*See attached.*]

Character Technologies, Inc.
700 El Camino Real, Suite 120, #1152
Menlo Park, CA 94025

September 18, 2026

Disney Worldwide Services, Inc.
500 South Buena Vista Street
Burbank, CA 91521-1245
Attention: Justin Radell

Ladies and Gentlemen:

WHEREAS, in connection with a proposed transaction involving Character Technologies, Inc. (the "**Company**") and Disney Worldwide Services, Inc. ("**Disney**") or one of its affiliates, the Company and Disney desire to enter into this letter agreement (the "**Exclusivity and Prepayment Agreement**"), which provides for, among other things, that the parties hereto will enter into the agreements contemplated by the term sheet attached hereto as Annex A (the "**Term Sheet**");

AND WHEREAS, the Term Sheet contemplates two interrelated and integrated transactions, namely, the "**Initial Transaction**" and the "**License Transaction**" (collectively, the "**Proposed Transaction**");

AND WHEREAS, in an effort to assist the Company in its efforts to maximize value and minimize employee attrition risk, and with the cooperation and assistance of the Company, Disney intends to make offers of employment to certain Company employees and to provide transition services to the Company for up to five months thereafter;

AND WHEREAS, subject to and following the Initial Transaction, and subject to the process set forth herein, the Term Sheet contemplates the Company will grant to Disney and/or one of its designated affiliates a perpetual, worldwide, non-exclusive license to certain Company intellectual property and related Technology (the "**IP License**") and enter into a release, waiver and covenant not to sue agreement with respect to such intellectual property, which shall irrevocably encumber the intellectual property subject to the IP License with respect to the rights granted under such license;

AND WHEREAS, the License Transaction will be subject to a competitive process and will be implemented free and clear of all claims (including successor liability), liabilities, interests and encumbrances, other than permitted encumbrances, pursuant to Sections 105 and 363 of the U.S. Bankruptcy Code;

AND WHEREAS, the Term Sheet contemplates that the parties shall negotiate and enter into, on or prior to the closing of the Proposed Transaction, definitive agreements to give effect to the Proposed Transaction;

NOW THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Disney hereby agree as follows:

1. Exclusivity.

(a) The Company agrees that, from the date of this Exclusivity and Prepayment Agreement through 5:00 p.m. (Eastern Time) on the earlier of (i) the date upon which the Company commences a chapter 11 case in accordance with this Exclusivity and Prepayment Agreement and the Term Sheet and (ii) fourteen (14) days following execution of this Exclusivity and Prepayment Agreement (as such period may be extended pursuant to this Section 1(a), the "**Exclusive Period**"), the Company will not, directly or indirectly, and the Company will cause its officers, directors, employees, consultants, advisors, agents, affiliates (companies which the Company controls), controlling persons and other representatives ("**Representatives**") to not, directly or indirectly, solicit, knowingly encourage, initiate, engage or participate in discussions with any third party (other than Disney or its Representatives), or provide any non-public information to any third party (other than Disney or its Representatives), regarding (i) any license, sale, assignment or other disposition of any intellectual property of the Company outside of the ordinary course of business, (ii) any financing, sale of equity, merger, recapitalization, liquidation or similar transaction involving the Company or (iii) any hiring, engagement or transfer of any employees of the Company (each a "**Strategic Transaction**"); *provided*, *however*, if a chapter 11 case is commenced, the Exclusive Period obligations in this paragraph (including in any Definitive Agreement) will cease (the "**Chapter 11 Exception**"). Notwithstanding the foregoing, the Exclusive Period shall automatically be extended for successive seven (7) day periods if, at the expiration of the then-current Exclusive Period, the parties are working diligently and in good faith toward the commencement of a chapter 11 case and the consummation of the Proposed Transaction; *provided*, *however*, that in no event shall the Exclusive Period extend beyond thirty (30) days following execution of this Exclusivity and Prepayment Agreement without the written mutual agreement of the Company and Disney. The Company will promptly notify Disney of any *bona fide* inquiry, offer or proposal relating to a potential Strategic Transaction received during the Exclusive Period. Upon the commencement of the Exclusive Period, but subject to the Chapter 11 Exception, the Company shall, and shall cause its Representatives to, immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with all other third parties (other than Disney and its Representatives) conducted heretofore with respect to any potential Strategic Transaction, and shall terminate any access to any virtual or physical data room to which access was previously furnished to any such person in connection with such a potential transaction.

(b) Upon the expiration of the later of (i) the thirtieth (30th) day following execution of this Exclusivity and Prepayment Agreement, unless such time is otherwise extended by mutual agreement of the parties and (ii) the expiration of the Exclusive Period, if Disney is ready, willing and able to execute the Definitive Agreements (as defined in the Term Sheet) in forms reasonably acceptable to the Company and Disney and progress the Proposed Transaction but the Company does not commence a chapter 11 case in the United States Bankruptcy Court for the District of Delaware on the terms set forth in the Term Sheet (including, but not limited to, having Disney serve as stalking horse bidder for the intellectual property subject to the IP License

referenced in the Term Sheet), then the Company shall promptly and fully refund to Disney the Refundable Deposit (as defined below) and Disney shall have no further obligation to the Company with respect to the Proposed Transaction or the subject matter of the Term Sheet.

(c) The terms of the Mutual Non-Disclosure Agreement, by and between Disney and the Company, dated August 19, 2026 (the "**NDA**"), shall remain in full force and effect and apply to this Exclusivity and Prepayment Agreement and, for the avoidance of doubt, this Exclusivity and Prepayment Agreement shall be considered Transaction Information (as defined in the NDA). During the Exclusive Period, the Company will use commercially reasonable efforts to provide Disney with reasonable access to information and management to facilitate Disney's due diligence. Each party will be responsible for its own costs and expenses, including, without limitation, all fees and expenses of such party's Representatives, incurred in connection with a potential transaction, including the negotiation of a term sheet and the negotiation, delivery and execution of this Exclusivity and Prepayment Agreement and the definitive agreements underlying the Proposed Transaction, including the Definitive Agreements (as defined in the Term Sheet).

(d) All communications relating to the Proposed Transaction by the Company or its Representatives shall be directed exclusively to the designated members of the Disney deal team (collectively, the "**Disney Deal Team**") and its legal, financial and other professional advisors. Disney shall designate the members of the Disney Deal Team in writing to the Company. The Company and its Representatives shall not initiate or engage in communications relating to the Proposed Transaction with any other employees, officers, directors or shareholders of Disney without the prior written consent of the Disney Deal Team.

(e) All communications relating to the Proposed Transaction by Disney or its Representatives shall be directed exclusively to the designated members of the Company deal team (collectively, the "**Company Deal Team**") and its legal, financial and other professional advisors. The Company shall designate the members of the Company Deal Team in writing to Disney. Disney and its Representatives shall not initiate or engage in communications relating to the Proposed Transaction with any other employees, officers, directors or shareholders of the Company without the prior written consent of the Company Deal Team.

2. Definitive Agreements. Upon execution of this Exclusivity and Prepayment Agreement, the parties shall use reasonable best efforts and shall work in good faith and expeditiously to execute the Definitive Agreements (as defined in the Term Sheet) on terms consistent with, and not deviating from, the terms set forth in the Term Sheet and implement the Proposed Transaction.

3. Prepayment.

(a) The parties agree that the Company shall be entitled to receive a total of US$20 million in the aggregate as cash consideration for entering into this Exclusivity and Prepayment Agreement and the TSA and consummating the Proposed Transaction (the "**Cash Consideration**"). US$5.5 million of the Cash Consideration shall be paid to the Company by Disney on the date hereof to an account specified in writing (email being sufficient) by the Company (the "**Up-Front Payment**"), which shall be non-refundable in all circumstances. In addition, US$2.0 million of the Cash Consideration shall be paid to the Company by Disney on

the date hereof to an account specified in writing (email being sufficient) by the Company, which amount shall be a deposit (the "**Refundable Deposit**") against the Cash Consideration that is promptly and fully refundable to Disney if (i) Disney is not selected as the winning bidder (to the extent there is an auction), (ii) the Proposed Transaction is not consummated prior to the Outside Date (as may be extended by mutual agreement) or (iii) Disney is entitled to a refund under Section 1(b). To the extent the Refundable Deposit is payable to Disney in accordance with the terms of this Exclusivity and Prepayment Agreement and the Term Sheet, Disney shall provide a notice to the Company specifying the account to which the Company shall wire funds in the amount of the Refundable Deposit (the "**Refundable Deposit Notice**"), and the Company shall wire such funds to Disney no later than three business days following the date of the Refundable Deposit Notice.

(b) At the closing of the License Transaction (the "**Closing**"), the remaining US$12.5 million of the Cash Consideration shall be paid to the Company by Disney to an account specified in writing (email being sufficient) by the Company (the "**Closing Payment**"). Employee compensation, retention payments and equity incentives will be payable directly by Disney to employees and will not constitute consideration payable to the Company. Each of the Up-Front Payment, the Refundable Deposit and the Closing Payment will be subject to applicable withholding. The Company will deliver to Disney a duly executed IRS Form W-9 on the date hereof.

4. Release and Waiver.

(a) The Company, for itself and on behalf of its affiliates and each of its and their Representatives, and any successors and assigns of the foregoing (individually and collectively, the "**Releasing Parties**"), hereby irrevocably, unconditionally and forever acquits, releases, waives and discharges, and further covenants and agrees that it will not assert, and completely waives and relinquishes, any claims against Disney and its affiliates and any of its or their Representatives (including any Company Service Provider hired by Disney or any of its affiliates ("**Hired Employees**")), divisions, affiliated corporations, affiliated non-corporation entities and any successors, predecessors and assigns of the foregoing (individually and collectively, the "**Disney Parties**") from any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action, liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, potential claims, counterclaims, cross-claims or demands, in law or in equity, asserted or unasserted, express or implied, actual or potential, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that a Releasing Party had, presently has or may hereafter have or claim or assert to have against any of the Disney Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and through the date hereof (collectively, "**Claims**"), including any Claims that in any way arise from or out of, are based upon or indirectly or directly relate to the following:

(i) the negotiation or execution of this Exclusivity and Prepayment Agreement, the Term Sheet or any of the transactions contemplated hereby, other than any claim arising out of a breach of Disney's obligations under the Exclusivity and Prepayment Agreement or, for the avoidance of doubt, if entered into, the other Definitive Agreements;

(ii) the recruitment, solicitation, hiring, employment or engagement by Disney or any of its affiliates of, or the offer of employment by Disney or any of its affiliates to, the Offered Employees or any other current or former employee, consultant or other service provider of the Company or any of its affiliates ("**Company Service Providers**"), and any restriction applicable to any of the Company Service Providers with respect to entering into any and all arrangements with, and providing any and all services and information to, the Disney Parties;

(iii) any wind-up, liquidation, dissolution or cessation of the Company's and its affiliates' business operations or the sale or license of the Company's and its affiliates' assets, including the termination of any Company Service Provider; and

(iv) the provision of any services by (x) any Company Service Provider to Disney or the other Disney Parties and (y) any Hired Employee to the Company or any of its affiliates (in each case, including the use of any Technology and Intellectual Property Rights developed by such employees, consultants or other service providers during their employment with, or provision of services to, the Company or any of its affiliates, or otherwise developed or owned by the Company or its affiliates, or the use of any ideas, know-how and techniques) (all Claims, including the foregoing (i)-(iv), collectively, the "**Released Matters**");

*provided*, *however*, that such Releasing Party is not releasing and does not acquit, waive, relinquish or discharge, and Released Matters does not include, any rights or claims (x) available pursuant to this Exclusivity and Prepayment Agreement, the Term Sheet or any other related agreement to which the Releasing Party is a party or the transactions contemplated hereby or thereby (including any rights to payment hereby or thereby), including the other Definitive Agreements, and any employment, compensation or other arrangements between a Hired Employee and Disney or its affiliates, (y) under any other agreement entered into between such Releasing Party and any Disney Party, or (z) any matter that cannot be released as a matter of applicable law. The Company, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Disney or any of the Disney Parties in connection with any of the Released Matters. Further, without limiting the foregoing, the Company, for itself and on behalf of the Releasing Parties, hereby covenants not to sue or otherwise seek to enforce or assert any rights against Disney or any of the Disney Parties in connection with the recruitment, solicitation, hiring, employment or engagement by Disney or any of its affiliates of, or the offer of employment by Disney or any of its affiliates to, a Company Service Provider (in each case, whether arising prior to, concurrently with or following the Closing).

(b) As a condition to Disney entering into this Exclusivity and Prepayment Agreement, the Company agrees and acknowledges that Disney and its affiliates are express third-party beneficiaries of the provisions of Section 4 of this Exclusivity and Prepayment Agreement with respect to Released Matters as such Released Matters pertain to the Hired Employees and shall have the right, exercisable in the sole discretion of Disney and its affiliates, to enforce the terms and conditions of this Section 4, or prevent the breach thereof, or to exercise any other right,

or seek any other remedy, which may be available to Disney and its affiliates as third-party beneficiaries of Section 4 of this Exclusivity and Prepayment Agreement, in each case, in respect of the Released Matters.

(c) The releases contained herein are intended to be complete, global and all-encompassing and specifically include claims that are known, unknown, fixed, contingent or conditional with respect to the matters described herein as of the date hereof. The Company hereby expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the released party, including the following provisions of California Civil Code Section 1542: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(d) The following definitions shall be for all purposes, unless otherwise clearly indicated to the contrary, applied to the terms used in this Exclusivity and Prepayment Agreement and the Term Sheet:

(i) "**Derivative Work**" means any "derivative work" as defined in the Copyright Law of the U.S., Title 17 U.S.C. § 101 *et seq.* (the "**Copyright Law**").

(ii) "**Intellectual Property Rights**" means any and all tangible and intangible and now known or hereafter existing (a) rights associated with works of authorship throughout the universe, including copyrights (including the sole and exclusive right to prepare Derivative Works of the copyrighted work and to copy, manufacture, reproduce, distribute copies of, modify, publicly perform and publicly display the copyrighted work and all Derivative Works thereof), Moral Rights, author's rights and mask-work rights; (b) rights in and relating to the protection of trade secrets and confidential information; (c) patents, designs, algorithms and other industrial property rights and rights associated therewith; (d) other intellectual and industrial property and proprietary rights (of every kind and nature throughout the universe and however designated) relating to intangible property that are analogous to any of the foregoing rights (including logos, character rights, "rental" rights and rights to remuneration), whether arising by operation of law, contract, license or otherwise; (e) if applicable, registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force in the U.S. and throughout the universe (including rights in any of the foregoing); and (f) rights in and relating to the sole and exclusive possession, ownership and use of any of the foregoing throughout the universe, including the right to license and sublicense, franchise, assign, pledge, mortgage, sell, transfer, convey, grant, gift over, divide, partition and use (or not use) in any way any of the foregoing now

or hereafter; provided that, for purposes of this Exclusivity and Prepayment Agreement, "Intellectual Property Rights" shall not include (x) domain names, uniform resource locators, other names and locators associated with the Internet, and applications or registrations therefor or social media accounts or handles, or (y) trade names, logos, common law trademarks and service marks, trademark and service mark registrations or any other brand elements, and applications therefor (including intent to use applications) throughout the world.

(iii) "**Moral Rights**" means rights of attribution, paternity and integrity, claims to authorship, rights to object to any distortion, mutilation or other modification of, or other derogatory actions in relation to, any Intellectual Property Rights, whether or not such would be prejudicial to a party's honor or reputation, and any similar right, existing under applicable laws.

(iv) "**Technology**" means all technology, methods, techniques, processes, designs, design rules, inventions (whether or not patented or patentable), diagrams, plans, discoveries, ideas, concepts, prototypes, specifications, schematics, formulae, compositions, communication protocols, algorithms, routines, reports, layout designs, topographies, cores, blocks, libraries, technology business plans, technology proposals, technology financial information, technology pricing and cost information, bills of material, user interfaces, websites, network configurations and architectures, test vectors and procedures, protocols, works of authorship, artificial intelligence (including deep learning, machine learning, natural language processing, neural network and reinforcement learning technologies, foundation models, language models, multi-modal models, world models, robotics and embodied models and agentic and embedding models), including all components, artifacts, materials and information embodying, comprising or used to develop, train, fine-tune, evaluate, deploy or operate such technologies (such as architectures, weights, parameters and other model artifacts, training, fine-tuning, evaluation, inference and orchestration pipelines, code, recipes, configurations, prompts, safety controls, benchmarks, evaluation and experiment results and memory and retrieval systems), software, files, information, documentation, test data, design data, performance data, quality data, technical data, datasets, databases and data collections, metadata and other scientific or technical information, as well as any other forms of technology and embodiments of Intellectual Property Rights, in each case whether or not embodied in any tangible form. Notwithstanding the foregoing, for purposes of this Exclusivity and Prepayment Agreement, "Technology" shall not include (i) customer data or databases and data collections of customer data, or any personally identifiable information or (ii) Unprocessed Data.

(v) "**Unprocessed Data**" means any data collected by or on behalf of the Company or its affiliates from publicly available sources and in Company's or its affiliates' possession or control that has not undergone the Company's

standard practices for onboarding such data into one or more Company database(s) of data available for training purposes, including pre-processing, de-identification, classification, reformatting, data cleaning or other similar processing activities, and that is identified to Disney reasonably in advance and in writing as "Unprocessed Data."

5. Termination. This Exclusivity and Prepayment Agreement will automatically terminate, and be of no further force and effect, upon the earlier of (i) the date on which Disney and the Company mutually agree that this Exclusivity and Prepayment Agreement shall terminate; (ii) the occurrence of the repayment of the Refundable Deposit to Disney by the Company in accordance with Section 1(b) or 3(a) of this Exclusivity and Prepayment Agreement; and (iii) the Outside Date (as defined in the Term Sheet); *provided*, that Section 1(b), Section 3(a) and Section 4 of this Exclusivity and Prepayment Agreement shall survive any termination of this Exclusivity and Prepayment Agreement and the Closing indefinitely; *provided further* that the termination of this Exclusivity and Prepayment Agreement will not relieve either Disney or the Company from any liability for willful and material breach of this Exclusivity and Prepayment Agreement.

6. Miscellaneous.

(a) To the extent that the terms of this Exclusivity and Prepayment Agreement and the Term Sheet conflict, the terms of this Exclusivity and Prepayment Agreement shall govern.

(b) All capitalized terms used and not otherwise defined in this Exclusivity and Prepayment Agreement shall have the respective meanings ascribed to them in the Term Sheet.

(c) This Exclusivity and Prepayment Agreement may be executed and delivered in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Exclusivity and Prepayment Agreement shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other party. Such delivery may be made by exchange of copies of the signature page by email transmission or other electronic means.

(d) Each of the parties hereto agrees that no failure or delay by any party hereto in exercising any of its rights, powers or privileges hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

(e) This Exclusivity and Prepayment Agreement (and any disputes arising in connection herewith, whether in contract, tort or otherwise) shall be governed by and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under the applicable principles of conflicts of laws thereof. Each party hereto (i) irrevocably submits to the personal jurisdiction of the United States District Court for the District of Delaware, or if and only if the United States District Court does not have jurisdiction, then before the Court of Chancery of the State of Delaware, or if and only if neither such court shall have jurisdiction, then before any other state or federal court sitting in Delaware having subject matter jurisdiction, and (ii) agrees that any actions or proceedings arising in connection with this Exclusivity and Prepayment Agreement, the Term Sheet or the transactions contemplated by this

Exclusivity and Prepayment Agreement or the Term Sheet shall be brought, tried and determined exclusively in the courts referred to in clause (i) of this paragraph 6(e) and consents to service of process outside the State of Delaware pursuant to the requirements of such court in any matter subject to it. The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may have to the laying of venue of any such action or proceeding in such courts and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

(f) EACH OF THE PARTIES HERETO KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS EXCLUSIVITY AND PREPAYMENT AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THIS EXCLUSIVITY AND PREPAYMENT AGREEMENT.

(g) The parties agree that irreparable damage would occur in the event that any of the provisions of this Exclusivity and Prepayment Agreement were not performed in accordance with their specific terms or were otherwise breached and that monetary damages, even if available, would not be an adequate remedy therefor. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Exclusivity and Prepayment Agreement and to enforce specifically the terms and provisions of this Exclusivity and Prepayment Agreement, in each case without proof of damages or the posting of any bond or other security, this being in addition to any other remedy to which any party is entitled at law or in equity.

(h) All notices, consents, waivers and other communications required or permitted by this Exclusivity and Prepayment Agreement shall be in writing and shall be deemed given to a party when (i) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), (ii) sent by email if sent during the addressee's normal business hours, and if not sent during normal business hours, then on the addressee's next business day, or (iii) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses or email addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, email address or individual as a party may designate by notice to the other party):

If to Disney:

c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521-0763
Attn: Justin Warbrooke, EVP, Head of Corporate Development & Corporate Planning
Email: justin.warbrooke@disney.com

With a copy, which shall not constitute notice, to:

c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521-1245
Attn: Justin Radell, Assistant Chief Counsel
Lisa Phua, Lead Counsel
Email: justin.radell@disney.com
lisa.phua@disney.com

and

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attn: Brandon Van Dyke
Ron E. Meisler
Samuel J. Cammer
Email: brandon.vandyke@skadden.com
ron.meisler@skadden.com
samuel.cammer@skadden.com

If to the Company:

c/o Character Technologies, Inc.
700 El Camino Real, Suite 120, #1152
Menlo Park, CA 94025
Attn: John Chatowski
Email: john.chatowski@character.ai

With a copy, which shall not constitute notice, to:

Wilson Sonsini Goodrich & Rosati, Professional Corporation
222 Delaware Avenue #800
Wilmington, DE 19801
Attn: Erin Fay
Email: efay@wsgr.com

and

Wilson Sonsini Goodrich & Rosati, Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Attn: Rich Mullen
Brendan Mahan
Email: rich.mullen@wsgr.com
bmahan@wsgr.com

(i) Any assignment of this Exclusivity and Prepayment Agreement by either party hereto without the prior written consent of the other party hereto shall be void.

(j) If any term or other provision of this Exclusivity and Prepayment Agreement is invalid, illegal or incapable of being enforced under any applicable law or public policy, all other terms and provisions of this Exclusivity and Prepayment Agreement shall nevertheless remain in full force and effect. If any term or provision of this Exclusivity and Prepayment Agreement is determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the parties agree that the court making such determination shall reduce such extent, duration, scope or other provision in the minimum amount necessary to make such provision enforceable and enforce it in its reduced form for all purposes contemplated by this Exclusivity and Prepayment Agreement.

(k) This Exclusivity and Prepayment Agreement, together with the Term Sheet and the NDA, constitutes the entire agreement between the parties hereto concerning the subject matter hereof, and no modification of this Exclusivity and Prepayment Agreement or waiver of the terms and conditions hereof shall be binding upon either party hereto, unless approved in writing by both such parties.

(l) The words "including," "includes" or "include" in this Exclusivity and Prepayment Agreement are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.

(m) Each party represents and warrants to the other party that (i) it has the requisite corporate power and authority to execute and deliver this Exclusivity and Prepayment Agreement and to perform its obligations hereunder, (ii) the execution, delivery and performance of this Exclusivity and Prepayment Agreement have been duly authorized by all necessary corporate action on the part of such party, and (iii) this Exclusivity and Prepayment Agreement has been duly executed and delivered by such party and constitutes the valid and binding obligation of such party, enforceable against it in accordance with its terms.

[*Remainder of page left intentionally blank. Signature pages follow.*]

Docusign Envelope ID: 396CBB34-7D7E-8947-80C9-35095EAABA4E


Please confirm your agreement with the foregoing by signing and returning to the undersigned the duplicate copy of this letter enclosed herewith.

CHARACTER TECHNOLOGIES, INC.

Signed by:

By: John Chatowski

341632B15BE94F0...

Name: John Chatowski
Title: General Counsel

Accepted and agreed as of
the date first written above:

DISNEY WORLDWIDE SERVICES, INC.

By:________________________________
Name:
Title:

Please confirm your agreement with the foregoing by signing and returning to the undersigned the duplicate copy of this letter enclosed herewith.

CHARACTER TECHNOLOGIES, INC.

By:______________________________
Name:
Title:

Accepted and agreed as of
the date first written above:

DISNEY WORLDWIDE SERVICES, INC.

Signed by:

By: David Howard

429A668EEF86420...

Name: David M. Howard
Title: President

**Annex A**
Binding Term Sheet

This binding term sheet (the "**Term Sheet**") between Disney Worldwide Services, Inc. ("**Disney**") and Character Technologies, Inc. ("**CAI**" or the "**Company**") sets forth a commitment by Disney and the Company to negotiate in good faith the Proposed Transaction (as defined below) and enter into the Definitive Agreements (as defined below). The terms of the Mutual Non-Disclosure Agreement, by and between Disney and CAI, dated August 19, 2026 (the "**NDA**"), shall remain in full force and effect and apply to this Term Sheet and, for the avoidance of doubt, this Term Sheet shall be considered Transaction Information (as defined in the NDA).

The terms and conditions of the Proposed Transaction are not limited to those set forth herein, and this Term Sheet is not intended to describe all of the terms, conditions and other provisions of the Proposed Transaction or that are to be contained in the Definitive Agreements. This Term Sheet does not purport to summarize all of the terms of the Definitive Agreements to be entered into by the parties hereto with respect to the Proposed Transaction.

| | |
|---|---|
| **1. Proposed Transaction** | • This Term Sheet contemplates two interrelated and integrated transactions: the "**Initial Transaction**" and the "**License Transaction**" (collectively, the "**Proposed Transaction**").<br>"**<u>Initial Transaction</u>**"<br>• In an effort to assist the Company in its efforts to maximize value and minimize employee attrition risk, the Company will provide Disney with the right to solicit and hire certain Company employees. Thereafter, Disney, working together with the Company, will provide offer letters and related employment documentation to Key Employees and the other Offered Employees (each as defined below). Disney and the Company will work collaboratively and in good faith to transition the applicable employees to Disney as soon as reasonably practicable.<br>• During and following the onboarding of Key Employees and the other Offered Employees, Disney will provide certain agreed upon transition services to the Company pursuant to a transition services agreement (the "**TSA**"). In connection with these employee-related matters, including the transition services, and in consideration for the same, the Company will grant Disney releases that will be incorporated into an exclusivity and prepayment agreement signed by the Company (the "**Exclusivity and Prepayment Agreement**").<br>• The onboarding and transition of employees to Disney and the provision of transition services will be documented through (i) offer letters and related employment documentation with the Key Employees and the other Offered Employees, (ii) the TSA, (iii) the Exclusivity and Prepayment Agreement and (iv) such side letters, resignations, consents and waivers as the parties agree.<br>"**<u>License Transaction</u>**"<br>• Subject to and following the Initial Transaction, and subject to the process set forth herein, the Company will grant to Disney and/or one of its designated affiliates (the "**Licensee**") a perpetual, worldwide, non- |

| | |
|---|---|
| | exclusive license to certain Company intellectual property and related Technology (the "**IP License**") and enter into a release, waiver and covenant not to sue agreement (the "**Release, Waiver and Covenant Not to Sue Agreement**"), which shall irrevocably encumber the intellectual property subject to the IP License with respect to the rights granted under such license. For the avoidance of doubt, references in this Term Sheet to the "License Transaction" refers solely to the IP License and the Release, Waiver and Covenant Not to Sue Agreement, and excludes all employee hiring, onboarding, transition, retention and related arrangements described in this Section 1. The License Transaction will be subject to a competitive process and will be implemented free and clear of all claims (including successor liability), liabilities, interests, and encumbrances, other than permitted encumbrances ("**Permitted Encumbrances**") pursuant to Sections 105 and 363 of the U.S. Bankruptcy Code (any Bankruptcy Court order approving the transaction, which shall be a final, non-appealable order and in form and substance acceptable to Disney in its sole discretion, a "**363 Free and Clear Order**"). The licensed IP that is the subject of the License Transaction shall have the protections of Section 365(n) of the U.S. Bankruptcy Code, and shall be memorialized in the IP License and in the 363 Free and Clear Order.<br><br>• As part of the 363 sale process, Disney will purchase any claims that the Company has against Disney employees that accept offers of employment with Disney that have not previously been released by the Company (the "**Purchased Employee Claims**").<br><br>• The venue for the Company's chapter 11 bankruptcy case shall be Delaware and the timeline related to any such 363 sale process shall be reasonably acceptable to Disney.<br><br>• In connection with any such competitive process, (i) as an inducement for Disney to be used as the floor bid for the License Transaction, (A) Disney will be named as stalking horse bidder for the IP License and granted customary bid protections, including a break-up fee and reasonable expense reimbursement collectively capped at 3.5% of the cash purchase price (the "**Bid Protections**"), and (B) Disney and the Company will agree on bid procedures, including a timeline for a bid procedures hearing and entry of a court order, a deadline for bid submissions, the auction (if any) and an approval hearing; and (ii) if a competing bidder other than Disney is the winning bidder for the IP License, or if another bidder is the winning bidder for substantially all of the Company's assets (including the intellectual property related to the IP License), properties, businesses, or operations, including through an acquisition of an exclusive license of the Company's intellectual property, then Disney will provide to such winning bidder transition services reasonably comparable to the TSA for a limited but reasonable period of time no greater than the lesser of (a) 60 days post-closing and (b) 75 days after conclusion of the auction; provided, that if there are multiple winning bidders, Disney shall only be required to provide transition services to one winning bidder. In connection with any such competitive process, Disney and CAI will work together in good faith to identify five (5) Key Employees who shall be made reasonably available for diligence with potential bidders who have (w) signed a non-disclosure agreement with the Company, (x) submitted evidence to the Company demonstrating the party's financial capability to consummate a proposed transaction, (y) submitted to the Company a preliminary indication of |

| | |
|---|---|
| | interest and (z) who the Company expects will be deemed to be qualified bidders under the relevant bidding procedures approved by the U.S. Bankruptcy Court for the District of Delaware (the "**Qualified Bidders**"). In addition, if Disney is not the winning bidder, then Disney will allow one winning bidder to interview and make employment offers to former Company employees who wish to consider opportunities with such winning bidder and will work in good faith with such winning bidder to transition those employees who accept an offer. Disney shall make reasonably available the former Company employees for the purpose described in the immediately preceding sentence and shall not interfere with, hinder or take any other action intended to impede the interview or offer process, provided that such employees can still perform their day-to-day work obligations in the ordinary course. Notwithstanding the foregoing, Disney may designate up to 20% of the former Company employees as outside the scope of such process and Disney need not make available or allow any party a right to interview or make employment offers to such former Company employees.<br>• Except for the rights granted under the IP License, the Company shall retain all right, title and interest in and to its assets, properties, businesses and operations. The Licensee shall not assume, and the Company and its successors shall not take any position that the Licensee has assumed, any liabilities or obligations of the Company or its past, current or future affiliates, whether arising before, on or after the closing of the Initial Transaction or the License Transaction. The Company shall retain responsibility for all such liabilities and obligations.<br>• The 363 Free and Clear Order shall provide customary findings, including that (i) the Proposed Transaction is not structured as, and is not intended to be treated as, an acquisition of equity or of all or substantially all of the assets or business of the Company, (ii) no employees will be deemed to transfer to Licensee by operation of law and (iii) Licensee will not be, and will not be deemed to be, a successor to the Company or its business. Any 363 Free and Clear Order shall provide for a release of Licensee by the Company for all matters related to the Proposed Transaction. The 363 Free and Clear Order shall provide for Disney's purchase of any Purchased Employee Claims.<br>• The License Transaction will be documented through (i) the IP License, (ii) the Release, Waiver and Covenant Not to Sue Agreement, (iii) a form of transition services or services agreement available to a winning bidder, if applicable, which will be reasonably comparable in terms to the TSA, and (iv) a 363 Free and Clear Order.<br>• Following the closing of the Proposed Transaction, the Company will remain a separate legal entity and may, in its sole discretion, continue to operate its business or wind down, dissolve or liquidate. At no time shall Disney have any responsibility for the operation, management or continuation of the Company's business.<br>• The Proposed Transaction is not intended to and shall not constitute a transfer of the Company's business as a going concern. Disney will not acquire or operate the Company's consumer-facing platform, products, services, customer accounts, contracts, trademarks, trade names, websites, domains or ongoing business operations. Any employment of Company personnel by Disney will result from separate employment arrangements entered into directly between Disney and such individuals and will not |

| | |
|---|---|
| | constitute a transfer of employees by operation of law. |
| **2. Consideration** | • The Company will receive US$20 million in the aggregate as cash consideration for the Proposed Transaction (the "**Cash Consideration**").<br>• US$5.5 million of the Cash Consideration shall be paid upon the execution of the Exclusivity and Prepayment Agreement and TSA and shall not be refundable (the "**Up-Front Payment**"), which will be non-refundable in all circumstances.<br>• In addition, another US$2.0 million shall be paid upon the execution of the Exclusivity and Prepayment Agreement and TSA, which amount shall be a deposit (the "**Refundable Deposit**") against the Cash Consideration that is promptly and fully refundable to Disney should Disney not be selected as the winning bidder (to the extent there is an auction) and the Proposed Transaction not be consummated.<br>• US$12.5 million of the Cash Consideration shall be paid upon the closing of the License Transaction.<br>• Employee compensation, retention payments and equity incentives will be payable directly to employees and will not constitute consideration payable to the Company. Disney and the Company will mutually agree on appropriate scope and quantum of any retention program.<br>• All payments will be subject to applicable withholding, and the Company will deliver a duly executed IRS Form W-9 at or prior to the closing. |
| **3. Due Diligence** | • Disney will engage in a customary and comprehensive due diligence process that includes financial, business, Technology, HR, accounting, legal, regulatory and tax review for the Proposed Transaction and all related business, legal and financial data by internal and external experts.<br>• If requested by Disney, the Company will use commercially reasonable efforts to accommodate Disney and its external advisors to conduct due diligence on-site to reduce the time needed to complete due diligence.<br>• Diligence will include a customary review of intellectual property and Technology matters, including ownership and chain of title, Permitted Encumbrances (including disclosure and information related to any existing licenses), employee and contractor invention assignment agreements, open source usage and copyleft exposure, third-party licenses and dependencies, model weights and the provenance of training data and datasets.<br>• Diligence will include a customary review of employment matters relating to the Key Employees and the other Offered Employees, including existing restrictive covenants, confidentiality and invention assignment obligations, equity, deferred compensation and severance arrangements, and visa and work authorization status.<br>• The Company will use commercially reasonable efforts to make the Key Employees and its senior technical personnel reasonably available for diligence sessions and technical reviews, subject to the NDA.<br>• The Company will provide Disney with reasonable access to documents relevant to the due diligence process. |

<table>
<tr>
<td>4. Licensed Intellectual Property</td>
<td>
<ul>
<li>In connection with the IP License, the Company will license to Licensee Company's (and not a third party's) training infrastructure, training pipelines, know-how, evaluation frameworks, safety tools, documentation, design-specifications and technical materials reasonably necessary to utilize the licensed Technology and develop future models and any embodiment of such intellectual property. The IP License will include only such intellectual property and Technology as is reasonably necessary for Licensee's approved use cases.</li>
<li>The Company shall not license to Licensee any finished models, user data, training data, corporate trademarks, trade names, branding, website content, domain names, social media accounts or consumer-facing applications or any third party technology.</li>
<li>The IP License will be perpetual, irrevocable, non-terminable, worldwide, royalty-free, fully paid-up, and non-exclusive and transferable, but only to (a) a buyer of a business, asset or entity from Disney that is using the IP License at the time of closing of such sale (a "Disney Assignee"), or (b) a successor in connection with a sale of a business to which the IP License relates, with the right to sublicense through multiple tiers as described below, and will survive any termination of the Definitive Agreements, any change of control, or assignment or exclusive licensing of the licensed intellectual property occurring after the date of the IP License and any bankruptcy or insolvency of the Company (including the protections available under Section 365(n) of the U.S. Bankruptcy Code). For the avoidance of doubt, Licensee may not sublicense (other than as set forth in the following bullet point), transfer or assign the IP License on a standalone basis to any third party.</li>
<li>The IP License (a) will allow for the provision of products and services only under the branding owned or controlled by Disney and its affiliates or to a Disney Assignee, and (b) is not sublicensable to third parties other than to (i) consumer end users of such Disney products and services, (ii) service providers of Disney and its affiliates in connection with the provision of services to Disney and its affiliates, (iii) affiliates of Disney but only for so long as such entity is an affiliate, and (iv) to a Disney Assignee in accordance with the immediately preceding bullet, but only to conduct the acquired business as it was conducted as of such divestiture and its natural evolutions.</li>
<li>The Company will retain ownership of the licensed intellectual property and may continue to use, develop, license and otherwise exploit it. Licensee by virtue of being the author or creator, will own all modifications, improvements, enhancements, Derivative Works and outputs (including any models, weights and synthetic data) created by or for Licensee using the licensed intellectual property.</li>
<li>Following the closing of the License Transaction, the Company will have no obligation to prosecute, maintain, enforce, support or update the licensed intellectual property and related Technology.</li>
</ul>
</td>
</tr>
</table>

| | |
|---|---|
| **5. Employees** | • Within ten (10) days of the date of this Exclusivity and Prepayment Agreement, Disney will require not more than six (6) employees of the Company, to be mutually-agreed by Disney and the Company, and one of which shall be the Company's chief executive officer (the "**Key Employees**") to accept an offer letter or enter into an employment agreement on a form substantially similar to Disney's standard form and to execute a resignation letter resigning from all positions with the Company and its subsidiaries, in each case effective as of the closing of the Proposed Transaction, with a subsidiary of Disney.<br>• Disney will offer employment to at least sixty (60) other Company employees (such employees, together with the Key Employees, the "**Offered Employees**"), at each such employee's appropriate salary, bonus and Disney stock-based compensation levels according to Disney's then-current compensation practices. Based on a preliminary review of approximately 65 Offered Employees, Disney estimates the annual run rate total compensation of the Offered Employees to be approximately US$60 million.<br>• Disney will also provide an aggregate retention pool in an amount equal to US$30 million to incentivize such employees to remain employed at Disney. A portion of the retention payment will be payable on each of the first and second anniversaries of the closing of the Initial Transaction and subject to continued employment through each such anniversary. This retention pool will supplement the compensation during years 1 and 2 until the run rate is reached. The estimated total compensation and retention over years 1-3 is estimated to be approximately US$ 180 million.<br>• Each Offered Employee shall independently determine whether to accept employment with Disney, and no employment relationship with Disney will arise until such employee's employment with the Company has terminated.<br>• The Company will waive any applicable notice periods and will not enforce against any Offered Employee any non-competition, non-solicitation, confidentiality or invention assignment covenant that would restrict such employee from being employed by, or providing services to, Disney or its affiliates.<br>• The Company will remain responsible for all compensation, benefits, accrued paid time off, employment taxes and severance, if any, owed to each Offered Employee through such employee's last day of employment with the Company (including as and to the extent triggered by their separation from the Company).<br>• The Company will release all employees, including its chief executive officer, that accept offers of employment with Disney from claims and causes of action including, as applicable, fiduciary duty claims. |
| **6. Conditions to Closing** | • The following shall be conditions to closing of the Initial Transaction.<br>o The absence of laws or court orders prohibiting, enjoining or otherwise staying the Initial Transaction.<br>o The Company shall have received the Up-Front Payment and Refundable Deposit. |

| | |
|---|---|
| | - The Company's board, acting upon the recommendation of a special committee of the board comprised solely of independent directors, will have reviewed and approved the Initial Transaction, including agreements related to transitioning Key Employees and the other Offered Employees, including the related employee arrangements, the TSA and the Exclusivity and Prepayment Agreement.<br><br>- The Exclusivity and Prepayment Agreement and TSA shall have been fully executed and delivered and shall be deemed effective as of the closing of the Initial Transaction.<br><br>- No Key Employee shall have revoked acceptance of employment or given notice of an intent to terminate employment, and no material adverse development shall have occurred with respect to the licensed intellectual property or the Key Employee group.<br><br>• The following shall be conditions to closing of the License Transaction:<br><br>- The closing of the Initial Transaction shall have occurred and the Company shall have received the Up-Front Payment and Refundable Deposit.<br><br>- The Company shall have given Disney reasonable access to diligence relevant to the Proposed Transaction consistent with this Term Sheet.<br><br>- The Definitive Agreements shall be reasonably satisfactory to each of Disney and the Company.<br><br>- Execution of employment documentation by the Key Employees within the ten (10) day period following the date of this Exclusivity and Prepayment Agreement.<br><br>- Entry of the 363 Free and Clear Order.<br><br>- The absence of laws or court orders prohibiting, enjoining or otherwise staying the License Transaction.<br><br>- The Company's board, acting upon the recommendation of a special committee of the board comprised solely of independent directors, will have reviewed and approved the License Transaction, including the IP License, the Release, Waiver and Covenant Not to Sue Agreement, the transaction economics, and, as applicable, the bid protections and bid procedures, the form of 363 Free and Clear Order.<br><br>- The Company will have provided the Licensee with access to, and copies of, the licensed intellectual property and related materials that are subject to the Licensed IP, which excludes third party technology.<br><br>- Receipt of all required approvals to complete the License Transaction, including any consents required related to the IP License, if any.<br><br>- No material adverse development shall have occurred with respect to |

| | |
|---|---|
| | the licensed intellectual property or the Key Employee group. |
| **7. Definitive Agreements** | • Disney will prepare initial drafts of the following documents (collectively, the "**Definitive Agreements**"): (i) the IP License, (ii) the TSA, (iii) the Exclusivity and Prepayment Agreement, (iv) the Release, Waiver and Covenant Not to Sue Agreement, (v) the form of 363 Free and Clear Order, (vi) the form of transition services if there is a winning bidder at auction other than Disney (as applicable) and (vii) such ancillary agreements and certificates as are customary for a transaction of this type. The Company shall prepare the form of order approving Disney as stalking horse bidder for the IP License, the Bid Protections, and bidding procedures for the solicitation of competing bids, each of which shall be satisfactory to Disney, in its sole discretion.<br>• The Definitive Agreements will contain representations and warranties, covenants, and conditions customary for transactions of this type.<br>• The Exclusivity and Prepayment Agreement and the Release, Waiver and Covenant Not to Sue Agreement will each include a release of existing claims, waivers relating to the solicitation and hiring of Company employees, a covenant not to sue relating to the licensed use of the Technology, a non-assertion covenant relating to intellectual property claims arising from activities authorized by the IP License and such other provisions customary for transactions of this type. The covenant not to sue and non-assertion provisions shall survive indefinitely following the closing of the Proposed Transaction.<br>• The transition services to a winning bidder (if any) will include a release of claims (if any) against Disney related to the hiring of Company employees and any related intellectual property use.<br>• The definitive agreements will include the Company's representations and warranties as to rights to grant the licenses granted, employment and benefits matters, absence of conflicting consents or approvals, and authorization. Otherwise, the IP License is granted as-is.<br>• The definitive agreements will include covenants that the Company will not sell, assign, exclusively license or encumber any of the licensed intellectual property in a manner that would limit Licensee's use of the IP License in any material respect and will refrain from taking actions intended to impair the availability of the Key Employees identified by Disney; provided, however, that, notwithstanding the foregoing, and for the avoidance of doubt, the Company may non-exclusively license, sell or otherwise provide the licensed intellectual property subject to the IP License to any third party. For the avoidance of doubt, the participation of Key Employees related to (x) Qualified Bidder discussions as described herein and (y) the performance of TSA services shall not be deemed to impair the availability of Key Employees identified by Disney so long as the time devoted to such functions and services does not exceed 20% of any such employee's weekly work obligations.<br>• The parties will collaborate to expeditiously complete due diligence and negotiate the definitive transaction documentation, with the aim of consummating the closing by November 16, 2026. Unless otherwise |

| | |
|---|---|
| | mutually agreed upon in writing between the parties, in no event shall the closing of the Proposed Transaction be consummated any later than the later of December 17, 2026 (the "**Outside Date**") and Disney shall have a termination right in the event that the closing of the Proposed Transaction has not occurred on or before the Outside Date. For the avoidance of doubt, the Refundable Deposit shall be promptly and fully refunded to Disney if the Proposed Transaction has not been consummated by the Outside Date. |
| **8. Restrictive Covenants; Non-Solicitation** | • From the closing of the Initial Transaction until the third anniversary of the closing of the Initial Transaction, the Company will not, and will cause its subsidiaries not to, directly or indirectly solicit, recruit or encourage any Offered Employee who becomes employed by Disney or any of its affiliates to leave such employment, or assist any other person in doing so; provided that general advertisements and searches by recruiters that are not targeted at such employees, and hiring of any such employee following the date that is six (6) months after such employee ceases to be employed by Disney and its affiliates, will not violate this covenant. |
| **9. Transition Services** | • To the extent the Company requires assistance from Offered Employees hired by Disney in order to satisfy its existing customer obligations or to wind down its operations, the parties will enter into a transition services agreement providing for (i) a defined scope of services and identified personnel, (ii) a 20% cap on the time each individual may devote to such services, (iii) a term of up to five (5) months, (iv) no fees during the five (5) month term, (v) ownership by the recipient of work product created in performing the services and (vi) customary liability limitations and indemnities. Any and all documented out-of-pocket costs incurred by Disney will be billed at Disney's cost and reimbursed promptly by the Company. |
| **10. Regulatory Matters** | • The parties do not expect the Proposed Transaction to require any antitrust or other regulatory clearance or the expiration of any waiting period, and the definitive agreements will include representations to that effect; the parties will confirm this position in diligence, including with respect to any non-U.S. filing obligations that may be triggered by the license of intellectual property or the hiring of personnel.<br>• From and after the closing of the Initial Transaction and the License Transaction, respectively, the Company will use commercially reasonable efforts to cooperate with Disney in connection with any governmental inquiry, investigation or proceeding relating to the Proposed Transaction. The Company will not participate in any meeting with any governmental authority regarding the Proposed Transaction without Disney's prior consent, expect as required by applicable law. |
| **11. Communications** | • All communications relating to the Proposed Transaction shall be directed exclusively to the designated members of the Disney deal team (collectively, the "**Disney Deal Team**") and its legal, financial and other professional advisors. Disney shall designate the members of the Disney Deal Team in writing to the Company. The Company and its officers, directors, employees, consultants, advisors, agents, affiliates (companies which the Company controls), controlling persons and other representatives shall not initiate or engage in communications relating to the Proposed Transaction with any other employees, officers, directors or shareholders |

| | |
|---|---|
| | of Disney without the prior written consent of the Disney Deal Team.<br>• Likewise, all communications relating to the Proposed Transaction shall be directed exclusively to the designated members of the Company deal team (collectively, the "**Company Deal Team**") and its legal, financial and other professional advisors. The Company shall designate the members of the Company Deal Team in writing to Disney. Disney and its officers, directors, employees, consultants, advisors, agents, affiliates (companies which Disney controls), controlling persons and other representatives shall not initiate or engage in communications relating to the Proposed Transaction with any other employees, officers, directors or shareholders of the Company without the prior written consent of the Company Deal Team. |
| **12. Fiduciary Out** | • Nothing in this Term Sheet, nor any obligations of the Company hereunder or in connection with the Initial Transaction or the License Transaction, shall restrict or limit the abilities of the Company's directors and officers to comply with their applicable fiduciary duties. |
| **13. Governing Law** | • This Term Sheet and any action or proceeding arising under this Term Sheet shall be governed by, and construed in accordance with, the governing law provisions set forth in the Exclusivity and Prepayment Agreement. |

* * * * *

**Exhibit B**

**Form of Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 ([___]) |

**ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE DESIGNATION OF DISNEY WORLDWIDE SERVICES, INC. AS STALKING HORSE PURCHASER WITH RESPECT TO THE DISNEY TARGET ASSETS, (E) AUTHORIZING THE DEBTOR TO DESIGNATE ADDITIONAL STALKING HORSE PURCHASERS FOR THE ASSETS; AND (F) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession (the "Debtor") for, *inter alia*, the entry of an order (a) authorizing and approving the bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit 1** for the sale, license or other disposition (the "Sale") of all or substantially all of the Debtor's assets (the "Assets"), or any subset thereof; (b) authorizing and approving certain bid protections (the "Bid Protections"), including a break-up fee and expense reimbursement of $700,000 (together, the "Break-Up Fee") for Disney Worldwide Services, Inc. ("Disney"), the stalking horse purchaser with respect to the Assets (the "Disney Target Assets") included in that certain Stalking Horse Transaction Agreement dated as of October __, 2026 attached to the Motion as Exhibit B (the "Stalking Horse Transaction Agreement"); (c) authorizing the Debtor to designate additional

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Motion.

stalking horse purchasers (each, an "Additional Stalking Horse Purchaser" and together with Disney, the "Stalking Horse Purchasers") and additional stalking horse agreements (each, an "Additional Stalking Horse Agreement"), with respect to all or any subset of the Assets, and to offer the Bid Protections to any Additional Stalking Horse Purchaser; (d) scheduling a hearing (the "Sale Hearing") for approval of the Sale and approval of other deadlines related to the same; (e) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") in connection therewith; (f) authorizing and approving certain assumption and assignment procedures for the Assigned Contracts provided for herein (collectively, the "Assumption and Assignment Procedures"); and (g) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as set forth herein; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion; and a hearing on the Motion having been held; and the Court having found and determined that the relief set forth herein is in the best interests of the Debtor, its estate and creditors and all parties in interest, and that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[3]

A. This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference.

B. Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C. The statutory and legal predicates for the relief requested in the Motion and provided for herein are sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D. The Debtor has demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required, except as otherwise provided for herein. A reasonable opportunity to object or to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

E. The Transaction Notice (as defined below), substantially in the form attached hereto as **Exhibit 2**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the auction for the Assets (the "Auction"), the Sale, and the Sale Hearing, and any and all objection deadlines related thereto, and no other or further notice of the foregoing is required.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F. The Bidding Procedures are: (a) fair, reasonable, and appropriate; (b) negotiated in good faith and at arm's length; and (c) designed to promote a competitive bidding process, so as to maximize recovery with respect to the Sale.

G. The Debtor has demonstrated a compelling and sound business justification for the Court to approve the Bid Protections, including payment of the Break-Up Fee, if necessary, to Disney in accordance with the Stalking Horse Transaction Agreement and, as applicable, to any Additional Stalking Horse Purchaser in accordance with the terms of the applicable Additional Stalking Horse Agreement. The Bid Protections approved herein are fair, reasonable, and provide a benefit to the Debtor's estate and stakeholders. If triggered in accordance with the terms of the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement designated by the Debtor, payment of the Break-Up Fee, under this Order and upon the conditions set forth in the Stalking Horse Transaction Agreement, or any other Additional Stalking Horse Agreement designated by the Debtor, and the Bidding Procedures are (a) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (b) reasonably tailored to encourage, rather than hamper, bidding for the applicable Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of potential bidders in the Sale process, thereby increasing the likelihood that the Debtor will receive the best possible price and terms for the Assets, (c) of substantial benefit to the Debtor's estate and stakeholders, (d) reasonable and appropriate, (e) a material inducement for, and conditions necessary to, ensure that Disney and any Additional Stalking Horse Purchaser designated by the Debtor will continue pursuit of the proposed agreement to purchase the Assets in accordance with the applicable Stalking Horse Agreement, and (f) reasonable in relation to the lost opportunities resulting from the time and

money spent pursuing such transaction of Disney or any Additional Stalking Horse Purchaser designated by the Debtor.

H. The Assumption and Assignment Procedures provided for herein and the Assumption Notice (as defined below), in substantially the form attached hereto as **Exhibit 3**, are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures and the Assumption and Assignment Notice have been tailored to provide an adequate opportunity for all Counterparties (as defined below) to assert any Contract Objections (as defined below).

I. Entry of this Order is in the best interests of the Debtor, its estate, its creditors, and all other interested parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The portions of the Motion seeking approval of (a) the Debtor's entry into the Stalking Horse Transaction Agreement (subject to higher or otherwise better offers in accordance with this Order) and all of its terms, including the Bid Protections, (b) the Debtor's ability to designate Additional Stalking Horse Purchasers and provide Bid Protections to such Additional Stalking Horse Purchasers, (c) the Assumption and Assignment Procedures, (d) the Bidding Procedures, (e) the date and time of the Sale Hearing, and (f) the noticing and objection procedures related to each of the foregoing, including, without limitation, the notice of the Sale and the entry of this Order, substantially in the form attached hereto as **Exhibit 2** (the "Transaction Notice"), and the notice of the Debtor's potential assumption and assignment of the Assigned Contracts, substantially in the form attached hereto as **Exhibit 3** (the "Assumption and Assignment Notice") (subclauses (a) – (f) above, collectively, the "Bidding and Auction Process") are hereby GRANTED to the extent set forth herein.

2. Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3. The Debtor is authorized to (a) designate Disney as the Stalking Horse Purchaser with respect to the Stalking Horse Transaction Agreement, and (b) grant the Bid Protections to Disney and such designation and grant are hereby approved.

4. The Debtor is further authorized to (a) designate Additional Stalking Horse Purchasers with respect to all or any subset of the Assets, other than the Assets proposed to be acquired by Disney, (b) to enter into a form of Additional Stalking Horse Agreement with such Additional Stalking Horse Purchaser(s), subject to final Court approval at the Sale Hearing, and (c) to grant the Bid Protections to such Additional Stalking Horse Purchasers.

5. The Bidding Procedures are hereby approved. The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order. The Debtor is hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

6. For all purposes under the Bidding Procedures: (a) Disney shall be considered a Qualifying Bidder and the Stalking Horse Transaction Agreement shall be considered a Qualifying Bid; (b) Disney is, and will be deemed to be a Qualifying Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by Disney; and (c) in determining whether the Potential Bidders

constitute Qualifying Bidders, the Debtor may consider a combination of bids for the Assets, including the Disney Target Assets.

7. The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

8. The Bid Protections set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement are approved, including, with respect to the Stalking Horse Transaction Agreement, the Break-Up Fee comprised of a break-up fee and expense reimbursement equal to $700,000, or 3.5% of the cash purchase price.

9. Further, if Disney is not selected as the Winning Bidder, consistent with the Stalking Horse Transaction Agreement, Disney will provide to one such Winning Bidder transition services reasonably comparable to those included in that certain form of transition services agreement, which is attached hereto as **Exhibit 4**, for a reasonable period of time no greater than the lesser of (a) 60 days following the closing of the Sale and (b) 75 days after conclusion of the Auction; provided, that, if there are multiple Winning Bidders, Disney shall only be required to provide such transition services to one Winning Bidder.

10. No entity other than Disney or any Additional Stalking Horse Purchaser designated by the Debtor in accordance with the Bidding Procedures shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

11. The obligations of the Debtor to pay the Break-Up Fee: (a) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code, *provided* that the Break-Up Fee shall be payable directly out of proceeds, and as a precondition to, an Alternative Transaction (as defined in the Bidding Procedures); (b) shall survive the termination

of the applicable Stalking Horse Agreement; and (c) shall be payable in accordance with the terms set forth in the applicable Stalking Horse Agreement. Disney is not required to seek relief from the automatic stay to enforce any remedies available to Disney related to the Break-Up Fee under the Stalking Horse Transaction Agreement.

12. The following "Assumption and Assignment Procedures" are hereby approved:

a. On or before November 4, 2026 (the "Assumption and Assignment Notice Deadline"), the Debtor shall file with the Court and serve on any non-Debtor counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assigned Contract, an Assumption and Assignment Notice.

b. Any Assumption and Assignment Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtor believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assigned Contracts. If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assigned Contract, (ii) the Cure Amount for its Assigned Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "Contract Objection") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c. Any Contract Objection shall: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **4:00 p.m. (ET) on November 18, 2026 (the "Contract Objection Deadline")**, and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required under the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. Any objections to adequate assurance of future performance by Disney shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Winning Bidder other than Disney or any Additional Stalking Horse Purchaser designated by the Debtor shall be filed in accordance with subparagraph (g) below.

d. The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801 (Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com); (ii) proposed investment banker to the Debtor, Houlihan

Lokey (Attn: Daniel Cullins (email: dcullins@hl.com)); (iii) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com) Bryan Uelk (bryan.uelk@skadden.com), and Samuel J. Cammer (samuel.cammer@skadden.com)); (iv) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; and (v) counsel to the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda J. Casey (linda.casey@usdoj.gov)).

e. As soon as practicable after the completion of the Auction, the Debtor shall file with the Court a notice identifying the bidder(s) selected as the winning bidder(s) with respect to all or any subset of the Assets (each, a "Winning Bidder" and, if more than one, the "Winning Bidders") (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) with respect to all or any of the Assets and the amount of each of the Winning Bid and the Back-Up Bid (if any) with respect to all or any of the Assets; and (ii) the Selected Assigned Contracts, *provided, however,* that if Disney is serving as the Back-Up Bidder, the protections that apply to Disney's Back-Up Bid as set forth in this Section 14 of the Bidding Procedures shall apply.

f. As soon as reasonably practicable after completion of the Auction, the Debtor will cause to be served by electronic mail, and if unavailable, overnight mail, upon each affected Counterparty and its counsel (if known) the Notice of Winning Bidder.

g. At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to Disney, any Additional Stalking Horse Purchaser, or in the event that a Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), of only those Assigned Contracts that have been selected by Disney or any Additional Stalking Horse Purchaser, or, in the event that any Stalking Horse Purchaser is not designated as a Winning Bidder, then the Winning Bidder, to be assumed and assigned (each, a "Selected Assigned Contract," and collectively, the "Selected Assigned Contracts"). The Debtor and its estate reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

h. If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the applicable Winning Bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with respect to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall

be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtor and its estate or the applicable Winning Bidder for such Selected Assigned Contract, or the property of any of them that existed prior to the entry of the Sale Order.

i. To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtor, in consultation with the Winning Bidder, or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtor and assigned to the Winning Bidder for such Selected Assigned Contract, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtor or the Winning Bidder for such Selected Assigned Contract, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

j. Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtor are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtor shall file with the Court and serve, by regular mail, on the Counterparties an Assumption and Assignment Notice, and such Counterparties shall be required to file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assigned Contracts to the applicable Winning Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

13. The Debtor's decision to assume and assign any Assigned Contracts is subject to this Court's approval and the closing of the applicable Sale(s). Accordingly, absent this Court's approval and the closing of the Sale(s), the Assigned Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtor and its estate under the Bankruptcy Code in connection with the chapter 11 case.

14. The Assumption and Assignment Procedures are appropriate and fair to all Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules. The Assumption and Assignment Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all Counterparties and any other affected parties of the Debtor's intent to assume and assign to the Winning Bidder, some or all of the Assigned Contracts, and (ii) afford the Counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

15. The inclusion of a contract, lease or other agreement on an Assumption Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtor and its estate with respect thereto shall be reserved.

16. The Transaction Notice, the Assumption and Assignment Notice, the Bidding Procedures, the Auction, the Sale Hearing, the Assumption and Assignment Procedures and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the assumption and assignment to the Winning Bidder or Winning Bidders of the Assigned Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby approved.

17. The Transaction Notice is approved. Within two (2) business days after entry of this Order, the Debtor shall serve the Transaction Notice by regular mail on: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Disney; (c) counsel to any official committee of unsecured creditors appointed in the chapter 11 case; (d) all parties known by the

Debtor to assert a lien or encumbrance on any of the Assets; (e) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (f) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (g) the Office of the United States Attorney for the District of Delaware; (h) the Office of the Attorney General in each state in which the Debtor has operated; (i) the Office of the Secretary of State in each state in which the Debtor has operated; (j) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (k) the Federal Trade Commission; (l) the United States Attorney General/Antitrust Division of Department of Justice; (m) all non-Debtor parties to any of the Assigned Contracts; (n) all of the Debtor's other known creditors and equity security holders; and (o) all other parties that have filed a notice of appearance and demand for service of papers in this chapter 11 case as of the service date (collectively, the "Transaction Notice Parties").

18. The Debtor shall post the Transaction Notice, the Assumption and Assignment Notice, and this Order, on the website of the Debtor's claims and noticing agent, Stretto, Inc. ("Stretto") at https://cases.stretto.com/chartech. With respect to parties whose identities or addresses are not reasonably ascertained by the Debtor, publication of the Transaction Notice in *USA Today* within seven (7) business days of the entry of this Order, or as soon as reasonably practicable thereafter, and shall also post the Transaction Notice on the Debtor's blog and online community webpages (which are the online locations through which the Debtor regularly communicates with the public). Publication of the Transaction Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008, and is reasonably calculated to provide notice to any affected party, including any Potential Bidders; and afford the affected

party the opportunity to exercise any rights affected by the Motion and the relief granted by the Order.

19. Any objections to the Sale or to the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on November 13, 2026** (**the "Sale Objection Deadline"**), and proof of service of such Sale Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties. If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale and being heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

20. Failure to file a Sale Objection on or before the Sale Objection Deadline (a) shall forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to the entry of the Sale Order, and/or to the consummation and performance of the Sale contemplated by the Stalking Horse Transaction Agreement, any other Additional Stalking Horse Agreement, or any Alternative Agreement with a Winning Bidder other than any Stalking Horse Purchaser, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to the entry of the Sale Order and consummation of the Sale and all transactions related thereto.

21. As part of its bid, each Qualifying Bidder must provide to the Debtor and the other Bidding Procedures Notice Parties information supporting the Qualifying Bidder's ability to

comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to such Qualifying Bidder, which information may include (i) financial statements and (ii) annual reports; and (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance. To the extent that a Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial or other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.

22. The Deposit of each Qualifying Bidder (including the Deposit Disney has already paid in accordance with that certain Exclusivity and Prepayment Agreement, dated September 18, 2026, between and among the Debtor and Disney, and any Deposit provided by any Additional Stalking Horse Purchaser) shall be held in a separate and designated account by the Debtor or its agent, and shall not become part of the Debtor's bankruptcy estate unless and until released from escrow to the Debtors pursuant to the applicable Stalking Horse Agreement or by order of this Court.

23. Any party in receipt of Adequate Assurance Information under this Order shall review the Adequate Assurance Information received on a confidential basis and shall not disclose the Adequate Assurance Information except as previously provided in this Order and the Bidding Procedures. Such counterparty may not use or disclose, except to representatives, attorneys, advisors, and financing sources (collectively, "Representatives"), any confidential Adequate

Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under section 365(f)(2)(B) and, if applicable, 365(b)(3) of the Bankruptcy Code has been provided; and (b) in support of any objection (the "Assignment Objection") (subject to the limitations on disclosure set forth herein) by such Counterparty relating to adequate assurance of future performance. Any Assignment Objection that includes confidential, non-public Adequate Assurance Information must be filed under seal unless disclosure of such confidential, non-public information is authorized by the Debtor and the applicable assignee. The party filing an Assignment Objection under seal shall follow the procedures for the same set forth in Local Rule 9018-1(d). The unredacted versions of such Assignment Objections shall be served upon the Debtor, the other Bidding Procedures Notice Parties, and the U.S. Trustee, with a copy to the Court's chambers; provided, further, that all rights of all parties in interest in the chapter 11 case are reserved to oppose the filing under seal of any such information and to seek any other relief from this Court with respect to such matter. Any Representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

24. If no timely Qualifying Bids other than the Stalking Horse Transaction Agreement for the Disney Target Assets or any other Additional Stalking Horse Agreement for all or substantially all of the Assets or any subset thereof, are submitted on or before the Bid Deadline, the Debtor shall not hold the Auction and shall request at the Sale Hearing that this Court approve the applicable Stalking Horse Agreement and the transactions contemplated thereunder. If the Debtor timely receives one or more Qualifying Bids for competing sets of the Assets, including, without limitation, the Disney Target Assets, then the Debtor shall conduct the Auction on November 23, 2026 at 10:00 a.m. (ET) at a location to be determined by the Debtor or virtually by

videoconference pursuant to information to be timely provided to the Auction Participants (as defined below). Only the Debtor, the Consultation Parties, the Auction Bidders, and any creditors or parties in interest who submit a request to attend the Auction in accordance with the Bidding Procedures (collectively, the "Auction Participants").

25. Following service of a notice of Auction results, parties may raise objections solely with respect to the conduct of the Auction, the Winning Bidder (only if not a Stalking Horse Purchaser), modifications to any Stalking Horse Agreement, and adequate assurance of future performance by a Winning Bidder other than any Stalking Horse Purchaser (each such objection, a "Supplemental Sale Objection") at the Sale Hearing.

26. The Debtor shall have until November 23, 2026 at Noon (ET) to file and serve a reply to any objection filed in connection with the Sale, including any Sale Objection or Contract Objection.

27. The Sale Hearing shall be held before this Court on November 24, 2026 at [●] (ET), unless otherwise determined by the Court.

28. The Sale Hearing and any other dates related thereto, including any dates set forth in the Bidding Procedures, may be adjourned by the Debtor in consultation with the Consultation Parties and the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 case.

29. In the event there is a conflict between this Order or the Bidding Procedures, on the one hand, and the Motion, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, an Alternative Agreement, or any notice served in connection with the Motion

or this Order on the other hand, this Order and the Bidding Procedures shall control and govern. If there is a conflict between this Order and the Bidding Procedures, this Order shall control and govern.

30. Prior to mailing the Assumption and Assignment Notice and the Transaction Notice, as applicable, the Debtor, in consultation with Disney and any Additional Stalking Horse Purchaser designated by the Debtor, may fill in, or cause to be filled in, any missing dates or other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make other non-material changes as the Debtor deems necessary or appropriate.

31. Nothing in this Order or the Bidding Procedures will require any director or officer of the Debtor to take any action, or to refrain from taking any action, to the extent such director or officer reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, would result in a violation of applicable law or be inconsistent with his or her fiduciary obligations.

32. This Order shall be immediately effective upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules is expressly waived. The Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order and may, in its sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

33. The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

34. Attached hereto as **Schedule A** is a summary of the key dates established by this Order.

35. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

**SCHEDULE A**

| **Date** | **Deadline/Event** |
|---|---|
| November 4, 2026 | Deadline for Debtor to file Assumption and Assignment Notice |
| November 9, 2026 | Deadline to designate Additional Stalking Horse Purchasers |
| November 13, 2026 at 4:00 p.m. (ET) | Sale Objection Deadline |
| November 18, 2026 at 4:00 p.m. (ET) | Contract Objection Deadline[1] |
| November 20, 2026 at 5:00 p.m. (ET) | Bid Deadline |
| November 21, 2026 | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |
| November 23, 2026 | Auction |
| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
| November 23, 2026 at Noon (ET) | Debtor's Deadline to Reply to Sale Objections |
| November 24, 2026, subject to Court availability | Sale Hearing |

[1] The Sale Objection Deadline and Contract Objection Deadlines apply to all objections to the Sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by any Stalking Horse Purchaser), with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* any Stalking Horse Purchaser, which shall be due at or prior to the Sale Hearing.

# EXHIBIT 1

## Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 ([___]) |

**BIDDING PROCEDURES**

On October 12, 2026, the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). The Debtor is maintaining its business and managing its property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On [●], 2026, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Bidding Procedures Order"), among other things, granting certain relief requested in the related motion [Docket No. [●]] (the "Bidding Procedures Motion"), including authorizing the Debtor to solicit bids and approving the procedures set forth herein (collectively, the "Bidding Procedures") to be employed by the Debtor in connection with the proposed sale, license or other disposition (the "Sale") of all or substantially all of the Debtor's assets (the "Assets") free and clear of all Encumbrances other than Assumed Liabilities,[2] including the Sale of certain of the Assets (the "Disney Target Assets") to Disney Worldwide Services, Inc. ( "Disney"), pursuant to the Stalking Horse Transaction Agreement dated as of October __, 2026 (the "Stalking Horse Transaction Agreement") between Disney and the Debtor, or any additional stalking horse agreement (each, an "Additional Stalking Horse Agreement") between the Debtor and any additional Stalking Horse Purchaser (an "Additional Stalking Horse Purchaser") designated by the Debtor or, in the event that any Stalking Horse Purchaser is not designated as a Winning Bidder, then an Alternative Agreement (as defined below) with the Winning Bidder(s). The Stalking Horse Transaction Agreement is attached to the Bidding Procedures Motion as Exhibit B.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

**(A) THE INVESTMENT BANKER FOR THE DEBTOR, HOULIHAN LOKEY, ATTN: DANIEL CULLINS (214-220-8473) (EMAIL: DCULLINS@HL.COM).; AND**

**(B) PROPOSED COUNSEL TO THE DEBTOR, WILSON SONSINI GOODRICH & ROSATI, P.C., ATTN: ERIN R. FAY (EFAY@WSGR.COM) AND SHANE M. REIL (SREIL@WSGR.COM).**

***Summary of Key Dates Established by Bidding Procedures***

| **Date** | **Deadline/Event** |
|---|---|
| November 4, 2026 | Deadline for Debtor to file Assumption Notice |
| November 9, 2026 | Deadline to designate Additional Stalking Horse Purchasers |
| November 13, 2026 at 4:00 p.m. (ET) | Sale Objection Deadline |
| November 18, 2026 at 4:00 p.m. (ET) | Contract Objection Deadline[3] |
| November 20, 2026 at 5:00 p.m. (ET) | Bid Deadline |
| November 21, 2026 | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |
| November 23, 2026 | Auction |
| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
| November 23, 2026 at Noon (ET) | Debtor's Deadline to Reply to Sale Objections |
| November 24, 2026, subject to Court availability For | Sale Hearing |

1. **The Stalking Horse Transaction Agreement**

On October __, 2026, the Debtor entered into the Stalking Horse Transaction Agreement with Disney. As set forth more fully in the Stalking Horse Transaction Agreement, the price to be paid by Disney consists of $20 million in cash (the "Stalking Horse Purchase Price"). Disney is deemed to be a Qualifying Bidder (as defined below), and the Stalking Horse Transaction Agreement is deemed to be a Qualifying Bid (as defined below).

[3] The Sale Objection Deadline and Contract Objection Deadlines apply to all objections to the Sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by any Stalking Horse Purchaser) with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* any Stalking Horse Purchaser, which shall be due at or prior to the Sale Hearing.

**2. Authorization to Designate Additional Stalking Horse Purchasers**

These Bidding Procedures authorize but do not require the Debtor to designate Additional Stalking Horse Purchasers with respect to all or any subset of the Assets, other than the Assets proposed to be acquired by Disney, any Additional Stalking Horse Agreement entered into with such Additional Stalking Horse Purchaser shall be deemed to be a Qualifying Bid (as defined below) and such Additional Stalking Horse Purchaser shall be deemed to be a Qualifying Bidder (as defined below) for all purposes under these Bidding Procedures.

**3. Assets for Sale**

The Debtor shall offer for Sale all or substantially all of the Assets or any subset thereof, including the Disney Target Assets, *provided* that the Debtor determines that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures. Potential Bidders may bid on all or any number or combination of the Assets.

**4. Participation Requirements**

Any interested party that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder." To become a Qualifying Bidder, and thus be able to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the assets (the "Data Room"), a Potential Bidder must submit to the Debtor and its advisors:

(a) documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated bidding and transaction process;

(b) an executed confidentiality agreement in form and substance satisfactory to the Debtor; and

(c) sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has the financial wherewithal to consummate a Sale, and (ii) intends to access the Data Room for a *bona fide* purpose consistent with these Bidding Procedures;

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

**5. Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents

of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

**6. Form of Agreement for Sale of the Assets; Including the Transferred Property**

Potential Bidders should reference the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement. As set forth below, Potential Bidders intending to submit bids that include the Disney Target Assetes, or any combination of Assets must include with their bids:

(a) a statement that such Potential Bidder offers to (i) purchase or license the Disney Target Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtor and its estate than, as applicable, the terms set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement designated by the Debtor with respect to the Assets included in the bid; and

(b) a clean and duly executed transaction agreement (an "Alternative Agreement") and a marked copy of such agreement showing variations from the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement.

**7. Due Diligence**

The Debtor will provide any Qualifying Bidder (including, for the avoidance of doubt), Disney with reasonable access to the Data Room and any other additional information that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtor, Houlihan Lokey, Attn: Daniel Cullins (214-220-8473); (dcullins@hl.com) and (b) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., Attn: Heather Lambert (hlambert@wsgr.com).

The due diligence period shall extend through and including the Bid Deadline. The Debtor, in its business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtor reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtor and its estate shall be authorized to provide due diligence information to Qualifying Bidders *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtor.

**8. Bid Requirements**

Other than in the case of Disney and the Stalking Horse Transaction Agreement or any Additional Stalking Horse Purchaser and its Additional Stalking Horse Agreement, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under these Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

a. be in writing;

b. fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

c. set forth the purchase price to be paid by such Qualifying Bidder;

d. not propose payment in any form other than cash;

e. state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f. specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase or license the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtor and its estate than, the terms set forth in, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

g. be accompanied by an alternative asset purchase agreement (an "Alternative Agreement") that reflects any variations from, as applicable, the Stalking Horse Transaction Agreement or any other Additional Stalking Horse Agreement that has been designated by the Debtor with respect to the Assets included in the bid;

h. state that such Qualifying Bidder's offer is formal, binding, and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;

i. to the extent that a Bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the sale, license or

other disposition set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtor, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtor;

j. contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtor to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtor's receipt of such information;

k. (A) identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative Agreement; (B) provide for the payment of cure costs related to such executory contracts and unexpired leases, and (C) demonstrate that the Qualifying Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases;

l. set forth the Qualifying Bidder's intentions with respect to (i) hiring any of the Debtor's current or former employees, and (ii) providing transition services to the Debtor;

m. include a commitment to close the transactions contemplated by the Alternative Agreement by no later than December 17, 2026;

n. not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment unless such Qualifying Bidder is seeking to be designated as an Additional Stalking Horse Purchaser with respect to the Assets in its bid;

o. if the Alternative Agreement contemplates the exclusive license or purchase of the Disney Target Assets, or the purchase of Assets subject to any other Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (1) the value offered by, as applicable, the Stalking Horse Transaction Agreement with respect to the Disney Target Assets or any Additional Stalking Horse Agreement with respect to any Assets included in the bid, plus (2) any applicable Break-Up Fee, plus (3) $1,000,000 (collectively, the "Minimum Overbid Amount");

p. not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

q. contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale. Such written acknowledgment and representation must include the following disclaimer: Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Assets without any surviving representations or warranties, on an "as is" and "where is" basis, except as set forth in the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement;

r. set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Sale, and the time within which the Qualified Bidder expects to receive such regulatory and third-party approvals, and the Debtor, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible, when considering the other Bid Requirements. Each Qualified Bidder must further agree that its legal counsel will coordinate in good faith with counsel to the

Debtor to provide pertinent information regarding the Qualified Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Qualified Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable;

s. provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Winning Bid, in accordance with the terms of the Alternative Agreement;

t. include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative Agreement;

u. provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative Agreement (or such additional amount as may be determined by the Debtor in its reasonable discretion); and

v. provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative Agreement, the Debtor and its estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtor in consultation with the Consultation Parties (defined below), shall constitute a Qualifying Bid. The Debtor reserves the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

### 9. Bid Deadline

A Qualifying Bidder, other than Disney or any Additional Stalking Horse Purchaser that may be designated by the Debtor, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties so as to be received on or before **November 20, 2026 at 5:00 p.m. (ET)** (the "Bid Deadline"); *provided* that the Debtor may extend the Bid Deadline in consultation with the Consultation Parties (defined below) without further order of the Court. To the extent that the Bid Deadline is extended for all

parties, the Debtor shall file a notice on the docket of the chapter 11 case indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

**10. Evaluation of Qualifying Bids**

The Debtor shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than **November 21, 2026**, the Debtor shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the Minimum Overbid Amount, the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

**11. No Qualifying Bids**

If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction with respect to the Assets covered by the applicable Stalking Horse Agreement and shall request at the Sale Hearing that the Court approve such Stalking Horse Agreement and the transactions contemplated thereunder.

**12. Auction**

If the Debtor timely receives one or more Qualifying Bids for all or any subset of the Assets, including, without limitation, the Disney Target Assets, then the Debtor shall conduct an auction (the "Auction"). Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes requested by the bidder in the form of Alternative Agreement as compared to any Stalking Horse Agreement designated by the Debtor with respect to the Assets subject to its bid; (c) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtor and its estate of such modifications or delay; (d) the total consideration to be received by the Debtor and its estate; (e) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (f) the net benefit to the Debtor's estate; and (g) any other qualitative or quantitative factors the Debtor may reasonably deem reasonably appropriate under the circumstances.

The Auction shall be governed by the following procedures:

(a) the Auction shall be held on **November 23, 2026 at 10:00 a.m. (ET)** at a location to be determined by the Debtor or virtually via video conference pursuant to

information to be timely provided by the Debtor to the Auction Participants (as defined below);

(b) only Disney, any Additional Stalking Horse Purchaser(s) designated by the Debtor, and the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

(c) the Auction Bidders shall appear at the Auction in-person (or via Zoom, if permitted) in the Debtor's sole discretion, or through a duly authorized representative;

(d) only the Debtor, the Consultation Parties, and the Auction Bidders, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any creditors or parties in interest in the chapter 11 case may request permission in writing to attend the Auction no later than Noon (ET) two (2) days prior to the Auction and the Debtor, in its sole discretion, may reasonably determine to grant or deny such permission;

(e) the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f) prior to start of the Auction, each of the Auction Bidders shall confirm on the record of the proceedings that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale;

(g) bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $500,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(h) in any successive bid by Disney or any Additional Stalking Horse Purchaser designated by the Debtor, the amount of the applicable Break-Up Fee shall be included in the calculation of such bid;

(i) the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(j) all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid;

(k) the Debtor and its professional advisors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, or any applicable order of the Court, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders in advance of their application;

(l) each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(m) the Auction Bidders shall have the right to make additional modifications to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion be less favorable to the Debtor and its estate than the terms of, as applicable, the Stalking Horse Transaction Agreement or any Additional Stalking Horse Agreement, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(n) the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(o) upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties and subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction for all or substantially all or any subset of the Assets (the "Winning Bids"). In making this decision, the Debtor shall consider the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and

nature of any changes to the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or any Alternative Agreement submitted with the Winning Bid, as applicable, requested by each bidder, and the net benefit to the Debtor's estate. The bidder submitting such Winning Bid at the Auction shall become a "Winning Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement, as applicable. The Debtor may, in its business judgment, designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Winning Bidder does not close the Sale;

(p) if the Winning Bidder is not Disney, Disney shall allow one (1) Winning Bidder to interview and make employment offers to any employees of Disney formerly employed by the Debtor who wish to consider opportunities with such Winning Bidder and shall work in good faith with such Winning Bidder to transition employees who accept an offer to the Winning Bidder; *provided* that Disney may designate up to 20% of such employees as outside the scope of such process, and Disney need not make available or allow the Winning Bidder (or any other party) the right to interview or make employment offers to such employees;

(q) if the Winning Bidder is not Disney, Disney shall be entitled to the Break-Up Fee;

(r) as soon as reasonably practicable after completion of the Auction, the Debtor will file with the Court and serve on the Transaction Notice Parties a notice setting forth the results of the Auction (the "Notice of Winning Bidder"), which will (a) identify the Winning Bidder and the Back-Up Bidder, if applicable; (b) include a copy of the Winning Bid and the Back-Up Bid, if applicable, or a summary of the material terms of such bid, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Adequate Assurance Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Transaction Notice Parties of the outcome of the Auction; and

(s) prior to the Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made;

**THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED STALKING HORSE TRANSACTION AGREEMENT, ADDITIONAL STALKING HORSE AGREEMENT, OR ALTERNATIVE AGREEMENT, AS APPLICABLE, SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**13. <u>Sale Hearing</u>**

The Winning Bid and any Back-Up Bid and, as applicable, the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement, or the Alternative Agreement related to such bids will be subject to approval by the Court. The Sale Hearing to approve the Winning Bid and any Back-Up and the applicable asset purchase agreements of such bids shall take place on **<u>November 24, 2026] at [●] (ET)</u>**.

The Sale Hearing and any additional deadlines established in connection with these Bidding Procedures may be adjourned by the Debtor, in consultation with any Consultation Parties, Disney, and any Additional Stalking Horse Purchaser, or in the event Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then in consultation with the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the chapter 11 case.

At the Sale Hearing, the Debtor will seek entry of an order, substantially in the form of the Sale Order that, among other things: (i) authorizes and approves the Sale to Disney, any Additional Stalking Horse Purchaser or, in the event that Disney or any Additional Stalking Horse Purchaser is not designated as a Winning Bidder, then to the Winning Bidder(s), pursuant to the terms and conditions set forth in the Stalking Horse Transaction Agreement, any Additional Stalking Horse Agreement or the Alternative Agreement submitted by the Winning Bidder, as applicable.

**14. <u>Back-Up Bidder</u>**

Notwithstanding any of the foregoing, in the event that the Winning Bidder fails to close the Sale on or before the date that is two weeks following entry of the Sale Order (or such date as may be extended by the Debtor), the Back-Up Bid will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtor shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties; *provided, however,* that Disney, if operating as the Back-Up Bidder, shall not be subject to any penalties, and, Disney shall be permitted to terminate the Sale unilaterally if the Sale does not close on or prior to December 17, 2026 and the failure to close is not on account of Disney's material breach; *provided, further,* that any duties and related requirements for Disney to serve as the Back-Up Bidder, or milestones in connection therewith, shall be subject to the terms of the last bid Disney submitted at the Auction.

**15. <u>Return of Deposits</u>**

All Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder no later than five (5) business days following the closing of the Sale, including that certain $2,000,000 fully refundable deposit to be paid to Disney to the extent Disney is not selected as the Winning Bidder. The deposit of the Winning Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such

bidder, then, subject to the terms of any Stalking Horse Transaction Agreement or any Alternative Agreement, as applicable, the Debtor and its estate shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.[4]

## 16. Bidding Procedures Notice Parties

The term "Bidding Procedures Notice Parties" shall mean: (a) proposed counsel to the Debtor, Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, Delaware 19801, Attn: Erin R. Fay (efay@wsgr.com) and Shane M. Reil (sreil@wsgr.com); (b) proposed investment banker for the Debtor, Houlihan Lokey, Attn: Daniel Cullins (dcullins@hl.com); (c) counsel to Disney, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001, Attn: Brandon Van Dyke (brandon.vandyke@skadden.com), Ron E. Meisler (ron.meisler@skadden.com), Bryan Uelk (bryan.uelk@skadden.com)_and Samuel J. Cammer (samuel.cammer@skadden.com)); and (d) counsel to any official committee of unsecured creditors that may be appointed in the chapter 11 case.

## 17. The Consultation Parties

The Debtor shall consult with any official committee of unsecured creditors appointed by the Bankruptcy Court and counsel to such committee (the "Consultation Parties") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtor shall not be required to consult with any Consultation Party (and its advisors) that is a Qualified Bidder. For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its reasonable business judgment.

## 18. Fiduciary Out

Nothing in these Bidding Procedures will require any director or officer of the Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such director or officer reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, would result in a violation of applicable law or be inconsistent with his or her fiduciary obligations.

## 19. Reservation of Rights

Except as otherwise provided in the Stalking Horse Transaction Agreement or the Bidding Procedures Order, the Debtor may, and reserves the right to, modify the Bidding Procedures at or prior to the Auction, including, without limitation, to modify, extend, enlarge, revise, or otherwise alter any or all of the deadlines set forth herein or related hereto including, without limitation, with respect to the marketing process, the submission of bids, the designation of Additional Stalking

[4] For the avoidance of doubt, the Debtor's retention of a Deposit shall not constitute a waiver of any of the Debtor's legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are reserved.

Horse Purchasers, Qualified Bidders, and Auction Participants, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the closing of any Sale to Winning Bidders or Back-Up Bidders, as applicable, as well as to modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all of the Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing. Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualifying Bidder, other than Disney subject to, and in accordance with the terms of these Bidding Procedures and the Stalking Horse Transaction Agreement.

**EXHIBIT 2**

**Transaction Notice**

**(Intentionally Omitted)**

# EXHIBIT 3

**Assumption and Assignment Notice**

**(Intentionally Omitted)**

# **EXHIBIT 4**

**Winning Bidder TSA**

**(Intentionally Omitted)**