**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CHARACTER TECHNOLOGIES, INC.,[1] | Case No. 26-11603 (BLS) |
| Debtor. | **Ref. Docket No. 15** |

**DECLARATION OF ADAM DUNAYER IN SUPPORT OF THE**
**DEBTOR'S BIDDING PROCEDURES MOTION**

I, Adam Dunayer, make this declaration (this "Declaration") under 28 U.S.C. § 1746 and state as follows:

1. I am a Managing Director in the Financial Restructuring Group at Houlihan Capital, Inc. ("Houlihan"), with offices located at 2601 Olive Street, Suite 2500, Dallas, Texas 75201.

2. Houlihan will file an application with the Court under 11 U.S.C. §§ 327(a) and 328(a) to be retained as the investment banker to debtor and debtor in possession in the above-captioned case (the "Debtor").

3. I have been a Managing Director at Houlihan since 2002. Prior to joining Houlihan, I was a Managing Director with Bear, Sterns & Co. and held the positions of Executive Vice President and Chief Financial Officer at Miller Industries. I have more than thirty years of experience consummating transactions and providing strategic advice to companies and creditors in connection with in- and out-of-court financial restructurings, mergers, acquisitions, and dispositions, as well as extensive experience in raising debt and equity capital in public and private

[1] The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

markets. I hold a Bachelor of Business Administration degree from the University of Texas at Austin.

4. I submit this Declaration in support of the relief requested in the motion (the "Bidding Procedures Motion"),[2] filed by the Debtor seeking approval of (a) the Sale of substantially all of the Debtor's assets (the "Assets") and (b) the Debtor's entry into the Stalking Horse Transaction Agreement (subject to higher or otherwise better offers) and all of its terms, including the Bid Protections, (c) the Debtor's ability to designate Additional Stalking Horse Purchasers and provide Bid Protections to such Stalking Horse Purchasers, (d) the Assumption and Assignment Procedures, (e) the Bidding Procedures, (f) the date and time of the Sale Hearing, (g) the noticing and objection procedures related to each of the foregoing, including, without limitation, the Sale Notice, and the notice of the Debtor's potential assumption and assignment of the Assigned Contracts and (h) granting related relief.

5. Based on my work with the Debtor and my oversight of the work that Houlihan has performed for the Debtor thus far, my review of relevant documents, and my discussions with members of the Debtor's management team and other professionals, I am familiar with the Debtor's day-to-day operations and business affairs.

6. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon: (i) my personal knowledge of the Debtor's operations and finances and the Sale Process (defined below); (ii) information learned from my review of relevant documents or supplied to me by members of the Debtor's management team or the Debtor's other professional advisors (including other members of the Houlihan team); or (iii) my opinion based on my

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures Motion.

experience, knowledge, and understanding of the Sale Process and the Debtor's operations and financial condition.

7. I am over the age of eighteen (18) and authorized to submit this declaration on behalf of the Debtor. I am not being compensated for this testimony other than through payments received by Houlihan as a professional engaged by the Debtor; none of those payments are specifically payable on account of this testimony. If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, and the information in this Declaration is complete and accurate to the best of my knowledge, information, and belief.

## HOULIHAN'S QUALIFICATIONS

8. Houlihan, together with the other subsidiaries of its direct parent company, Houlihan, Inc., is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 1,900 professionals. Houlihan is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled company both in and outside of bankruptcy. Houlihan has been, and is, involved in some of the largest restructurings in the United States, both out of court and in chapter 11 cases.

9. Since September 2026, professionals employed by Houlihan have advised the Debtor in connection with its efforts to explore strategic and financial restructuring alternatives. During this time, they have become familiar with the Debtor's business, affairs, assets, and contractual arrangements. They have worked closely with the Debtor and its management to analyze the Debtor's financial position and to assist the Debtor in evaluating various asset sale, financing, and restructuring options. Accordingly, Houlihan has the necessary background to address the current and potential interest for a sale of some, all, or substantially all of the Assets, as well as how to maximize the value

of the Assets through a thorough and efficient Sale Process under the circumstances, and the need to provide Disney and any Additional Stalking Horse Purchasers with the Bid Protections.

10. The resources, capabilities and experience of Houlihan in advising the Debtor are crucial to enabling the Debtor to successfully conduct a value-maximizing Sale Process with respect to their Assets and successfully prosecute this chapter 11 case. An investment banker with a deep bench of experience, such as Houlihan, fulfills a critical need that complements the services offered by the Debtor's other advisors.

11. Houlihan has also run sale processes on similarly expedited timelines to the timeline proposed in the Bidding Procedures Motion. *See, e.g., In re True Value Company, L.L.C.* (Bankr. D. Del. 2024) (sale approved thirty days after the petition date); *In re Corsicana Bedding, LLC*, Bankr. N.D. Tex. 2022) (sale approved approximately eight weeks after the petition date); *In re Alamo Drafthouse Cinemas Holdings, LLC* (Bankr. D. Del. 2021) (approximately nine week sale process); *see also In re Wellstat Therapeutics Corp.* (Bankr. D. Md. 2023) (chapter 7 case where auction of debtor's assets was held approximately five weeks after Houlihan was retained by the chapter 7 trustee).

## THE PREPETITION SALE PROCESS

### A. Overview of the Debtor's Prepetition Marketing Efforts

12. As set forth in the *Declaration of Colin M. Adams in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"), the Debtor has suffered from financial and operational challenges for several years leading up to the Petition Date. Accordingly, over a year prior to the Petition Date, the Debtor began searching for strategic or financial acquirors or partners to provide a path to continued operations of Character.AI. In connection with these efforts, in August 2025, the Debtor engaged another investment bank

(the "Prior Banker") to pursue strategic and financing alternatives in parallel. As part of this process, the Prior Banker oversaw the marketing of the Debtor's Assets and approached approximately 28 potential parties (largely strategic and financial parties). Character and the Prior Banker received consistent feedback in this process that, although Character's product and engaged user base were impressive, the litigation and regulatory overhang on Character was too great. The Prior Banker's outreach resulted in only one proposal that was ultimately not deemed to be actionable.

13. Thereafter, the strategic process continued in consultation with the Prior Banker, while the Debtor focused on engaging with strategic partners and undertaking operational changes to improve revenue and reduce costs. The Prior Banker's engagement with the Debtor concluded in August 2026. Thereafter, in September 2026, the Debtor engaged Houlihan to serve as its investment banker to assist in canvassing the market for interested buyers of all or substantially all of the Assets. Upon its retention, Houlihan immediately began conducting due diligence with respect to the Assets and preparing marketing materials.

**B. The Stalking Horse Transaction**

14. In September 2026, the Debtor, through a special transaction committee (the "Initial Transaction Committee"), comprised of independent directors on the Debtor's board of directors (the "Board"), was engaged in discussions primarily with two parties who expressed interest in strategic transactions with Character.[3] The Initial Transaction Committee considered proposals from both parties, including the relevant value that each would bring, the likelihood of the proposals being actionable, Character's ability to safely operate its platform after a transaction,

[3] On October 1, 2026, Mr. Christopher Sontchi was appointed to the Board as an Independent Director. The Board thereafter formed a committee of the Board comprised solely of independent directors (the "Restructuring Committee"), which is charged with overseeing the remainder of the Sale Process and the entirety of the chapter 11 case.

the path for Character after a transaction to further maximize value, and the overall benefit to Character and its stakeholders. Character engaged in rounds of negotiations with both parties and the Initial Transaction Committee discussed the same over multiple meetings.

15. Ultimately, the Initial Transaction Committee determined that the proposal from Disney Worldwide Services, Inc. ("Disney") was a superior proposal for several reasons. First and foremost, the unique proposal allowed Character to reduce its personnel costs promptly because Disney agreed to hire the majority of Character's workforce, including its chief executive officer, up front and prior to the Petition Date. At the same time, Character retained access to key employees to assist with safely running Character's platform for a limited period because Disney agreed to make those newly hired employees available to provide transition services to Character for up to five months. Second, the proposal provided Character with additional cash on hand because Disney agreed to pay \$7.5 million of the \$20 million cash consideration up front and prior to the Petition Date, rather than at closing, \$2 million of which serves as a refundable good faith deposit. This payment and the transition services, facilitated a path forward to maximize value for all stakeholders through a chapter 11 filing. As described in more detail below, Character and Disney entered into an agreement to complete a multi-faceted transaction to be fully consummated in a chapter 11 sale process. Disney's transaction will be subject to higher and better offers through a sale process conducted by Houlihan, who the Debtor believes has the necessary experience, reputation, and global buyer network to support such process.

16. The Initial Transaction Committee finalized the terms with Disney in an exclusivity and prepayment letter agreement (the "EPA") and a Transition Services Agreement (as amended, modified, or restated from time to time, the "TSA"). Thereafter, the Initial Transaction

Committee recommended final approval of the EPA and the TSA to the Board and Character signed the agreements on September 18, 2026.[4]

17. Pursuant to the terms of the EPA, the Debtor and Disney agreed upon a term sheet that contemplates a comprehensive transaction, whereby the Debtor agreed to, among other things, permit Disney to hire certain employees (subject to certain employees remaining available to assist with the Debtor's operations and sale process), release Disney and the transferring employees for certain matters, and negotiate exclusively with Disney from September 18, 2026 through the Petition Date with respect to, among other things, the subset of assets it seeks to acquire (the "Disney Target Assets") and the provision of transition services. Through the TSA, Disney agreed to provide certain critical services to the Debtor for up to five months at no cost to the Debtor other than actual expenses incurred (*i.e.*, at no charge for employee time). In connection with the EPA, Disney made offers to certain of the Debtor's employees and the vast majority of such employees accepted the offers.

18. Thereafter, the parties negotiated and entered into an amended and restated TSA and a stalking horse agreement with respect to, among other things, the Disney Target Assets (the "Stalking Horse Transaction Agreement"). The Stalking Horse Transaction is proposed to serve as a baseline bid for prospective bidders to negotiate from and will be subject to higher and otherwise better bids for the Disney Target Assets pursuant to the Bidding Procedures. The Stalking Horse Transaction Agreement also includes certain case milestones related to the Sale Process (as defined below).

[4] Given the timing of these negotiations relative to Houlihan's retention, Houlihan was not involved in these negotiations.

## APPROVAL OF THE SALE PROCESS AND BID PROTECTIONS

### A. The Chapter 11 Sale Process

19. Through the EPA, Disney required that the transaction be subject to a chapter 11 process and the EPA and the Stalking Horse Transaction Agreement expressly contemplate a competitive process and that the transaction would be implemented free and clear of all claims (including successor liability), liabilities, interests and encumbrances, pursuant to Sections 105 and 363 of the Bankruptcy Code.

20. The Stalking Horse Transaction Agreement will serve as a baseline bid for the Disney Target Assets. All prospective bidders may submit higher and otherwise better bids for the Disney Target Assets pursuant to the Bidding Procedures and may also seek to acquire the Debtor's other Assets. The Stalking Horse Transaction Agreement also includes certain case milestones related to the Sale Process.

21. Given that the Debtor's Assets were marketed for more than a year prepetition—both with the assistance of the Prior Banker and also independently by the Debtor—and will be marketed again in this chapter 11 case by Houlihan, the Debtor determined in its business judgment that the terms of Disney's bid, notwithstanding the short-term exclusivity and the Break-Up Fee, maximized the value of its Assets.

22. To augment the prepetition marketing process for the Assets, which resulted in a stalking horse bid for the Disney Target Assets, and contemporaneous with the filing of this chapter 11 case, Houlihan has now commenced a post-petition sale process, including circulating a "teaser" to prospective bidders. The "teaser" includes a brief description of the Assets and the process outlined for the proposed sale, license, or disposition of the Assets (the "Sale Process"). When the "teaser" is circulated to prospective bidders, it will be accompanied by a form non-disclosure

agreement (an "NDA"). Houlihan has also populated an electronic data room (the "Data Room") with related diligence information. The "teaser" and Data Room will be made available to potential bidders upon execution of an NDA.

**B. The Bidding Procedures and Sale Timeline Should be Approved.**

23. I have reviewed and am familiar with the Bidding Procedures Motion and the related Bidding Procedures. It is my opinion that the Bidding Procedures and the Debtor's proposed sale timeline (the "Sale Timeline") will allow the Debtor to obtain the highest or otherwise best value for the Assets under the circumstances of the chapter 11 case and the Debtor's business.

24. The Bidding Procedures are designed to provide the Debtor with flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate a transaction (or multiple transactions) to ensure that the Assets are sold for their highest or otherwise best value. The Bidding Procedures are intended to strike an appropriate balance between ensuring that there is a full and fair opportunity for the Debtor and its stakeholders to review and consider proposed transactions, manage the Debtor's operational and liquidity needs, and afford the best opportunity for the Debtor to continue servicing its users and maintaining relationships with vendors.

25. In this respect, I believe that the Bidding Procedures provide a transparent and competitive avenue through which the Debtor will further solicit competing bids for the Assets. I further believe that the Bidding Procedures reflect the Debtor's objective of conducting the Sale Process in an orderly and open manner, while ensuring that the highest or otherwise best bid is generated for the Assets.

26. Notwithstanding the Debtor's designation of Disney as a Stalking Horse Purchaser with respect to the Disney Target Assets, the Debtor and Houlihan will continue marketing efforts

with respect to the Assets during the chapter 11 case, including with respect to the potential designation of Additional Stalking Horse Purchasers and, if multiple bids are received with respect to the same Assets, the holding of an Auction to further ensure that the highest or otherwise best bid for such Assets is received. Ultimately, it is anticipated that this marketing and Sale Process will last nearly six weeks to ensure that the market is thoroughly canvassed and all actionable proposals are solicited.

27. I believe that the Sale Timeline allows for sufficient post-petition marketing of the Debtor's business and is reasonable and appropriate to enable the Debtor to seek the highest value for its Assets under the circumstances. As set forth in greater detail in the First Day Declaration, filed contemporaneously herewith, the chapter 11 case is being funded using the Debtor's cash on hand and the Debtor is facing a variety of factors affecting its liquidity and its business. For these reasons, the Sale Timeline must be appropriately tailored. Indeed, I believe that the Debtor cannot afford a longer Sale Process due to the Debtor's high operating costs and because the Stalking Horse Transaction Agreement (and Disney's willingness to serve as Stalking Horse Purchaser in connection therewith) includes an outside date for the sale closing on or prior to December 17, 2026.

28. Furthermore, as described above, the Debtor's business was previously marketed for over a year and will have been marketed by Houlihan since the start of this chapter 11 case. Although Houlihan intends to run a robust and thorough marketing process with respect to the Assets, the unique nature of the Debtor's Assets is such that the pool of prospective purchasers is relatively limited and many potentially viable prospects for such a purchase have already been contacted. Consequently, I believe that the Sale Timeline is appropriate in light of the circumstances of this case and in my experience.

**C. The Debtor's Entry Into the Stalking Horse Transaction Agreement and Ability to Designate Additional Stalking Horse Purchasers Should be Authorized.**

29. The Debtor, through the recommendation of the Restructuring Committee, determined that the Stalking Horse Transaction provides the best option to maximize value for stakeholders. The Restructuring Committee, with the assistance of the Debtor's professional advisors, engaged in good-faith, arms'-length negotiations with Disney regarding the Stalking Horse Transaction. The Debtor's entry into the Stalking Horse Transaction Agreement and the assumption of the TSA permits the Debtor to conduct a value-maximizing Sale Process for all or substantially all of its Assets with Disney's Stalking Horse Transaction serving as the anchor bid for the Disney Target Assets.

30. Likewise, the Debtor's consummation of a Sale pursuant to the terms of the Stalking Horse Transaction is subject to higher or otherwise better offers (in whole or through a combination of bids) that the Debtor may receive for the Assets pursuant to the Bidding Procedures. Accordingly, there is a strong business justification for the Debtor's entry into the Stalking Horse Transaction Agreement and the assumption of the TSA.

31. Further, the Stalking Horse Transaction benefits the Debtor by serving as a floor for the Disney Target Assets and provides for an overbid process to ensure that the Debtor receives the highest or otherwise best offer for such Assets. Because the Bidding Procedures expressly provide flexibility for the Debtor to designate Additional Stalking Horse Purchasers with respect to all, substantially all, or any subset of the Assets (including the Disney Target Assets) and to offer such Additional Stalking Horse Purchasers the Bid Protections, the Debtor has flexibility in the Sale Process to ensure that all of its Assets are market-tested and sold for the highest or otherwise best price. Indeed, if multiple Qualifying Bids are received with respect to the Additional Stalking Horse

Agreements executed by such Additional Stalking Horse Purchasers, additional auctions may be held to ensure that competitive bidding produces the highest or otherwise best price for such Assets.

32. By contrast, in the absence of Disney's willingness to consummate the proposed transaction between it and the Debtor and serve as a Stalking Horse Purchaser, the Debtor would not have the benefit of the TSA or a floor with respect to any sale of the Disney Target Assets and the risks of an unsuccessful chapter 11 outcome would be much greater to the detriment of the Debtor and its stakeholders, including its employees.

**D. The Bid Protections Should Be Approved.**

33. As a key inducement and prerequisite to the execution of the Stalking Horse Transaction Agreement and Disney's willingness to pursue the broader transaction with the Debtor, the Debtor has agreed, subject to Court approval, to provide Disney with the Break-Up Fee. The Break-Up Fee was the subject of good faith, arm's length negotiations between the Debtor and Disney. Without the Break-Up Fee, Disney would not have agreed to serve as stalking horse with respect to the Stalking Horse Transaction at the value reflected in the EPA, the TSA, and the Stalking Horse Transaction Agreement.

34. The Bidding Procedures further provide that the Bid Protections, including payment of the Break-Up Fee, if necessary, may be payable to any Additional Stalking Horse Purchaser in accordance with the terms of any Additional Stalking Horse Agreement and to induce such Additional Stalking Horse Purchasers to come to the table and incur the costs of doing so. To the extent that the Debtor determines to designate any such Additional Stalking Horse Purchaser, I expect that such Additional Stalking Horse Purchaser will also request the Bid Protections as a condition of its willingness to establish a floor for bidding with respect to the Assets included in any such bid.

35. Based on my substantial experience and personal knowledge of the Debtor's sale and marketing efforts to date, I believe the proposed Bid Protections are reasonably tailored to encourage, rather than hamper, bidding for the applicable Assets by providing a baseline of value, increasing the likelihood of competitive bidding at any Auction to be held, and facilitating the participation of potential bidders in the Sale Process, thereby increasing the likelihood that the Debtor will receive the best possible price and terms for the Assets subject to a Stalking Horse Agreement.

36. Further, the Bid Protections are necessary to ensure that Disney and any Additional Stalking Horse Purchaser designated by the Debtor will continue pursuit of the proposed agreement to purchase the Assets subject to a Stalking Horse Agreement. Finally, the amount of the Bid Protections is reasonable in relation to the lost opportunities resulting from the time and money Disney and any Additional Stalking Horse Purchaser would spend pursuing such transaction.

**E. The Debtor's Sale Process Is Intended to Maximize Value and Should be Approved**

37. In conclusion, for the reasons discussed above, I believe that approval of the proposed Bidding Procedures, Sale Timeline, and the Bid Protections will enable the Debtor to obtain the highest or otherwise best offer for the Assets under the circumstances and will thereby maximize value for the benefit of all stakeholders in the chapter 11 case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 13, 2026

*/s/ Adam Dunayer*
Adam Dunayer
Managing Director
Houlihan Capital, Inc.