**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARACTER TECHNOLOGIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11603 (BLS)<br><br>Re: D.I. 15<br><br>**Hearing Date**: October 30, 2026, at 10 AM (ET)<br>**Obj. Deadline**: Friday, October 23, 2026, at 4 PM (ET) |

**THE COALITION OF STATES' OBJECTION TO THE DEBTOR'S MOTION PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE DESIGNATION OF DISNEY WORLDWIDE SERVICES, INC. AS STALKING HORSE PURCHASER WITH RESPECT TO THE DISNEY TARGET ASSETS, (E) AUTHORIZING THE DEBTOR TO DESIGNATE ADDITIONAL STALKING HORSE PURCHASERS FOR THE ASSETS AND (F) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS, (B) APPROVING THE ASSUMPTION OF THE TSA AND THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

COMES NOW, the State of Arkansas, *ex rel*. Tim Griffin, Attorney General; People of the State of California; State of Colorado, *ex rel.* Phil J. Weiser, Attorney General; Office of the Attorney General, State of Connecticut; District of Columbia, Office of the Attorney General; State of Delaware *ex rel.* Kathleen Jennings, Attorney General; State of Hawaii; The Attorney General of Idaho; The State of Kansas, *ex rel*. Kris Kobach; Commonwealth of Kentucky, *ex.*

[1]The Debtor and the last four digits of its taxpayer identification number are: Character Technologies, Inc. (8842). The Debtor's mailing address for purposes of the chapter 11 case is 700 El Camino Real, Suite 120, P.O. Box 1152, Menlo Park, CA 94025.

*rel.* Russell Coleman, Attorney General; State of Louisiana; State of Maine; State of Massachusetts; Michigan Attorney General, *ex rel*. the People of the State of Michigan; State of Minnesota, by its Attorney General, Keith Ellison; State of Mississippi *ex rel.* Attorney General Lynn Fitch; State of North Carolina; State of Nevada; State of New York ; State of North Dakota, *ex rel.* Drew H. Wrigley, Attorney General; New Hampshire Office of the Attorney General; Ohio Attorney General; State of Oklahoma; State of Rhode Island; The State of South Carolina *ex rel*. Alan Wilson; State of Tennessee, *ex rel*. Jonathan Skrmetti, Attorney General and Reporter; State of Vermont by and through the State Attorney General; State of Washington; and the State of Wisconsin by and through Abigail Rushing Ryan, Bankruptcy Counsel, National Association of Attorneys General; and by the State of Massachusetts, through Assistant Attorney General, Meena Seralathan; the State of New Jersey, through Jennifer Davenport, Attorney General of the State of New Jersey and Christopher L. Peterson, Acting Director of the New Jersey Division of Consumer Affairs; by the State of Oregon *ex rel*. Dan Rayfield, Oregon Attorney General, by and through Senior Assistant Attorney General, Justin D. Leonard; and by the Commonwealth of Pennsylvania, Office of the Attorney General, by Attorney General David W. Sunday, Jr., by and through Chief Deputy Attorney General, Melissa L. Van Eck (each a "State" and collectively the "States"), and hereby submits this objection ( "Objection") to the bidding procedures relief requested in the *Debtor's Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling Certain Dates and Deadlines with Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving the Designation of Disney Worldwide Services, Inc. as Stalking Horse Purchaser with Respect to the Disney Target Assets, (E) Authorizing the Debtor to Designate Additional Stalking Horse Purchasers for the Assets and*

*(F) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases; and (II) an Order (A) Authorizing and Approving the Sale of Assets, (B) Approving the Assumption of the TSA and the Assumption and Assignment of the Assumed Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [D.I. 15] (the "Motion").[2] In support of the States respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Motion asks the Court to approve bidding procedures for what the Debtor calls the "second, postpetition stage" of a two-stage transaction with Disney. Mot. ¶ 16. The first stage — the "Initial Transaction" — closed before the petition was filed and without Court oversight. In it, the Debtor (i) gave Disney the right to solicit and hire the Debtor's workforce, including its chief executive officer; (ii) waived its non-competition, non-solicitation, confidentiality, and invention-assignment rights against every departing employee; (iii) granted Disney and each hired employee a general release "from the beginning of time," including a release of the Debtor's technology and know-how claims; and (iv) agreed to a broad exclusivity covenant that required it to end discussions with every other counterparty and shut off their data-room access. In return, the Debtor received a $5.5 million payment that is "non-refundable in all circumstances." Exclusivity and Prepayment Agreement "EPA" §§ 1(a), 3(a), 4; Term Sheet §§ 1, 2, 5.

2. By Disney's own estimate, the employees it hired will receive approximately $180 million in compensation and retention over three years — paid directly to them and

[2] Capitalized terms used but not defined in this Objection have the meanings given to them in the Motion, the Stalking Horse Transaction Agreement (D.I. 15-2, Ex. B) (the "SHA"), the Exclusivity and Prepayment Agreement dated September 18, 2026 (D.I. 15-2 at 100–112) (the "EPA"), or the binding term sheet annexed to the EPA (D.I. 15-2 at 113–122) (the "Term Sheet"), as applicable. Citations to "D.I. 15-1" and "D.I. 15-2" are to the ECF-stamped page numbers.

expressly "not . . . consideration payable to the Company." Term Sheet §§ 2, 5; EPA § 3(b). The estate, by contrast, will receive at most $20 million in total (including the pre-petition payment of $5.5 million). What remains for auction is a *non-exclusive* license of technology that the departing workforce built and now uses for Disney, plus whatever estate claims against those employees have not already been released. Mot. ¶ 16.

3. The States do not ask the Court to unwind the Debtor's prepetition decisions on this Motion. The States ask something narrower: that the Court not use a bidding procedures order to bless them, and that the procedures it does approve give competing bidders a fair opportunity to bid. As proposed, the procedures fall short in five respects.

4. **First**, the proposed Bidding Procedures Order would find that the procedures were "negotiated in good faith and at arm's length" (Proposed BPO ¶ F), and the bidding framework would sell to Disney the estate's remaining claims against Disney's new hires. Those findings and that sale would effectively ratify the prepetition releases — including releases of an insider — before any creditors' committee exists and before anyone independent has investigated them.

5. **Second**, the $700,000 Bid Protections do not meet the Third Circuit's standard in *Calpine Corp. v. O'Brien Environmental, Inc.* 181 F3d. 527 (3rd Cir. 1999). Disney committed to serve as stalking horse before the petition date in exchange for the workforce, the releases, and exclusivity; the motion itself identifies Disney's "hiring of former Debtor employees" as a reason for the fee. SHA § 16.2(b); Mot. ¶ 24. Disney received those benefits regardless of the fee. The Debtor's first-day declarant confirms the point: the release and exclusivity "were critical to Disney to agree to serve as a Stalking Horse Purchaser." First Day Decl. ¶ 62.

6. **Third**, the procedures chill bidding. The Minimum Overbid ignores the $5.5 million the estate keeps regardless of outcome. As a result, a competing bidder must offer at least $21.7 million even though any bid above roughly $15.2 million would leave the estate better off. Competing bidders also face a shorter closing deadline than Disney, limited and Disney-controlled access to the employees who know the technology, and a requirement that any winning bidder release Disney to obtain transition services.

7. **Fourth**, the timeline — 38 days of postpetition marketing, a sale objection deadline that falls a week *before* the bid deadline, an auction and sale hearing the week of Thanksgiving, and no committee yet appointed — reflects milestones Disney set before the filing, not the needs of the estate. *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014).

8. **Fifth**, the proposed Transaction Notice tells creditors only that the Assets will be sold "free and clear of all encumbrances." D.I. 15-1 at ECF page 38. It does not tell personal-injury claimants, governmental units, or the Debtor's users that the proposed sale order would permanently enjoin "litigation claimants" from suing Disney's employees, including the Debtor's former CEO, or that silence will be treated as consent. Because a release that forms part of the consideration in a 363 sale might not be reviewable once the sale closes, the notice must be meaningful before the Sale Objection Deadline, not after.

## BACKGROUND

### A. The Chapter 11 Case

9. On October 12, 2026 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition. Mot. ¶ 6. As of the filing of the Motion, no trustee, examiner, or official committee

of unsecured creditors had been appointed. *Id.* The Motion was filed the next day, on October 13, 2026 — the deadline Disney had imposed. SHA §§ 5.3(b), 16.1(c)(iii).

10. The Debtor operates the Character.AI platform. It attributes its financial distress to high development costs, "accelerated by litigation and a changing regulatory environment." Mot. ¶¶ 7, 10. As of the Petition Date, the Debtor had no funded debt and approximately $57 million in unrestricted cash, cash equivalents, and investments, and it burns $8–9 million a month. Declaration of Colin M. Adams [D.I. 18] (the "First Day Declaration" or "First Day Decl.") ¶¶ 18, 70. Its equity is held entirely by "current or former directors or employees." *Id.* ¶ 17. The Debtor's first investment banker contacted approximately 28 parties between August 2025 and August 2026. That outreach produced a single proposal, which was not actionable, with some concerned with the "litigation and regulatory overhang." Mot. ¶ 11. The Prior Banker's engagement "concluded in late August 2026," before the transaction with Disney was negotiated. First Day Decl. ¶ 12.

**B. The Prepetition "Initial Transaction"**

11. Disney and the Debtor signed a mutual non-disclosure agreement on August 19, 2026. EPA § 1(c). In September 2026, a committee of independent directors (the "Initial Transaction Committee") negotiated with two parties during a period the Debtor describes as one of "mounting employee attrition." Mot. ¶ 12. Both parties had expressed their interest "directly to the company's management." First Day Decl. ¶ 13. The Restructuring Committee that now oversees the case was formed only after a new independent director joined the Board on October 1, 2026, nearly two weeks after the EPA was signed. *Id.* ¶ 13 n.7. On September 18, 2026, the Debtor signed the EPA, the Term Sheet, and a transition services agreement (as amended, the "TSA"). Mot. ¶ 14. Among other things:

(a) **Workforce.** The Debtor gave Disney "the right to solicit and hire certain Company employees." Disney required up to six "Key Employees," one of whom had to be the Debtor's chief executive officer, to accept offers and resign within ten days. Disney also offered employment to at least 60 other employees. Term Sheet §§ 1, 5. Ultimately, 66 of the Debtor's approximately 86 full-time employees accepted. First Day Decl., Ex. A ¶ 79. The Debtor now reports 18 active full-time employees, only 8 of whom are expected to remain through key portions of the case. *Id.* ¶ 78. Disney estimated the Offered Employees' annual compensation at approximately $60 million, plus a $30 million retention pool, for an estimated total of approximately $180 million over three years. The Debtor and Disney were to "mutually agree on [the] appropriate scope and quantum of any retention program." Term Sheet at §§ 2, 5.

(b) **Covenant waivers.** The Debtor agreed to "waive any applicable notice periods" and not to enforce "any non-competition, non-solicitation, confidentiality or invention assignment covenant" against any Offered Employee with respect to Disney. Term Sheet § 5.

(c) **Releases.** The Debtor released Disney and every Hired Employee from all claims "from the beginning of time up to and through" September 18, 2026. The release expressly covers the hiring and the employees' use of "any Technology and Intellectual Property Rights developed by such employees . . . or otherwise developed or owned by the Company," and "any ideas, know-how and techniques." It includes a waiver of California Civil Code § 1542, survives termination "indefinitely," and makes Disney a third-party beneficiary. EPA §§ 4(a)–(c), 5. The Term Sheet further provides that the Debtor "will release all employees, including its chief executive officer, that accept offers of employment with Disney from claims and causes of action including, as applicable, fiduciary duty claims." Term Sheet § 5. The First Day Declaration describes the release only as a release of Disney and the transferring employees "from certain matters." First Day Decl. ¶ 62.

(d) **Payment.** Disney paid $7.5 million on signing. Of that amount, $5.5 million (the "Up-Front Payment") is "non-refundable in all circumstances," and $2.0 million is a refundable deposit. EPA § 3(a). Receipt of the Up-Front Payment was a condition to closing the Initial Transaction. Term Sheet §§ 2, 6.

(e) **Exclusivity.** For the period from signing through the Petition Date, the Debtor agreed not to engage with any third party about any IP license or disposition, "any financing, sale of equity, merger, recapitalization, liquidation or similar transaction," or "any hiring, engagement or transfer of any employees." The Debtor also agreed to "immediately cease" all other discussions and "terminate any access to any virtual or physical data room." EPA § 1(a). The Motion describes this covenant only as exclusivity "with respect to the subset of assets [Disney] seeks to acquire." Mot. ¶ 15 at (iv).

(f) **Control of the case.** Disney set the venue and the timeline and approved the bidding procedures in its "sole discretion." It is also entitled to a sale order that is "final [and] non-appealable" and acceptable to it in its "sole and absolute

discretion." The sale order must find that the transaction is not a sale of substantially all assets, that no employee transfers to Disney by operation of law, and that Disney is not a successor. Term Sheet §§ 1, 7; SHA § 14.2(e).

(g) **Other covenants.** The Debtor agreed to a three-year non-solicitation covenant protecting Disney's new hires. It also agreed not to meet with any governmental authority about the transaction without Disney's consent, except as required by law. Term Sheet §§ 8, 10. That covenant is difficult to reconcile with the Debtor's stated intent to use this case "as a forum to negotiate a consensual resolution with the Multistate Group" of 46 states and territories that is investigating it. First Day Decl. ¶¶ 31, 48.

12. The Motion concedes that the Debtor's chief executive officer, an "insider" under section 101(31), was among the employees Disney hired. Mot. at ECF Page 15 n.5 & ¶ 50. The Motion nonetheless represents, in the disclosure required by Local Rule 6004-1(b)(iv)(B), that "[t]here are no agreements between Disney and the Debtor's current management." Mot. ¶ 24 at ECF Page 15.

## C. The License Transaction and the Proposed Bidding Procedures

13. The SHA implements the "second, postpetition stage." Under it, Disney would acquire (i) a perpetual, worldwide, *non-exclusive*, royalty-free license to certain aspects of the Debtor's technology and patents and (ii) "any unreleased claims that the Debtor has against any of its former employees that accept offers of employment with Disney" (the "Purchased Employee Claims"), which the Debtor says have no value. Mot. ¶¶ 16, 24 on ECF page 19. The price is $20 million, of which $7.5 million has already been paid. SHA § 5.1. Disney would also receive a general release through the later of closing or entry of the sale order, an exculpation for its TSA services, and Bid Protections of up to $700,000 entitled to administrative-expense priority. Mot. ¶ 24.

14. The proposed schedule is as follows: Sale Objection Deadline, November 13, 2026; Bid Deadline, November 20, 2026; Auction, November 23, 2026; and Sale Hearing,

November 24, 2026. Mot. ¶ 30. A Qualifying Bid must (i) be all cash; (ii) be on terms substantially the same as or better than the SHA; (iii) exceed the SHA's "value" by the Break-Up Fee plus $1,000,000; and (iv) commit to close by November 30, 2026, even though Disney's own outside date is December 17, 2026. Mot. ¶ 29(d)(iv), (vi), (xiii), (xv); SHA § 16.1(c). If a competing bidder wins, Disney must allow that bidder to interview and make offers to former employees. However, Disney may designate up to 20% of those employees as off limits, and only five Key Employees must be made available for due diligence. Term Sheet § 1. The form transition services agreement for a competing winning bidder requires that bidder to release Disney from all claims since August 1, 2026, including claims relating to Disney's hiring of the Debtor's employees and "any related intellectual property use, including with respect to the Licensed IP." D.I. 15-1 at 65–66; TSA at § 8.1.

## OBJECTION

### I. The Debtor Bears the Burden of Showing That the Procedures Will Maximize Value, and Closer Scrutiny Is Warranted Here.

15. The Debtor's business judgment is not a substitute for proof. A debtor seeking to sell estate property outside the ordinary course must show a sound business purpose, fair and reasonable consideration, adequate notice, and good faith. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147–50 (3d Cir. 1986). Bidding procedures are approved because they serve that objective — maximizing value through a fair and open process — and not as an end in themselves. Courts look closely at procedures that the stalking horse effectively wrote, that favor the stalking horse over other bidders, or that compress the process without a satisfactory explanation. *See Fisker*, 510 B.R. 55, 61 (Bankr. Del. 2014) (limiting stalking horse's bid rights where the buyer "insisted on an unfair process, i.e., a hurried process"); *see e.g. In re Family*

*Christian, LLC*, 533 B.R. 600 (Bankr. W.D. Mich. 2015) (declining to approve sale where bidding process was tilted toward stalking horse).

16. Four features of this case call for closer scrutiny. First, the stalking horse hired the Debtor's CEO, an insider, as part of the same integrated transaction, and the Debtor released that insider from claims that include fiduciary-duty claims. Term Sheet § 5; Mot. at ECF page 15 n.5. Transactions in which an insider stands on both sides, or benefits personally from the buyer, receive heightened scrutiny. *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997). The Debtor's response — that independent committees led the negotiations and that former insiders had no "meaningful input" (Mot. at ECF page 15 n.5) — may prove correct, but it is a factual assertion that interested parties have had no opportunity to test. Second, the transaction documents largely dictate the sale order findings, its timeline, and its form. Term Sheet §§ 1, 7. Third, no committee has been appointed to investigate any of this on behalf of unsecured creditors. Fourth, the EPA was negotiated with parties that approached management directly, after the Prior Banker's engagement had ended and before the Restructuring Committee existed. First Day Decl. ¶¶ 12–13 & n.7. The Debtor's investment banker confirms that, "[g]iven the timing of these negotiations relative to Houlihan's retention, Houlihan was not involved in these negotiations." Declaration of Adam Dunayer [D.I. 17] (the "Dunayer Declaration" or "Dunayer Decl.") ¶ 16 n.4. The EPA and Term Sheet, including the releases, the exclusivity covenant, the milestones, and the 3.5% Bid Protections, were therefore negotiated without any investment banker. Term Sheet § 1. The States do not question the independence of the directors involved. The point is that the prepetition market check on which the Debtor relies did not test the transaction actually before the Court.

## II. The Bidding Procedures Order Should Not Approve, Ratify, or Make Findings About the Prepetition Initial Transaction.

### A. Good-Faith and Arm's-Length Findings Are Premature.

17. Proposed BPO ¶ F would find that the Bidding Procedures were "negotiated in good faith and at arm's length." D.I. 15-2 at F. Proposed BPO ¶ G would find that the Bid Protections are a "material inducement" and "necessary" to secure Disney's participation. *Id.* at G. Under *Abbotts Dairies*, good faith concerns "the integrity of [the purchaser's] conduct in the course of the sale proceedings," and misconduct includes "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." 788 F.2d at 147. Whether Disney's prepetition conduct — taking the workforce, obtaining the releases, and imposing exclusivity that shut down a competing negotiation — gave it an unfair advantage is precisely the question the Sale Hearing must decide on a full record. It should not be decided by a finding embedded in a procedures order entered on shortened notice.

18. The proposed form of sale order confirms the concern. It would approve "the terms and all actions taken under the Exclusivity and Prepayment Agreement." It would also find that the EPA, including its releases, was "necessary to induce" Disney and that Disney's "prepetition employment of the Debtor's former employees" was done "as part of the Transaction." D.I. 15-2 at ECF pages 38, 44–45. Whatever the Court ultimately decides at the Sale Hearing, nothing in the Bidding Procedures Order should be read as a step toward those findings. Paragraphs F and G should be stricken or limited to findings that the procedures are reasonable for purposes of conducting the auction, with all other issues expressly reserved. The Dunayer Declaration's statement that the Restructuring Committee "engaged in good-faith, arms'-length negotiations with Disney regarding the Stalking Horse Transaction" (Dunayer Decl. ¶ 29) does not cure the problem. The Restructuring Committee did not exist until after October 1,

2026. By then, the Term Sheet had already fixed the price, the Bid Protections, the milestones, and Disney's approval rights over the bidding procedures and the sale order, all negotiated without a banker. Term Sheet at ECF page 100, and *see* §§ 1, 7; Dunayer Decl. ¶ 16 n.4.

**B. The Releases Are Compromises of Estate Claims That Require Independent Review.**

19. A debtor's release of its own causes of action is a compromise subject to Bankruptcy Rule 9019. Approval requires the Court to weigh the probability of success, collection difficulties, complexity and expense of litigation, and the paramount interest of creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The Debtor has not moved under Rule 9019 and has offered no evidence on the value of what it released.

20. There is reason to believe that value is not trivial. The Debtor released, at a time when its financial condition was, at a minimum, precarious: claims against an insider; claims arising from employees' use of Debtor technology, "ideas, know-how and techniques" for Disney; and the protection of its own confidentiality and invention-assignment covenants. EPA § 4(a)(iv); Term Sheet § 5. A release of claims is a transfer of property of the debtor. If it was made for less than reasonably equivalent value while the debtor was insolvent, was left with unreasonably small capital, or intended or believed it would incur debts beyond its ability to pay, 11 U.S.C. § 548(a)(1)(B)(ii), it may be avoidable under 11 U.S.C. §§ 544(b) and 548 and recoverable from the initial transferee or the entity for whose benefit it was made under § 550. The Debtor reports $57 million in cash and no funded debt, so balance-sheet insolvency may be disputed. But it also faces substantial contingent liabilities, including the claims of a 46-member Multistate Group; it burns $8–9 million a month; and it describes its prepetition runway as "limited." First Day Decl. ¶¶ 18, 31, 59, 70. Those facts make the alternative tests of section 548(a)(1)(B)(ii) directly relevant. The States do not ask the Court to resolve those questions now.

The Bidding Procedures Order should simply make clear that (i) nothing in it approves, ratifies, or finds reasonable the EPA, the Initial Transaction, or any release; (ii) all estate claims relating to the Initial Transaction are preserved; and (iii) any committee subsequently appointed (or, if none, any party in interest) will have a reasonable challenge period to investigate and assert those claims.

### C. The Purchased Employee Claims Should Be Removed from the Sale.

21. The SHA would sell to Disney "any unreleased claims that the Debtor has against any of its former employees that accept offers of employment with Disney." SHA § 5.2. The Debtor says these claims have no value (Mot. ¶ 24 at ECF page 19), yet Disney made their purchase a term of the deal. Term Sheet § 1. The Debtor also carries directors' and officers' liability coverage, First Day Decl., Ex. A ¶ 26, so claims against its former officers may have value whether or not the individuals could pay a judgment. A buyer acquiring the estate's claims against its own employees — including the Debtor's former CEO — is not purchasing an asset it intends to enforce. It is obtaining a release under another name. The Purchased Employee Claims should be excluded from the Disney Target Assets. Alternatively, they should be marketed and sold separately, so that the market (or a committee) can test the Debtor's valuation.

## III. The Bid Protections Do Not Satisfy *O'Brien*.

22. In the Third Circuit, a break-up fee and expense reimbursement are allowable only as administrative expenses under section 503(b), and only if the proponent shows that they were "actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535–37 (3d Cir. 1999). Business judgment is not the test. *Id.* Where the bidder would have bid without the fee, the fee is not

necessary and should be denied. *See In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010).

23. The Debtor's showing does not meet that standard:

(a) **Disney committed to serve as stalking horse before the filing.** The Term Sheet obligates the Debtor to file in Delaware with Disney as stalking horse, on pain of refunding Disney's deposit. EPA § 1(b); Term Sheet § 1. Disney's commitment was secured by the Initial Transaction — the workforce, the releases, and exclusivity — not by the prospect of a postpetition fee. The Debtor's own declarant agrees: "[t]he release in the EPA and the exclusivity period were critical to Disney to agree to serve as a Stalking Horse Purchaser." First Day Decl. ¶ 62.

(b) **The fee compensates Disney for its own benefit.** The SHA states that the Bid Protections are paid "[i]n consideration for [Disney] having expended considerable time and expense in connection with . . . the hiring of former Licensor employees." SHA § 16.2(b); Mot. ¶ 24 at ECF page 19. Disney's cost of hiring a workforce it keeps no matter who wins the auction is not a cost of preserving the estate.

(c) **Disney keeps the core value regardless of outcome.** If Disney is outbid, it still keeps the employees, the prepetition releases, the non-solicitation covenant, and the right to wall off 20% of the hired employees. Term Sheet §§ 1, 5, 8; EPA §§ 4, 5. A party that keeps the most valuable part of the deal when it loses has little need to be compensated for losing. The Debtor's banker confirms where that value lies. He identifies Disney's agreement "to hire the majority of Character's workforce, including its chief executive officer," as the "first and foremost" reason the Initial Transaction Committee chose Disney. Dunayer Decl. ¶ 15.

(d) **The Debtor's evidence of necessity is conclusory.** The Motion asserts in a single sentence that, without the fee, Disney's participation "would likely have been significantly curtailed." Mot. ¶ 67. The First Day Declaration adds only that the declarant "understand[s]" the Bid Protections were "a necessary inducement." First Day Decl. ¶ 66. That statement is conclusory, is not framed as personal knowledge, and is in tension with the same declarant's testimony that the release and exclusivity were what was "critical" to Disney. *Id.* ¶ 62. The Dunayer Declaration goes further, stating that the Break-Up Fee was "a key inducement and prerequisite" and that without it Disney "would not have agreed to serve as stalking horse . . . at the value reflected in the EPA, the TSA, and the Stalking Horse Transaction Agreement." Dunayer Decl. ¶ 33. But the Bid Protections were fixed in the Term Sheet on September 18, 2026 (Motion at para. 14; Term Sheet at ECF page 100 ), and Houlihan "was not involved in these negotiations" (Dunayer Decl. ¶ 16 n.4). Mr. Dunayer therefore has no personal knowledge of what induced Disney. His further statement that the fee is "reasonable in relation to the lost opportunities" Disney would incur (*id.* ¶ 36) identifies no lost opportunity and quantifies no cost. No declaration offers facts about the negotiations, and the expense reimbursement component is not separately capped or documented.

24. The Bid Protections should be denied. Alternatively, they should be limited to reimbursement of documented, reasonable out-of-pocket expenses incurred after the Petition Date in connection with the License Transaction, subject to a cap substantially lower than $700,000 and payable only from the proceeds of a closed alternative transaction.

25. The same reasoning applies with greater force to the request for advance authority to grant Bid Protections of up to 3.5% to any Additional Stalking Horse Purchaser designated by November 9, 2026. Mot. ¶ 26. *O'Brien* requires a showing, on the facts of a particular bid, that the protections were actually necessary to preserve the value of the estate. 181 F.3d at 535–37. The only support offered is Mr. Dunayer's expectation that any such purchaser "will also request the Bid Protections." Dunayer Decl. ¶ 34. A request is not a necessity. And because Additional Stalking Horse Purchasers may be designated for "any subset of the Assets (including the Disney Target Assets)," *id.* ¶ 31, the procedures could stack a second 3.5% fee on the same assets and raise the overbid floor further. Any Bid Protections for an Additional Stalking Horse Purchaser should require notice and an opportunity to object, with the *O'Brien* showing made at that time.

## IV. The Bidding Procedures Chill Competitive Bidding.

### A. The Minimum Overbid Ignores the Non-Refundable Up-Front Payment.

26. A competing Qualifying Bid for the Disney Target Assets must exceed the SHA's value ($20 million) plus the Break-Up Fee ($700,000) plus $1,000,000 — a floor of $21.7 million. Mot. ¶ 29(d)(xv). The Motion justifies that floor on the ground that it ensures the fee "will not diminish the Debtor's estate." Mot. ¶ 68. But the comparison ignores the fact that the estate keeps Disney's $5.5 million Up-Front Payment whether or not Disney wins. EPA § 3(a). Neither declaration addresses this. Mr. Dunayer's opinion that the procedures will produce the

"highest or otherwise best value" (Dunayer Decl. ¶ 23) does not account for the non-refundable payment.

The economics are as follows:

| | **Disney wins** | **Competing bid of $X wins** |
|---|---|---|
| Up-Front Payment retained by estate | $5.5 million | $5.5 million |
| Refundable deposit | $2.0 million (applied) | $0 (refunded to Disney) |
| Closing payment | $12.5 million | $X |
| Break-Up Fee paid by estate | $0 | – $0.7 million |
| **Net to estate** | **$20.0 million** | **$X + $4.8 million** |

27. On these terms, any competing bid above approximately $15.2 million produces more for the estate than Disney's bid. The procedures nonetheless exclude every bid between $15.2 million and $21.7 million — a range of $6.5 million, or more than 40% above the break-even point. Excluding value-maximizing bids is the definition of a chilling term. The Minimum Overbid should instead be measured against the consideration that remains at stake — $14.5 million — plus any approved Bid Protections and a modest increment. The procedures should also direct the Debtor to evaluate bids on the estate's net recovery.

**B. Competing Bidders Face Terms Disney Does Not.**

(a) **Closing deadline.** Competing bidders must commit to close by November 30, 2026 (Mot. ¶ 29(d)(xiii)). Disney's outside date is December 17, 2026 (SHA § 16.1(c)). The deadline should be the same for all bidders. Neither declaration explains the difference. Mr. Dunayer identifies Disney's December 17 outside date as the operative constraint on the schedule. Dunayer Decl. ¶ 27.

(b) **Access to the employees who built the technology.** Only five Key Employees must be made available for due diligence. They are selected jointly by Disney and the Debtor, and the Term Sheet protects their availability to bidders only up to 20% of their working time. Disney may also exclude up to 20% of the hired employees from any competing bidder's recruiting. Term Sheet §§ 1, 7. A non-exclusive

license of AI training infrastructure and know-how has limited value to a buyer that cannot reach the people who operate it. That problem is acute here. After the Disney hiring, the Debtor reports only 18 active full-time employees, 8 of whom are expected to remain. First Day Decl., Ex. A ¶ 78. A competing bidder will depend almost entirely on personnel Disney now employs. The order should require Disney to make all Hired Employees reasonably available for diligence and recruiting by Qualifying Bidders, without a carve-out.

(c) **The release toll.** To obtain the transition services Disney promised, a competing winning bidder must release Disney from all claims since August 1, 2026, including claims relating to "any related intellectual property use, including with respect to the Licensed IP." D.I. 15-1 at 65–66, § 8.1. A bidder seeking to acquire the Debtor's technology must therefore waive claims for misuse of that same technology. That condition should be removed.

(d) **"Substantially the same terms."** Qualifying Bids must be on terms substantially the same as or better than the SHA (Mot. ¶ 29(d)(vi)). The SHA includes the estate's general release of Disney and its exculpation. Competing bidders should not be required to replicate releases and exculpations for Disney's benefit, and the procedures should say so. The proposed form of sale order makes the point more pressing. It would provide that no future chapter 11 plan may "conflict with or derogate from" the Disney agreements, and it would permanently enjoin "litigation claimants" from suing any "Buyer Party," a term that includes Disney's employees. D.I. 15-2 at ECF pages 43, 52, 56, 66 (Finding U, ¶¶ 10, 15, 43). The Bidding Procedures Order should state that it does not approve the form of sale order, and that competing bidders need not offer comparable provisions.

(e) **All-cash requirement.** The prohibition on non-cash consideration (Mot. ¶ 29(d)(iv)) excludes structures — such as royalties, earn-outs, or assumption of liabilities — that could be worth more to a creditor body facing substantial litigation claims. The Debtor should be permitted to consider non-cash consideration, in consultation with the Consultation Parties.

## C. The Timeline Is Not Justified.

28. Disney fixed the milestones before the filing. Term Sheet § 1; SHA §§ 5.3, 16.1(c). The Debtor proposes only 38 days of postpetition marketing. Mot. ¶ 41. The Sale Objection Deadline (November 13) falls a week before the Bid Deadline (November 20). Creditors must therefore object to a sale before they know who the buyer is, what it will pay, or what releases it will demand. Mot. ¶ 30. That sequencing matters more in this Circuit than elsewhere. Where releases form part of the consideration for a section 363 sale, a challenge to

them becomes statutorily moot under section 363(m) once the sale closes without a stay. *In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025). The Sale Hearing may be the only meaningful opportunity to be heard on those releases. The Auction and Sale Hearing are set for November 23 and 24, immediately before Thanksgiving. And no committee has yet been appointed to review the record.

29. In *Fisker*, the court found a sale timetable that straddled the holidays and left limited time for challenges "troublesome." It held that a buyer's insistence on a "hurried process" without a satisfactory reason weighed against approval. 510 B.R. at 61. Here, the Debtor states that Disney's up-front payment "provides sufficient runway to market its Assets." Mot. ¶ 20. If the runway is sufficient, the compression is not driven by liquidity. The First Day Declaration is candid about what does drive it: the schedule reflects "the time constraints imposed by Character's cash position and the stalking horse agreement," whose milestones "were negotiated between Character and Disney." First Day Decl. ¶¶ 58, 70. The States recognize that the Debtor burns $8–9 million a month. *Id.* ¶ 70. But several of the modifications requested below, including a single closing date for all bidders and a sale objection deadline that follows the Auction, would cost the estate nothing. Moreover, the prior marketing process on which the Debtor relies produced a single non-actionable proposal for a different transaction. It did not test a non-exclusive license after the workforce had already left. Mot. ¶ 11. The Dunayer Declaration confirms both points. Mr. Dunayer testifies that the Debtor "cannot afford a longer Sale Process" both because of its operating costs and "because the Stalking Horse Transaction Agreement (and Disney's willingness to serve as Stalking Horse Purchaser in connection therewith) includes an outside date for the sale closing on or prior to December 17, 2026." Dunayer Decl. ¶ 27. He justifies the compressed schedule on the ground that "many potentially

viable prospects . . . have already been contacted." *Id.* ¶ 28. But those contacts were made for a different transaction, under the litigation and regulatory overhang that the free-and-clear relief sought here is meant to remove. *Id.* ¶ 12. Neither declaration reports how many parties have received the teaser or signed NDAs since the Petition Date. And of the four expedited processes Mr. Dunayer cites as precedent, by his own description two ran roughly eight and nine weeks. *Id.* ¶ 11.

30. The States request that the Court (i) extend the Bid Deadline by at least 21 days; (ii) move the Sale Objection Deadline to a date after the Debtor files its notice of the Winning Bidder, with a supplemental objection deadline for issues arising from the Auction; and (iii) direct the Debtor to give prompt notice of the Bidding Procedures to every party it engaged during the prepetition process, including the second party with which the Initial Transaction Committee negotiated in September 2026.

**D. Disney Should Not Control the Process.**

31. The SHA requires the Debtor to give Disney advance copies of all filings relating to the transaction. It also requires the Debtor to notify Disney promptly of any threatened objection. SHA § 5.3(a). The Bidding Procedures Order allows the Debtor to fill in and modify notices "in consultation with Disney." Proposed BPO ¶ 30. Disney is a bidder. It should have no consultation, information, or approval rights over the sale process beyond those available to every Qualifying Bidder. The order should also confirm that the fiduciary-out in Proposed BPO ¶ 31 permits the Debtor to share information with, and negotiate with, any party notwithstanding the EPA. It should likewise confirm that nothing in the Term Sheet, including section 10, limits the Debtor's communications with any governmental unit, the U.S. Trustee, or any committee.

## V. The Transaction Notice Is Inadequate.

32. The proposed Bidding Procedures Order would find that the Transaction Notice is "reasonably calculated to provide all interested parties with timely and proper notice" of the Sale and that "no other or further notice of the foregoing is required." Proposed BPO ¶ E. The notice does not support that finding. It describes the Sale only as a sale of assets "free and clear of all encumbrances." D.I. 15-1 at ECF Page 38. Nothing in it tells a reader that the proposed sale order would (i) permanently enjoin "litigation claimants" and "governmental, tax, and regulatory authorities" from asserting claims "in any way relating to" the Debtor against any "Buyer Party," including Disney's employees, among them the Debtor's former CEO (D.I. 15-2 at ECF pages 43, 52, 56 (Finding U, ¶¶ 10, 15)); (ii) bar successor and products-liability claims "now existing or hereafter arising" (*id.* ¶¶ 12, 14); (iii) approve the EPA's releases and find the Initial Transaction unavoidable (*id.* at ECF pages 40, 43–44, 48 (Findings N, T, V, ¶ 3)); or (iv) treat any holder that does not object as having "consented" (*id.* at ECF pages 48, 51 (¶¶ 2, 9)).

33. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). A creditor reading the Transaction Notice would have no reason to suspect that its claims against non-debtor individuals were at stake. Yet the Debtor's banker confirms that free-and-clear relief "(including successor liability)" is something "Disney required." Dunayer Decl. ¶ 19. Mr. Dunayer lists the notice procedures among the relief his declaration supports (*id.* ¶ 4), but neither declaration offers any evidence that the Transaction Notice is adequate. Where silence is to be treated as consent, and where section 363(m) may foreclose review after closing, the notice must say plainly what is at stake. The affected population is also unusually broad. The platform serves

approximately 12 million monthly active users, and the claims against the Debtor arise largely from minors' use of the platform, and 46 states and territories are investigating. First Day Decl. ¶¶ 7, 29, 31.

34. The Court should strike Finding E, or condition it on a revised Transaction Notice that (i) describes conspicuously and in plain language each release, injunction, successor-liability bar, and deemed-consent provision in the proposed sale order, and identifies the protected persons as including Disney's employees and the Debtor's former officers; (ii) is served on all personal-injury claimants and their counsel, including the parties to the January 2026 settlements, and on each member of the Multistate Group; and (iii) is posted on the Character.AI platform itself, not only on the Debtor's blog and community pages.

## VI. The Motion's Disclosures Are Incomplete.

35. Local Rule 6004-1 requires that a sale motion highlight, among other things, any agreements with management and any releases. The Motion's statement that "[t]here are no agreements between Disney and the Debtor's current management" (Mot. ¶ 24 at ECF page 15) is accurate only because the CEO's employment with the Debtor ended under the very transaction at issue. Before the Court considers the Bid Protections or any finding of good faith, the Debtor should file:

(a) the offer letters, employment agreements, and retention arrangements between Disney and each Key Employee, including the former CEO, with compensation terms (filed under seal if necessary and produced to the U.S. Trustee, any committee, and the undersigned Multistate group);

(b) a description of the Debtor's role in determining the "scope and quantum" of the retention program (Term Sheet § 2);

(c) the identity and terms of the competing proposal considered by the Initial Transaction Committee, and the reasons for its rejection;

(d) the minutes and materials of the Initial Transaction Committee and the Restructuring Committee relating to the EPA, the releases, and the Bid Protections;

(e) any analysis of the value of the released claims and the Purchased Employee Claims;

(f) the original September 18, 2026, TSA and a redline against the amended TSA; and

(g) an explanation of the Debtor's statement that the Stalking Horse Transaction Agreement is a baseline for a sale process covering "all or substantially all of the Debtor's Assets" (First Day Decl. ¶ 65), given Disney's requirement that the sale order find that the transaction is not a sale of substantially all assets (Term Sheet § 1 ECF page 115). The Debtor's banker likewise describes the Motion as seeking approval of "the Sale of substantially all of the Debtor's assets." Dunayer Decl. ¶¶ 4, 29.

## VII. Reservation of Rights.

36. This Objection is limited to the bidding procedures relief. The States reserve all rights to object to the Sale and the proposed Sale Order on any ground. These include, without limitation: (i) any finding under section 363(m) or that Disney is a good-faith purchaser; (ii) any approval of the EPA, the Initial Transaction, or any release or exculpation; (iii) the proposed findings regarding successor liability and the transfer of employees; (iv) the waiver of the stay under Bankruptcy Rules 6004(h) and 6006(d); (v) the assumption of the TSA; (vi) whether a consumer privacy ombudsman is required under section 363(b)(1), given Disney personnel's access to user personal data under the TSA and pending the outstanding multistate investigations, including New Jersey's investigation into Character.AI's prepetition safety and data practices; as well as the FTC and Texas investigations concerning children's privacy and data-privacy compliance, First Day Decl. ¶¶ 38–39; (vii) any use or allocation of sale proceeds, including in light of *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017); (viii) whether the proposed sale order's injunction, release, and plan-binding provisions, including paragraphs 10, 15, 35, 36, and 43, exceed the Court's authority under section 363(b), *see In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024); and (ix) any matter

raised by a committee, once appointed. The States further reserve the right to supplement this Objection, to take discovery, and to be heard at any hearing on the Motion.

## REQUESTED MODIFICATIONS

37. If the Court is inclined to approve bidding procedures, the States request that the Bidding Procedures Order be modified to:

(a) strike findings F and G, or limit them to findings that the procedures are reasonable for purposes of conducting the Auction, and provide that nothing in the order constitutes a finding of good faith, arm's-length dealing, or necessity, or approves or ratifies the EPA, the Initial Transaction, the TSA, or any release;

(b) preserve all estate claims relating to the Initial Transaction, and establish a challenge period of not less than [60] days after appointment of a committee (or, if none, after entry of the order) for any committee or party in interest to investigate and assert them;

(c) exclude the Purchased Employee Claims from the Disney Target Assets, or require that they be marketed and sold separately;

(d) deny the Bid Protections or, alternatively, limit them to documented, reasonable, postpetition out-of-pocket expenses subject to a reduced cap, and require notice and an opportunity to object before Bid Protections are granted to any Additional Stalking Horse Purchaser;

(e) reset the Minimum Overbid by reference to the $14.5 million in consideration that remains at stake, and require the Debtor to evaluate bids on the estate's net recovery;

(f) apply a single outside closing date to all bidders;

(g) require Disney to make all Hired Employees reasonably available for diligence and recruiting by Qualifying Bidders, without the 20% carve-out or the 20% time cap during the bidding period;

(h) strike the requirement that a competing winning bidder release Disney as a condition of receiving transition services, and confirm that Qualifying Bids need not include releases or exculpations of Disney;

(i) permit the Debtor to consider non-cash consideration in consultation with the Consultation Parties;

(j) extend the Bid Deadline by at least [21] days, set the Sale Objection Deadline after the filing of the notice of Winning Bidder, and provide a supplemental objection deadline for Auction-related issues;

(k) eliminate Disney's consultation, notice, and advance-review rights over the sale process and the Debtor's filings, and confirm that nothing in the Term Sheet limits the Debtor's communications with governmental units, the U.S. Trustee, or any committee;

(l) require the supplemental disclosures described in Part VI before the Sale Hearing;

(m) provide that nothing in the Bidding Procedures Order approves the form of sale order, and that Qualifying Bids need not include provisions comparable to paragraphs 10, 15, 35, 36, and 43 of that form; and

(n) strike or condition Finding E and require a revised Transaction Notice as described in Part V.

## **CONCLUSION**

WHEREFORE, the States respectfully request that the Court (i) deny the bidding procedures relief requested in the Motion or, in the alternative, condition any approval on the modifications set forth above; and (ii) grant such other and further relief as is just and proper.

DATED: October 23, 2026,

(*Remainder of Page Intentionally Left Blank – Signature Page Follows*)

RESPECTFULLY SUBMITTED,

**NAAG CLIENT STATES**

*/s/Abigail Rushing Ryan*
ABIGAIL RUSHING RYAN
Texas Bar No. 24035956
Bankruptcy Counsel
National Association of Attorneys General
1850 M Street NW, 12th Floor
Washington, D.C. 20036
Telephone: 202-326-6000, Ext. 258
Email: aryan@naag.org

STATE OF ARKANSAS, *EX REL*. TIM GRIFFIN, ATTORNEY GENERAL

PEOPLE OF THE STATE OF CALIFORNIA

STATE OF COLORADO, *EX REL*. PHIL J. WEISER, ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL, STATE OF CONNECTICUT

DISTRICT OF COLUMBIA, OFFICE OF THE ATTORNEY GENERAL

STATE OF DELAWARE, *EX REL*. KATHLEEN JENNINGS, ATTORNEY GENERAL

STATE OF HAWAII

THE ATTORNEY GENERAL OF IDAHO

THE STATE OF KANSAS, *EX REL*. KRIS KOBACH

COMMONWEALTH OF KENTUCKY, *EX REL*. RUSSELL COLEMAN, ATTORNEY GENERAL

STATE OF LOUISIANA

STATE OF MAINE

MICHIGAN ATTORNEY GENERAL, *EX REL*. THE PEOPLE OF THE STATE OF MICHIGAN

STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL, KEITH ELLISON

STATE OF MISSISSIPPI

STATE OF NORTH CAROLINA

STATE OF NORTH DAKOTA, *EX REL*. DREW H. WRIGLEY, ATTORNEY GENERAL

STATE OF NEVADA

NEW HAMPSHIRE OFFICE OF THE ATTORNEY GENERAL

STATE OF NEW YORK

OHIO ATTORNEY GENERAL

STATE OF OKLAHOMA

STATE OF RHODE ISLAND

THE STATE OF SOUTH CAROLINA, *EX REL*. ALAN WILSON

STATE OF TENNESSEE, *EX REL*. JONTHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER

STATE OF VERMONT BY AND THROUGH THE STATE ATTORNEY GENERAL

STATE OF WASHINGTON

STATE OF WISCONSIN

**STATE OF COLORADO**

/S/ ROBERT PADJEN
ROBERT PADJEN, NO. 14678CO
SENIOR ASSISTANT ATTORNEY GENERAL
COLORADO DEPARTMENT OF LAW
RALPH L. CARR COLORADO JUDICIAL CENTER
1300 Broadway, 8th Floor
Denver, Colorado 80203
Direct dial: 720-508-6346
E-mail: robert.padjen@coag.gov

**COMMONWEALTH OF MASSACHUSETTS**
**ANDREA JOY CAMPBELL**
**ATTORNEY GENERAL**

/s/ Meena Seralathan
Meena Seralathan
Assistant Attorney General
Senior Trial Counsel, Privacy and Responsible Technology Division
Massachusetts Office of the Attorney General
One Ashburton Place
Boston, MA 02108
o: 617-963-2161
meena.seralathan@mass.gov

**JENNIFER DAVENPORT, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND CHRISTOPHER L. PETERSON, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS**

/S/ THOMAS HUYNH
THOMAS HUYNH
NEW JERSEY BAR NO. 200942017
SECTION CHIEF, DEPUTY ATTORNEY GENERAL
DIVISION OF LAW 124 HALSEY STREET – 5TH FLOOR
NEWARK, NEW JERSEY 07101
609-712-2806
EMAIL: THOMAS.HUYNH@LAW.NJOAG.GOV

**FOR STATE OF OREGON, DAN RAYFIELD ATTORNEY GENERAL OF OREGON**

/S/ JUSTIN D. LEONARD
JUSTIN D. LEONARD, E.D. MO. D.C. # 033736OR
SENIOR ASSISTANT ATTORNEY GENERAL
OREGON DEPARTMENT OF JUSTICE
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4400
Email: Justin.Leonard@doj.oregon.gov

COUNSEL FOR THE STATE OF OREGON, *EX REL.*, DAN RAYFIELD, ATTORNEY GENERAL OF OREGON

**COMMONWEALTH OF PENNSYLVANIA**
**OFFICE OF ATTORNEY GENERAL**
**DAVID W. SUNDAY, JR.**

BY: /S/ MELISSA L. VAN ECK
MELISSA L. VAN ECK
ATTORNEY I.D. #88616
CHIEF DEPUTY ATTORNEY GENERAL
COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
FINANCIAL ENFORCEMENT SECTION
15TH FLOOR, STRAWBERRY SQUARE
HARRISBURG, PA 17120
PHONE: (717) 574-3921
MVANECK@ATTORNEYGENERAL.GOV
COUNSEL FOR COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL BUREAU OF CONSUMER PROTECTION

DATED: October 23, 2026,

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on October 23, 2026.

*/s/ Abigail Rushing Ryan*
Abigail Rushing Ryan
Bankruptcy Counsel